# EXHIBIT A

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------X<br>In re:                                                                  :<br>                                                                              :<br>   MUSICLAND HOLDING CORP., et al.,       :<br>                                                                              :<br>                                   Debtors.                       :<br>------------------------------------------------------------X<br>BUENA VISTA HOME ENTERTAINMENT,      :<br>INC., a California corporation; CARGILL         :<br>FINANCIAL SERVICES INTERNATIONAL,    :<br>INC., a Delaware corporation; HAIN CAPITAL :<br>GROUP, LLC, a Delaware limited liability       :<br>company; PARAMOUNT PICTURES                    :<br>CORPORATION, a Delaware corporation;        :<br>TWENTIETH CENTURY FOX HOME                   :<br>ENTERTAINMENT LLC, a Delaware limited     :<br>liability company; UBS WILLOW FUND, LLC,  :<br>a Delaware limited liability company; and        :<br>VÄRDE INVESTMENT PARTNERS, L.P., a       :<br>Delaware limited partnership,                              :<br>                                                                              :<br>                                   Plaintiffs,                      :<br>       -- against --                                                  :<br>                                                                              :<br>WACHOVIA BANK, N.A., a national banking     :<br>association, in its capacity as Agent; and          :<br>HARRIS N.A., a national banking association, :<br>                                                                              :<br>                                   Defendants.                   :<br>------------------------------------------------------------X | FOR PUBLICATION<br><br><br>Chapter 11<br>Case No. 06-10064(SMB)<br>Jointly Administered<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Adv. Proc. No.: 07-01705 |

## MEMORANDUM DECISION AND ORDER
## GRANTING MOTION TO DISMISS COMPLAINT

**A P P E A R A N C E S:**

OTTERBOURG STEINDLER HOUSTON & ROSEN, P.C.
Attorneys for Defendant Wachovia Bank, N.A.
230 Park Avenue
New York, New York 10169

    Richard Haddad, Esq.
    Stuart J. Wells, Esq.
        Of Counsel

PACHULSKI STANG ZIEHL YOUNG JONES
    & WEINTRAUB LLP
Attorneys for Plaintiff
780 Third Avenue, 36th Floor
New York, New York 10017

    Robert J. Feinstein, Esq.
    Alan J. Kornfeld, Esq.
    Beth E. Levine, Esq.
    Marc A. Beilinson, Esq.
        Of Counsel

CHAPMAN & CUTLER LLP
Co-Counsel to Defendant Harris, N.A.
111 West Monroe Street
Chicago, Ilinois 60603

    Fredrick Lochbihler, Esq.
    David S. Barritt, Esq.
    Michael T. Benz, Esq.
        Of Counsel

PILIERO GOLDSTEIN KOGAN & MILLER LLP
Co-Counsel to Defendant Harris, N.A.
10 East 53rd Street
New York, New York 10022

    Robert D. Piliero, Esq.
    Richard D. Brosnick, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

    The plaintiffs, secured trade creditors of the debtors (collectively, "Musicland"), brought this adversary proceeding against the defendant banks, alleging claims for breach of contract, various torts and unjust enrichment relating to a pre-petition intercreditor agreement. The defendants moved to dismiss for failure to state a claim upon which relief can be granted. For the reasons that follow, the motions are granted.

## BACKGROUND

At all relevant times, Musicland operated hundreds of retail stores throughout the United States, selling music, movies, games, and other entertainment-related products. Musicland filed chapter 11 petitions in this Court on January 12, 2006. All of the events relating to this litigation occurred before the petitions were filed.

### A.     The Relevant Agreements

#### 1.     Revolving Credit Agreement

On or about August 11, 2003, Musicland, Congress Financial Corporation (the predecessor of defendant Wachovia Bank, N.A., and collectively, "Wachovia"), and Fleet Retail Finance, Inc. ("Fleet"), entered into a Loan and Security Agreement dated as of August 11, 2003 (the "Revolving Credit Agreement").[1] Fleet and Wachovia agreed to provide Musicland with revolving credit of up to $200 million. Wachovia also acted as the administrative and collateral agent. (Revolving Credit Agreement, at § 1.5.) Section 13.6 permitted Wachovia and Fleet to assign portions of their loan commitments or sell participation interests. Assignees became "Lenders" under the Revolving Credit Agreement upon execution of an Assignment and Acceptance Agreement. (Id., at §§ 13.6, 1.66.)

The Revolving Credit Agreement was, as the name suggests, a revolving loan. "Loans" under the agreement referred to "the loans now or hereafter made by or on behalf of Lenders or by Agent for the account of Lenders on a revolving basis pursuant to the Credit Facility (involving advances, repayments and readvances.)" (Id., at § 1.70.).

---

[1]     A copy of the Revolving Credit Agreement is attached to the Complaint as Exhibit A.

The debt was secured by a first priority lien in substantially all of Musicland's assets, including all inventory and proceeds. (Complaint, at ¶ 23.) The lien secured the "Obligations" (Revolving Credit Agreement, at § 5.1), and the "Obligations" included "any and all Loans, Letters of Credit Accommodations and all other obligations, liabilities and indebtedness of every kind, nature and description . . . arising under this Agreement or any of the other Financing Agreements." (Id., at § 1.80.) "Financing Agreements" included, inter alia, "all other agreements, documents and instruments now or at any time hereinafter executed and/or delivered by any Borrower or Obligor in connection with this Agreement." (Id., at § 1.52.) "Obligors" referred to any guarantor or other party (other than a Borrower) that was liable for the Obligations or owned any of the collateral that secured the Obligations. (Id., at § 1.81.)

Section 11.3 dealt with amendments. Generally speaking, the Revolving Credit Agreement could be amended through a writing signed by the Agent and the "Required Lenders" (Revolving Credit Agreement, at 11.3(a).) Required Lenders essentially meant those Lenders whose commitments aggregated 66 2/3% of the aggregate commitments of all of the Lenders. (Id., at § 1.100.) Certain amendments required the consent of all of the Lenders. (See id., at § 11.3(a)(iii).)

2.    **The Security Agreement**

The plaintiffs or their predecessors (collectively, the "Plaintiffs") sold music CDs, DVDs, and similar merchandise to Musicland on credit for resale at Musicland's retail stores throughout the United States. (Complaint, at ¶ 25.) In 2003, Musicland was experiencing substantial financial difficulties. To induce the Plaintiffs to continue to supply inventory, Musicland granted the Plaintiffs a lien on its inventory and proceeds

4

thereof pursuant to a Security Agreement dated as of November 5, 2003 (the "Security Agreement", by and between Musicland (and certain additional affiliates) and the Bank of New York, as Collateral Agent for the named Trade Creditors, i.e., the Plaintiffs in this lawsuit.[2] (Id..) The Collateral Agent's lien was "subject only to the terms of that certain Intercreditor and Subordination Agreement, dated as of November 5, 2003," (Security Agreement, at § 2), and junior only to "Permitted Encumbrances," (id., at § 4(b)), which included "the security interests and liens of Congress for itself and the benefit of the Lenders pursuant to the Congress Facility." (Id., at § 1(i)(a).)

### 3. The Intercreditor Agreement

Concurrently with the Security Agreement, Wachovia and the Collateral Agent entered into the aforementioned Intercreditor and Subordination Agreement (the "Intercreditor Agreement").[3] The Intercreditor Agreement provided for the subordination of the Plaintiffs' inventory lien to the "Liens of the Revolving Loan Creditors therein to the full extent of the Revolving Loan Debt." (Intercreditor Agreement, at § 2.2.)

The Intercreditor Agreement included several definitions, the net effect of which provided that the Lenders' priority extended to the debts under the current Revolving Creditor Agreement, and any amended agreement, including any new loans of any type made under any amended agreement. For example, the "Revolving Loan Creditors" referred to the Lenders under the Revolving Creditor Agreement, their successors and

---

[2]    A copy of the Security Agreement is attached to the Complaint as Exhibit B.

[3]    A copy of the Intercreditor Agreement is attached to the Complaint as Exhibit C.

assigns and "any other lender or group of lenders that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt <u>or is otherwise a party to the Revolving Creditor Agreements</u>." (Id., at § 1.15)(emphasis added.) The "Revolving Creditor Agreements" meant the "Revolving Loan Agreement" and all agreements subsequently executed by "the Debtors or any other person to, with or in favor of Revolving Loan Creditors in connection therewith or related thereto" as now exist "or may hereafter be amended, modified, supplemented, extended, renewed restated, refinanced, replaced or restructured." (Id., at § 1.11.) The "Revolving Loan Debt" referred to "any and all obligations, liabilities and indebtedness of every kind, nature and description" owed by the Debtors "whether now existing or hereafter arising" under the Revolving Creditor Agreements. (Id., at § 1.16.)

Thus, the Intercreditor Agreement contemplated future amendments of (and additional loans under) the Revolving Credit Agreement, and the Trade Creditors gave their prior consent to all such amendments. Section 4.3 of the Intercreditor Agreement stated, in pertinent part:

> Trade Creditors also waive notice of, and hereby consent to, (a) any amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements .... Any of the foregoing shall not, in any manner, affect the terms hereof or impair the obligations of the Trade Creditors hereunder. All of the Revolving Loan Debt shall be deemed to have been made or incurred in reliance upon this Intercreditor Agreement.

The Intercreditor Agreement placed only one limit on what Wachovia and the Lenders could and could not do. The Debtors' affiliates could not be lenders under the Revolving Creditor Agreements, except that the Trade Creditors would not object to a "Permitted Affiliate Refinancing." (Id., at § 1.11.) "Permitted Affiliate Refinancing"

6

referred to an amendment, modification, supplement, etc. of the Revolving Creditor Agreements pursuant to which an affiliate of the Debtors did not own or hold more than 25% of the Revolving Loan Debt, provided that Musicland could not pay a dividend or any amount in redemption of any equity interest to the affiliate while the affiliate owned or held the debt. (Id., at § 1.9.)

Finally, the Intercreditor Agreement was governed by New York law. (Id., at § 5.8.)

### 4. Amendment No. 8 to the Revolving Credit Agreement ("Amendment No. 8")

In the Fall of 2005, Musicland asked the Lenders to increase availability under the Revolving Credit Agreement, but the Lenders refused. (Complaint, at ¶ 32.) Sun, Musicland's corporate parent, also refused to provide additional capital on a subordinated debt or equity basis. (Id.) Defendant Harris, N.A. ("Harris") had a banking relationship with Sun. (Id., at ¶ 33.) At Sun's request, Harris agreed to make a $25 million term loan (the "Harris Term Loan") to Musicland, but would not extend revolving credit under the terms of the Revolving Credit Agreement. (Id.) The Harris Term Loan contained materially different terms from the Revolving Credit Agreement: (1) it was a term loan, not revolving credit, (2) Sun guaranteed repayment to Harris (but not to any other Lender), and (3) the Harris Term Loan was a quick fix, designed to tide Musicland over during the peak season; it was to be repaid shortly, regardless of its maturity date and whether or not the Lenders were repaid. (Id.)

If documented as a separate loan, the Harris Term Loan would have been subordinate to the Trade Creditors' inventory lien. (Id., at ¶ 34.) Moreover, the Security

Agreement prohibited Musicland from granting a lien encumbering its collateral other than the lien under the Revolving Credit Agreement. (Id.) Consequently, Wachovia and Harris devised Amendment No. 8[4] to the Revolving Credit Agreement to circumvent these restrictions. (Id.) Amendment No. 8 incorporated the Harris Term Loan into the Revolving Credit Facility in order to shelter Harris under the umbrella of Wachovia's superior lien, and wrongly extend the first priority Revolver Lien to cover the repayment of the Harris Term Loan. (Id., at ¶ 35.) The parties added new definitions, (see Amendment No. 8, at § 1(a)), or rewrote the existing definitions under the Revolving Credit Agreement, (see id., at § 1(b)), to accomplish their end.

Amendment No. 8 nevertheless treated the existing revolving loans and Harris Term Loan separately. (Complaint, at ¶ 35.) Harris was only entitled to monthly interest payments. (Id.) In addition, except for prepayments, the Lenders generally had priority in repayment over Harris. (Id.) Although the Harris Term Loan and the Revolving Credit Agreement had the same maturity date, Musicland could prepay the Harris Term Loan at anytime provided that availability existed under the Revolving Credit Facility. (Id.)

B.  **The Prepayment of the Harris Loan**

On or about December 5, 2005, Musicland repaid the Harris Term Loan in full. (Id., at ¶ 37.) Shortly thereafter, the Lenders changed the borrowing base calculations and/or reserve requirements under the Revolving Credit Facility, and Musicland was thrust into a liquidity crisis. On January 12, 2006, Musicland filed their chapter 11 petitions. (Id.)

---

[4]  A copy of Amendment No. 8 is attached to the Complaint as Exhibit D.

8

By order dated March 24, 2006, the Court approved the sale of substantially all of Musicland's assets, and the Lenders were paid in full from the sale proceeds. (Id., at ¶ 38.) The Trade Creditors held claims aggregating between $170 million and $173 million. Pursuant to subsequent Court orders, the Trade Creditors received the aggregate amount of $44 million. (Id.) Musicland's remaining assets total $22.1 million, leaving the Trade Creditors substantially undersecured. (Id.)

C.  **This Adversary Proceeding**

The Plaintiffs commenced this adversary proceeding on May 15, 1007. Their Complaint included the following seven claims for relief, all tied to one overarching theory: the Security Agreement and the Intercreditor Agreement gave the Plaintiffs a superior lien in the funds used to pay Harris, and Amendment No. 8 and the repayment in full of the Harris Term Loan violated those rights, causing them damage in the sum of $25 million:

| Count | Defendants | Nature of Claim |
|---|---|---|
| 1 | Wachovia | Breach of the Intercreditor Agreement |
| 2 | Wachovia | Breach of the covenant of good faith and fair dealing relating to the Intercreditor Agreement. |
| 3 | Harris | Tortious interference with contractual relations by procuring a breach of the Intercreditor Agreement |
| 4 | Wachovia and Harris | Tortious interference with contractual relations by procuring a breach of the Security Agreement |
| 5 | Harris | Conversion of the Plaintiffs' collateral |
| 6 | Wachovia | Aiding and abetting the conversion |
| 7 | Harris | Unjust enrichment |

9

D.  **The Motions to Dismiss**

Both defendants moved to dismiss the Complaint, and the Plaintiffs subsequently withdrew Count 2. In a nutshell, the defendants contend that Amendment No. 8, which incorporated the Harris Term Loan into the Revolving Credit Agreement, was permitted under the terms of the Intercreditor Agreement. The incorporation of the Harris Term Loan gave Harris a superior lien in Musicland's inventory (by virtue of the Intercreditor Agreement), and the repayment of the Harris Term Loan did not violate any of the Plaintiffs' rights.

The Plaintiffs' position is encapsulated in the first two sentences of the Preliminary Statement of their opposition memorandum:

> Plaintiffs bargained for a lien that was subordinate only to obligations under Musicland's existing revolving credit facility. Their lien was leapfrogged when Wachovia, the revolver agent, agreed to use the revolver lien to secure an entirely different kind of obligation, a $25 million term loan by Harris (the "Term Loan").

(<u>Memorandum of Law in Opposition to Defendants' Motion to Dismiss Complaint</u>, at p. 1, dated July 13, 2007 ("<u>Opposition</u>")) (ECF Doc. # 21.) In short, the Plaintiffs argue that the Intercreditor Agreement did not allow Wachovia and the Lenders to amend the Revolving Credit Agreement to bring the Harris Term Loan within its priority and protection. Accordingly, Wachovia breached the Intercreditor Agreement when it entered into Amendment No. 8, Harris and/or Wachovia tortiously interfered with their rights and converted their collateral, and the defendants' conduct injured the Plaintiffs in the amount of $25 million, the sum wrongfully paid to Harris.

## DISCUSSION

When faced with a motion to dismiss a complaint under FED. R. CIV. P. 12(b)(6), a court must "accept all factual allegations in the complaint as true," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007); accord Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 162, 164 (1993), even if the allegations are doubtful in fact. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007). The plaintiff must plead more than "labels and conclusions," and "a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp., 127 S. Ct. at 1965. Instead, the plaintiff must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)(emphasis in original); see Bell Atlantic Corp., 127 S. Ct. at 1965 ("Factual allegations must be enough to raise a right to relief above the speculative level."). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Bell Atlantic Corp., 127 S. Ct. at 1969; accord Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007).

"[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc., 127 S. Ct. at 2509. "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)(internal

quotation marks omitted); accord Roth, 489 F.3d at 510; Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir.1991), cert. denied, 503 U.S. 960 (1992). "Where a plaintiff's conclusory allegations are clearly contradicted by documentary evidence incorporated into the pleadings by reference, however, the court is not required to accept them." Labajo v. Best Buy Stores, L.P., 478 F.Supp.2d 523, 528 (S.D.N.Y.2007); accord Kuhne v. Midland Credit Management, Inc., No. 06 Civ. 5888(DC), 2007 WL 2274873, at *1 (S.D.N.Y. Aug 09, 2007); Matusovsky v. Merrill Lynch, 186 F.Supp.2d 397, 400 (S.D.N.Y. 2002).

As noted, the motions turn on Wachovia's right under the Intercreditor Agreement to enter into Amendment No. 8, and thereby extend the Lenders' lien priority to the Harris Term Loan. All of the relevant agreements are attached to the Complaint, and may be considered. Furthermore, they cannot be contradicted by the Plaintiffs' allegations. Accordingly, the present motion presents a question of contract interpretation; if the unambiguous terms of the Intercreditor Agreement gave Wachovia the right to enter into Amendment No. 8, both defendants are entitled to an order dismissing the Complaint. See Thayer v. Dial Indus. Sales, Inc., 85 F. Supp. 2d 263, 269 (S.D.N.Y. 2000) ("Issues of contract interpretation are generally matters of law and therefore suitable for disposition on a motion to dismiss.") (quoting Marketing/Trademark Consultants, Inc. v. Caterpillar, Inc., No. 98 Civ. 2570, 1999 WL 721954, at *2 (S.D.N.Y. Sept. 16, 1999)).

The rules for interpreting contracts are familiar. The primary objective is to give effect to the parties' intent as revealed in the language that they used. Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir.

1993); Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992). "The secret or subjective intent of the parties is irrelevant." Klos v. Polskie Linie Lotnice, 133 F.3d 164, 168 (2d Cir. 1997); accord Nycal Corp. v. Inoco PLC, 988 F. Supp. 296, 301 (S.D.N.Y. 1997); Brown Bros. Elec. Contractors, Inc. v. Beam Construction Corp., 361 N.E.2d 999, 1001 (N.Y. 1977).

Whether a contract is ambiguous presents a question of law. Bailey v. Fish & Neave, 837 N.Y.S.2d 600, 603 (N.Y. 2007). The court must "consider the entire contract to 'safeguard against adopting an interpretation that would render any individual provision superfluous.'" RJE Corp. v. Northville Industries Corp., 329 F.3d 310, 314 (2d Cir. 2003)(quoting Sayers, 7 F.3d at 1095); accord Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'")(quoting Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 27 (2d Cir. 1988)); Bailey, 837 N.Y.S.2d at 603 (Contracts "should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases.") An agreement is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who examines the entire contract and knows the customs, practices, usages and terminology generally understood in the particular trade or business. Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996); Sayers, 7 F.3d at 1095; Seiden Assocs., 959 F.2d at 428; Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987). If the agreement is ambiguous, "parol evidence is not admissible to create an ambiguity." Readco, Inc. v.

Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996); see Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 527 (2d Cir.1990).

As noted, the Intercreditor Agreement contemplated future amendments to the Revolving Credit Agreement. These amendments were not restricted to revolving debt. "Revolving Loan Debt" included "any and all obligations, liabilities and indebtedness of every kind, nature and description" owing by Musicland "whether now existing or hereafter arising" under the Revolving Creditor Agreements. (Intercreditor Agreement, at § 1.16.) Nor were they restricted to the original Lenders or their assignees. "Revolving Loan Creditors" included the original Lenders, their successors and assigns, and "any other lender or group of lenders that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise a party to the Revolving Creditor Agreements." (Id., at § 1.15)(emphasis added.) Finally, the Plaintiffs consented in advance to "any amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements." (Id., at § 4.3.)

Accordingly, the Intercreditor Agreement unambiguously authorized Wachovia to amend the Revolving Credit Agreement to bring in a term lender. Thus, the provisions of the Intercreditor Agreement were sufficiently broad on their face to encompass the incorporation of the Harris Term Loan, and to allow the parties to amend or supplement the existing definitions and other terms of the Revolving Credit Agreement to accomplish that end.[5] Moreover, the Intercreditor Agreement expressly limited amendments

---

[5] The Plaintiffs have not argued that Amendment No. 8 was invalid under the Revolving Credit Agreement.

14

regarding loans by affiliates, and the absence of a similar limitation concerning term loans lends additional support to the defendants' interpretation. See RJE Corp., 329 F.3d at 315.

The Plaintiffs' opposition relies on their expectation or understanding that they "bargained for a lien that was subordinate only to obligations under Musicland's existing revolving credit facility." (Opposition, at p. 1.) That bargain is not reflected in the terms of the Intercreditor Agreement, which gave Wachovia a broad right to amend the Revolving Credit Agreement to cover any type of loan. If the Plaintiffs harbored such an expectation, it remained a secret one, contradicted by the language they agreed to in their contract. The Court cannot rewrite the contract to fulfill their unspoken expectation. See Times Mirrors Magazines, Inc. v. Field & Stream Licenses Co., 294 F.3d 383, 394-95 (2d Cir. 2002) ("Having already found that the express terms of the agreements clearly set forth the parties' respective rights . . . [plaintiff] cannot avoid the express terms of the contract by relying on the implied covenant of good faith and fair dealing.").

In conclusion, the unambiguous provisions of the Intercreditor Agreement allowed the parties to enter into Amendment No. 8, amend the Revolving Credit Agreement to incorporate the Harris Term Loan, and thereby extend the lien priority granted under the Intercreditor Agreement to that loan. Accordingly, Wachovia did not breach the Intercreditor Agreement, the defendants did not tortiously interfere with the Plaintiffs' contractual rights or participate in the conversion of the Plaintiffs collateral,

and Harris was not unjustly enriched. The Clerk of the Court is directed to enter a judgment dismissing the Complaint.

So ordered.

Dated: New York, New York
August 24, 2007

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
Chief United States Bankruptcy Judge