UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | 07-CV-08423-(RWS) |
| | ) | |
| MUSICLAND HOLDING CORP., *et al.*, | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | |
| | ) | |
| _____ | ) | Bk. Case No. 06-10064 (SMB) |
| BUENA VISTA HOME ENTERTAINMENT, | ) | Jointly Administered |
| INC., a California corporation; CARGILL | ) | |
| FINANCIAL SERVICES INTERNATIONAL, | ) | Adv. Proc. No. 07-01705 (SMB) |
| INC., a Delaware corporation; HAIN | ) | |
| CAPITAL GROUP, LLC, a Delaware limited | ) | On Appeal from the Order and |
| liability company; PARAMOUNT PICTURES | ) | Judgment of the United States |
| CORPORATION, a Delaware corporation; | ) | Bankruptcy Court of the Southern |
| TWENTIETH CENTURY FOX HOME | ) | District of New York Granting |
| ENTERTAINMENT LLC, a Delaware limited | ) | Defendants' Motions to Dismiss |
| liability company; UBS WILLOW FUND, | ) | Complaint |
| LLC, a Delaware limited liability company; and | ) | |
| VÄRDE INVESTMENT PARTNERS, L.P., a | ) | |
| Delaware limited partnership, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WACHOVIA BANK, N.A., a national banking | ) | |
| association, in its capacity as Agent; and | ) | |
| HARRIS N.A., a national banking association, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

<u>**OPENING BRIEF OF APPELLANTS**</u>

Robert J. Feinstein (RF 2836)
Alan J. Kornfeld (AK 5647)
Beth E. Levine (BL 6715)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:   (212) 561-7777

Counsel for Appellants

59182-001\DOCS_LA:174680.3

# TABLE OF CONTENTS

Page Nos.

BASIS FOR APPELLATE JURISDICTION ................................................................ 1

ISSUE PRESENTED ................................................................................................... 1

STANDARD OF APPELLATE REVIEW .................................................................. 1

STATEMENT OF THE CASE .................................................................................... 2

    I.    Nature of the Case .......................................................................... 2

    II.    Course of Proceedings .................................................................. 4

    III.    Disposition by the Bankruptcy Court ........................................... 6

STATEMENT OF FACTS ........................................................................................... 9

    I.    The Revolving Credit Facility ....................................................... 9

    II.    The Security Agreement ............................................................... 10

    III.    The Intercreditor Agreement ....................................................... 10

    IV.    Amendment No. 8 to the Revolving Credit Agreement ............... 13

    V.    Early Repayment of the Harris Term Loan and the Musicland Bankruptcy ....... 16

SUMMARY OF ARGUMENT .................................................................................. 16

ARGUMENT .............................................................................................................. 20

    I.    The Bankruptcy Court Erred in Dismissing Appellants' Claim for Breach of the Intercreditor Agreement ............................ 20

        A.    The Bankruptcy Court Misconstrued Certain Provisions of the Intercreditor Agreement as Permitting Wachovia to Enter Amendment No. 8. .............................. 20

        B.    The Single Passage on Which the Decision Rests Cannot Be Fairly Interpreted as Permitting Wachovia to Enter Amendment No. 8. .......... 23

        C.    Wachovia Breached the Implied Covenant of Good Faith and Fair Dealing .................................................. 28

        D.    The Alternative Basis for Breach of Contract Alleged by Appellants Was Not Addressed and Cannot Be Dismissed Under Rule 12(b)(6). ........................ 30

        E.    At Most, the Terms of the Contract Are Ambiguous and the Claim for Breach of Contract Cannot Be Dismissed Under Rule 12(b)(6). ........ 33

    II.    Because the Dismissal of the Claim for Breach of the Intercreditor Agreement Was the Predicate for Dismissal of the Remaining Claims for Relief, the Dismissal of Such Claims Must Also Be Vacated. ..................... 35

CONCLUSION ........................................................................................................... 36

## TABLE OF AUTHORITIES

Page Nos.

**CASES**

*511 West 232nd Owners Corp. v. Jennifer Realty Co.*
746 N.Y.S.2d 131 (2002) .................................................................. 28

*Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's*
136 F.3d 82 (2d Cir. 1998) .............................................................. 34

*Ari & Co. v. Regent Int'l Corp.*
273 F. Supp. 2d 518 (S.D.N.Y. 2003) ............................................... 28

*Bank of China v. Chan*
937 F.2d 780 (2d Cir. 1991) .............................................................. 29

*Cable Science Corp. v. Rochdale Village, Inc.*
920 F.2d 147 (2d Cir. 1988) .............................................................. 34

*Carvel Corp. v. Baker*
79 F. Supp. 2d 53 (D. Conn. 1997) .................................................. 29

*D.C. USA Operating Co. LLC v. Indian Harbor Ins. Co.*
2007 WL 945016 (S.D.N.Y. Mar. 27, 2007) ..................................... 33

*Eighth Ave. Coach Corp. v. City of New York*
286 NY 84 (1941) .............................................................................. 17

*Essex Ins. Co. v. Pingley*
839 N.Y.S.2d 208, 41 A.D.3d 774 (2007) ......................................... 25

*Goldin-Feldman v. Blum & Fink, Inc.*
2000 WL 1182798 (S.D.N.Y. Aug. 18, 2000) ................................... 33

*Gulf States Exploration Co. v. Manvill Forest Products (In re Manville Forest Prods. Corp.)*
896 F.2d 1384 (2d Cir. 1990) ............................................................ 1

*Ilco Toy Co. USA v. Block*
1991 WL 64203 (S.D.N.Y. April 18, 1991) ....................................... 34

*In re Pinelawn Cemetery*
177 A.D.2d 274, 575 N.Y.S.2d 851 (1991) ....................................... 24

*International Audiotext Network, Inc. v. American Telephone & Telegraph Co.*
62 F.3d 69 (2d Cir. 1995) .................................................................. 33

*International Equity Investments, Inc. v. Opportunity Equity Partners Ltd.*
472 F. Supp. 2d 544 (S.D.N.Y 2007) ................................................ 33

*Kham & Nate's Shoes No. 2 v. First Bank*
908 F.2d 1351 (7th Cir. 1990) ........................................................... 29

*Land Mind Enterprises v. Sylvester Builders, Inc.*
1993 WL 307853 (S.D.N.Y., Aug. 11, 1993) ..................................... 34

*Lightfoot v. Union Carbide Corp.*
110 F.3d 898 (2d Cir. 1997) ......................................................... 33, 35

*Madison Avenue Leasehold, LLC v. Madison Bentley Assoc.*
30 A.D.3d 1,  811 N.Y.S.2d 47 (2006) .............................................. 24

*Miller v. Wolpoff & Abramson, L.L.P.*
 321 F.3d 292 (2d Cir. 2003)....................................................................20, 30

*Nowak v. Ironworkers Local 6 Pension Fund* 81 F.3d 1182 (2d Cir. 1996) ...............................2

*Roth v. Jennings*
 489 F.3d 499 (2d Cir. 2007)........................................................................20

*Sayers v. Rochester Tel. Corp.*
 7 F.3d 1091 (2d Cir. 1993)..........................................................................33

*Schever v. Rhodes*
 416 U.S. 232 (1974)...................................................................................20

*Statland Holliday, Inc. v. Stendig Development Corp.*
 362 N.Y.S.2d 2, 46 A.D.2d 135 (1974) ..............................................26, 27, 34

*Stone v. Golden Wexler & Sarnese, P.C.*
 341 F. Supp. 2d 189 (E.D.N.Y. 2004)............................................................34

*Subaru Distributors Corp v. Subaru of America*
 425 F.3d 119 (2d Cir. 2005)..........................................................................2

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
 127 S. Ct. 2499 (2007)..................................................................................9

*Times Mirrors Magazines, Inc. v. Field & Stream Licenses Co.*
 294 F.3d 383 (2d Cir. 2002)........................................................................29

*Todd v. Exxon Corp.*
 275 F.3d 191 (2d Cir. 2001)........................................................................20

*Tougher Heating & Plumbing Co. v. State of New York*
 423 N.Y.S.2d 289, 73 A.D.2d 732 (1979) ...............................................24, 25

*TVT Records and TVT Music Inc. v. Island Def Jam Music Group*
 244 F. Supp. 2d 263 (S.D.N.Y. 2003)...........................................................28

*United States v. Barrow*
 400 F.3d 109 (2d Cir. 2005)..........................................................................2

*Zodiac Enterprises, Inc. v. American Broadcasting Cos.*
 440 N.Y.S.2d 240, 81 A.D.2d 337 (1981), *aff'd*, 56 N.Y.2d 738 (1982) ......17, 27

**STATUTES**

28 U.S.C. § 158(a)(1)....................................................................................1

**RULES**

Federal Rule of Civil Procedure 12(b)(6) ..................................................2, 4

## BASIS FOR APPELLATE JURISDICTION

This is an appeal from an order of the Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") dismissing the complaint in the above-captioned adversary proceeding (the "Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docket No. 1, Appellants' Appendix ("AA"), Tab 1.) [1] This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

## ISSUE PRESENTED

The Complaint states claims arising from the violation of appellants' rights under an intercreditor agreement between secured creditors of Musicland Holding Corp. ("Musicland" or the "Debtor"). Appellants contend that the Bankruptcy Court erred in dismissing the Complaint based on its ruling that, as a matter of law, the Intercreditor Agreement can only be interpreted in a manner that permits the alleged violations of appellants' rights. Accordingly, the issue on appeal is:

Whether the Bankruptcy Court erred in dismissing the Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## STANDARD OF APPELLATE REVIEW

A district court reviews a bankruptcy court's conclusions of law *de novo*, while findings of fact are reviewed for clear error. *Gulf States Exploration Co. v. Manvill Forest Products (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1388 (2d Cir. 1990); Fed. R. Bankr. P. 8103.

---

[1] Except as otherwise noted, all references to "Docket No. __" are to the Bankruptcy Court's docket for Adversary Proceeding No. 07-01705. References to "Case Docket No. __" are to the Bankruptcy Court's docket for the Musicland Bankruptcy Case No. 06-10064. For the Court's convenience, Appellants have filed concurrently herewith, under separate cover, an appendix ("AA") that contains the: (1) Complaint (Docket No. 1) ) (including Exhibit A: Revolving Credit Agreement, Exhibit B: Security Agreement, Exhibit C: Intercreditor Agreement and Exhibit D: Amendment No. 8); (2) Bankruptcy Court's Memorandum of Decision and Order Granting Motion to Dismiss Complaint (Docket No. 37); (3) Bankruptcy Court's Judgment (Docket No. 38); and (4) Transcript of the Bankruptcy Court's August 9, 2007 Hearing on the Appellants' Motion to Dismiss the Complaint (Docket No. 36).

The dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is subject to *de novo* review. *Subaru Distributors Corp v. Subaru of America*, 425 F.3d 119, 122 (2d Cir. 2005). Issues of contract interpretation, in particular, are reviewed *de novo*. *United States v. Barrow*, 400 F.3d 109, 117 (2d Cir. 2005); *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996) ("whether a written contract is ambiguous is a question of law for the trial court whose determinations will be reviewed *de novo*").

## STATEMENT OF THE CASE

### I.    Nature of the Case

Appellants ("Appellants") are trade vendors (or their assignees) that supplied Musicland on credit with CDs, DVDs and similar merchandise. In 2003, when Musicland was experiencing substantial financial difficulties, it granted Appellants a lien on inventory to induce them to continue shipping. Concurrently, Appellants entered into an intercreditor agreement ("Intercreditor Agreement") with Musicland's senior secured creditors, lenders holding participation interests in Musicland's revolving credit facility ("Revolver Lenders").

The Intercreditor Agreement was intended to ensure that Appellants received what they bargained for: a lien that was subordinate only to obligations under Musicland's Revolving Credit Agreement. As its name suggests, that agreement provided only for revolving credit, to be advanced only by participating lenders, or by other lenders that might later acquire participation interests in the revolving credit facility. Like all revolving credit, the agreement contained borrowing base requirements to ensure that Musicland would always have more than enough collateral to cover the loans. The Intercreditor Agreement also specifically prohibited any affiliate of Musicland from obtaining a lien position senior to Appellants.

In 2005, Musicland was in financial trouble and needed cash. The Revolver Lenders would not make advances in excess of their borrowing base. Reflecting the risk, Musicland's

parent, Sun, would not lend money unless it was secured ahead of Appellants. But that was impossible without Appellants' consent, because the Intercreditor Agreement prohibited insider loans from obtaining lien priority over Appellants, and any newly recorded lien would be junior.

Necessity is the mother of invention, and a "solution" was devised. Sun had its own lender, Harris N.A. ("Harris"), agree to make a $25 million term loan (the "Harris Term Loan"), guaranteed by Sun. Without Appellants' knowledge or consent, Wachovia Bank, N.A. ("Wachovia") (the successor agent for the Revolver Lenders), agreed to enter into an "amendment" to the Revolving Credit Agreement, which purported to make the Harris Term Loan part of the revolving credit facility. "Amendment No. 8" made sweeping definitional changes to the nomenclature of the Revolving Credit Agreement to make it appear to accommodate a term loan. In substance, however, the amendment was a sham. The Harris Term Loan was not part of the revolving credit facility in any substantive respect, from interest rate to payment terms. Harris was not replacing or refinancing any of the revolving loans; in fact, the amendment was structured so that the Harris Term Loan was subordinated to the revolving loans. It was, in substance, a mezzanine lien secured by exactly the same tranche of Musicland's assets that secured Appellants' lien, *i.e.*, assets in excess of the borrowing base.

The mezzanine loan was a loan that a Revolver Lender would not (and did not) make. Loading a separate term loan on top of revolving credit exposed Appellants to risks that were not presented by the Revolving Credit Agreement as it existed when Appellants entered the Intercreditor Agreement. It was made possible only by clumsily grafting onto the Revolving Credit Agreement an entirely different type of credit. Discovery will show that the only purpose of Amendment No. 8 was to place the Harris Term Loan ahead of Appellants' lien (but below the

Revolver Lenders' lien), while avoiding the Intercreditor Agreement's restrictions on insider financing.

Placing Harris ahead of Appellants ensured that Sun would not be responsible for repaying the loan.  Instead, Harris was paid by Musicland with $25 million in funds that were subject to Appellants' lien more than eight months before Harris' loan was due.  A little more than a month after that, having kept Sun from having to make good on its guarantee by using Appellants' collateral to pay Harris, Musicland filed for relief under Chapter 11 of the Bankruptcy Code.

## II.    Course of Proceedings

On May 15, 2007, Appellants filed their Complaint (Docket No. 1, AA Tab 1), asserting the following claims for relief: (1) against Wachovia for breach of the Intercreditor Agreement by Wachovia; (2) against Wachovia for breach of the covenant of good faith and fair dealing;[2] (3) against Harris for tortious interference with Appellants' rights under the Intercreditor Agreement; (4) against both Wachovia and Harris for tortious interference with Appellants' rights under the security agreement with Musicland; (5) against Harris for conversion; (6) against Wachovia for aiding and abetting conversion; and (7) against Harris for unjust enrichment.

On June 15, 2007, each Appellee filed a motion to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motions") and a memorandum of law in support thereof.  (Docket Nos. 3, 4, 7 & 8.)  On July 13, 2007, Appellants filed their memorandum of law in opposition to the Motions.  (Docket No. 21.)  On July 26, 2007, each Appellee filed its respective reply memorandum of law in further support of the Motions.  (Docket Nos. 23 & 24.)

---

[2] Under New York law, a claim for breach of the implied covenant of good faith and fair dealing is subsumed by the claim for breach of contract, and thus this claim is subsumed by the first claim for relief.

The Bankruptcy Court heard oral argument on the Motions on August 9, 2007.
Transcript of Hearing held on August 9, 2007 (Docket No. 36, AA Tab 4) ("Transcript").  As of
that date, the confirmation hearing on the Second Amended Joint Plan of Liquidation of
Musicland Holding Corp. and Its Affiliated Debtors (the "Second Amended Plan") was
scheduled to take place on September 27, 2007.

Also, pending on August 9, 2007 (and still pending currently) was Wachovia's Objection
to Confirmation of the Second Amended Plan (the "Plan Objection"), dated April 23, 2007.
(Case Docket No. 1600.)  In the Plan Objection, Wachovia asserted, among other things, that the
Musicland Plan was not feasible because Wachovia held an administrative claim, potentially in
excess of more than $25,000,000, based upon its purported right to indemnification in connection
with the claims asserted against it by Appellants.  In a subsequent filing in the bankruptcy case,
Wachovia stated that if the Bankruptcy Court granted Wachovia's motion to dismiss Appellants'
Complaint "there will no longer be a feasibility issue standing in the way of confirmation.
However, if Wachovia's Motion to Dismiss is denied in any respect, then Wachovia is entitled to
be indemnified . . . and the Second Amended Plan cannot be confirmed because it fails to
provide a mechanism for payment of Wachovia's indemnity claims which must be paid in full."
Wachovia's Reply to the Response of the Informal Committee of Secured Trade Vendors to
Wachovia's Confirmation Objection at 2.  (Case Docket No. 1676.)

The Bankruptcy Court's Memorandum Decision and Order Granting Motion to Dismiss
Complaint (the "Memorandum Order") was entered on August 27, 2007.  (Docket No. 37, AA
Tab 2.)  Judgment was entered on August 27, 2007.  (Docket No. 38, AA Tab 3.)  Appellants
timely filed an amended notice of appeal on August 30, 2007.  (Docket No. 40.)

### III.    Disposition by the Bankruptcy Court

The Bankruptcy Court granted the Motions and dismissed the Complaint, ruling that "the Intercreditor Agreement unambiguously authorized Wachovia to amend the Revolving Credit Agreement to bring in a term lender." (Memorandum Order at 14, AA Tab 2.) Thus, to the extent Appellants bargained for more, "[t]hat bargain is not reflected in the terms of the Intercreditor Agreement, which gave Wachovia a broad right to amend the Revolving Credit Agreement to cover any type of loan." (*Id.* at 15.) There being no breach of the Intercreditor Agreement, there was also no tortious interference, conversion, or unjust enrichment. (*Id.*)

The Bankruptcy Court identified three provisions in the Intercreditor Agreement to support its conclusion that the contract unambiguously permitted Wachovia to enter Amendment No. 8. The first (section 1.16) provided that Appellants had subordinated to "Revolving Loan Debt" and that this term included obligations "hereafter arising" under the Revolving Creditor Agreements. (*Id.* at 14.) The second (section 1.15) provided that "Revolving Loan Creditors" was defined to include "any other lender or group of lenders that at any time refinances, replaces or succeeds to all or any portion of the revolving Loan Debt *or is otherwise a party to the Revolving Creditor Agreements*" (*Id.* (emphasis in original).) The third (section 4.3) provided that Appellants had consented in advance to "any amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements." (*Id.*)

The Bankruptcy Court's parsing of the definitions in the Intercreditor Agreement and Revolving Credit Agreement was imprecise, and its conclusion that Wachovia could change the Revolving Loan Agreement in any manner it saw fit without violating Appellants' rights under the Intercreditor Agreement was erroneous. As set forth in greater detail below, Appellants' lien was subordinated under the Intercreditor Agreement to the "Liens of the *Revolving Loan*

*Creditors* therein *to the full extent of the Revolving Loan Debt.*"  One could only become a party to the Revolving Credit Agreement, and thus become a "Revolving Loan Creditor," by acquiring a participation interest from the original lenders.  Harris did not acquire a participation interest. Further, "Revolving Loan Debt" referred exclusively to revolving loans under the Revolving Creditor Agreements, so the reference to "obligations hereafter arising" under such agreements begs the question of whether the Revolving Creditor Agreements could be turned into term loan agreements in the first place.

That leaves section 4.3 of the Intercreditor Agreement as the only basis for the Bankruptcy Court ruling.  But squeezing an unrelated type of loan into the equity margins of a revolving credit facility (outside the borrowing base but under the maximum) – effectively the same assets that secured Appellants' claims – was far more than an "amendment, modification, supplement, extension, renewal, or restatement" of the revolving credit facility.  It is firmly settled that a court must look to the text and purpose of the entire contract when assessing the meaning of a particular provision, and that isolated terms are not applied literally but given a fair and reasonable interpretation in view of such facts.  The Bankruptcy Court did not follow these basic rules of contract interpretation.

The Bankruptcy Court ignored both the purpose of the Intercreditor Agreement and its text.  Its analysis ignores section 4.3's explicit examples of what an "amendment, modification, etc." of the Revolving Loan Debt or the Revolving Creditor Agreements was contemplated to include.  Those examples include routine actions such as: (1) extension of repayment time; (2) changes in interest rate, fees, or other charges; and (3) increase or decrease in the collateral. Those examples indicate that changing, for example, the interest rate was permitted; changing Musicland's capital structure and lien priority, to the detriment of Appellants, was not.

The Bankruptcy Court's read of section 4.3 in a textual vacuum lead to its conclusion that Wachovia could do anything it wanted to do. The phrase "amendment, modification supplement, extension, renewal or restatement of the Revolving Loan Debt or the Revolving Creditor Agreements" cannot mean as a matter of law that Wachovia can subordinate Appellants' lien priority. On the facts and context presented, the cited terms on their face did not authorize "Amendment No. 8."

Moreover, the Bankruptcy Court's ruling does not at all address Appellants' theory of liability that the Harris Term Loan violated the Intercreditor Agreement's restriction on affiliate financing. The Intercreditor Agreement contains carefully negotiated terms on which a Musicland affiliate may obtain a lien ahead of Appellants. The Sun-guaranteed Harris Term Loan and Amendment No. 8 were the functional equivalent of a transaction that was prohibited under the Intercreditor Agreement and were designed to circumvent the contract. This violated the Intercreditor Agreement and its implied covenant of good faith and fair dealing.

Finally, at most, the contract is ambiguous. Under New York law, contract terms are ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of customs, practices, usages, and terminology as generally understood in the particular trade or business. If the Intercreditor Agreement did not expressly *forbid* revising the Revolving Credit Agreement to incorporate a term loan, it also did not expressly *permit* it. A person cognizant of relevant customs and practices would recognize that term debt and revolving credit are fundamentally different, that term debt presents different risks to a subordinating lienholder, and that terms in an intercreditor agreement such as "and amendments or modifications" can be interpreted to mean routine revisions to loan terms are permitted, but a

fundamental capital restructuring that primes a third party's priority lien is not. That is, the "amendment, modification" language does not permit extending a senior revolver lien to cover an unrelated term loan that does not look or act like revolving credit. Caselaw supports this common sense conclusion.

For all these reasons, dismissal of the Complaint for failure to state a claim was erroneous.

## STATEMENT OF FACTS

The following facts are alleged in the Complaint, and are assumed to be true for purposes of a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).

## I.    The Revolving Credit Facility

Pursuant to a loan and security agreement dated as of August 11, 2003 (the "Revolving Credit Agreement"), Fleet Retail Finance, Inc. and Congress Financial Corporation (Wachovia's predecessor in interest), as the agent for the Revolver Lenders, agreed to provide Musicland with revolving credit of up to, at that point, $200 million (the "Revolving Credit Facility"). The obligations thereunder were secured by a first priority lien in substantially all of Musicland's assets, including inventory and proceeds (the "Revolver Lien"). (Complaint ¶ 23, AA Tab 1; Complaint Exh. A.)

The Revolving Credit Agreement provided for revolving credit exclusively. It defines the "Credit Facility" as the "Loans," and "Loans" are defined, in turn, as "the loans now or hereafter made by or on behalf of Lenders or by Agent for the account of Lenders on a revolving basis pursuant to the Credit Facility . . . ." (Complaint Exh. A, §§ 1.29, 1.70) (emphasis added).) The Revolver Lien was no more expansive. It secured only the "Obligations" (*id.* § 5.1), which term is defined as:

> "any and all *Loans*, Letters of Credit Accommodations and all other
> obligations, liabilities and indebtedness of every kind, nature and
> description . . . *arising under this Agreement or any of the other Financing
> Agreements. . . .*"

(*Id.* § 1.80 (emphasis added).)  As discussed below, Wachovia was forced to *change* the

definition of "Obligations" to include term loans solely to encompass the Harris Term Loan

(defined below), long after the Intercreditor Agreement was in force. (Complaint ¶ 24; Exh. A.)

## II.     The Security Agreement

In 2003, Musicland was experiencing substantial financial difficulties.  To induce

Appellants to continue to supply music CDs, DVDs and similar inventory, Musicland granted

them a lien on inventory and proceeds thereof (the "Inventory Lien"), pursuant to a security

agreement dated November 5, 2003 (the "Security Agreement").  The Bank of New York acted

as Appellants' collateral agent.[3]  (*Id.* ¶ 25; Complaint Exh. B.)

Pursuant to the Security Agreement, the Inventory Lien was "subject only to the terms of

that certain Intercreditor and Subordination Agreement, dated as of November 5, 2003 . . . ."

(Complaint Exh. B § 2.)  The Inventory Lien was junior only to "Permitted Encumbrances" (*id.*

§ 4(b)), which include only "the security interests and liens of Congress for itself and the benefit

of the Lenders pursuant to the Congress Facility" and certain other limited, inapplicable liens.

(*Id.* at 2 § 1(i).)

## III.    The Intercreditor Agreement

Concurrently with the Security Agreement, Wachovia, as agent for the Revolver Lenders,

and Bank of New York, as Appellants' collateral agent, entered into an intercreditor and

subordination agreement (the "Intercreditor Agreement").  (*Id.* ¶ 28; Complaint Exh. C.)

---

[3] Wilmington Trust Company is the successor in interest to The Bank of New York as Trade Agent under the Trade
Security Agreement.

In the Memorandum Order, the Bankruptcy Court characterizes the definitions of the Intercreditor Agreement as providing for subordination to "debts under the current Revolving Creditor Agreement and any amended agreement, including any new loans of any type made under any amended agreement." (Memorandum Order at 5, AA Tab 2 (emphasis added).) That is inaccurate. Parsed carefully, the definitions of the Intercreditor Agreement provide for the subordination of the Inventory Lien solely to revolving loans, as follows:

        1.      The Inventory Lien is subordinated only to the "Liens of the *Revolving Loan Creditors* therein *to the full extent of the Revolving Loan Debt*." (Complaint Exh. C § 2.2 (emphasis added).)

        2.      "Revolving Loan Creditors" are defined as parties to the Revolving Credit Agreement and, by its terms, *only lenders providing revolving credit can be parties to the Revolving Credit Agreement.* "Lenders," as defined in the Revolving Credit Agreement, comprised (a) the original Revolver Lenders, and (b) *lenders that acquired a participation interest in the Credit Facility from an original Lender.*

> 1.66 "Lenders" shall mean the financial institutions who are signatories hereto as Lenders and other persons made a party to this Agreement as a Lender in accordance with Section 13.6 hereof, and their respective successors and assigns; each sometimes being referred to herein individually as a "Lender". [sic]

> 13.6 <u>Assignments; Participations</u>.

>     (a)    Each Lender may assign all or, if less than all, a portion equal to at least $5,000,000 in the aggregate for the assigning Lender, of such rights and obligations under this Agreement to one or more Eligible Transferees . . . each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Acceptance. . .

>     (c)    Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and to the other Financing Agreements and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and

Acceptance, have the rights and obligations . . . of a Lender hereunder and thereunder. . . .

(Complaint Exh. A §§ 1.66, 13.6.)

3.     The other limitation on the scope of the subordination is that it is limited to "Revolving Loan Debt," which is defined as "any and all obligations . . . arising under the *Revolving Creditor Agreements*. . . ." (*Id*. § 1.16.) "Revolving Creditor Agreements" is defined in § 1.11 of the Intercreditor Agreement as the original revolving loan documents, as they "now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders . . . that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise a party to the Revolving Creditor Agreements)." (Complaint Exh. C § 1.11.) As set forth above, at the time the Intercreditor Agreement was entered, the "Revolving Creditor Agreements" provided for the extension of revolving loans *exclusively*.[4] As set forth below, the terms "amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured" may not be interpreted as a matter of law as describing the Term Loan, which was a subordinated loan that did not replace, refinance, or even affect the Revolving Loan Debt. (Complaint ¶ 30; Complaint Exh. C.)

The Intercreditor Agreement also contains an additional *exclusion* from the scope of the subordination. It provides that in order to be senior in priority to the Inventory Lien, the lender or lenders "shall not be affiliates of Debtors" except by a "Permitted Affiliate Refinancing." (Complaint Exh. C, § 1.11.) Under Section 1.9, a "Permitted

---

[4] As set forth above, the Revolving Credit Agreement established a "Credit Facility" consisting in relevant part of the "Loans," which were in turn defined as loans made "on a revolving basis." (Complaint Exh. A §§ 1.29, 1.70.)

Affiliate Refinancing" is one in which an affiliate, inter alia, "makes revolving loan debt

available to the Debtors" provided that "such affiliate does not own or hold more than

twenty-five (25%) percent of the Revolving Loan Debt subject to such Refinancing. . . ."

(Complaint ¶ 31; Complaint Exh. C.)

Finally, the Intercreditor Agreement provides in part, under the heading

"Waivers":

> The Trade Creditors also waive notice of, and hereby consent to, (a) any
> amendment, modification, supplement, extension, renewal, or restatement
> of any of the Revolving Loan Debt or the Revolving Creditor Agreements,
> including, without limitation, extensions of time of payment of or increase
> or decreases in the amount of any of the Revolving Loan Debt, the interest
> rate, fees, other charges, or any collateral, (b) the taking, exchange,
> surrender and releasing of Trade Collateral or guarantees now or at any
> time held by or available to Revolving Loan Agent or any of the
> Revolving Loan Creditors for the Revolving Loan Debt, (c) the exercise of
> or refraining from the exercise of any rights against Debtors or any other
> obligor or any Trade Collateral, (d) the settlement compromise or release
> of, or the waiver of any default with respect to, any of the Revolving Loan
> Debt, and/or (e) Revolving Loan Creditors' election, in any proceeding
> instituted under the U.S. Bankruptcy Code, of the application of Section
> 1111(b)(2) of the U.S. Bankruptcy Code. Any of the foregoing shall not,
> in any manner, affect the terms hereof or impair the obligations of Trade
> Creditors hereunder.

(Complaint Exh. C § 4.3.) As argued below, Amendment No. 8 was not an "amendment,

modification, supplement, extension, renewal or restatement" within the contemplated scope of

this provision, and certainly cannot be interpreted so as a matter of law.

## IV.    <u>Amendment No. 8 to the Revolving Credit Agreement</u>

In the fall of 2005, Musicland asked the Revolver Lenders to increase availability under

the Revolving Credit Facility, but they refused. Musicland's parent, Sun, also refused to provide

additional capital on a subordinated debt or equity basis. (Complaint ¶ 32.)

Harris had a banking relationship with Sun. At Sun's request, Harris agreed to make a

$25 million term loan to Musicland (the "Harris Term Loan"), on materially different terms from

the existing credit facility: (i) it was a term loan, not revolving credit; (ii) Sun guaranteed repayment to Harris (but not to Revolver Lenders); and (iii) it was short-term financing designed to meet Musicland's liquidity needs during the peak shopping season – that would be repaid shortly regardless of its stated maturity date, whether or not other Revolver Lenders were paid. (Complaint ¶ 33.)

If documented as a separate loan and financing statement, the Harris Term Loan would have been subordinate to Appellants' Inventory Lien.  The Security Agreement prohibited Musicland from granting any lien encumbering Appellants' collateral, other than the Revolver Lien.  (*Id.* ¶ 34.)  Instead, Wachovia and Harris devised Amendment No. 8 to the Revolving Credit Agreement, which purported to incorporate the Harris Term Loan into the Revolving Credit Facility for the transparent purpose of cloaking it in a senior lien, leapfrogging Appellants' Inventory Lien.  (*Id.* ¶ 35; Complaint  Exh. D.)

Amendment No. 8 made basic definitional changes in order to graft a term loan onto a revolving credit facility.  The definition of "Obligations," which effectively limited the scope of the security interest to revolving loans, was amended so that "[a]ll references to the term "Obligations" herein and in the Loan Agreement and the other Financing Agreements shall be deemed . . . to include . . . indebtedness of Borrowers in respect of the Term Loan." (Complaint Exh. D § 1(b)(ix).)  Whereas before there had been only "Lenders" and all nomenclature ultimately referred to revolving loans and revolver lenders, Amendment No. 8 changed: (1) the definition of Loan (to mean the Revolving Loans and the Term Loan) (*id.* § 1(b)(vii): (2) the definition of "Lenders" (to mean the Revolving Loan Lenders and the Term Loan Lender) (*id.* § 1(b)(vii)); and (3) the definition of "Commitments" (to mean the Revolving Loan Commitments and the Term Loan Commitment).  (*Id.* § 1(b)(v).)

Substantively, the credit facility was bifurcated into revolving credit and subordinated term loan components. The Harris Term Loan was a separate, junior credit facility. It had its own interest rate. (*Id.* § 1(b)(ii).) It was structurally subordinated. The Harris Term Loan was not paid *pari passu* with the revolving loans; rather, loan payments were applied first to the Revolving Loan Debt, including all interest and principal, and only then to interest and principal on the Harris Term Loan. (*Id.* § 4, amending § 6.4 of the Intercreditor Agreement.) Although the stated maturity date of the Harris Term Loan was co-terminous with the Revolving Credit Facility, Amendment No. 8 permitted early prepayment at anytime after November 2005, provided that Musicland then had certain excess availability under the Revolving Credit Facility (*i.e.*, if it presented no risk to the Revolver Lenders). (*Id.* ¶ 35; Complaint Exh. D.)

Amendment No. 8 was structured so that the Harris Term Loan would not impair the security for the Revolving Loan Debt, but would effectively supplant Appellants' Inventory Lien. Like any revolving loan, the maximum amount of the Revolving Loan Debt was limited under section 2.1 of the Revolving Loan Agreement to the amount of the borrowing base, regardless of the stated maximum amount of the credit facility (and thus there would normally be an equity cushion in the collateral). (Complaint Exh. A.) Amendment No. 8 maintains that limitation in effect. (Complaint Exh. D § 2.) The Harris Term Loan, however, was not limited by the borrowing base; rather, the sum of the Revolving Loan Debt and the Harris Term Loan was limited only by the maximum credit limit of the Revolving Credit Facility. *Id.* Because the Revolving Loan Debt stayed within the borrowing base and had payment priority (and thus was secured by the collateral comprising the borrowing base), while the Harris Term Loan was not limited by the borrowing base and was subordinated in payment priority, the Harris Term Loan

was effectively secured by collateral in excess of the borrowing base, *i.e.*, the same collateral that secured Appellants' claims.

**V.    Early Repayment of the Harris Term Loan and the Musicland Bankruptcy**

For no apparent reason except to absolve its corporate parent of its $25 million guarantee obligation, Musicland repaid the Harris Term Loan in full on or about December 5, 2005. Musicland took this action despite its obviously precarious financial situation and despite the fact that as of December 5, 2005, the Harris Term Loan would not have been due for more than eight months. Shortly thereafter, and not at all surprising given Musicland's questionable use of its diminishing cash, the Revolver Lenders changed the borrowing base calculations and/or reserve requirements under the revolving credit facility, and Musicland was thrust into a liquidity crisis. On January 12, 2006, Musicland filed for relief under chapter 11 of the Bankruptcy Code.

As discussed in the Complaint, collectively, Appellants' claims against Musicland are undersecured by over $100 million. (Complaint ¶¶ 37, 38.)

## SUMMARY OF ARGUMENT

Appellants bargained for a lien that was subordinate only to obligations under Musicland's existing revolving credit facility. Their lien was leapfrogged when Wachovia agreed to use the Revolver Lien to secure the Harris Term Loan. Harris was not participating in or refinancing the revolving loans, but making a type of loan that was not contemplated or even permitted under the definitions of the Revolving Loan Agreement as it existed when the Intercreditor Agreement was entered. Wachovia was required to rewrite basic definitions and permutate the Revolving Loan Agreement to provide Harris with a lien superior to that of Appellants.

The Bankruptcy Court ruled that the Intercreditor Agreement unambiguously authorized Wachovia to amend the Revolving Credit Agreement to include the Harris Term Loan.

Fundamental rules of contract interpretation, and a careful dissection of the technical definitions, compel a different result. It is hornbook law that specific words and terms of a contract may not be considered in isolation and applied literally, but must be given a fair and reasonable meaning based upon the terms and factual context of the entire agreement. "In a written document, the word obtains its meaning from the sentence, the sentence from the paragraph, and the latter from the whole document, all based upon the situation and circumstances existing at its creation." *Zodiac Enterprises, Inc. v. American Broadcasting Cos.*, 440 N.Y.S.2d 240, 241-42, 81 A.D.2d 337 (1981), *aff'd*, 56 N.Y.2d 738 (1982) (quoting *Eighth Ave. Coach Corp. v. City of New York*, 286 NY 84, 88-89 (1941)).

In this case, the purpose of the Intercreditor Agreement was to protect the rights and interests of Appellants and the Revolver Lenders under their respective liens. When it was entered into, revolving credit was the only type of credit for which the Revolving Credit Agreement made any provision. A revolving credit loan is a formula-driven loan based upon a borrowing base and definitions of eligibility all designed to support each advance with more than adequate collateral. There is a built-in cushion of excess collateral to support each advance. In contrast, a term loan is simply a fixed amount of money that is loaned to the borrower, not necessarily tied to a borrowing base (particularly where there is a solvent guarantor). Appellants did not subordinate to $300 million of any type of debt, but to $300 million of revolving loans, a limit that would not be reached unless there was collateral to support it.

This case exemplifies why the distinction is important. By permitting the Harris Term Loan to exceed the borrowing base, while maintaining the payment priority in favor of the Revolver Lenders, Amendment No. 8 was structured so that, if lenders were required to seek recourse against their collateral, the collateral securing the Harris Term Loan would effectively

be collateral in excess of the borrowing base – the same collateral that secured Appellants'

claims. Exceeding the borrowing base was a risk that a Revolver Lender would not and did not

take. But a term lender with a guaranty – like Harris – might take a mezzanine lien. Wachovia

placed a lien ahead of Appellants that would not have existed with the revolving credit of the

nature to which Appellants subordinated. It did not modify the revolving credit facility; it

modified Musicland's capital structure.

In this factual context, the sentence in section 4.3(a) of the Intercreditor Agreement in

which Appellants waived notice and consented in advance to "any amendment, modification,

supplement, extension, renewal, or restatement" of the Revolving Credit Agreement cannot be

fairly interpreted to authorize Wachovia to do as it pleased with the Revolving Credit Agreement

to Appellants' detriment without violating the Intercreditor Agreement. Any reasonable reading

of the contracts reflects a realistic expectation that Appellants were subordinating to revolving

credit and not to any other obligation that Wachovia was willing to pile on top of Appellants'

lien.

The Bankruptcy Court read the "amendment, modification" language of section 4.3 in a

textual vacuum. Indeed, the Bankruptcy Court ignored the list of examples of permitted

amendments and modifications to the Revolving Loan Debt. That list of permitted, routine

modifications demonstrates that the Bankruptcy Court's conclusion – that Wachovia could do as

it wished, including priming the Appellants' lien – was erroneous and unreasonable. New York

authority is uniform in counseling against the literal application of contract terminology – such

as the words "amendment" or "modification" – when, as here, it is not supported by the purpose

and meaning of the contract as a whole, in view of the facts and circumstances in which it was

made.

In addition, the Bankruptcy Court's ruling does not address at all Appellants' claim that Amendment No. 8 was a breach of the Intercreditor Agreement's restriction on sheltering insider financing with a senior lien. Even under the Bankruptcy Court's restrictive interpretation of the scope of the Intercreditor Agreement, Wachovia was forbidden to do that. Appellants allege that the Harris Term Loan was *de facto* insider financing. Discovery will likely show that the entire transaction was structured to circumvent this restriction, that Harris was essentially a stand-in for financing by Sun, and that Musicland used the Appellants' collateral to pay off the Harris Term Loan to prevent Musicland's parent, Sun, from having to make good on its $25 million guarantee. Discovery could even show that Sun provided the funds for Harris to fund the Harris Term Loan, directly or indirectly. On this basis alone, dismissal of the claim for breach of contract for failure to state a claim was inappropriate.

Finally, at most, the contract is ambiguous. Under New York law, contract terms are ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of customs, practices, usages, and terminology as generally understood in the particular trade or business. If the Intercreditor Agreement did not expressly *forbid* revising the Revolving Credit Agreement to incorporate a term loan, it also did not expressly *permit* it. A person cognizant of relevant customs and practices would recognize that term debt is fundamentally different than revolving credit, that it presents different risks to a subordinating lienholder, that sophisticated secured trade creditors like Appellants do not ever implicitly consent to subordination of their liens, and that the consent to "amendment, modification, etc." cannot be interpreted as being permission to use a senior revolver lien to prime a third party's lien with an unrelated term loan. Caselaw also supports this common sense conclusion.

For all these reasons, the Memorandum Order and Judgment should be reversed.

## ARGUMENT

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant

is entitled to offer evidence to support the claims." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d

Cir. 2001) (quoting *Schever v. Rhodes*, 416 U.S. 232, 236 (1974)). Accordingly, courts "accept

the complaint's factual allegations, and all reasonable inferences that can be drawn from those

allegations in the plaintiff's favor, as true." *Roth v. Jennings*, 489 F.3d 499, 501 (2d Cir. 2007).

A case "should not be dismissed unless the court is satisfied that the complaint cannot state any

set of facts that would entitle the plaintiff to relief." *Miller v. Wolpoff & Abramson, L.L.P.*, 321

F.3d 292, 300 (2d Cir. 2003).

## I.    The Bankruptcy Court Erred in Dismissing Appellants' Claim for Breach of the Intercreditor Agreement

### A.    The Bankruptcy Court Misconstrued Certain Provisions of the Intercreditor Agreement as Permitting Wachovia to Enter Amendment No. 8.

The Bankruptcy Court identified the following provisions of the Intercreditor Agreement

as the basis for its holding that the Intercreditor Agreement could only be interpreted to permit

Amendment No. 8.

> As noted, the Intercreditor Agreement contemplated future amendments of
> the Revolving Credit Agreement. These amendments were not restricted
> to revolving debt. "Revolving Loan Debt" included "any and all
> obligations, liabilities and indebtedness of every kind, nature and
> description" owing by Musicland "whether now existing or hereafter
> arising" under the revolving Creditor Agreements. Nor were they
> restricted to the original Lenders or their assignees. "Revolving Loan
> Creditors" included the original Lenders, their successors and assigns, and
> "any other lender or goup of lenders that at any time refinances, replaces
> or succeeds to all or any portion of the Revolving Loan Debt or *is
> otherwise a party to the revolving Creditor Agreements*." Finally, the
> Appellants consented in advance to "any amendment, modification,
> supplement, extension, renewal, or restatement of any of the Revolving
> Loan Debt or the Revolving Creditor Agreements."

> Accordingly, the Intercreditor Agreement unambiguously authorized
> Wachovia to amend the Revolving Credit Agreement to bring in a term
> lender.

(Memorandum Order at 14, AA Tab 2 (citations omitted).)

The Bankruptcy Court's conclusion is not supported by the text of the Intercreditor
Agreement. The scope of the subordination is limited in section 2.2 of the Intercreditor
Agreement to the "Liens of the *Revolving Loan Creditors* therein *to the full extent of the
Revolving Loan Debt.*" (Complaint Exh C § 2.2, AA Tab 1 (emphasis added).) Citing section
1.15 of the Intercreditor Agreement, the Bankruptcy Court emphasized that "Revolving Loan
Creditors" included a lender that "*is otherwise a party to the Revolving Creditor Agreement,*" but
it overlooked the fact that the Revolving Credit Agreement itself restricted who can become such
a party. (Memorandum Order at 14, AA Tab 2.) By the terms of the Revolving Credit
Agreement, only lenders providing revolving credit could be parties to the Revolving Credit
Agreement. "Lenders" were defined under section 1.66 of the Revolving Credit Agreement as
"the financial institutions who are signatories hereto as Lenders and other persons made a party
to this Agreement as a Lender in accordance with Section 13.6 hereof. . . ." (Complaint Exh. A.)
Section 13.6 is the only provision relating to new parties, and it provides only for the assignment
of full or partial participation interests.[5] (*Id.*)

Accordingly, section 1.15 of the Intercreditor Agreement does *not* support the
Bankruptcy Court's conclusion that Wachovia was free to add a term lender to the Revolving
Credit Agreement. Furthermore, because the Intercreditor Agreement limited the scope of the
subordination to "Liens of the Revolving Loan Creditors," this alone precludes any argument

---

[5] A lender "may assign all or, if less than all, a portion equal to at least $5,000,000 in the aggregate for the assigning Lender, of such rights and obligations under this Agreement to one or more Eligible Transferees . . . each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Acceptance." (Complaint Exh. A at 112, AA Tab 1.)

that the interconnected definitions of the Intercreditor Agreement and the Revolving Credit Agreement permitted Wachovia to enter Amendment No. 8.

The other, independent limitation on the scope of the subordination under section 2.2 of the Intercreditor Agreement is that it is limited to "Revolving Loan Debt." (Complaint Exh. C.) That is defined as "any and all obligations . . . whether now existing or hereafter arising, under the Revolving Creditor Agreements. . . ." (*Id.* §1.16). The Bankruptcy Court emphasized "now existing or hereafter arising." (Memorandum Order at 14, AA Tab 2.) But it disregarded the definition of "Revolving Creditor Agreements," which is more limiting. As defined in section 1.11 of the Intercreditor Agreement, the Revolving Creditor Agreements are the original revolving loan documents, as they "now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders . . . that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise a party to the Revolving Creditor Agreements)." (Complaint Exh. C § 1.11.)

At the time the Intercreditor Agreement was entered into, the "Revolving Creditor Agreements" provided for the extension of revolving loans *exclusively*. As set forth above, the Revolving Credit Agreement established a "Credit Facility" consisting in relevant part of the "Loans," which were in turn defined as loans made "on a revolving basis." (Complaint Exh. A, §§ 1.29, 1.70.) Thus whether the term "Revolving Creditor Agreements" could encompass Amendment No. 8 depends upon whether Amendment No. 8 comes within the intention of the parties when they employed the terms "amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured" (followed immediately by a parenthetical that suggests strongly the parties contemplated that any amendment that involved new lenders would

be one that "refinances, replaces or succeeds" the existing revolving debt, not a new and added

subordinated term loan). Whether it could is discussed below.

Regardless, the Harris Term Loan failed to satisfy the first limitation on subordination

under section 2.2 of the Intercreditor Agreement because, as discussed above, Harris did not

qualify as a Revolving Loan Creditor under the interconnected definitions of the Intercreditor

Agreement and the Revolving Credit Agreement. Accordingly, the Harris Term Loan could only

fit within the defined scope of Appellants' subordination under the Intercreditor Agreement if

Wachovia could completely rewrite the basic underlying definitions of the Revolving Credit

Agreement to make it fit. That is precisely what Amendment No. 8 systematically does. The

*only* provision of the Intercreditor Agreement that can even be argued to suggest that the parties

contemplated that such a rewrite was permissible is section 4.3(a). This section's significance

warrants its restatement from the Statement of Facts. The section's pertinent language is a fairly

small portion of section 4.3, under the general heading "Waivers," which states:

> The Trade Creditors also waive notice of, and hereby consent to, (a) any
> amendment, modification, supplement, extension, renewal, or restatement
> of any of the Revolving Loan Debt or the Revolving Creditor Agreements,
> including, without limitation, extensions of time of payment of or increase
> or decrease in the amount of any of the Revolving Loan Debt, the interest
> rate, fees, other charges, or any collateral. . . . Any of the foregoing shall
> not, in any manner, affect the terms hereof or impair the obligations of
> Trade Creditors hereunder.

(Complaint Exh. C § 4.3.) As argued below, Amendment No. 8 was not an "amendment,

modification, supplement, extension, renewal or restatement" within the contemplated scope of

this provision, and certainly cannot be interpreted so as a matter of law.

**B.    The Single Passage on Which the Decision Rests Cannot Be Fairly
Interpreted as Permitting Wachovia to Enter Amendment No. 8.**

Consistent with the foregoing technical analysis, the Bankruptcy Court recognized at the

hearing that the endpoint of the analysis is section 4.3 of the Intercreditor Agreement, stating: "I

think it really comes down to 4.3, which seems to give, I used the phrase carte blanche, but it seems to give carte blanche authority to adversely affect your rights." (Transcript at 39:1-3, AA Tab 4.) Under this interpretation, the Bankruptcy Court concluded that "[t]he Intercreditor Agreement placed only one limit on what Wachovia and the Lenders could and could not do. The Debtors' affiliates could not be lenders under the Revolving Creditor Agreements, except that the Trade Creditors would not object to a 'Permitted Affiliate Refinancing.'" (Memorandum Order at 6, AA Tab 2.)

"It is a fundamental principle that the intention of the parties must be gleaned from all corners of the document, rather than from sentences or clauses viewed in isolation, and every part of a contract should be interpreted to give effect to its general purpose. Where, as here, a literal construction defeats and contravenes the purpose of the agreement, it should not be so construed. Due consideration must be given to the purposes of the parties in making the contract, and a fair and reasonable interpretation consistent with that purpose must guide the courts in enforcing the agreement." [6] *Tougher Heating & Plumbing Co. v. State of New York*, 423 N.Y.S.2d 289, 290-91, 73 A.D.2d 732 (1979) (citations omitted). Authority for these principles is legion. *See, e.g., In re Pinelawn Cemetery*, 177 A.D.2d 274, 275, 575 N.Y.S.2d 851 (1991) ("Put another way, a 'determination of the meaning of the language used by the parties should be based on the basic purpose underlying the contract and should not be foreclosed by a rigid or formalistic reading without regard to the realities of the situation.'") *Madison Avenue Leasehold, LLC v. Madison Bentley Assoc.*, 30 A.D.3d 1, 8-9, 811 N.Y.S.2d 47, 53 (2006) (court must consider "the reasonable expectations of the parties and the business purpose to be served by their contract"; "not merely the literal language, but whatever may be reasonably implied therefrom must be taken into account"); *Essex Ins. Co. v. Pingley*, 839 N.Y.S.2d 208, 210, 41

---

[6] Section 5.8 of the Intercreditor Agreement provides that its interpretation shall be governed by New York law.

A.D.3d 774 (2007) ("In construing the meaning of an agreement, courts must accord words their 'fair and reasonable meaning,' rather than their mere literal meaning.")

In *Essex Ins. Co. v. Pingley*, a liability policy for a junkyard excluded coverage for injuries "[t]o any person removing parts from an auto, or any person allowed in the yard area unless accompanied by an employee for the purpose of looking at parts only." 839 N.Y.S.2d at 209. An independent contractor who worked on the premises was injured and sued. He was, literally, "a person allowed in the yard area who was not accompanied by an employee," and so the carrier denied coverage. The court found against the carrier. "While a literal reading of the Endorsement, supports Essex's contention that coverage is barred because Pingley is 'any person' and the damages he allegedly sustained arose out of his removal of parts from an auto, the Endorsement is subject to another reasonable interpretation." *Id.* at 210. Giving the term a "fair and reasonable" rather than a "literal" meaning, the court interpreted "any person" to mean not just any person, but "a non-employee or person not working in the yard. . . ." *Id.*

Here, the Bankruptcy Court did exactly what the *Essex* court and the line of New York cases that followed it caution against. The Bankruptcy Court applied a "literal construction" that "defeats and contravenes" the fundamental purpose of the Intercreditor Creditor Agreement's protection of Appellants' lien priority. *See Tougher Heating & Plumbing Co.*, 433 N.Y.S.2d at 290-91.

Appellants were trade vendors subordinating to their customer's revolving credit facility. That credit facility was not a term loan that sits there like a time bomb, accruing interest daily and if unpaid, could eviscerate any collateral available to junior secured creditors. The credit facility was revolving financing, driven by formulas and eligibility requirements designed to ensure that each advance was supported by more than adequate collateral. The manifest purpose

of the Intercreditor Agreement was to confirm the subordination of the Inventory Lien to obligations under the revolving credit facility and regulate the parties' respective rights with respect to such issues as payment priority and recourse to collateral.

"Amendment No. 8" consisted of sweeping definitional changes intended to reconcile the Harris Term Loan with a Revolving Credit Agreement that had over 140 references to "revolving" and not one mention of term debt, in order to effectively establish a tranche of senior subordinated debt, junior to the Revolving Loan Debt in every substantive respect, but senior to Appellants' Inventory Lien. The Harris Term Loan did not replace, refinance, or succeed the Revolving Loan Debt. According to Appellees and the Bankruptcy Court's decision, it was justified as an "amendment, modification, supplement, extension, renewal or restatement." The terms "supplement, extension, renewal or restatement" do not cover the creation of a new, separate, subordinated and fundamentally different form of credit. Neither does the term "modification."

In *Statland Holliday, Inc. v. Stendig Development Corp.*, 362 N.Y.S.2d 2, 46 A.D.2d 135 (1974), the holder of a purchase money mortgage agreed to subordinate its lien to the buyer's development loan. When the buyer needed to secure a second development loan, the seller refused to subordinate a second time. The contract provided that the mortgagee would subordinate its lien to "a lien of any first mortgage . . . and to any and all renewals, modifications, consolidations, replacements and extensions of any such mortgage. . . ." 46 A.D.2d at 136. The buyer argued that the additional loan was a modification of the original mortgage. The court disagreed: "We find the controlling clause in the mortgage to be ambiguous. *The acquiring of additional funding cannot be mere 'modification,' which term involves an alteration or change in an incidental or subordinate feature.*" *Id.* at 137 (emphasis

added).  While the *Statland* court found that "consolidation" did imply additional funding, the issue in this case is not additional funding, *per se*, but intrinsically different funding.

That leaves the term "amendment."  Is the meaning of that term so much broader than "modification" as to manifest the contemplation of the parties that "Revolving Loan Debt" could be redefined to include non-revolving debt?  The context does not suggest it.  The examples set forth in section 4.3 of the Intercreditor Agreement suggest the scope of the "amendments" contemplated under that provision:  "including, without limitation, extensions of time of payment of or increase or decreases in the amount of any of the Revolving Loan Debt, the interest rate, fees, other charges, or any collateral."  (Complaint Exh. C, § 4.3, AA Tab 1.)  "[T] he word obtains its meaning from the sentence, the sentence from the paragraph, and the latter from the whole document, all based upon the situation and circumstances existing at its creation."  *Zodiac Enterprises, Inc.*, 440 N.Y.S.2d at 241-42.  The Bankruptcy Court's interpretation that the parties intended such a redefinition simply does not square with the circumstances, the whole document, or the paragraph.  It does not even square with the rest of the sentence.

Indeed, if the interpretation urged by Appellees and adopted by the Bankruptcy Court were correct, these few words in this one provision gave Wachovia *carte blanche* to do anything but give an affiliate a lien.  Even Wachovia's counsel was unconvinced his client had that much discretion:

> Court:  So you're saying that basically, 4.3 gave you carte blanche to do anything you wanted –
>
> Mr. Haddad [Wachovia's counsel]:  No, it didn't give us –
>
> Court:  – subject to not taking – that affiliated restriction you mentioned.
>
> Mr. Haddad:  It didn't give us carte blanche.
>
> Court:  Well, what couldn't you do?  Because this seems to –

Mr. Haddad: Well, that's one thing. That's – that's one thing right there that we couldn't do.

Court: This seems to say you could do anything else, so that's what you're really arguing.

Mr. Haddad: We could generally do a lot of other things, yes, but we –

Court: You could do anything else.

Mr. Haddad: Well, I don't know about anything else.

(Transcript 14:3-18, at AA Tab 4.)

Such an interpretation is untenable. The content and purpose of the Intercreditor Agreement, and the circumstances in which it was entered, do not support the interpretation that consent to "amendments, modifications, supplements, extensions, renewals and restatements" meant that the Revolver Lenders could create whatever level of subdebt they wished and change Musicland's capital structure, so long as they incorporated compatible definitions into the Revolving Loan Agreement. Certainly, it is not the *only* reasonable interpretation, as a matter of law. That is a remarkable and erroneous proposition.

### C.   Wachovia Breached the Implied Covenant of Good Faith and Fair Dealing

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance. This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 746 N.Y.S.2d 131, 135 (2002) (citations omitted). Its purpose is to "further an agreement by protecting a promise against the 'breach of the reasonable expectations and inferences derived from the agreement.'" *Ari & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) (quoting *TVT Records and TVT Music Inc. v. Island Def Jam Music Group*, 244 F. Supp. 2d 263, 278 (S.D.N.Y. 2003)).

As the Bankruptcy Court noted correctly, obligations cannot be implied that are inconsistent with the other terms of the contract. *Times Mirrors Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 394-95 (2d Cir. 2002). Rather, it applies when the conduct in question is neither expressly authorized nor prohibited under the contract. *See Carvel Corp. v. Baker*, 79 F. Supp. 2d 53, 62 (D. Conn. 1997) (applying New York law). "When the contract is silent, principles of good faith . . . fill the gap." *Kham & Nate's Shoes No. 2 v. First Bank*, 908 F.2d 1351, 1357 (7th Cir. 1990). In that situation, "[a] party's actions may implicate the implied covenant of good faith when it acts so directly to impair the value of a contract for another party that it may be assumed that [those actions] are inconsistent with the intent of the parties." *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991).

The Intercreditor Agreement does not expressly permit the addition of a term loan to the revolving credit facility. Nor does it expressly prohibit it. That Amendment No. 8 did not comport with Appellants' reasonable expectations is manifest from the terms of the contract and its essential purpose, as set forth above. That it was inconsistent with the implied covenant of good faith is further evidenced by the substance of Amendment No. 8 itself. As set forth above, all manner of definitional acrobatics were required to change the nomenclature of a typical Revolving Credit Agreement to cover a Term Loan.[7] The only point of these efforts was to create the illusion of an integrated credit facility, because the *substance* of Amendment No. 8

---

[7] For example, whereas before there had been only "Lenders" and all labels ultimately referred to the revolving loans and revolver lenders, Amendment No. 8 changed: (i) the definition of "Commitments" (to mean the Revolving Loan Commitments and the Term Loan Commitment (Complaint Exh. D § 1(b)(v)); (ii) the definition of "Lenders" (to mean the Revolving Loan Lenders and the Term Loan Lender) (*id.* § 1(b)(vii)); and (iii) the definition of "Loan" (to mean the revolving loans and the Harris Term Loan (*id.* §1(b)(vii)). The definition of "Obligations" (which limits the scope of the security interest granted to the Lenders) had referenced revolving loans but not term loans, the definition was amended so that "[a]ll references to the term 'Obligations' herein and in the Loan Agreement and the other Financing Agreements shall be deemed and each such reference is hereby amended to include, in addition and not in limitation, the present and future obligations, liabilities and indebtedness of Borrowers in respect of the Term Loan." The only reason for Wachovia to contort the contract was to squeeze the Harris Term Loan into the definitions of the Intercreditor Agreement.

was the creation of new and separate subordinated term debt, with different interest and payment terms, carefully structured not to impair the Revolver Lenders' collateral position or payment priority in the slightest. That is inconsistent with principles of good faith and fair dealing.

### D. The Alternative Basis for Breach of Contract Alleged by Appellants Was Not Addressed and Cannot Be Dismissed Under Rule 12(b)(6).

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a case "should not be dismissed unless the court is satisfied that the complaint cannot state any set of facts that would entitle the plaintiff to relief." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d at 300. This rule was not followed, because the Bankruptcy Court's decision ignores a set of facts and corresponding theory of liability that was pled by Appellants and that would entitle them to relief.

The Complaint alleges that Wachovia breached the Intercreditor Agreement's affiliate financing restriction. As set forth above, the Intercreditor Agreement prohibited any Musicland affiliate from becoming a Revolver Lender except as part of a "Permitted Affiliate Refinancing." (Complaint Exh. C, §§1.9 and 1.11, AA Tab 1.) The Intercreditor Agreement reflects on its face that this was a carefully negotiated provision. The Bankruptcy Court recognized that this express restriction on affiliate financing was enforceable and that it was an obligation that could not be extinguished by amendment, modification or supplement, etc.:

> The Intercreditor Agreement placed only one limit on what Wachovia and the Lenders could and could not do. The Debtors' affiliates could not be lenders under the Revolving Creditor Agreements, except that the Trade Creditors would not object to a "Permitted Affiliate Refinancing." "Permitted Affiliate Refinancing" referred to an amendment, modification, supplement, *etc.* of the Revolving Creditor Agreements pursuant to which an affiliate of the Debtors did not own or hold more than 25% of the Revolving Loan Debt, provided that Musicland could not pay a dividend or any amount in redemption of any equity interest to the affiliate while the affiliate owned or held the debt.

(Memorandum Order at 6-7, AA Tab 2 (citations omitted).) Thus even if, *arguendo*, Amendment No. 8 was otherwise permissible, it still could not be used to override the express restrictions in the Intercreditor Agreement.

This restriction on affiliate financing is not surprising. Insider or affiliate transactions (including financing transactions) are typically more suspect because there is substantial risk that the insider lender could directly or indirectly manipulate or control the subsidiary or affiliate or otherwise misuse its position of power for the benefit of the insider. For example, an insider-senior lender could pressure the affiliate debtor to: (a) agree to more onerous credit terms, or provisions less favorable to the debtor and its junior lenders and more beneficial to the insider; and (b) take other actions such as early repayment of an insider financing irrespective of the debtor's financial condition, at the expense of the debtor and its junior creditors.[8]

Both of these things appear to have happened here. Without pressure from its corporate parent, would a company about five weeks short of bankruptcy take $25 million of its exceedingly scarce capital and use it repay the loan of a true outsider more than eight months before that loan was due? Can the Appellees honestly contend that if not for the influence of Sun or Musicland's inappropriate desire to protect Sun, that Musicland really would have used so much of its remaining cash to pay off the Harris Term Loan so far in advance of that loan's due date? Sun was the loan's guarantor, Musicland's parent company and the only entity along with Harris that benefited from Musicland's decision to use the Appellants' collateral to pay off Harris. There is something undeniably wrong about what happened in this case and the Appellants should be allowed to pursue this claim.

---

[8] In a true arms' length transaction involving third party lenders, the debtor would vigorously negotiate – at arms' length – with the non-affiliate for the best terms possible and take actions in the debtor's best interest. In insider transactions, there is inherently the possibility that the subsidiary would yield in whole or in part to the parent's demands because of the control directly or indirectly exerted by the parent or by virtue of the close relationship of the parties.

In the Complaint, therefore, Appellants allege facts that give rise to claims for relief based on the affiliate financing restriction of the Intercreditor Agreement. In particular, Appellants alleged that Amendment No. 8 was, in substance, a disguised loan from Sun, Musicland's corporate parent.

> [T]he Harris Term Loan was a transparent attempt to sidestep the prohibition under the Intercreditor Agreement against Sun and other Musicland affiliates taking priority over Appellants. The new $25 million loan was, in effect, financing provided by Sun. This financing from Harris, which had a working relationship with Sun, would never have been procured but for Sun's guaranty of Musicland's obligations under the Harris Term Loan (the 'Guaranty' or 'Sun Guaranty'). The Guaranty minimized the risk to Harris. In turn, the pretense that the Harris Term Loan was part of the Revolving Credit Facility, and Sun's directive to Musicland to pay off the Harris Term Loan early, served to eliminate the risk to Sun, by sidestepping the Intercreditor Agreement's restrictions on affiliate refinancing.

(Complaint ¶ 8, AA Tab 1.) Thus, Appellants pled that "[b]y participating in this charade and treating Harris as if it were a Revolver Lender secured by a senior lien, Wachovia violated Appellants' rights under the Intercreditor Agreement." (*Id.* ¶ 9.)

Accordingly, Appellants stated a set of facts that support a claim for breach of the Intercreditor Agreement. The facts that were pled, and the reasonable inferences that may be drawn therefrom, can support a finding that Harris was no more than a nominee for Sun. Discovery may reveal that the transaction was designed for this exact purpose. The use of Harris as a shill to circumvent an express prohibition in the Intercreditor Agreement would patently be in breach of the implied covenant of good faith and fair dealing under the contract – comprising an independent basis for Appellants' breach of contract claim.

Although it recognized the efficacy of the contractual prohibition, the Bankruptcy Court's decision does not acknowledge or address the Complaint's express allegations that the alleged facts breached the Intercreditor Agreement's provisions concerning Permitted Affiliate

Refinancing. These allegations, and the reasonable inferences therefrom, constitute a set of facts that entitle the Appellants to relief. For this reason alone, dismissal of the Complaint was erroneous.

**E.    At Most, the Terms of the Contract Are Ambiguous and the Claim for Breach of Contract Cannot Be Dismissed Under Rule 12(b)(6).**

On a motion to dismiss pursuant to Rule 12(b)(6), any contractual ambiguities must be resolved in favor of the plaintiff. *International Audiotext Network, Inc. v. American Telephone & Telegraph Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *see also International Equity Investments, Inc. v. Opportunity Equity Partners Ltd.*, 472 F. Supp. 2d 544, 547 (S.D.N.Y 2007) (at the motion to dismiss stage, court will "strive to resolve any contractual ambiguities in [claimant's] favor"). Not surprisingly, courts routinely deny motions to dismiss breach of contract claims where the contractual provisions at issue are found to be ambiguous. *See, e.g., D.C. USA Operating Co. LLC v. Indian Harbor Ins. Co.*, 2007 WL 945016, at * 8, 12 (S.D.N.Y. Mar. 27, 2007) (denying motion to dismiss claim for breach of contract where contract ambiguous); *Goldin-Feldman v. Blum & Fink, Inc.*, 2000 WL 1182798, at * 3 (S.D.N.Y. Aug. 18, 2000) (same).

An ambiguity exists where the terms of a contract are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997); *Sayers v. Rochester Tel. Corp.*, 7 F.3d 1091, 1095 (2d Cir. 1993).

"Ambiguity with respect to the meaning of contract terms can arise either from the language itself or from inferences that can be drawn from this language. Hence, 'only where the language and the inferences to be drawn from it are unambiguous' may a district court 'construe

a contract as a matter of law and grant summary judgment accordingly,'" *Alexander &*
*Alexander Services, Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir.
1998) (quoting *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir. 1988)).
In that case, the district court "turned to the dictionary for the meaning of 'clients' and adopted
the dictionary definition. . . ." *Id.* at 87.  The Second Circuit ruled the lower court erred by "not
consider[ing] the meaning of the terms . . . with respect to customs or terminology generally
understood in the insurance brokerage trade." *Id.*; *see also Land Mind Enterprises v. Sylvester
Builders, Inc.*, 1993 WL 307853, at *2 (S.D.N.Y., Aug. 11, 1993) ("The fact that a particular
word may be clear in one context does not preclude the possibility of its being ambiguous in
another.").

     In *Statland Holliday, Inc. v. Stendig Development Corp.*,  the contract terms bore a
striking resemblance to this case: the mortgagee had subordinated its lien to "a lien of any first
mortgage . . . and to any and all renewals, modifications, consolidations, replacements and
extensions of any such mortgage. . . ." 46 A.D.2d at 136.  On the issue of whether that clause
covered a second development loan, the court ruled that the controlling clause in the mortgage
was ambiguous. *Id.* at 137.  *See also Ilco Toy Co. USA v. Block*, 1991 WL 64203 (S.D.N.Y.
April 18, 1991) ("1% Royalty on all sales of our #8722 Mickey Mouse Play Gym" was
ambiguous where party could reasonably believe that "#8722 Mickey Mouse Play Gym" was
descriptive rather than limiting).[9]

---

[9] *See Stone v. Golden Wexler & Sarnese, P.C.*, 341 F. Supp. 2d 189 (E.D.N.Y. 2004) (applying materially similar
Virginia law; finding agreement provision that "[w]e [credit card lender] may amend or change any part of your
Agreement [with customer]" was susceptible of more than one interpretation and was thus ambiguous, and holding
that more reasonable interpretation of parties' intent precluded lender from unilaterally amending agreement to add
arbitration clause). "The Court is persuaded that there is nothing in the Customer Agreement that suggests that
plaintiff intended to grant the Bank such latitude. There is no mention of dispute resolution mechanisms.  Instead,
the Customer Agreement as a whole defines the key financial aspects of the relationship between the cardholder and
the Bank. . . . [T]he terms discussed in the change-in-terms clause must supply the universe of terms which could be

As in *Stratland*, the relevant clause of the Intercreditor Agreement's section 4.3 is ambiguous. The "consent to amendment, modification, etc." phase is "capable of more than one meeting when viewed objectively in context by a reasonably intelligent person in light of custom and practice." *See Lightfoot*, 110 F.3d at 906. Appellants' interpretation – that the clause contemplates routine changes to the revolving credit facility, not changing lien priorities – is as plausible as the Bankruptcy Court's interpretation that the clause allowed Wachovia to do anything it wanted to do.

There is an ambiguity. This Bankruptcy Court erred in granting the Motion to Dismiss.

II.    **Because the Dismissal of the Claim for Breach of the Intercreditor Agreement Was the Predicate for Dismissal of the Remaining Claims for Relief, the Dismissal of Such Claims Must Also Be Vacated.**

The sole basis of the Bankruptcy Court's dismissal of the complaint was its conclusion that "the unambiguous provisions of the Intercreditor Agreement allowed the parties to enter into Amendment No. 8, amend the revolving Credit Agreement to incorporate the Harris Term Loan, and thereby extend the lien priority granted under the Intercreditor Agreement to that loan." (Memorandum Order at 15, AA Tab 2.) "Accordingly, Wachovia did not breach the Intercreditor Agreement, the defendants did not tortiously interfere with the Appellants' contractual rights or participate in the conversion of the Appellants collateral, and Harris was not unjustly enriched." (*Id.*) *A fortiori*, reversal of the Bankruptcy Court's dismissal of the claim for breach of contract requires reversal of the remaining claims as well.

---

altered or affected pursuant to the clause. To hold otherwise would permit the Bank to add terms to the Customer Agreement without limitation as to the substance or nature of such terms." *Id.* at 198.

## CONCLUSION

For all of the foregoing reasons, Appellants respectfully request that the Court reverse the

Memorandum Order and Judgment, and grant such other and further relief as the Court may

deem just and proper.

Dated: New York, New York
      November 2, 2007

                                                      */s/ Alan J. Kornfeld*
                                                      Robert J. Feinstein (RF 2836)
                                                      Alan J. Kornfeld (AK 5647)
                                                      Beth E. Levine (BL 6715)
                                                      PACHULSKI STANG ZIEHL & JONES LLP
                                                      780 Third Avenue, 36th Floor
                                                      New York, New York 10017
                                                      Telephone:  (212) 561-7700
                                                      Facsimile:  (212) 561-7777

                                                      Counsel for Appellants