EXHIBIT  A A 1

Robert J. Feinstein (RF 2836)
Alan J. Kornfeld (AK 5647)
PACHULSKI STANG ZIEHL YOUNG JONES
  & WEINTRAUB LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Tel: (212) 561-7700 / Fax: (212) 561-7777

Marc A. Beilinson
PACHULSKI STANG ZIEHL YOUNG JONES
  & WEINTRAUB LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067
Tel: (310) 277-6910 / Fax: (310) 201-0760

Attorneys for Plaintiffs

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Case No. 06-10064 (SMB) |
| MUSICLAND HOLDING CORP., et al.,[1] | Chapter 11 |
| Debtors. | Jointly Administered |
| BUENA VISTA HOME ENTERTAINMENT, INC., a California corporation; CARGILL FINANCIAL SERVICES INTERNATIONAL, INC., a Delaware corporation; HAIN CAPITAL GROUP, LLC, a Delaware limited liability company; PARAMOUNT PICTURES CORPORATION, a Delaware corporation; TWENTIETH CENTURY FOX HOME ENTERTAINMENT LLC, a Delaware limited liability company; UBS WILLOW FUND, LLC, a Delaware limited liability company; and VÄRDE INVESTMENT PARTNERS, L.P., a Delaware limited partnership, | Adv. Proc. No.: _____ |
| Plaintiffs, | |
| v. | |
| WACHOVIA BANK, N.A., a national banking association, in its capacity as Agent; and HARRIS N.A., a national banking association, | |
| Defendants. | |

---

[1] The Debtors are: Musicland Holding Corp., Media Play, Inc., MG Financial Services, Inc., MLG Internet, Inc., Musicland Purchasing Corp., Musicland Retail, Inc., Request Media, Inc., Sam Goody Holding Corp., Suncoast Group, Inc., Suncoast Holding Corp., Suncoast Motion Picture Company, Inc., Suncoast Retail, Inc., TMG Caribbean, Inc., TMG-Virgin Islands, Inc., The Musicland Group, Inc.

**COMPLAINT FOR: (1) BREACH OF CONTRACT, (2) TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS, (3) CONVERSION, AND (4) UNJUST ENRICHMENT; DEMAND FOR JURY TRIAL**

For their Complaint, Plaintiffs Buena Vista Home Entertainment, Inc., Cargill Financial Services International, Inc., Hain Capital Group, LLC, Paramount Pictures Corporation, Twentieth Century Fox Home Entertainment LLC, UBS Willow Fund, LLC, and Värde Investment Partners, L.P. allege, on personal knowledge as to their own actions, and on information and belief as to all other allegations, as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs are secured trade creditors who bring this action to recover $25 million wrongfully paid to a bank that was not entitled to priority over their liens. Defendants are the lender, Harris N.A. ("Harris") and its putative agent, Wachovia Bank, N.A. ("Wachovia").

2.      With bankruptcy looming, the above captioned Debtors (collectively, "Debtor" or "Musicland") wanted cash. The Debtor's lenders would not extend more revolving credit. Nor would the Debtor's corporate parent ("Sun") lend money without a first priority lien. Standing in the way were Plaintiffs' liens, junior only to the lien securing obligations under the revolving credit facility. The solution? Sun had one of its bankers, Harris, make a term loan to the Debtor, which Sun guaranteed, and which Wachovia, as agent for the revolver lenders, agreed to pretend was part of the revolving credit facility (and thus secured by the preexisting senior lien).

3.      Then, about a month prior to the bankruptcy filing, Sun instructed the Debtor to pay off the Harris term loan early, before the revolving loans were repaid. This subterfuge − treating a new short term loan as if it were part of the revolving credit facility − violated Plaintiffs' rights under their Security Agreement with Musicland and their Intercreditor Agreement with Wachovia, and impermissibly shifted the risk of a default under the term loan from Sun and Harris, and placing it directly on the back of the Plaintiffs. As a direct result of

this chicanery, Harris was paid with money subject to Plaintiffs' security interest. Plaintiffs want that money back.

4.      When this case was filed on January 12, 2006, Plaintiffs held over $170 million in claims against Musicland. Those claims were secured by a perfected lien on inventory that Musicland had granted to Plaintiffs in November 2003. At that time, Plaintiffs had entered into an Intercreditor Agreement with Wachovia's predecessor, as the agent of the lenders providing Musicland's revolving credit facility (the "Revolver Lenders" and "Revolving Credit Facility", respectively). The Intercreditor Agreement provided that Plaintiffs would subordinate their inventory lien only to the lien that secured repayment of the operating capital loaned to Musicland under the Revolving Credit Facility.

5.      In August/September 2005, approximately four months prior to its bankruptcy filing, Musicland sought money to gear up for the holiday season and one last crack at reversing its fortunes. Prudently, the Revolver Lenders refused to make additional funds available under the Revolving Credit Facility. Likewise, Sun refused to contribute cash either as subordinated debt or as equity and, as a corporate affiliate, was unable to step in front of Plaintiff's inventory lien under the Intercreditor Agreement.

6.      Instead, Sun asked one of its bankers, Harris, to make a $25 million short term loan to Musicland. Harris was not a Revolver Lender and was not interested in becoming one. So Sun guaranteed the $25 million term loan (the "Harris Term Loan"), something it did not do for the Revolver Lenders or any previous Musicland financing. Defendants agreed to document the Harris Term Loan by the artifice of an "amendment" to the existing revolving credit agreement (specifically "Amendment No. 8" to the original revolving credit agreement and security agreement), with the goal of extending the umbrella of the Revolver Lenders' Lien (and

therefore, the priority of its UCC-1 financing statement) to the Harris Term Loan. But the Harris Term Loan had nothing to do with the Revolving Credit Facility. In substance, it was a separate, stand-alone financing transaction. It had little in common with the Revolving Credit Facility other than the shared lien. Although the term loan was stated to have the same maturity date, that was purely a façade: at Sun's direction, the Harris Term Loan was repaid in full in December 2005, prepetition, completely independently of the Revolving Credit Facility (which was repaid in full during the bankruptcy case). The source of repayment was Plaintiffs' collateral.

7.      It may be debated whether it was proper for Musicland to go deeper into debt by taking a $25 million term loan to finance a quixotic quest. But it was not proper to obtain the term loan by dressing it up as part of a Revolving Credit Facility and endowing it with a lien priority to which it was not entitled, a maneuver that placed the risk of default on Plaintiffs rather than on Sun and Harris. Wachovia's floating lien was not a buoy in the middle of the ocean that any new prospective lender could climb aboard, and Wachovia was not free to invite anyone to do so.

8.      Furthermore, the Harris Term Loan was a transparent attempt to sidestep the prohibition under the Intercreditor Agreement against Sun and other Musicland affiliates taking priority over Plaintiffs. The new $25 million term loan was, in effect, financing provided by Sun. This financing from Harris, which had a working relationship with Sun, would never have been procured but for Sun's guaranty of Musicland's obligations under the Harris Term Loan (the "Guaranty" or "Sun Guaranty"). The Guaranty minimized the risk to Harris. In turn, the pretense that the Harris Term Loan was part of the Revolving Credit Facility, and Sun's directive to Musicland to pay off the Harris Term Loan early, served to eliminate the risk to Sun, by

sidestepping the Intercreditor Agreement's restrictions on affiliate financing.

9.      By participating in this charade and treating Harris as if it were a Revolver Lender secured by a senior lien, Wachovia violated Plaintiffs' rights under the Intercreditor Agreement. Harris tortiously interfered with Plaintiffs' rights under both the Intercreditor Agreement and the Security Agreement, and when it was repaid, converted over $25 million in Plaintiffs' collateral and was unjustly enriched.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

11.      This adversary proceeding has been referred to this Court pursuant to 28 U.S.C. § 157(a) and the Standing Order of the Honorable Robert J. Ward of the United States District Court for the Southern District of New York dated July 10, 1984.

12.      This adversary proceeding is a non-core proceeding that is related to the Debtor's pending above-captioned chapter 11 case pursuant to 28 U.S.C. § 157(c). Plaintiffs consent to the entry of final orders or judgments by the Court in this adversary proceeding.

13.      Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409(a).

## PARTIES

14.      Plaintiff Buena Vista Home Entertainment, Inc. is a California corporation.

15.      Plaintiff Cargill Financial Services International, Inc. is a Delaware corporation. It is the successor by claim assignment to Warner Home Video Inc.

16.      Plaintiff Paramount Pictures Corporation is a Delaware corporation.

17.      Plaintiff Hain Capital Group, LLC is a Delaware limited liability company.

18.    Plaintiff Twentieth Century Fox Home Entertainment LLC is a Delaware limited liability company.

19.    Plaintiff UBS Willow Fund, LLC is a Delaware limited liability company. It is the successor by claim assignment to Warner/Elektra/Atlantic Corp., Sony Pictures Home Entertainment, Inc., and Universal Music and Video Distribution.

20.    Plaintiff Värde Investment Partners, L.P. is a Delaware limited partnership. It is the successor by claim assignment to Sony BMG Music Distribution and EMI Recorded Music, North America.

21.    Upon information and belief, Defendant Wachovia is a national banking association and successor by merger to Congress Financial Corporation (Florida).

22.    Upon information and belief, Defendant Harris is a national banking association.

## FACTUAL BACKGROUND

### A.    The 2003 Revolver Credit Facility

23.    Pursuant to a Loan and Security Agreement dated as of August 11, 2003 (the "2003 Revolving Credit Agreement") (attached hereto as Exhibit A), by and among Musicland, Congress Financial Corporation (Florida), a Florida corporation (Wachovia's predecessor in interest), as agent for the Revolver Lenders, and certain other parties, the Revolver Lenders provided Musicland with revolving credit of up to, at that point, $200 million (the "Revolving Credit Facility"). The obligations thereunder were secured by the Revolver Lenders' first priority lien in substantially all of Musicland's assets, including all inventory and proceeds thereof. (Wachovia and Congress Financial Corporation (Florida) are referred to as the "Revolving Loan Agent").

24.    The 2003 Revolving Credit Agreement did not contain any term loan component, and none of its provisions alluded to or contemplated term loans. It defines the "Credit Facility"

as the "Loans" provided to or for the benefit of Musicland (Ex. A at p. 7, § 1.29). "Loans" are

defined, in turn, as "the loans now or hereafter made by or on behalf of Lenders or by Agent for

the account of Lenders <u>on a revolving basis</u> pursuant to the Credit Facility ...." (<u>id.</u>, p. 19, §

1.70) (emphasis added). The Revolver Lenders' Lien secures only the "Obligations" (<u>id.</u>, p. 39,

§ 5.1), which term is defined as:

> "any and all <u>Loans</u>, Letters of Credit Accommodations and all other obligations,
> liabilities and indebtedness of every kind, nature and description owing by any or
> all Borrowers to Agent or any Lender and/or any of their Affiliates, including
> principal, interest, charges, fees, costs and expenses, however evidenced, whether
> as principal, surety, endorser, guarantor or otherwise, arising under this
> Agreement or any of the other Financing Agreements, including, all obligations in
> respect of cash management services, interest rate swap agreements, currency
> swap agreements and other similar agreements designed to hedge against
> fluctuations in interest rates or foreign exchange rates ...."

(<u>id.</u>, pp. 20-21, § 1.80) (emphasis added)  Thus, when the Intercreditor Agreement was entered,

the Revolver Lenders' Lien extended only to obligations related to existing and future loans

made "on a revolving basis," and letter of credit accommodations.  To facilitate their subterfuge,

the parties to Amendment No. 8 <u>changed</u> the definition of Obligations to include term loans,

solely to encompass the Harris Term Loan, but long after the Intercreditor Agreement was in

force.

**B.**    **<u>Plaintiffs' Security Agreement</u>**

25.    Plaintiffs and/or their predecessors in interest and assignors supplied Musicland

on credit with music CDs, DVDs, and similar and related merchandise for sale at its retail stores

throughout the United States.   In 2003, Musicland was experiencing substantial financial

difficulties.  To induce Plaintiffs to continue to supply inventory, Musicland granted Plaintiffs

the Inventory Lien in its inventory and proceeds thereof (the "Inventory Collateral" or

"Plaintiffs' Collateral"), pursuant to a Security Agreement dated as of November 5, 2003 (the

"Security Agreement") by and between Musicland and The Bank of New York, as collateral agent (the "Trade Agent").   (The Security Agreement is attached hereto as Exhibit B.) Wilmington Trust Company ("Wilmington Trust") is the successor in interest to The Bank of New York as Trade Agent under the Security Agreement.  Plaintiffs are parties to the Security Agreement and/or third party beneficiaries of the Security Agreement.

26.    Pursuant to the Security Agreement, Musicland granted Plaintiffs the Inventory Lien "subject only to the terms of that certain Intercreditor and Subordination Agreement, dated as of November 5, 2003 ...." Security Agreement, p. 3, § 2.  The Inventory Lien was junior only to "Permitted Encumbrances" (id., p. 4, § 4(b)) which include only "the security interests and liens of Congress for itself and the benefit of the Lenders pursuant to the Congress Facility" and certain other limited, inapplicable liens and security interests (id., p. 2, § 1(i)).  None of the terms "Congress," "Lenders" and "Congress Facility" are defined in the Security Agreement.

27.    Under the Security Agreement, Musicland:

(i)    represented that it held the Inventory Collateral free and clear of all liens, claims, security interests and encumbrances, except for (1) "the security interest granted by [Musicland] to Congress for and on behalf of itself and the Lenders that are party to the Congress Facility," (2) Plaintiffs' Inventory Lien, and (3) the Permitted Encumbrances (Security Agreement, p. 4, § 6);

(ii)    covenanted that it will not "pledge or otherwise encumber, or permit any liens or security interests to attach to, any of the [Inventory] Collateral ... other than those liens described above [in paragraph (i)]" (id.);

(iii)    covenanted that, without prior written consent of Plaintiffs' collateral agent, it will not directly or indirectly sell, exchange, replace, dispose of, or transfer any item of

the Inventory Collateral, including any proceeds thereof, except (1) so long as the Trade Agent is not in the process of exercising any remedies in the case of default under the Security Agreement, Musicland has "the right in the ordinary course of [its] business to process and sell the Inventory and collect payment therefor in the ordinary course of business and to return Inventory to the suppliers thereof in the ordinary course of its business, in each case free and clear of the [Inventory Lien]," and (2) "to the extent any such sale or disposition of the Collateral is permitted under the Congress Facility, such sale or disposition shall be deemed consented to by Collateral Agent hereunder." (Id.)

## C.    The Intercreditor Agreement

28.    Concurrent with the Security Agreement, the parties entered an Intercreditor Agreement dated November 5, 2003 (the "Intercreditor Agreement"), by and among the Trade Agent, in its capacity as agent for Plaintiffs, and the Revolving Loan Agent, in its capacity as agent for the Revolver Lenders. (The Intercreditor Agreement is attached hereto as Exhibit C.) Plaintiffs are third party beneficiaries of the Intercreditor Agreement.

29.    The Intercreditor Agreement provides for the subordination of Plaintiffs' Inventory Lien to the lien of the Revolver Lenders solely to the extent it arose from the revolving credit facility, and in all events, not to Musicland affiliates. It does not subordinate the Inventory Lien to any lien securing term loan debt or financing other than on a revolving basis. The subordination provision (§ 2.2) provides: "... the Liens upon the Trade Collateral for the benefit of Revolving Loan Creditors has and shall have priority over the Liens upon the Trade Collateral of Trade Agent for the benefit of Trade Creditors and such Liens of Trade Creditors are and shall be, in all respects, subject and subordinate to the Liens of Revolving Loan Creditors therein to the full extent of the Revolving Loan Debt." Intercreditor Agreement, § 2.2 (emphasis added).

30.    "Revolving Loan Debt," in turn, is defined in § 1.16 of the Intercreditor Agreement as a debt to Revolving Loan Creditors "arising under the Revolving Creditor Agreements." "Revolving Creditor Agreements," in turn, is defined § 1.11 of the Intercreditor Agreement as the original revolving loan documents, as they "now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders . . . that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt)." (emphasis added). Harris did not refinance, replace or succeed to any portion of the Revolving Loan Debt. To the contrary, it made a new loan of a different type, on different terms and with additional security (the Sun guaranty) than the Revolving Loan Debt.

31.    The Intercreditor Agreement further excludes from the scope of the subordination any debt from intercompany financing, whether from Musicland's corporate parent, Sun, or another affiliate. It provides that in order to be senior in priority to Plaintiffs' lien, the lender or lenders "shall not be affiliates of Debtors" unless pursuant to a "Permitted Affiliate Refinancing." Intercreditor Agreement, § 1.11. Under § 1.9, a "Permitted Affiliate Refinancing" is one in which an affiliate of Musicland, *inter alia*, "makes revolving loan debt available to the Debtors" provided that "such affiliate does not own or hold more than twenty-five (25%) percent of the Revolving Loan Debt subject to such Refinancing...".

**D.    The 2005 Harris Term Loan and Sun Guaranty**

32.    In Fall 2005, Musicland requested that the Revolver Lenders increase availability under the Revolving Credit Facility. The Revolver Lenders refused. Nor did Sun provide additional capital on a subordinated debt basis or equity basis.

33.    Harris has or had a banking relationship with Sun. It was not a Revolver Lender. It would not extend revolving credit under the terms of the 2003 Revolving Credit Agreement, as amended. At Sun's request, it agreed to make a $25 million term loan to Musicland. The loan contained materially different terms from the existing credit facility:

      (i)    It was a term loan, not revolving credit.

      (ii)    Harris' repayment was guaranteed by Sun; repayment to the Revolver Lenders was not.

      (iii)    It was short-term financing – a quick fix to Musicland's liquidity needs during the peak season – that would be repaid shortly regardless of its stated maturity date, whether or not other Revolver Lenders were paid.

34.    If documented as a separate loan, the lien securing the Harris Term Loan would be junior to the Inventory Lien and could not be repaid from the proceeds of Plaintiffs' collateral. Harris would have been required to file its own separate UCC-1 financing statement and consequently, the lien securing the Harris Term Loan would have been junior to Plaintiffs' Inventory Lien. Indeed, by virtue of the Security Agreement, Musicland was prohibited from granting any lien encumbering Plaintiffs' Inventory Collateral, other than to the Revolving Lenders as part of the Revolving Credit Facility. Instead, Defendants devised Amendment No. 8 to the 2003 Revolving Credit Agreement (a copy of which is attached hereto as Exhibit D).

35.    Amendment No. 8 purports to incorporate the Harris Term Loan into the Revolving Credit Facility, for the purpose of sheltering Harris under the umbrella of Wacovia's UCC-1 financing statement, thereby wrongly extending the first priority Revolver Lien to cover the repayment of the Harris Term Loan. The Revolving Credit Facility and the Harris Term Loan were effectively treated as separate credit facilities. Only interest payments were required

to be made to Harris monthly. Payments by Musicland (other than prepayments) would generally go first to pay down the Revolver Lenders' claims ahead of the Harris Term Loan. Although the stated maturity date of the Harris Term Loan was co-terminous with the Revolving Credit Facility, Amendment No. 8 permitted early prepayment at anytime after November 2005, so long as Musicland then had certain excess availability under the Revolving Credit Facility.

36.    Amendment No. 8 purports to change the definition of "Obligations" used in the 2003 Revolving Credit Agreement to expressly include term loans: "All references to the term 'Obligations' herein and in the Loan Agreement and the other Financing Agreements shall be deemed and each such reference is hereby amended to include, in addition and not in limitation, the present and future obligations, liabilities and indebtedness of Borrowers in respect of the Term Loan." Amendment No. 8, p. 5, § 1(b)(ix).

**E.    Early Repayment of the Harris Term Loan and the Musicland Bankruptcy**

37.    On or about December 5, 2005, the Harris Term Loan was repaid in full. Shortly thereafter, the Revolver Lenders changed the borrowing base calculations and/or reserve requirements under the Revolving Credit Facility, and Musicland was thrust into a liquidity crisis. On January 12, 2006, Musicland filed for relief under Chapter 11 of the Bankruptcy Code.

38.    Plaintiff's claims are substantially undersecured by their Inventory Lien. Pursuant to an order dated March 24, 2006, the Court approved the sale of substantially all of Musicland's remaining assets to a third party purchaser, which sale was consummated on or about March 27, 2006. Out of the sale proceeds, the Revolver Lenders' claims were paid in full, and pursuant to a subsequent Court order entered on August 11, 2006, approximately $26 million was paid by Musicland to certain Secured Trade Creditors on account of their secured claims

aggregating to no less than $170-173 million (as estimated by Musicland). As of November 27, 2006, Musicland held $28.35 million in cash. By order entered December 28, 2006, the Secured Trade Creditors were authorized to foreclose on $15.7 million of such funds. Based on information and belief, based on the Debtor's filed Monthly Operating Statement for January 2007, Musicland holds no more than approximately $11.9 million in cash, with combined current assets (including cash) totaling approximately $22.1 million.

### FIRST CLAIM FOR RELIEF

#### (Breach of Contract – Intercreditor Agreement)

#### (As to Defendant Wachovia)

39.    Plaintiffs repeat and reallege the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

40.    The Intercreditor Agreement is a valid, binding and enforceable contract by and between Wilmington Trust, as the successor Trade Agent for Plaintiffs, and Wachovia, as successor Revolving Loan Agent. Plaintiffs are third party beneficiaries of the Intercreditor Agreement and the Security Agreement.

41.    Plaintiffs have fulfilled all obligations on their part to be performed pursuant to the Intercreditor Agreement, and there are no conditions to or legal excuses for the breaches of the Intercreditor Agreement as alleged herein.

42.    By the conduct alleged herein, including by: (a) causing, directing and authorizing the Revolver Lenders to enter Amendment No. 8; (b) purporting to act as the agent of Harris as a putative Revolver Lender in respect of the Harris Term Loan; (c) according the Harris Term Loan treatment as a senior secured claim with priority over the Inventory Lien; and (d) authorizing and causing the repayment of the Harris Term Loan ahead of any payment to Plaintiffs, Wachovia breached the terms of the Intercreditor Agreement.

43.    As a proximate result of Wachovia's breach of the Intercreditor Agreement, Plaintiffs have suffered damages in the amount of no less than $25,000,000, with interest thereon at the legal rate in a sum according to proof.

## SECOND CLAIM FOR RELIEF

### (Breach of the Covenant of Good Faith and Fair Dealing – Intercreditor Agreement)

### (As to Defendant Wachovia)

44.    Plaintiffs repeat and reallege the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

45.    The Intercreditor Agreement is a valid, binding and enforceable contract by and between Wilmington Trust, as the successor Trade Agent for Plaintiffs, and Wachovia, as successor Revolving Loan Agent. Implied in the Intercreditor Agreement is a covenant by all parties not to take actions intended or that have the effect of depriving any of the other parties to the benefits of the contract. Plaintiffs are third party beneficiaries of the Intercreditor Agreement.

46.    Plaintiffs have fulfilled all obligations on their part to be performed pursuant to the Intercreditor Agreement, and there are no conditions to or legal excuses for the breaches of the Intercreditor Agreement as alleged herein.

47.    By the conduct alleged herein, including by: (a) causing, directing and authorizing the Revolver Lenders to enter Amendment No. 8; (b) purporting to act as the agent of Harris as a putative Revolver Lender in respect of the Harris Term Loan; (c) according the Harris Term Loan treatment as a senior secured claim with priority over the Inventory Lien; and (d) authorizing and causing the repayment of the Harris Term Loan ahead of any payment to Plaintiffs, Wachovia breached the covenant of good faith and fair dealing.

48.    As a proximate result of Wachovia's breach of the covenant of good faith and fair

dealing, Plaintiffs have suffered damages in the amount of no less than $25,000,000, with interest thereon at the legal rate in a sum according to proof.

**THIRD CLAIM FOR RELIEF**

**(Tortious Interference with Contractual Relations – Intercreditor Agreement)**

**(As to Defendant Harris)**

49.     Plaintiffs repeat and reallege the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

50.     The Intercreditor Agreement is a valid, binding and enforceable agreement by and between Wilmington Trust, as successor Trade Agent for Plaintiffs, and Wachovia, as successor Revolving Loan Agent. Plaintiffs are third party beneficiaries of the Intercreditor Agreement.

51.     At all times relevant hereto, Harris knew of the existence of the Intercreditor Agreement and Plaintiffs' rights thereunder.

52.     By its conduct alleged herein, Harris acted intentionally and knowingly to procure the breach of the Intercreditor Agreement.

53.     As a proximate result of Harris' conduct, Plaintiffs have suffered damages in the amount of no less than $25,000,000, with interest thereon at the legal rate in a sum according to proof.

54.     In engaging in the conduct herein alleged, Harris acted in deliberate disregard of the rights of Plaintiffs and with the intent to vex, injure and annoy, such as to constitute oppression, fraud and malice. Plaintiffs are therefore entitled to punitive and exemplary damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### (Tortious Interference with Contractual Relations – Security Agreement)

### (As to All Defendants)

55.    Plaintiffs repeat and reallege the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

56.    The Security Agreement is a valid, binding and enforceable agreement by and between Musicland and Wilmington Trust, as successor Trade Agent for Plaintiffs. Plaintiffs are parties and/or third party beneficiaries of the Security Agreement.

57.    At all times relevant hereto, Defendants knew of the existence of the Security Agreement and Plaintiffs' rights thereunder.

58.    By its conduct alleged herein, Defendants acted intentionally and knowingly to procure the breach of the Security Agreement.

59.    As a proximate result of Defendants' wrongful tort, Plaintiffs have suffered damages in the amount of no less than $25,000,000, with interest thereon at the legal rate in a sum according to proof.

60.    In engaging in the conduct herein alleged, Defendants acted in deliberate disregard of the rights of Plaintiffs and with the intent to vex, injure and annoy, such as to constitute oppression, fraud and malice. Plaintiffs are therefore entitled to punitive and exemplary damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (Conversion)

### (As to Defendant Harris)

61.    Plaintiffs repeat and reallege the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

62.     At all times relevant hereto, the Inventory Lien held by Plaintiffs pursuant to the Security Agreement was a valid and properly perfected security interest in Musicland's inventory, senior to all other interests, including the lien granted to Harris in connection with the Harris Term Loan, except the Revolving Lenders' Lien and the limited encumbrances provided for in the Intercreditor Agreement.

63.     The Harris Term Loan was paid from proceeds of inventory, constituting Plaintiffs' collateral, in violation of the Security Agreement and Intercreditor Agreement. Upon the breach of the Security Agreement, Plaintiffs had an immediate right to possession of their collateral.

64.     In receiving and retaining Plaintiff's collateral, Harris has unlawfully and without authorization exercised control and dominion, and continues to exercise control and dominion, over Plaintiffs' collateral.

65.     As a proximate result of the conversion of its property, Plaintiffs have suffered damages in the amount of no less than $25,000,000, with interest thereon at the legal rate in a sum according to proof.

66.     In engaging in the conduct herein alleged, Harris acted in deliberate disregard of the rights of Plaintiffs and with the intent to vex, injure and annoy, such as to constitute oppression, fraud and malice. Plaintiffs are therefore entitled to punitive and exemplary damages in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF

### (Aiding and Abetting Conversion)

### (As to Defendant Wachovia)

67.     Plaintiffs repeat and reallege the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

68.     In connection with the conversion by Harris of Plaintiffs' collateral, Wachovia (i) knew that Harris had no lawful right to Plaintiffs' collateral and (ii) by its actions detailed above, including the devising and implementing of Amendment No. 8 and participation in causing Musicland to pay off the Harris Term Loan, substantially assisted Harris in converting Plaintiffs' collateral.

69.     As a proximate result of the conversion of its property, Plaintiffs have suffered damages in the amount of no less than $25,000,000, with interest thereon at the legal rate in a sum according to proof.

70.     In engaging in the conduct herein alleged, Wachovia acted in deliberate disregard of the rights of Plaintiffs and with the intent to vex, injure and annoy, such as to constitute oppression, fraud and malice.   Plaintiffs are therefore entitled to punitive and exemplary damages in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF

### (Unjust Enrichment)

### (As to Defendant Harris)

71.     Plaintiffs repeat and reallege the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

72.     Harris received a benefit from the repayment of the Harris Term Loan, which was junior in priority to the repayment of Plaintiffs' claims, because of Plaintiffs' senior Inventory Lien.

73.     It is inequitable and unjust for Harris to have received, been enriched by, and retained the benefits in connection with the repayment of the Harris Term Loan, which was junior in priority to the repayment of Plaintiffs' claims.

74.     Equity and good conscience require that Harris disgorge monies and/or benefit

improperly obtained as described above.

75.     Accordingly, Plaintiffs are entitled to judgment against Harris in an amount no less than $25,000,000, with interest thereon at the legal rate in a sum according to proof.

**WHEREFORE**, Plaintiffs prays for judgment as follows:

(1)     On all Claims for Relief, awarding compensatory damages in an amount to be determined at trial but in all events no less than $25,000,000, plus prejudgment interest, reasonable attorneys' fees, and costs of suit incurred herein;

(2)     On the Third, Fourth, Fifth and Sixth Claims for Relief, awarding punitive and exemplary damages; and

(3)     Granting such other and further relief as is just and proper.

Dated:  New York, New York

May 15, 2007

*Alan J. Korfel*

Robert J. Feinstein (RF 2836)
Alan J. Kornfeld (AK 5647)
PACHULSKI STANG ZIEHL YOUNG JONES
   & WEINTRAUB LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777

Marc A. Beilinson
PACHULSKI STANG ZIEHL YOUNG JONES
   & WEINTRAUB LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760

Attorneys for Plaintiffs