# EXHIBIT "A"

Case 1:07-cv-08423-RWS   Document 10-3   Filed 11/02/2007   Page 1 of 19

# LOAN AND SECURITY AGREEMENT

by and among

SUNCOAST MOTION PICTURE COMPANY, INC.
SUNCOAST GROUP, INC.
SUNCOAST RETAIL, INC.
TMG CARIBBEAN, INC.
THE MUSICLAND GROUP, INC.
MUSICLAND PURCHASING CORP.
MUSICLAND RETAIL, INC.
TMG-VIRGIN ISLANDS, INC.
MLG INTERNET, INC.
MEDIA PLAY, INC.
REQUEST MEDIA, INC.

as Borrowers

and

MUSICLAND HOLDING CORP.
MG FINANCIAL SERVICES, INC.
SAM GOODY HOLDING CORP.
SUNCOAST HOLDING CORP.

as Guarantors

and

CONGRESS FINANCIAL CORPORATION (FLORIDA),
as Administrative and Collateral Agent and Co-Lead Arranger

and

FLEET RETAIL FINANCE INC.,
as Syndication Agent and Co-Lead Arranger

and

THE FINANCIAL INSTITUTIONS NAMED HEREIN,
as Lenders

Dated: August 11, 2003

231201-7

# TABLE OF CONTENTS

Page

SECTION 1. DEFINITIONS ............................................................. 1

SECTION 2. CREDIT FACILITIES ................................................ 27
    2.1    Loans ...................................................................... 27
    2.2    Letter of Credit Accommodations ............................ 28
    2.3    Commitments ......................................................... 32

SECTION 3. INTEREST AND FEES ............................................. 32
    3.1    Interest .................................................................... 32
    3.2    Fees ........................................................................ 33
    3.3    Changes in Laws and Increased Costs of Loans. ..... 34

SECTION 4. CONDITIONS PRECEDENT ................................... 36
    4.1    Conditions Precedent to Initial Loans and Letter of Credit Accommodations .. 36
    4.2    Conditions Precedent to All Loans and Letter of Credit Accommodations ..... 39

SECTION 5. GRANT AND PERFECTION OF SECURITY INTEREST ................. 39
    5.1    Grant of Security Interest ........................................ 39
    5.2    Special Provisions Regarding Collateral ................. 41
    5.3    Perfection of Security Interests ............................... 41

SECTION 6. COLLECTION AND ADMINISTRATION ............... 45
    6.1    Borrowers' Loan Accounts ..................................... 45
    6.2    Statements .............................................................. 45
    6.3    Collection of Accounts ........................................... 46
    6.4    Payments ................................................................ 47
    6.5    Authorization to Make Loans ................................. 48
    6.6    Use of Proceeds ..................................................... 49
    6.7    Appointment of Administrative Borrower as Agent for Requesting Loans and Receipts of Loans and Statements ............................. 49
    6.8    Pro Rata Treatment ................................................. 50
    6.9    Sharing of Payments, Etc. ....................................... 50
    6.10   Settlement Procedures ............................................ 51
    6.11   Obligations Several; Independent Nature of Lenders' Rights ............... 53

SECTION 7. COLLATERAL REPORTING AND COVENANTS ..................... 53
    7.1    Collateral Reporting ............................................... 54
    7.2    Accounts Covenants ............................................... 55
    7.3    Inventory Covenants .............................................. 56
    7.4    Equipment and Real Property Covenants ............... 57
    7.5    Power of Attorney .................................................. 58
    7.6    Right to Cure .......................................................... 59

| | | |
|---|---|---:|
| 7.7 | Access to Premises | 59 |
| **SECTION 8.** | **REPRESENTATIONS AND WARRANTIES** | 59 |
| 8.1 | Existence, Power and Authority | 59 |
| 8.2 | Name; State of Organization; Chief Executive Office; Collateral Locations. | 60 |
| 8.3 | Financial Statements; No Material Adverse Change. | 61 |
| 8.4 | Priority of Liens; Title to Properties | 61 |
| 8.5 | Tax Returns | 61 |
| 8.6 | Litigation | 62 |
| 8.7 | Compliance with Other Agreements and Applicable Laws | 62 |
| 8.8 | Environmental Compliance | 62 |
| 8.9 | Employee Benefits. | 63 |
| 8.10 | Bank Accounts | 64 |
| 8.11 | Intellectual Property | 64 |
| 8.12 | Subsidiaries; Affiliates; Capitalization; Solvency | 65 |
| 8.13 | Labor Disputes | 66 |
| 8.14 | Restrictions on Subsidiaries | 66 |
| 8.15 | Material Contracts | 66 |
| 8.16 | Credit Card Agreements | 66 |
| 8.17 | Payables Practices | 67 |
| 8.18 | Acquisition of Purchased Stock | 67 |
| 8.19 | Interrelated Businesses | 68 |
| 8.20 | Transition Services Agreement | 68 |
| 8.21 | Accuracy and Completeness of Information | 68 |
| 8.22 | Survival of Warranties; Cumulative | 68 |
| **SECTION 9.** | **AFFIRMATIVE AND NEGATIVE COVENANTS** | 69 |
| 9.1 | Maintenance of Existence. | 69 |
| 9.2 | New Collateral Locations | 69 |
| 9.3 | Compliance with Laws, Regulations, Etc. | 69 |
| 9.4 | Payment of Taxes and Claims | 71 |
| 9.5 | Insurance | 71 |
| 9.6 | Financial Statements and Other Information | 72 |
| 9.7 | Sale of Assets, Consolidation, Merger, Dissolution, Etc. | 74 |
| 9.8 | Encumbrances | 77 |
| 9.9 | Indebtedness | 79 |
| 9.10 | Loans, Investments, Etc. | 82 |
| 9.11 | Dividends and Redemptions | 84 |
| 9.12 | Transactions with Affiliates | 84 |
| 9.13 | Credit Card Agreements | 85 |
| 9.14 | Compliance with ERISA. | 86 |
| 9.15 | End of Fiscal Years; Fiscal Quarters | 86 |
| 9.16 | Change in Business | 86 |
| 9.17 | Limitation of Restrictions Affecting Subsidiaries | 86 |
| 9.18 | Capital Expenditures | 87 |
| 9.19 | Excess Availability | 87 |

    9.20    License Agreements ............................................................. 87
    9.21    After Acquired Real Property ................................................ 88
    9.22    Rate of Inventory Purchases .................................................. 89
    9.23    Costs and Expenses ............................................................. 89
    9.24    Further Assurances .............................................................. 89

SECTION 10.  EVENTS OF DEFAULT AND REMEDIES .......................................... 90
    10.1    Events of Default ................................................................. 90
    10.2    Remedies ............................................................................. 93

SECTION 11.  JURY TRIAL WAIVER; OTHER WAIVERS
                   AND CONSENTS; GOVERNING LAW ............................................... 96
    11.1    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver ..... 96
    11.2    Waiver of Notices ................................................................ 97
    11.3    Amendments and Waivers. ................................................... 98
    11.4    Waiver of Counterclaims ...................................................... 99
    11.5    Indemnification ................................................................... 99

SECTION 12.  THE AGENT ........................................................................... 100
    12.1    Appointment, Powers and Immunities ................................ 100
    12.2    Reliance by Agent .............................................................. 101
    12.3    Events of Default ............................................................... 101
    12.4    Congress in its Individual Capacity .................................... 101
    12.5    Indemnification ................................................................. 102
    12.6    Non-Reliance on Agent and Other Lenders ........................ 102
    12.7    Failure to Act .................................................................... 102
    12.8    Additional Loans ............................................................... 103
    12.9    Concerning the Collateral and the Related Financing Agreements ........ 103
    12.10  Field Audit, Examination Reports and other Information;
             Disclaimer by Lenders ...................................................... 103
    12.11  Collateral Matters .............................................................. 103
    12.12  Agency for Perfection ....................................................... 106
    12.13  Successor Agent ................................................................ 106
    12.14  Co-Agent ........................................................................... 106

SECTION 13.  TERM OF AGREEMENT; MISCELLANEOUS ................................ 107
    13.1    Term ................................................................................... 107
    13.2    Interpretative Provisions .................................................... 109
    13.3    Notices ............................................................................... 110
    13.4    Partial Invalidity ................................................................ 111
    13.5    Successors ......................................................................... 111
    13.6    Assignments; Participations. .............................................. 111
    13.7    Entire Agreement .............................................................. 113
    13.8    Counterparts, Etc ............................................................... 114
    13.9    Confidentiality .................................................................. 114

231201-7

(iii)

# INDEX TO
# EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Information Certificate |
| Exhibit C | Form of Compliance Certificate |
| Schedule 1.30 | Customs Brokers |
| Schedule 1.60 | Intercompany Notes |
| Schedule 1.86 | Permitted Holders |
| Schedule 8.16 | Credit Card Agreements |

## **LOAN AND SECURITY AGREEMENT**

This Loan and Security Agreement, dated August 11, 2003, is entered into by and among Suncoast Motion Picture Company, Inc., a Delaware corporation ("SMPC"), Suncoast Group, Inc., a Delaware corporation ("SGI"), Suncoast Retail, Inc., a Delaware corporation ("SRI"), TMG Caribbean, Inc., a Delaware corporation ("Caribbean"), The Musicland Group, Inc., a Delaware corporation ("TMG"), Musicland Purchasing Corp., a Delaware corporation ("Purchasing"), Musicland Retail, Inc., a Delaware corporation ("MRI"), TMG-Virgin Islands, Inc., a Delaware corporation ("TMGVI"), MLG Internet, Inc., a Delaware corporation ("Internet"), Media Play, Inc., a Delaware corporation ("Media Play") and Request Media, Inc., a Delaware corporation ("Request" and, together with SMPC, SGI, SRI, Caribbean, TMG, Purchasing, MRI, TMGVI, Media Play and Internet, individually each, a "Borrower" and collectively, "Borrowers"), Musicland Holding Corp., a Delaware corporation ("Holding"), MG Financial Services, Inc., a Delaware corporation ("MGF"), Sam Goody Holding Corp., a Delaware corporation ("Sam Goody") and Suncoast Holding Corp., a Delaware corporation ("Suncoast" and, together with Holding, MGF and Sam Goody, individually each, a "Guarantor" and collectively, "Guarantors"), the financial institutions from time to time parties hereto as lenders, whether by execution of this Agreement or an Assignment and Acceptance (individually, each a "Lender" and collectively, "Lenders"), Fleet Retail Finance Inc., in its capacity as syndication agent and co-lead arranger for Lenders (in such capacity, "Co-Agent"), and Congress Financial Corporation (Florida), a Florida corporation, in its capacity as administrative and collateral agent and co-lead arranger for Lenders (in such capacity, "Agent").

W I T N E S S E T H:

WHEREAS, Borrowers and Guarantors have requested that Agent and Lenders enter into financing arrangements with Borrowers pursuant to which Lenders may make loans and provide other financial accommodations to Borrowers; and

WHEREAS, each Lender is willing to agree (severally and not jointly) to make such loans and provide such financial accommodations to Borrowers on a pro rata basis according to its Commitment (as defined below) on the terms and conditions set forth herein and Agent is willing to act as agent for Lenders on the terms and conditions set forth herein and the other Financing Agreements;

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## SECTION 1.    **DEFINITIONS**

For purposes of this Agreement, the following terms shall have the respective meanings given to them below:

231201-7

1.1 "Accounts" shall mean, as to each Borrower and Guarantor, all present and future rights of such Borrower and Guarantor to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a secondary obligation incurred or to be incurred, or (d) arising out of the use of a credit or charge card or information contained on or for use with the card, including, without limitation, Credit Card Receivables.

1.2 "Adjusted Eurodollar Rate" shall mean, with respect to each Interest Period for any Eurodollar Rate Loan, the rate per annum (rounded upwards, if necessary, to the next one-sixteenth (1/16) of one (1%) percent) determined by dividing (a) the Eurodollar Rate for such Interest Period by (b) a percentage equal to: (i) one (1) minus (ii) the Reserve Percentage. For purposes hereof, "Reserve Percentage" shall mean the reserve percentage, expressed as a decimal, prescribed by any United States or foreign banking authority for determining the reserve requirement which is or would be applicable to deposits of United States dollars in a non-United States or an international banking office of Reference Bank used to fund a Eurodollar Rate Loan or any Eurodollar Rate Loan made with the proceeds of such deposit, whether or not the Reference Bank actually holds or has made any such deposits or loans. The Adjusted Eurodollar Rate shall be adjusted on and as of the effective day of any change in the Reserve Percentage.

1.3 "Administrative Borrower" shall mean Musicland Retail, Inc., a Delaware corporation in its capacity as Administrative Borrower on behalf of itself and the other Borrowers pursuant to Section 6.7 hereof and its successors and assigns in such capacity.

1.4 "Affiliate" shall mean, with respect to a specified Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes (a) any Person which beneficially owns or holds fifteen (15%) percent or more of any class of Voting Stock of such Person or other equity interests in such Person, (b) any Person of which such Person beneficially owns or holds fifteen (15%) percent or more of any class of Voting Stock or in which such Person beneficially owns or holds fifteen (15%) percent or more of the equity interests and (c) any director or executive officer of such Person. For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by agreement or otherwise.

1.5 "Agent" shall mean Congress Financial Corporation (Florida), a Florida corporation, in its capacity as administrative and collateral agent on behalf of Lenders pursuant to the terms hereof and any replacement or successor agent hereunder.

1.6 "Agent Payment Account" shall mean account no. 5000000030334 of Agent at Wachovia Bank, National Association, or such other account of Agent as Agent may from time to time designate to Administrative Borrower as the Agent Payment Account for purposes of this Agreement and the other Financing Agreements.

1.7 "Assignment and Acceptance" shall mean an Assignment and Acceptance substantially in the form of Exhibit A attached hereto (with blanks appropriately completed) delivered to Agent in connection with an assignment of a Lender's interest hereunder in accordance with the provisions of Section 13.6 hereof.

1.8 "Availability" shall mean, at any time, the aggregate amount of Loans available to Borrowers based on the formula set forth in Section 1.11(a)(i) hereof, without any reduction for the amount of Loans and Letter of Credit Accommodations outstanding.

1.9 "Blocked Accounts" shall have the meaning set forth in Section 6.3 hereof.

1.10 "Borrowers" shall mean, collectively, the following (together with their respective successors and assigns): (a) Suncoast Motion Picture Company, Inc., (b) Suncoast Group, Inc., (c) Suncoast Retail, Inc., (d) TMG Caribbean, Inc., (e) The Musicland Group, Inc., (f) Musicland Purchasing Corp., (g) Musicland Retail, Inc., (h) TMG-Virgin Islands, Inc., (i) MLG Internet, Inc., (j) Media Play, Inc., and (k) Request Media, Inc., each a Delaware corporation, sometimes being referred to herein individually as a "Borrower".

1.11 "Borrowing Base" shall mean, at any time, the amount equal to:

(a) the lesser of:

   (i) the amount equal to:

   (A) eighty-five (85%) percent of the Net Amount of Eligible Credit Card Receivables, plus

   (B) the amount equal to:

   (1) the lesser of: (a) sixty (60%) percent multiplied by the Value of Eligible Inventory consisting of Media Play Inventory, or (b) eighty-five (85%) percent of the Net Recovery Cost Percentage multiplied by the Value of Eligible Inventory consisting of Media Play Inventory, plus

   (2) the lesser of: (a) sixty (60%) percent multiplied by the Value of Eligible Inventory consisting of Suncoast Inventory, or (b) eighty-five (85%) percent of the Net Recovery Cost Percentage multiplied by the Value of Eligible Inventory consisting of Suncoast Inventory, plus

   (3) the lesser of: (a) sixty (60%) percent multiplied by the Value of Eligible Inventory consisting of Sam Goody Inventory, or (b) eighty-five (85%) percent of the Net Recovery Cost

        Percentage multiplied by the Value of Eligible Inventory consisting of Sam Goody Inventory, or

    (ii) the Maximum Credit,

<u>minus</u>

    (b) Reserves.

    1.12 "Business Day" shall mean any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of Florida, or the State of North Carolina, and a day on which Agent is closed for the transaction of business and any day on which Agent is open for the transaction of business, except that if a determination of a Business Day shall relate to any Eurodollar Rate Loans, the term Business Day shall also exclude any day on which banks are closed for dealings in dollar deposits in the London interbank market or other applicable Eurodollar Rate market.

    1.13 "Capital Expenditures" shall mean all expenditures for, or contracts for expenditures for, any fixed or capital assets (including, but not limited to, tooling) or improvements, or for replacements, substitutions or additions thereto, which have a useful life of more than one (1) year, including, but not limited to, the direct or indirect acquisition of such assets by way of offset items or otherwise and shall include the principal amount of capitalized lease payments.

    1.14 "Capital Leases" shall mean, as applied to any Person, any lease of (or any agreement conveying the right to use) any property (whether real, personal or mixed) by such Person as lessee which in accordance with GAAP, is required to be reflected as a liability on the balance sheet of such Person.

    1.15 "Capital Stock" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated) of such Person's capital stock or partnership, limited liability company or other equity interests at any time outstanding, and any and all rights, warrants or options exchangeable for or convertible into such capital stock or other interests (but excluding any debt security that is exchangeable for or convertible into such capital stock).

    1.16 "Cash Equivalents" shall mean, at any time, (a) any evidence of Indebtedness with a maturity date of one hundred eighty (180) days or less issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof or any agency or instrumentality thereof; <u>provided, that,</u> the full faith and credit of the United States of America is pledged in support thereof; (b) certificates of deposit or bankers' acceptances with a maturity of one hundred eighty (180) days or less of any financial institution that is a member of the Federal Reserve System having combined capital and surplus and undivided profits of not less than $500,000,000; (c) commercial paper (including variable rate demand notes) with a maturity of one hundred eighty (180) days or less issued by an entity (except an Affiliate of any Borrower or Guarantor) organized under the laws of any State of the United States of America or the District

of Columbia and rated at least A-1 by Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc. or at least P-1 by Moody's Investors Service, Inc.; (d) repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (a) above entered into with any financial institution having combined capital and surplus and undivided profits of not less than $500,000,000; (e) repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the United States of America, or, in each case, issued by any governmental agency thereof and backed by the full faith and credit of the United States of America, in each case, maturing within one hundred eighty (180) days or less from the date of acquisition; provided, that, the terms of such agreements comply with the guidelines set forth in the Federal Financial Agreements of Depository Institutions with Securities Dealers and Others, as adopted by the Comptroller of the Currency on October 31, 1985; and (f) investments in money market funds and mutual funds which invest substantially all of their assets in securities of the types described in clauses (a) through (e) above.

1.17 "Change of Control" shall mean, other than as permitted in Section 9.7 hereof, (a) the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of any Borrower or Guarantor to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act); (b) the liquidation or dissolution of any Borrower or Guarantor or the adoption of a plan by the stockholders of any Borrower or Guarantor relating to the dissolution or liquidation of such Borrower or Guarantor; (c) the acquisition by any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), except for one or more Permitted Holders, of beneficial ownership, directly or indirectly, of a majority of the voting power of the total outstanding Voting Stock of Holding or the Board of Directors of Holding; (d) during any period of two (2) consecutive years, individuals who at the beginning of such period constituted the Board of Directors of Holding (together with any new directors who have been appointed by any Permitted Holder, or whose nomination for election by the stockholders of Holding, was approved by a vote of at least sixty-six and two-thirds (66 2/3%) percent of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of Holding then still in office, unless the new directors have been appointed by a Permitted Holder; or (e) the failure of Parent and/or its Affiliates to collectively own and control, directly or indirectly, more than fifty (50%) percent of the Voting Power of the total outstanding Voting Stock of Holding.

1.18 "Code" shall mean the Internal Revenue Code of 1986, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

1.19 "Collateral" shall have the meaning set forth in Section 5 hereof.

1.20 "Collateral Access Agreement" shall mean an agreement in writing, in form and substance satisfactory to Agent, from any lessor of premises to a Borrower, or any other person to whom any Collateral (including Inventory, Equipment, bills of lading or other documents of title) is consigned or who has custody, control or possession of any such Collateral or is otherwise the

owner or operator of any premises on which any of such Collateral is located, pursuant to which such lessor, consignee or other person, inter alia, acknowledges the first priority security interest of Agent, for the benefit of Lenders, in such Collateral, agrees to waive any and all claims such lessor, consignee or other person may, at any time, have against such Collateral, whether for processing, storage or otherwise, and agrees to permit Agent access to, and the right to remain on, the premises of such lessor, consignee or other person so as to exercise Agent's rights and remedies and otherwise deal with such Collateral and, in the case of any consignee or other person who at any time has custody, control or possession of any Collateral, acknowledges that it holds and will hold possession of the Collateral for the benefit of Agent and agrees to follow all instructions of Agent with respect thereto.

1.21 "Commitment" shall mean, at any time, as to each Lender, the principal amount set forth below such Lender's signature on the signature pages hereto or on Schedule 1 to the Assignment and Acceptance Agreement pursuant to which such Lender became a Lender hereunder in accordance with the provisions of Section 13.6 hereof, as the same may be adjusted from time to time in accordance with the terms hereof; sometimes being collectively referred to herein as "Commitments".

1.22 "Congress" shall mean Congress Financial Corporation (Florida), a Florida corporation, in its individual capacity, and its successors and assigns.

1.23 "Consolidated Net Income" shall mean, with respect to any Person for any period, the aggregate of the net income (loss) of such Person and its Subsidiaries, on a consolidated basis, for such period (excluding to the extent included therein any extraordinary and/or one time or unusual and non-recurring gains or any non-cash losses) after deducting all charges which should be deducted before arriving at the net income (loss) for such period and, without duplication, after deducting the Provision for Taxes for such period, all as determined in accordance with GAAP; provided, that, (a) the net income of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions paid or payable to such Person or a Subsidiary of such Person; (b) except to the extent included pursuant to the foregoing clause, the net income of any Person accrued prior to the date it becomes a Subsidiary of such Person or is merged into or consolidated with such Person or any of its Subsidiaries or that Person's assets are acquired by such Person or by its Subsidiaries shall be excluded; and (c) the net income (if positive) of any Subsidiary (other than a Borrower or Obligor) to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary to such Person or to any other wholly-owned Subsidiary of such Person is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary shall be excluded. For the purposes of this definition, net income excludes any gain or non-cash loss, together with any related Provision for Taxes for such gain or non-cash loss, realized upon the sale or other disposition of any assets that are not sold in the ordinary course of business (including, without limitation, dispositions pursuant to sale and leaseback transactions) or of any Capital Stock of such Person or a Subsidiary of such Person and any net income realized or loss incurred as a result of changes in accounting principles or the application thereof to such Person.

1.24 "Cost" shall mean the Inventory located in any retail store, warehouse or similar owned or leased premises of a Borrower, as of any date, the cost of such Inventory as of such date, determined on a first-in-first-out basis principally on the "discounted standard cost basis", where standard equals actual cost, in accordance with GAAP.

1.25 "Credit Card Acknowledgments" shall mean, collectively, the agreements by Credit Card Issuers or Credit Card Processors who are parties to Credit Card Agreements in favor of Agent acknowledging Agent's first priority security interest, for and on behalf of Lenders, in the monies due and to become due to a Borrower (including, without limitation, credits and reserves) under the Credit Card Agreements, and agreeing to transfer all such amounts to the Blocked Accounts, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, sometimes being referred to herein individually as a "Credit Card Acknowledgment".

1.26 "Credit Card Issuer" shall mean any person (other than a Borrower) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa U.S.A., Inc. or Visa International and American Express, Discover and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc.

1.27 "Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

1.28 "Credit Card Receivables" shall mean, collectively, (a) all present and future rights of any Borrower or Guarantor to payment from any Credit Card Issuer, Credit Card Processor or other third party arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and (b) all present and future rights of any Borrower or Guarantor to payment from any Credit Card Issuer, Credit Card Processor or other third party in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the Credit Card Agreements or otherwise.

1.29 "Credit Facility" shall mean the Loans and Letter of Credit Accommodations provided to or for the benefit of any Borrower pursuant to Sections 2.1 and 2.2 hereof.

1.30 "Customs Broker" shall mean the persons listed on Schedule 1.30 hereto and any other persons selected by any Borrower or Guarantor after written notice by such Borrower or Guarantor to Agent who are reasonably acceptable to Agent to perform port of entry services to process Inventory imported by such Borrower or Guarantor from outside the United States of

America and to supply facilities, labor and materials to such Borrower or Guarantor in connection therewith; provided, that, as to each such person (a) Agent shall have received a Collateral Access Agreement duly authorized, executed and delivered by such person, (b) such agreement is in full force and effect and (c) such person shall be in compliance in all material respects with the terms thereof.

1.31 "Default" shall mean an act, condition or event which with notice or passage of time (including applicable grace periods, if any, expressly set forth in Section 10.1) or both would constitute an Event of Default.

1.32 "Defaulting Lender" shall have the meaning set forth in Section 6.10 hereof.

1.33 "Deposit Account Control Agreement" shall mean an agreement in writing, in form and substance satisfactory to Agent, by and among Agent, each Borrower or Guarantor with a deposit account at any bank and the bank at which such deposit account is at any time maintained which provides that such bank will comply with instructions originated by Agent directing disposition of the funds in the deposit account without further consent by such Borrower or Guarantor and such other terms and conditions as Agent may require, including as to any such agreement with respect to any Blocked Account, providing that all items received or deposited in the Blocked Accounts are the property of Agent, that the bank has no lien upon, or right to setoff against, the Blocked Accounts, the items received for deposit therein, or the funds from time to time on deposit therein and that the bank will (unless otherwise directed by Agent) wire, or otherwise transfer, in immediately available funds, on a daily basis to the Agent Payment Account all funds received or deposited into the Blocked Accounts.

1.34 "EBITDA" shall mean, as to any Person, with respect to any period, an amount equal to: (a) the Consolidated Net Income of such Person and its Subsidiaries for such period, plus (b) depreciation, amortization and other non-cash charges (including, but not limited to, imputed interest, deferred compensation and charges associated with impairment of goodwill pursuant to FASB 142) for such period (to the extent deducted in the computation of Consolidated Net Income of such Person), all in accordance with GAAP, plus (c) Interest Expense for such period (to the extent deducted in the computation of Consolidated Net Income of such Person), plus (d) the Provision for Taxes for such period (to the extent deducted in the computation of Consolidated Net Income of such Person), plus (e) management fees paid or accrued during such period in accordance with Section 9.12(b)(ii) (to the extent deducted in the computation of Consolidated Net Income of such Person).

1.35 "Eligible Credit Card Receivables" shall mean the Credit Card Receivables of Borrowers which are and continue to be acceptable to Agent based on the criteria set forth below. Credit Card Receivables shall be Eligible Credit Card Receivables if:

(a) such Credit Card Receivables arise from the actual and bona fide sale and delivery of goods or rendition of services by a Borrower in the ordinary course of the business of such Borrower which transactions are completed in accordance with the terms and provisions

contained in any agreements binding on such Borrower or the other party or parties related thereto;

(b) such Credit Card Receivables are not past due (beyond any stated applicable grace period, if any, therefor) pursuant to the terms set forth in the Credit Card Agreements with the Credit Card Issuer or Credit Card Processor of the credit card or debit card used in the purchase which give rise to such Credit Card Receivables;

(c) such Credit Card Receivables are not unpaid more than five (5) Business Days days after the date of the sale of Inventory giving rise to such Credit Card Receivables;

(d) all procedures required by the Credit Card Issuer or the Credit Card Processor of the credit card or debit card used in the purchase which gave rise to such Credit Card Receivables shall have been followed in all material respects by such Borrower and all documents required for the authorization and approval by such Credit Card Issuer or Credit Card Processor shall have been obtained in connection with the sale giving rise to such Credit Card Receivables;

(e) the required authorization and approval by such Credit Card Issuer or Credit Card Processor shall have been obtained for the sale giving rise to such Credit Card Receivables;

(f) such Borrower shall have submitted all sales slips, drafts, charges and other reports and other materials required by the Credit Card Issuer or Credit Card Processor obligated in respect of such Credit Card Receivables in order for such Borrower to be entitled to payment in respect thereof;

(g) the Credit Card Issuer or Credit Card Processor obligated in respect of such Credit Card Receivable has not failed to remit any monthly payment in respect of such Credit Card Receivable within (10) Business Days after the date on which such monthly payment is generally payable by such Credit Card Issuer or Credit Card Processor;

(h) such Credit Card Receivables comply with the applicable terms and conditions contained in Section 7.2 of this Agreement;

(i) the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivables has not asserted a counterclaim, defense or dispute and does not have any right of setoff against such Credit Card Receivables (other than transactions in the ordinary course of the business of such Borrower) and such Credit Card Issuer or Credit Card Processor has not setoff against amounts otherwise payable by such Credit Card Issuer or Credit Card Processor to such Borrower for the purpose of establishing a reserve or collateral for obligations of such Borrower to such Credit Card Issuer or Credit Card Processor (notwithstanding that the Credit Card Issuer or Credit Card Processor may have setoffs for fees and chargebacks consistent with the practices of such Credit Card Issuer or Credit Card Processor with such Borrower as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card

Issuer or Credit Card Processor applicable to its customers generally and unrelated to the circumstances of such Borrower);

(j) there are no facts, events or occurrences which would impair in any material respect the validity, enforceability or collectability of such Credit Card Receivables or reduce the amount payable or delay payment thereunder (other than for setoffs for fees and chargebacks consistent with the practices of such Credit Card Issuer or Credit Card Processor with such Borrower as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the circumstances of such Borrower);

(k) such Credit Card Receivables are subject to the first priority, valid and perfected security interest and lien of Agent, for and on behalf of Lenders, as to such Credit Card Receivables of such Borrower and any goods giving rise thereto are not, and were not at the time of the sale thereof, subject to any security interest, charge or other encumbrance except as may be permitted pursuant to Section 9.8(l) hereof;

(l) as of the date which is one hundred eighty (180) days after the date hereof, Agent shall have received, in form and substance satisfactory to Agent, a Credit Card Acknowledgment duly authorized, executed and delivered by the Credit Card Issuer (except in the case of American Express) or Credit Card Processor for the credit card or debit card used in the sale which gave rise to such Credit Card Receivable, such Credit Card Acknowledgment shall be in full force and effect and the Credit Card Issuer or Credit Card Processor party thereto shall be in compliance with the terms thereof;

(m) there are no proceedings or actions which are pending or to the best of any Borrower's knowledge threatened, against the Credit Card Issuers or Credit Card Processors with respect to such Credit Card Receivables which would reasonably be expected to result in any material adverse change in the continued collectability of the Credit Card Receivables with respect to the Credit Card Issuers or Credit Card Processors;

(n) such Credit Card Receivables are owed by Credit Card Issuers or Credit Card Processors deemed creditworthy at all times by Agent in good faith;

(o) no material default or material event of default has occurred under the Credit Card Agreement of such Borrower with the Credit Card Issuer or Credit Card Processor who has issued the credit card or debit card or handles payments under the credit card or debit card used in the sale which gave rise to such Credit Card Receivables which default gives such Credit Card Issuer or Credit Card Processor the right to cease or suspend payments to such Borrower and no material default or material event of default shall have occurred which gives such Credit Card Issuer or Credit Card Processor the right to setoff against amounts otherwise payable to such Borrower (other than for then current fees and chargebacks consistent with the current practices of such Credit Card Issuer or Credit Card Processor as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the circumstances of such

Borrower) or the right to establish reserves or establish or demand collateral and such Credit Card Agreements are otherwise in full force and effect and constitute the legal, valid, binding and enforceable obligations of the parties thereto;

(p) the terms of the sale giving rise to such Credit Card Receivables and all practices of such Borrower with respect to such Credit Card Receivables comply in all material respects with applicable Federal, State, and local laws and regulations;

(q) the Credit Card Issuer or Credit Card Processor has not sent any notice of default and/or notice of its intention to cease or suspend payments to such Borrower in respect of such Credit Card Receivables or to establish reserves or cash collateral for obligations of such Borrower to such Credit Card Issuer or Credit Card Processor (other than for then current fees and chargebacks consistent with the current practices of such Credit Card Issuer or Credit Card Processor as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the circumstances of such Borrower); and

(r) the customer using the credit card or debit card giving rise to such Credit Card Receivable shall not have returned the merchandise purchased giving rise to such Credit Card Receivable.

General criteria for Eligible Credit Card Receivables may only be changed and any new criteria for Eligible Credit Card Receivables may only be established by Agent in good faith, based on either: (i) an event, condition or other circumstance arising after the date hereof, or (ii) existing on the date hereof to the extent Agent has no written notice thereof from a Borrower prior to the date hereof, in either case under clause (i) or (ii) which adversely affects or could reasonably be expected to adversely affect the collectability of the Credit Card Receivables in the good faith determination of Agent. Any Credit Card Receivables which are not Eligible Credit Card Receivables shall nevertheless be part of the Collateral.

1.36 "Eligible Inventory" shall mean Inventory of Borrowers consisting of finished goods held for resale in the ordinary course of the business of a Borrower which are acceptable to Agent based on the criteria set forth below. In general, Eligible Inventory shall not include (a) work-in-process; (b) raw materials; (c) spare parts for equipment; (d) packaging and shipping materials; (e) supplies used or consumed in a Borrower's business; (f) Inventory at premises other than those owned or leased and controlled by a Borrower or at the distribution center of Borrowers subject to the Transition Services Agreement; provided, that, (i) as to retail store locations which are leased by a Borrower, Agent may, at its option, establish such Reserves in respect of amounts at any time due or to become due to the owner and lessor thereof as Agent shall determine in accordance with Section 1.101 hereof, (ii) as to all other locations leased by a Borrower, if Agent shall not have received a Collateral Access Agreement from the owner and lessor with respect to such location, duly authorized, executed and delivered by such owner and lessor (or Agent shall determine to accept a Collateral Access Agreement that does not include all required provisions or provisions in the form otherwise required by Agent), Agent may, at its option, establish such Reserves in respect of amounts at any time due or to become due to the owner and lessor thereof.

as Agent shall determine, and (iii) as to locations owned and operated by a third person, if Agent shall not have received a Collateral Access Agreement from the owner and operator with respect to such location, duly authorized, executed and delivered by such owner and operator (or Agent shall determine to accept a Collateral Access Agreement that does not include all required provisions or provisions in the form otherwise required by Agent), Agent may, at its option, establish such Reserves in respect of amounts at any time due or to become due to the owner and operator thereof as Agent shall determine, provided that, in addition, if required by Agent, in order for such Inventory at locations owned and operated by a third person to be Eligible Inventory, Agent shall have received: (A) UCC financing statements between the owner and operator, as consignee or bailee and such Borrower, as consignor or bailor, in form and substance satisfactory to Agent, which are duly assigned to Agent and (B) a written notice to any lender to the owner and operator of the first priority security interest in such Inventory of Agent; (g) inventory marked "return to vendor"; (h) Inventory subject to a security interest or lien in favor of any person other than Agent except those permitted in this Agreement(i) bill and hold goods; (j) obsolete and slow moving Inventory, without duplication for any categories taken into account in an applicable appraisal; (k) Inventory which is not subject to the first priority, valid and perfected security interest of Agent; (l) damaged and/or defective Inventory; and (m) Inventory purchased or sold on consignment. General criteria for Eligible Inventory may only be changed and any new criteria for Eligible Inventory may only be established by Agent in good faith, based on either: (i) an event, condition or other circumstance arising after the date hereof, or (ii) existing on the date hereof to the extent Agent has no written notice thereof from a Borrower prior to the date hereof, in either case under clause (i) or (ii) which adversely affects or could reasonably be expected to adversely affect the quality, mix, condition or saleability of the Inventory or the security interest of Agent, for the benefit of Lenders, therein, in each case in the good faith determination of Agent. To the extent Eligible Inventory shall not otherwise have been designated by Administrative Borrower as Media Play Inventory, Suncoast Inventory, or Sam Goody Inventory, as the case may be, the advance rate applicable to such Eligible Inventory shall be the lowest advance rate set forth in Section 1.11(a)(ii). Any Inventory which is not Eligible Inventory shall nevertheless be part of the Collateral.

    1.37 "Eligible Transferee" shall mean (a) any Lender; (b) the parent company of any Lender and/or any Affiliate of such Lender which is at least fifty (50%) percent owned by such Lender or its parent company; (c) any person (whether a corporation, partnership, trust or otherwise) that is engaged in the business of making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and is administered or managed by a Lender or with respect to any Lender that is a fund which invests in bank loans and similar extensions of credit, any other fund that invests in bank loans and similar extensions of credit and is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor, and in each case is approved by Agent; and (d) any other commercial bank, financial institution or "accredited investor" (as defined in Regulation D under the Securities Act of 1933) approved by Agent, provided, that, (i) neither any Borrower nor any Guarantor or any Affiliate of any Borrower or Guarantor shall qualify as an Eligible Transferee and (ii) no Person to whom any Indebtedness which is in any way subordinated in right of payment to any other Indebtedness of any Borrower or Guarantor shall qualify as an Eligible Transferee, except as Agent may otherwise specifically agree.

1.38 "Environmental Laws" shall mean all foreign, Federal, State and local laws (including common law), legislation, rules, codes, licenses, permits (including any conditions imposed therein), authorizations, judicial or administrative decisions, injunctions or agreements between any Borrower or Guarantor and any Governmental Authority, (a) relating to pollution and the protection, preservation or restoration of the environment (including air, water vapor, surface water, ground water, drinking water, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or to occupational health or safety, (b) relating to the exposure to, or the use, storage, recycling, treatment, generation, manufacture, processing, distribution, transportation, handling, labeling, production, release or disposal, or threatened release, of Hazardous Materials, or (c) relating to all laws with regard to recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials. The term "Environmental Laws" includes (i) the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Federal Superfund Amendments and Reauthorization Act, the Federal Water Pollution Control Act of 1972, the Federal Clean Water Act, the Federal Clean Air Act, the Federal Resource Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments thereto), the Federal Solid Waste Disposal and the Federal Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, and the Federal Safe Drinking Water Act of 1974, (ii) applicable state counterparts to such laws and (iii) any common law or equitable doctrine that may impose liability or obligations for injuries or damages due to, or threatened as a result of, the presence of or exposure to any Hazardous Materials.

1.39 "Equipment" shall mean, as to each Borrower and Guarantor, all of such Borrower's and Guarantor's now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

1.40 "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as in effect from time to time, together with all rules and regulations thereunder or related thereto.

1.41 "ERISA Affiliate" shall mean any person required to be aggregated with any Borrower, any Guarantor or any of its or their respective Subsidiaries under Sections 414(b), 414(c), 414(m) or 414(o) of the Code.

1.42 "ERISA Event" shall mean the occurrence of any of the following: (a) any "reportable event", as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Plan for which the Pension Benefit Guaranty Corporation notice requirement has not been waived; (b) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (c) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (d) the filing pursuant to Section 412 of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the occurrence of a non-exempt