to 9:00 a.m. (New York City time) on that day by each of the three leading brokers of Federal funds transactions in New York City selected by Agent and if such amounts are not paid within three (3) days of the demand of Agent, at the highest Interest Rate provided for in Section 3.1 hereof applicable to Loans consisting of Prime Rate Loans, whichever Agent may elect. During the period in which such Lender has not paid such corresponding amount to Agent, notwithstanding anything to the contrary contained in this Agreement or any of the other Financing Agreements, the amount so advanced by Agent to or for the benefit of any Borrower shall, for all purposes hereof, be a Loan made by Agent for its own account. Upon any such failure by a Lender to pay Agent, Agent shall promptly thereafter notify Administrative Borrower of such failure and Borrowers shall pay such corresponding amount to Agent for its own account within five (5) Business Days of Administrative Borrower's receipt of such notice. A Lender who fails to pay Agent its Pro Rata Share of any Loans made available by the Agent on such Lender's behalf, or any Lender who fails to pay any other amount owing by it to Agent, is a "Defaulting Lender". Agent shall not be obligated to transfer to a Defaulting Lender any payments received by Agent for the Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees). Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent. Agent may hold and, in its discretion, relend to a Borrower the amount of all such payments received or retained by it for the account of such Defaulting Lender. For purposes of voting or consenting to matters with respect to this Agreement and the other Financing Agreements and determining Pro Rata Shares, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero (0). This Section shall remain effective with respect to a Defaulting Lender until such default is cured. The operation of this Section shall not be construed to increase or otherwise affect the Commitment of any Lender, or relieve or excuse the performance by any Borrower or Obligor of their duties and obligations hereunder.

(e) Nothing in this Section or elsewhere in this Agreement or the other Financing Agreements shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitment hereunder or to prejudice any rights that any Borrower may have against any Lender as a result of any default by any Lender hereunder in fulfilling its Commitment.

6.11 Obligations Several; Independent Nature of Lenders' Rights. The obligation of each Lender hereunder is several, and no Lender shall be responsible for the obligation or commitment of any other Lender hereunder. Nothing contained in this Agreement or any of the other Financing Agreements and no action taken by the Lenders pursuant hereto or thereto shall be deemed to constitute the Lenders to be a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and subject to Section 12.3 hereof, each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

## SECTION 7.    COLLATERAL REPORTING AND COVENANTS

7.1  Collateral Reporting.

(a) Borrowers shall provide Agent with the following documents in a form satisfactory to Agent:

(i)  as soon as possible after the end of each calendar week (but in any event within three (3) Business Days after the end thereof), or more frequently as Agent may request, with respect to each Borrower (A) a report of credit card sales during such week, including the amount of the chargebacks and credits with respect thereto and providing an aging of such sales identifying those outstanding more than five (5) Business Days since the sale date giving rise thereto, (B) an inventory summary report by category and mix from the "RIM Report" (as reported in the most recent appraisal contemplated hereby), (C) a weekly borrowing base certificate in form acceptable to Agent in all respects and (D) the "616 Report" of Borrowers with all attachments thereto;

(ii)  as soon as possible after the end of each month (but in any event within ten (10) Business Days after the end thereof), on a monthly basis or more frequently as Agent may request, (A) perpetual inventory reports from the "RIM Report", (B) inventory reports by location and category from the "Stock Ledger" and which "Stock Ledger" shall include the following subparts: "Corporate Retail Inventory Report" and "Division Grand Total Report" (and including the amounts of Inventory of each Borrower and the value thereof at any leased locations and at premises of warehouses, processors or other third parties and identifying Inventory consigned to any Borrower (other than from Purchasing), specifying the consignor and consignee with respect thereto and the location of all such consigned Inventory), (C) agings of accounts payable (and including information indicating the amounts owing to owners and lessors of leased premises, warehouses, fulfillment centers, processors and other third parties from time to time in possession of any Collateral), (D) reports on sales and use tax collections, deposits and payments, including monthly sales and use tax accruals, (E) a reconciliation of the "Stock Ledger" to the "RIM Report", (F) a detailed breakdown of the calculations of Inventory to be returned to vendors, (G) an aging report with respect to all outstanding coupons and gift certificates, (H) the month-end "616 Report" reconciled to the general ledger and "Stock Ledger", (I) a month-end calculation of the Borrowing Base reflecting the "Stock Ledger" activity for such month and (J) a general ledger trial balance;

(iii)  as soon as possible after the end of each month (but in any event ten (10) Business Days after the end thereof), in each case certified by the chief financial officer or controller of Administrative Borrower as true and correct: (A) a statement confirming the payment of rent and other amounts due to owners and lessors of real property used by Borrowers and Guarantors in the immediately preceding month, subject to year-end or periodic adjustments, (B) the addresses of all new retail store locations of Borrowers opened and existing retail store locations closed or sold, in each case since the date of the most recent certificate delivered to Agent containing the information required under this clause and (C) a report of any new deposit account established or used by any Borrower with any bank or other financial institution, including the Borrower in whose name the account is maintained, the account number, the name

and address of the financial institution at which such account is maintained, the purpose of such account and, if any, the amount held in such account on or about the date of such report;

(iv)  upon Agent's request, (A) copies of customer statements and credit memos, remittance advices and reports, and copies of deposit slips and bank statements, (B) copies of shipping and delivery documents, and (C) copies of purchase orders, invoices and delivery documents for Inventory and Equipment acquired by any Borrower or Guarantor;

(v)  upon Agent's request, (A) reports of sales for each category of Inventory by each Borrower (including separate identification of each of Musicland Inventory, Sam Good Inventory and Suncoast Inventory), (B) reports of aggregate Inventory purchases of Borrowers and Guarantors (including all costs related thereto, such as freight, duty and taxes) and identifying items of Inventory in transit to any Borrower or Guarantor related to the applicable documentary letter of credit and/or bill of lading number, (C) copies of remittance advices and reports, and copies of deposit slips and bank statements, (D) copies of shipping and delivery documents, (E) copies of purchase orders, invoices and delivery documents for Inventory and Equipment acquired by Borrowers and Guarantors, and (F) reports by retail store location of sales and operating profits for each such retail store location;

(vi)  upon Agent's request, the monthly statements received by any Borrower, Guarantor from any Credit Card Issuers or Credit Card Processors, together with such additional information with respect thereto as shall be sufficient to enable Agent to monitor the transactions pursuant to the Credit Card Agreements;

(vii)  such other reports as to the Collateral as Agent shall request from time to time.

(b)  If any Borrower's or Guarantor's records or reports of the Collateral are prepared or maintained by an accounting service, contractor, shipper or other agent, such Borrower and Guarantor hereby irrevocably authorizes such service, contractor, shipper or agent to deliver such records, reports, and related documents to Agent and to follow Agent's instructions with respect to further services at any time that an Event of Default exists or has occurred and is continuing.

7.2  Accounts Covenants.

(a)  Administrative Borrower shall notify Agent promptly of the assertion of (i) any claims, offsets, defenses or counterclaims by any account debtor, Credit Card Issuer or Credit Card Processor or any disputes with any of such persons or any settlement, adjustment or compromise thereof, to the extent any of the foregoing exceeds $250,000 in any one case or $1,000,000 in the aggregate and (ii) all material adverse information relating to the financial condition of any account debtor, Credit Card Issuer or Credit Card Processor. No credit, discount, allowance or extension or agreement for any of the foregoing shall be granted to any account debtor, Credit Card Issuer or Credit Card Processor except in the ordinary course of Borrowers' business in accordance with the current practices of Borrowers as in effect on the date hereof. So long as no Event of Default exists or has occurred and is continuing, Borrowers shall

settle, adjust or compromise any claim, offset, counterclaim or dispute with any account debtor, Credit Card Issuer, Credit Card Processor. At any time that an Event of Default exists or has occurred and is continuing, Agent shall, at its option, have the exclusive right to settle, adjust or compromise any claim, offset, counterclaim or dispute with account debtors, Credit Card Issuers or Credit Card Processors or grant any credits, discounts or allowances.

(b) With respect to each Account: (i) no payments shall be made thereon except payments delivered to the Blocked Accounts and remitted to the Agent Payment Account pursuant to the terms of this Agreement, (ii) there shall be no setoffs, deductions, contras, defenses, counterclaims or disputes existing or asserted with respect thereto except as reported to Agent in accordance with the terms of this Agreement and (iii) none of the transactions giving rise thereto will violate in any material respect any applicable State or Federal Laws or regulations, all documentation relating thereto will be legally sufficient under such laws and regulations and all such documentation will be legally enforceable in accordance with its terms.

(c) Administrative Borrower shall notify Agent promptly of: (i) any notice of a material default by any Borrower under any of the Credit Card Agreements or of any default which has a reasonable likelihood of resulting in the Credit Card Issuer or Credit Card Processor ceasing to make payments or suspending payments to Borrowers, (ii) any notice from any Credit Card Issuer or Credit Card Processor that such person is ceasing or suspending, or will cease or suspend, any present or future payments due or to become due to Borrower from such person, or that such person is terminating or will terminate any of the Credit Card Agreements, and (iii) the failure of any Borrower or Guarantor to comply with any material terms of the Credit Card Agreements or any terms thereof which has a reasonable likelihood of resulting in the Credit Card Issuer or Credit Card Processor ceasing or suspending payments to any Borrower or Guarantor.

(d) Agent shall have the right at any time or times, in Agent's name or in the name of a nominee of Agent, to verify the validity, amount or any other matter relating to any Account or other Collateral, by mail, telephone, facsimile transmission or otherwise.

7.3 Inventory Covenants. With respect to the Inventory: (a) Borrowers shall at all times maintain inventory records reasonably satisfactory to Agent, keeping correct and accurate records itemizing and describing the kind, type (including, without limitation, specifying the Media Play Inventory, the Sam Goody Inventory and the Suncoast Inventory), quality and quantity of Inventory, such Borrower's cost therefor and daily withdrawals therefrom and additions thereto; (b) Borrowers shall conduct a physical count of the Inventory either through periodic cycle counts or wall to wall counts, so that all Inventory is subject to such counts at least once each year, but at any time or times as Agent may request at any time an Event of Default exists or has occurred and is continuing, and promptly following such physical inventory (whether through periodic cycle counts or wall to wall counts) shall supply Agent with a report in the form and with such specificity as may be reasonably satisfactory to Agent concerning such physical count; (c) Borrowers shall not remove any Inventory from the locations set forth or permitted herein, without the prior written consent of Agent, except for sales of Inventory in the ordinary course of Borrowers' business and except to move Inventory directly from one location set forth or

permitted herein to another such location and except for Inventory shipped from the manufacturer thereof to a Borrower which is in transit to the locations set forth or permitted herein; (d) Borrowers shall, at their expense, not more than four (4) times in each twelve (12) month period, but at any time or times as Agent may request at Agent's expense, or at any time or times as Agent may request at Borrowers' expense at any time an Event of Default exists or has occurred and is continuing, deliver or cause to be delivered to Agent written appraisals as to the Inventory in form, scope and methodology acceptable to Agent and by an appraiser acceptable to Agent, addressed to Agent and upon which Agent is expressly permitted to rely; (e) upon Agent's request, Borrowers shall, at their expense, conduct through RGIS Inventory Specialists, Inc. or another inventory counting service acceptable to Agent, a physical count of the Inventory in form, scope and methodology acceptable to Agent no more than one (1) time in any twelve (12) month period, but at any time or times as Agent may request at any time an Event of Default exists or has occurred and is continuing or at any time or times as Agent may request in the event of test count variances in excess of the shrinkage reserve established by Borrowers, the results of which shall be reported directly by such inventory counting service to Agent and Borrowers shall promptly deliver confirmation in a form satisfactory to Agent that appropriate adjustments have been made to the inventory records of Borrowers to reconcile the inventory count to Borrowers' inventory records; (f) Borrowers shall produce, use, store and maintain the Inventory, with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity with applicable laws (including the requirements of the Federal Fair Labor Standards Act of 1938, as amended and all rules, regulations and orders related thereto); (g) none of the Inventory or other Collateral constitutes farm products or the proceeds thereof; (h) Borrowers assume all responsibility and liability arising from or relating to the production, use, sale or other disposition of the Inventory; (i) Borrowers shall not sell Inventory to any customer on approval, or any other basis which entitles the customer to return or may obligate any Borrower or Guarantor to repurchase such Inventory except for the right of return given to retail customers of Borrowers in the ordinary course of the business of Borrowers in accordance with the then current return policies of Borrowers; (j) Borrowers shall keep the Inventory in good and marketable condition; and (k) Borrowers shall not, without prior written notice to Agent or the specific identification of such Inventory in a report with respect thereto provided by Borrowers to Agent pursuant to Section 7.1(a) hereof, acquire or accept any Inventory on consignment or approval, other than Inventory consigned by Purchasing to a Borrower in the ordinary course of business.

7.4 Equipment and Real Property Covenants. With respect to the Equipment and Real Property: (a) upon Agent's request, Borrowers and Guarantors shall, at their expense, no more than one (1) time in any twelve (12) month period, but at any time or times as Agent may request upon the occurrence and during the continuance of an Event of Default, deliver or cause to be delivered to Agent written appraisals as to the Equipment and/or the Real Property in form, scope and methodology acceptable to Agent and by an appraiser acceptable to Agent, addressed to Agent and upon which Agent is expressly permitted to rely; (b) Borrowers and Guarantors shall keep the Equipment in good order, repair, running and marketable condition (ordinary wear and tear excepted); (c) Borrowers and Guarantors shall use the Equipment and Real Property with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity with all applicable laws; (d) the Equipment is and shall be used in the business of

Borrowers and Guarantors and not for personal, family, household or farming use; (e) without limitation upon the rights of Borrowers to dispose of Equipment pursuant to Section 9.7(b)(ii) hereof, Borrowers and Guarantors shall not remove any Equipment from the locations set forth or permitted herein, except to the extent necessary to have any Equipment repaired or maintained in the ordinary course of its business or to move Equipment directly from one location set forth or permitted herein to another such location and except for the movement of motor vehicles used by or for the benefit of such Borrower or Guarantor in the ordinary course of business; (f) the Equipment is now and shall remain personal property and Borrowers and Guarantors shall not permit any of the Equipment other than shelving installed at retail store locations of Borrowers to be or become a part of or affixed to real property; (g) each Borrower and Guarantor assumes all responsibility and liability arising from the use of the Equipment and Real Property; and (h) promptly upon Agent's request, each Borrower shall furnish to Agent a list, in reasonable detail, of all Equipment owned by such Borrower.

7.5  Power of Attorney.  Each Borrower and Guarantor hereby irrevocably designates and appoints Agent (and all persons designated by Agent) as such Borrower's and Guarantor's true and lawful attorney-in-fact, and authorizes Agent, in such Borrower's, Guarantor's or Agent's name, to: (a) at any time an Event of Default exists or has occurred and is continuing (i) demand payment on Receivables or other Collateral, (ii) enforce payment of Receivables by legal proceedings or otherwise, (iii) exercise all of such Borrower's or Guarantor's rights and remedies to collect any Receivable or other Collateral, (iv) sell or assign any Receivable upon such terms, for such amount and at such time or times as the Agent deems advisable, (v) settle, adjust, compromise, extend or renew an Account, (vi) discharge and release any Receivable, (vii) prepare, file and sign such Borrower's or Guarantor's name on any proof of claim in bankruptcy or other similar document against an account debtor or other obligor in respect of any Receivables or other Collateral, (viii) notify the post office authorities to change the address for delivery of remittances from account debtors or other obligors in respect of Receivables or other proceeds of Collateral to an address designated by Agent, and open and dispose of all mail addressed to such Borrower or Guarantor and handle and store all mail relating to the Collateral; and (ix) do all acts and things which are necessary, in Agent's determination, to fulfill such Borrower's or Guarantor's obligations under this Agreement and the other Financing Agreements and (b) at any time to (i) take control in any manner of any item of payment in respect of Receivables or constituting Collateral or otherwise received in or for deposit in the Blocked Accounts or otherwise received by Agent or any Lender, (ii) have access to any lockbox or postal box into which remittances from account debtors or other obligors in respect of Receivables or other proceeds of Collateral are sent or received, (iii) endorse such Borrower's or Guarantor's name upon any items of payment in respect of Receivables or constituting Collateral or otherwise received by Agent and any Lender and deposit the same in Agent's account for application to the Obligations, (iv) endorse such Borrower's or Guarantor's name upon any chattel paper, document, instrument, invoice, or similar document or agreement relating to any Receivable or any goods pertaining thereto or any other Collateral, including any warehouse or other receipts, or bills of lading and other negotiable or non-negotiable documents, (v) clear Inventory the purchase of which was financed with Letter of Credit Accommodations through U.S. Customs or foreign export control authorities (or similar authorities) in such Borrower's or Guarantor's name, Agent's name or the name of Agent's designee, and to sign and deliver to customs

58

officials powers of attorney in such Borrower's or Guarantor's name for such purpose, and to complete in such Borrower's or Guarantor's or Agent's name, any order, sale or transaction, obtain the necessary documents in connection therewith and collect the proceeds thereof, and (vi) sign such Borrower's or Guarantor's name on any verification of Receivables and notices thereof to account debtors or any secondary obligors or other obligors in respect thereof. Each Borrower and each Guarantor hereby releases Agent and Lenders and their respective officers, employees and designees from any liabilities arising from any act or acts under this power of attorney and in furtherance thereof, whether of omission or commission, except as a result of Agent's or any Lender's own gross negligence or willful misconduct as determined pursuant to a final non-appealable order of a court of competent jurisdiction.

7.6 <u>Right to Cure</u>. Agent may, at its option, upon prior notice to Administrative Borrower, (a) cure any material default by any Borrower or Guarantor under any material agreement with a third party that affects the Collateral, its value or the ability of Agent to collect, sell or otherwise dispose of the Collateral or the rights and remedies of Agent or any Lender therein or the ability of any Borrower or Guarantor to perform its obligations hereunder or under any of the other Financing Agreements, (b) pay or bond on appeal any material judgment entered against any Borrower or Guarantor, (c) discharge material taxes or discharge liens, security interests or other encumbrances (other than liens, security interests or encumbrances expressly permitted by Section 9.8 (excluding Sections 9.8(c) and 9.8(l)) unless an Event of Default exists) at any time levied on or existing with respect to the Collateral and pay any amount, incur any expense or perform any act which, in Agent's judgment, is necessary or appropriate to preserve, protect, insure or maintain the Collateral and the rights of Agent and Lenders with respect thereto. Agent may add any amounts so expended to the Obligations and charge any Borrower's account therefor, such amounts to be repayable by Borrowers on demand. Agent and Lenders shall be under no obligation to effect such cure, payment or bonding and shall not, by doing so, be deemed to have assumed any obligation or liability of any Borrower or Guarantor. Any payment made or other action taken by Agent or any Lender under this Section shall be without prejudice to any right to assert an Event of Default hereunder and to proceed accordingly.

7.7 <u>Access to Premises</u>. From time to time as requested by Agent, at the cost and expense of Borrowers, (a) Agent or its designee shall have complete access to all of each Borrower's and Guarantor's premises during normal business hours and after notice to Administrative Borrower, or at any time and without notice to Administrative Borrower if an Event of Default exists or has occurred and is continuing, for the purposes of inspecting, verifying and auditing the Collateral and all of each Borrower's and Guarantor's books and records, including the Records (it being acknowledged and agreed by Borrowers and Guarantors that Agent intends to conduct not fewer than four (4) audits of the Collateral and books and records, including the Records of Borrowers and Guarantors, in each full calendar year) and (b) each Borrower and Guarantor shall promptly furnish to Agent such copies of such books and records or extracts therefrom as Agent may request, and Agent or any Lender or Agent's designee may use during normal business hours such of any Borrower's and Guarantor's personnel, equipment, supplies and premises as may be reasonably necessary for the foregoing and if an Event of Default exists or has occurred and is continuing for the collection of Receivables and realization of other Collateral.

## SECTION 8. REPRESENTATIONS AND WARRANTIES

Each Borrower and Guarantor hereby represents and warrants to Agent and Lenders the following (which shall survive the execution and delivery of this Agreement), the truth and accuracy of which are a continuing condition of the making of Loans and providing Letter of Credit Accommodations to Borrowers:

8.1  Existence, Power and Authority. Each Borrower and Guarantor is a limited liability company or a corporation duly formed or organized and in good standing under the laws of its state or jurisdiction of incorporation or organization and is duly qualified as a foreign limited liability company or foreign corporation and in good standing in all states or other jurisdictions where the nature and extent of the business transacted by it or the ownership of assets makes such qualification necessary, except for those jurisdictions in which the failure to so qualify would not have a material adverse effect on such Borrower's or Guarantor's financial condition, results of operation or business or the rights of Agent in or to any of the Collateral. The execution, delivery and performance of this Agreement, the other Financing Agreements and the transactions contemplated hereunder and thereunder (a) are all within each Borrower's and Guarantor's powers as a limited liability company or corporate powers, (b) have been duly authorized, (c) are not in contravention of law or the terms of any Borrower's or Guarantor's articles of organization, operating agreement, certificate of incorporation, by-laws, or other organizational documentation, or any indenture, agreement or undertaking to which any Borrower or Guarantor is a party or by which any Borrower or Guarantor or its property are bound and (d) will not result in the creation or imposition of, or require or give rise to any obligation to grant, any lien, security interest, charge or other encumbrance upon any property of any Borrower or Guarantor. This Agreement and the other Financing Agreements to which any Borrower or Guarantor is a party constitute legal, valid and binding obligations of such Borrower and Guarantor enforceable in accordance with their respective terms , except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar laws limiting creditors' rights generally and by general equitable principles.

8.2  Name; State of Organization; Chief Executive Office; Collateral Locations.

(a) The exact legal name of each Borrower and Guarantor is as set forth on the signature page of this Agreement and in the Information Certificate. No Borrower or Guarantor has, during the past five years, been known by or used any other corporate or fictitious name or been a party to any merger or consolidation, or acquired all or substantially all of the assets of any Person, or acquired any of its property or assets out of the ordinary course of business, except for the acquisition of the Purchased Stock or as set forth in the Information Certificate.

(b) Each Borrower and Guarantor is an organization of the type and formed or organized in the jurisdiction set forth in the Information Certificate. The Information Certificate accurately sets forth the organizational identification number of each Borrower and Guarantor or accurately states that such Borrower or Guarantor has none and accurately sets forth the federal employer identification number of each Borrower and Guarantor.

231201-7                                    60

(c)    The chief executive office and mailing address of each Borrower and Guarantor and each Borrower's and Guarantor's Records concerning Accounts are located only at the address identified as such in Schedule 8.2 to the Information Certificate and its only other places of business and the only other locations of Collateral, if any, are the addresses set forth in Schedule 8.2 to the Information Certificate or are in transit to one of the addresses set forth in Schedule 8.2 to the Information Certificate, subject to the rights of any Borrower or Guarantor to establish new locations in accordance with Section 9.2 below; provided, that, Borrowers and Guarantors shall have the right to send Equipment out for repair in the ordinary course of business and consistent with past practice so long as such Equipment is promptly returned upon the completion of such repair to a location set forth on Schedule 8.2 to the Information Certificate (as supplemented by new locations established in accordance with Sections 9.2). The Information Certificate correctly identifies any of such locations which are not owned by a Borrower or Guarantor and sets forth the owners and/or operators thereof.

8.3    Financial Statements; No Material Adverse Change. All financial statements relating to any Borrower or Guarantor which have been or may hereafter be delivered by any Borrower or Guarantor to Agent and Lenders have been prepared in accordance with GAAP (except as to any interim financial statements, to the extent such statements are subject to normal year-end adjustments and do not include any notes) and fairly present in all material respects the financial condition and the results of operation of such Borrower and Guarantor as at the dates and for the periods set forth therein. Except as disclosed in any interim financial statements furnished by Borrowers and Guarantors to Agent prior to the date of this Agreement, there has been no act, condition or event which has had or is reasonably likely to have a Material Adverse Effect since the date of the most recent audited financial statements of any Borrower or Guarantor furnished by any Borrower or Guarantor to Agent prior to the date of this Agreement. The execution and delivery of the Purchase Agreements and the consummation of the transactions contemplated thereby have not resulted in and will not result in (a) any violation by any Borrower or Guarantor of any provisions of the Worker Adjustment and Retraining Notification Act (or any similar law) or (b) any liability to any Borrower or Guarantor under such Act (or similar law) or under any pension plan, benefits plan, severance plan or union contract.

8.4    Priority of Liens; Title to Properties. The security interests and liens granted to Agent under this Agreement and the other Financing Agreements constitute valid and perfected first priority liens and security interests in and upon the Collateral subject only to the liens indicated on Schedule 8.4 to the Information Certificate and the other liens permitted under Section 9.8 hereof. Each Borrower and Guarantor has good and marketable fee simple title to or valid leasehold interests in all of its Real Property and good, valid and merchantable title to all of its other properties and assets subject to no liens, mortgages, pledges, security interests, encumbrances or charges of any kind, except those granted to Agent and such others as are specifically listed on Schedule 8.4 to the Information Certificate or permitted under Section 9.8 hereof.

8.5    Tax Returns. Except as set forth on Schedule 8.5 to the Information Certificate, each Borrower and Guarantor has filed, or caused to be filed, in a timely manner all material tax

returns, reports and declarations which are required to be filed by it. All information in such tax returns, reports and declarations is complete and accurate in all material respects. Each Borrower and Guarantor has paid or caused to be paid all material taxes due and payable or claimed due and payable in any assessment received by it, except (a) taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower or Guarantor and with respect to which adequate reserves have been set aside on its books and (b) taxes for which a valid extension to file the applicable tax returns have been granted. Adequate provision has been made for the payment of all material accrued and unpaid Federal, State, county, local, foreign and other taxes whether or not yet due and payable and whether or not disputed.

8.6 <u>Litigation</u>. Except as set forth on Schedule 8.6 to the Information Certificate, (a) there is no investigation by any Governmental Authority pending, or to the best of any Borrower's or Guarantor's knowledge threatened, against or affecting any Borrower or Guarantor, its or their assets or business, or the Purchased Stock and (b) there is no action, suit, proceeding or claim by any Person pending, or to the best of any Borrower's or Guarantor's knowledge threatened, against the Purchased Stock, any Borrower or Guarantor or its or their assets or goodwill, or against or affecting any transactions contemplated by this Agreement, in each case, which if adversely determined against such Borrower or Guarantor has or could reasonably be expected to have a Material Adverse Effect.

8.7 <u>Compliance with Other Agreements and Applicable Laws</u>.

(a) Borrowers and Guarantors are not in default in any respect under, or in violation in any material respect of the terms of, any Material Contract. Borrowers and Guarantors are in compliance with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority relating to their respective businesses, including, without limitation, those set forth in or promulgated pursuant to the Occupational Safety and Health Act of 1970, as amended, the Fair Labor Standards Act of 1938, as amended, ERISA, the Code, as amended, and the rules and regulations thereunder, and all Environmental Laws, except where the failure to so comply would not reasonably be expected to have a Material Adverse Effect.

(b) Borrowers and Guarantors have obtained all material permits, licenses, approvals, consents, certificates, orders or authorizations of any Governmental Authority required for the lawful conduct of its business (the "Permits"), except that as to Permits required under Environmental Laws, such Permits have been obtained in accordance with Section 8.8(d). All of the Permits are valid and subsisting and in full force and effect. There are no actions, claims or proceedings pending or to the best of any Borrower's or Guarantor's knowledge, threatened that seek the revocation, cancellation, suspension or modification of any of the Permits.

(c) No consent, approval or other action of, or filing with, or notice to any Governmental Authority is required in connection with the execution, delivery and performance of this Agreement, the other Financing Agreements or any of the instruments or documents to be

delivered pursuant hereto or thereto, except for the filing of UCC financing statements and similar instruments.

8.8  Environmental Compliance.

(a)  Except as set forth on Schedule 8.8 to the Information Certificate, Borrowers, Guarantors or any Subsidiary of any Borrower or Guarantor have not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off its premises (whether or not owned by it) in any manner which at any time violates any applicable Environmental Law or Permit, except for such violations which could not reasonably be expected to result in a Material Adverse Effect, and the operations of Borrowers, Guarantors or any Subsidiary of any Borrower or Guarantor comply in all material respects with all Environmental Laws and all Permits, except where the failure to so comply could not be reasonably expected to have a Material Adverse Effect.

(b)  Except as set forth on Schedule 8.8 to the Information Certificate, there has been no investigation by any Governmental Authority or any proceeding, complaint, order, directive, claim, citation or notice by any Governmental Authority or any other person nor is any pending or to the best of any Borrower's or Guarantor's knowledge threatened, with respect to any non-compliance with or violation of the requirements of any Environmental Law by any Borrower or Guarantor or any Subsidiary of any Borrower or Guarantor the release, spill or discharge, threatened or actual, of any Hazardous Material or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, occupational health or safety matter, which could reasonably be expected to have a Material Adverse Effect.

(c)  Except as set forth on Schedule 8.8 to the Information Certificate, Borrowers, Guarantors and their Subsidiaries have no material liability (contingent or otherwise) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials which could be reasonably expected to result in a Material Adverse Effect.

(d)  Except as set forth on Schedule 8.8 to the Information Certificate, Borrowers, Guarantors and their Subsidiaries have all Permits required to be obtained or filed in connection with the operations of Borrowers and Guarantors under any Environmental Law and all of such licenses, certificates, approvals or similar authorizations and other Permits are valid and in full force and effect, except where the failure to obtain or file could not be reasonably expected to have a Material Adverse Effect.

8.9  Employee Benefits.

(a)  Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or State law. Each Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the

Internal Revenue Service and to the best of any Borrower's or Guarantor's knowledge, nothing has occurred which would cause the loss of such qualification. Each Borrower and its ERISA Affiliates have made all required contributions to any Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)  There are no pending, or to the best of any Borrower's or Guarantor's knowledge, threatened claims (other than routine claims for benefits), actions or lawsuits, or action by any Governmental Authority, with respect to any Plan. There has been no non-exempt prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan which could be reasonably expected to result in any material liability to any Borrower or Guarantor.

(c)  (i)  No ERISA Event has occurred and no condition, event or circumstance exists that could be reasonably expected to result in the occurrence of an ERISA Event; (ii) the current value of the assets of each Plan subject to Title IV of ERISA (determined in accordance with the assumptions used for funding such Plan pursuant to Section 412 of the Code) are not less than such Plan's liabilities under Section 4001(a)(16) of ERISA; (iii) each Borrower and Guarantor and their ERISA Affiliates have not incurred, and no condition, event or circumstance exists that could be reasonably expected to result in, any material liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) each Borrower and Guarantor, and their ERISA Affiliates, have not incurred and do not reasonably expect to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) each Borrower and Guarantor, and their ERISA Affiliates, have not engaged in a transaction that would be subject to Section 4069 or 4212(c) of ERISA.

8.10 Bank Accounts.  All of the deposit accounts, investment accounts or other accounts in the name of or used by any Borrower or Guarantor maintained at any bank or other financial institution are set forth on Schedule 8.10 to the Information Certificate, subject to the right of each Borrower and Guarantor to establish new accounts in accordance with Section 5.3 hereof.

8.11 Intellectual Property.  Except as set forth on Schedule 8.11 to the Information Certificate, to the knowledge of any Borrower and Guarantor, each Borrower and Guarantor owns or licenses or otherwise has the right to use all Intellectual Property necessary for the operation of its assets and its business as presently conducted or proposed to be conducted.  As of the date hereof, Borrowers and Guarantors do not have any Intellectual Property registered, or subject to pending applications, in the United States Patent and Trademark Office or any similar office or agency in the United States, any State thereof, any political subdivision thereof or in any other country, other than those described in Schedule 8.11 to the Information Certificate and have not granted any licenses with respect thereto other than as set forth in Schedule 8.11 to the Information Certificate.  Except as set forth on Schedule 8.11 to the Information Certificate, no event has occurred which permits or would permit after notice or passage of time or both, the revocation, suspension or termination of such rights, other than the expiration in the ordinary

231201-7                          64

course of business of any license agreement pertaining to any licensed Intellectual Property and the expiration of any registered Intellectual Property in accordance with its terms. To the knowledge of any Borrower and Guarantor, no slogan or other advertising device, product, process, method, substance or other Intellectual Property or goods bearing or using any Intellectual Property presently contemplated to be sold by or employed by any Borrower or Guarantor infringes any patent, trademark, servicemark, tradename, copyright, license or other intellectual property owned by any other Person presently and except as set forth on Schedule 8.11, no claim or litigation is pending or, to the knowledge of any Borrower and Guarantor, threatened against or affecting any Borrower or Guarantor contesting its right to sell or use any such Intellectual Property. Schedule 8.11 to the Information Certificate sets forth all of the agreements or other arrangements of each Borrower and Guarantor pursuant to which such Borrower or Guarantor has a license (other than shrink wrap licenses available in retail stores) or other right to use any trademarks, logos, designs, representations or other Intellectual Property owned by another person as in effect on the date hereof (collectively, together with such agreements or other arrangements as may be entered into by any Borrower or Guarantor after the date hereof the "License Agreements" and individually, a "License Agreement"). No trademark, servicemark, copyright or other Intellectual Property at any time used by any Borrower or Guarantor which is owned by another person, or owned by such Borrower or Guarantor subject to any security interest, lien, collateral assignment, pledge or other encumbrance in favor of any person other than Agent, is affixed to any Eligible Inventory, except (a) to the extent permitted under the term of the license agreements listed on Schedule 8.11 to the Information Certificate and (b) to the extent the sale of Inventory to which such Intellectual Property is affixed is permitted to be sold by such Borrower or Guarantor under applicable law (including the United States Copyright Act of 1976).

8.12 Subsidiaries; Affiliates; Capitalization; Solvency.

(a) Each Borrower and Guarantor does not have any direct or indirect Subsidiaries or Affiliates and is not engaged in any joint venture or partnership except as set forth in Schedule 8.12 to the Information Certificate.

(b) As of the date hereof, each Borrower and Guarantor is the record and beneficial owner of all of the issued and outstanding shares of Capital Stock of each of the Subsidiaries listed on Schedule 8.12 to the Information Certificate as being owned by such Borrower or Guarantor and there are no proxies, irrevocable or otherwise, with respect to such shares and no equity securities of any of the Subsidiaries are or may become required to be issued by reason of any options, warrants, rights to subscribe to, calls or commitments of any kind or nature and there are no contracts, commitments, understandings or arrangements by which any Subsidiary is or may become bound to issue additional shares of it Capital Stock or securities convertible into or exchangeable for such shares, except as set forth in Schedule 8.12 to the Information Certificate.

(c) The issued and outstanding shares of Capital Stock of each Borrower and Guarantor are directly and beneficially owned and held by the persons indicated in the Information Certificate, and in each case all of such shares have been duly authorized and are

231201-7                                65

fully paid and non-assessable, free and clear of all claims, liens, pledges and encumbrances of any kind, except as set forth in Schedule 8.12 to the Information Certificate.

(d) Borrowers, taken as a whole, are Solvent and will continue to be Solvent after the creation of the Obligations, the security interests of Agent and the other transaction contemplated hereunder and after giving effect to any rights of contribution which such Borrower may have.

(e) Parent and/or H.I.G. Sun Partners, Inc. and Ableco Finance LLC have, prior to the date hereof, made a cash equity contribution to Holding in the amount of $1,111,111.11

8.13. Labor Disputes.

(a) Set forth on Schedule 8.13 to the Information Certificate is a list (including dates of termination) of all collective bargaining or similar agreements between or applicable to each Borrower and Guarantor and any union, labor organization or other bargaining agent in respect of the employees of any Borrower or Guarantor on the date hereof.

(b) There is (i) no material unfair labor practice complaint pending against any Borrower or Guarantor or, to the best of any Borrower's or Guarantor's knowledge, threatened against it, before the National Labor Relations Board (or similar Governmental Authority), and no material grievance or material arbitration proceeding arising out of or under any collective bargaining agreement is pending on the date hereof against any Borrower or Guarantor or, to best of any Borrower's or Guarantor's knowledge, threatened against it, and (ii) no material strike, labor dispute, slowdown or stoppage is pending against any Borrower or Guarantor or, to the best of any Borrower's or Guarantor's knowledge, threatened against any Borrower or Guarantor.

8.14 Restrictions on Subsidiaries. Except as set forth in Schedule 8.14 hereto and except for restrictions contained in this Agreement or any other agreement with respect to Indebtedness of any Borrower or Guarantor permitted hereunder as in effect on the date hereof, there are no contractual or consensual restrictions on any Borrower or Guarantor or any of its Subsidiaries which prohibit or otherwise restrict (a) the transfer of cash or other assets (i) between any Borrower or Guarantor and any of its or their Subsidiaries or (ii) between any Subsidiaries of any Borrower or Guarantor or (b) the ability of any Borrower or Guarantor or any of its or their Subsidiaries to incur Indebtedness or grant security interests to Agent or any Lender in the Collateral.

8.15 Material Contracts. Schedule 8.15 to the Information Certificate sets forth all Material Contracts to which any Borrower or Guarantor is a party or is bound as of the date hereof. Borrowers and Guarantors have delivered true, correct and complete copies of such Material Contracts to Agent on or before the date hereof. Borrowers and Guarantors are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of the intention of any other party thereto to terminate any Material Contract. Each Borrower and Guarantor is a party to all contracts necessary for the operation of its business, as presently conducted, as conducted immediately prior to the date hereof or as presently

231201-7

66

proposed to be conducted, except for those the failure to obtain could not reasonably be expected to have a Material Adverse Effect.

8.16 <u>Credit Card Agreements</u>. Set forth in Schedule 8.16 hereto is a correct and complete list of (a) all of the Credit Card Agreements and all other agreements, documents and instruments existing as of the date hereof between or among any Borrower, Guarantor, any of their Affiliates, the Credit Card Issuers, the Credit Card Processors and any of their Affiliates, (b) the percentage of each sale payable to the Credit Card Issuer or Credit Card Processor under the terms of the Credit Card Agreements, (c) all other fees and charges payable by any Borrower or Guarantor under or in connection with the Credit Card Agreements and (d) the term of such Credit Card Agreements. The Credit Card Agreements constitute all of such agreements necessary for each Borrower to operate its business as presently conducted with respect to credit cards and debit cards and no Receivables of any Borrower or Guarantor arise from purchases by customers of Inventory with credit cards or debit cards, other than those which are issued by Credit Card Issuers with whom such Borrower or Guarantor has entered into one of the Credit Card Agreements set forth on Schedule 8.16 hereto or with whom a Borrower or Guarantor has entered into a Credit Card Agreement in accordance with Section 9.13 hereof. Each of the Credit Card Agreements constitutes the legal, valid and binding obligations of the Borrower or Guarantor that is party thereto and to the best of each Borrower's and Guarantor's knowledge, the other parties thereto, enforceable in accordance with their respective terms and is in full force and effect. No material default or material event of default, or act, condition or event which after notice or passage of time or both, would constitute a material default or a material event of default under any of the Credit Card Agreements exists or has occurred. Each Borrower or Guarantor and the other parties thereto have complied with all of the material terms and conditions of the Credit Card Agreements to the extent necessary for such Borrower or Guarantor to be entitled to receive all payments thereunder. Borrowers have delivered, or caused to be delivered to Agent, true, correct and complete copies of all of the Credit Card Agreements.

8.17 <u>Payables Practices; Retention of Title</u>. Each Borrower and Guarantor has not made any material change in the historical accounts payable practices from those in effect immediately prior to the date hereof. As of the date hereof, none of the conditions of supply of any supplier or other creditor of a Borrower or Guarantor include any retention of title provisions which pertain to such Borrower or Guarantor.

8.18 <u>Acquisition of Purchased Stock</u>.

(a) The Purchase Agreements and the transactions contemplated thereunder have been duly executed, delivered and performed in accordance with their terms by the respective parties thereto in all material respects, including the fulfillment (not merely the waiver, except as may be disclosed to Agent and consented to in writing by Agent) of all conditions precedent set forth therein and giving effect to the terms of the Purchase Agreements and the assignments executed and delivered by Sellers (or any of their affiliates or subsidiaries) thereunder, Holding has acquired and has good and marketable title to the Purchased Stock, free and clear of all claims, liens, pledges and encumbrances of any kind, except as permitted hereunder.

(b)   All actions and proceedings required (if any) of Borrowers or Guarantors by the Purchase Agreements, applicable law or regulation (including, but not limited to, compliance by Borrower, Guarantors, Parent and Sellers with the Hart-Scott-Rodino Anti-Trust Improvements Act of 1976, as amended, and compliance by Borrowers and Guarantors with the Worker Adjustment and Retaining Notification Act) have been taken, the transactions required thereunder have been duly and validly taken and consummated.

(c)   No court of competent jurisdiction has issued any injunction, restraining order or other order which prohibits the consummation of the transactions described in the Purchase Agreements and no governmental or other action or proceeding has been commenced or, to any Borrower's knowledge, threatened, seeking any injunction, restraining order or other order which seeks to void or otherwise modify the transactions described in the Purchase Agreements.

(d)   Borrowers have delivered, or caused to be delivered, to Agent, true, correct and complete copies of the Purchase Agreements.

8.19 Interrelated Businesses.  Borrowers and Guarantors make up a related organization of various entities constituting a single economic and business enterprise so that Borrowers and Guarantors share an identity of interests such that any benefit received by any one of them benefits the others. Each Borrower and Guarantor renders services to or for the benefit of the other Borrowers and/or Guarantors, as the case may be, purchases or sells and supplies goods to or from or for the benefit of the other Borrowers and Guarantors (including inter alia, the payment by Borrowers and Guarantors of Indebtedness of the other Borrowers and Guarantors and provides administrative, marketing, payroll and management services to or for the benefit of the other Borrowers and Guarantors).  Borrowers and Guarantors have centralized accounting and legal service, common officers and directors and are identified to creditors as a single economic and business enterprise.

8.20 Transition Services Agreement.  Borrowers have delivered to Agent on or prior to the date hereof a true, complete and correct copy of the Transition Services Agreement, together with all exhibits and schedules thereto, as in effect on the date hereof and shall promptly furnish to Agent all material supplements, amendments and additions thereto at all times hereafter.  The Transition Services Agreement is in full force and effect, has not been amended or modified and, to the knowledge of Borrowers and Guarantors, none of the parties thereto is in default of any of its obligations thereunder.

8.21 Accuracy and Completeness of Information.  All information furnished by or on behalf of any Borrower or Guarantor in writing to Agent or any Lender in connection with this Agreement or any of the other Financing Agreements or any transaction contemplated hereby or thereby, including all information on the Information Certificate (but excluding any financial projections for purposes of this Section 8.20) is true and correct in all material respects on the date as of which such information is dated or certified and does not omit any material fact necessary in order to make such information not misleading in any material respect.  No event or circumstance has occurred since June 30, 2003 which has had or could reasonably be expected to

have a Material Adverse Effect, which has not been fully and accurately disclosed to Agent in writing prior to the date hereof.

8.22 <u>Survival of Warranties; Cumulative</u>. All representations and warranties contained in this Agreement or any of the other Financing Agreements shall survive the execution and delivery of this Agreement and shall be deemed to have been made again to Agent and Lenders on the date of each additional borrowing or other credit accommodation hereunder and shall be conclusively presumed to have been relied on by Agent and Lenders regardless of any investigation made or information possessed by Agent or any Lender. The representations and warranties set forth herein shall be cumulative and in addition to any other representations or warranties which any Borrower or Guarantor shall now or hereafter give, or cause to be given, to Agent or any Lender.

## SECTION 9.  AFFIRMATIVE AND NEGATIVE COVENANTS

9.1  <u>Maintenance of Existence</u>.

(a) Each Borrower and Guarantor shall at all times preserve, renew and keep in full force and effect its existence and rights and franchises with respect thereto and maintain in full force and effect all licenses, trademarks, tradenames, approvals, authorizations, leases, contracts and Permits necessary to carry on the business as presently conducted, except as to any Guarantor permitted under Section 9.7.

(b) No Borrower or Guarantor shall change its name unless each of the following conditions is satisfied: (i) Agent shall have received not less than thirty (30) days prior written notice from Administrative Borrower of such proposed change in its corporate name, which notice shall accurately set forth the new name; and (ii) Agent shall have received a copy of the amendment to the Articles of Organization or Certificate of Incorporation (or similar organizational documents) of such Borrower or Guarantor providing for the name change, certified by the Secretary of State (or similar Governmental Authority) of the jurisdiction of incorporation or organization of such Borrower or Guarantor as soon as it is available.

(c)  No Borrower or Guarantor shall change its chief executive office or its mailing address or organizational identification number (or if it does not have one, shall not acquire one) unless Agent shall have received not less than thirty (30) days' prior written notice from Administrative Borrower of such proposed change, which notice shall set forth such information with respect thereto as Agent may require and Agent shall have received such agreements as Agent may reasonably require in connection therewith. No Borrower or Guarantor shall change its type of organization or jurisdiction of organization.

9.2  <u>New Collateral Locations</u>. Borrowers may open or occupy any new location within the United States, in each case, provided, that, such Borrower or Guarantor (a) gives Agent thirty (30) days prior written notice of the intended opening of any such new location and (b) executes and delivers, or causes to be executed and delivered, to Agent such agreements, documents, and

231201-7                                    69

instruments as Agent may deem reasonably necessary or desirable to perfect and protect its interests in the Collateral at such location.

9.3    Compliance with Laws, Regulations, Etc.

(a)    Each Borrower and Guarantor shall, and shall cause any Subsidiary to, at all times, comply in all material respects with all laws, rules, regulations, licenses, approvals, orders and other Permits applicable to it and duly observe all requirements of any foreign, Federal, State or local Governmental Authority, including without limitation, ERISA, the Code, the Occupational Safety and Health Act of 1970, as amended, the Fair Labor Standards Act of 1938, as amended, and all Environmental Laws; provided, that, unless the failure to comply with Environmental Laws could be reasonably expected to have a Material Adverse Effect as determined by Agent in good faith, the failure by any Borrower or Guarantor to comply with Environmental Laws in any material respect shall not constitute a breach of this Section 9.3(a) so long as each of the following conditions have been satisfied as determined by Agent in good faith: (i) such Borrower or Guarantor is promptly and diligently taking actions in accordance with applicable Environmental Laws to cure and remedy such non-compliance to the extent required by Environmental Laws and adequate reserves have been established on the books of such Borrower or Guarantor with respect thereto as required in accordance with GAAP; (ii) such Borrower or Guarantor shall promptly notify Agent in writing of such failure to comply and state whether or not Sellers are liable for losses, costs and expenses in connection with such failure; and (iii) the aggregate amounts incurred (or reasonably expected to be incurred) by Borrowers and Guarantors in connection with such non-compliance (whether remediation costs or otherwise) shall not exceed $3,500,000 during any twelve-month period.

(b)    Borrowers and Guarantors shall give written notice to Agent promptly upon any Borrower's or Guarantor's receipt of any written notice of, or any Borrower's or Guarantor's otherwise obtaining knowledge of, (i) the occurrence of any event involving the release, spill or discharge, threatened or actual, of any Hazardous Material by any Borrower or Guarantor that is material or required to be reported to a Governmental Authority under any Environmental Law or (ii) any investigation, proceeding, complaint, order, directive, claims, citation or notice with respect to: (A) any non-compliance with or violation of any Environmental Law by any Borrower or Guarantor in any material respect or (B) the release, spill or discharge, threatened or actual, of any Hazardous Material by any Borrower or Guarantor other than in the ordinary course of business and other than as permitted under any applicable Environmental Law. Copies of all material environmental surveys, audits, assessments, feasibility studies and results of remedial investigations shall be promptly furnished, or caused to be furnished, by such Borrower or Guarantor to Agent. Each Borrower and Guarantor shall take prompt action to respond to any material non-compliance with any of the Environmental Laws and shall regularly report to Agent on such response.

(c)    Without limiting the generality of the foregoing, whenever Agent reasonably determines that there is a violation, or any condition which requires any action by or on behalf of any Borrower or Guarantor in order to avoid any violation, of any Environmental Law in any material respect, Borrowers shall, at Agent's request and Borrowers' expense: (i) cause an

231201-7

70

independent environmental engineer reasonably acceptable to Agent to conduct such tests of the site where a violation or alleged violation of such Environmental Laws has occurred as to the subject matter of such violation and prepare and deliver to Agent a report as to the violation setting forth the results of such tests, a proposed plan for responding to any violation of Environmental Laws described therein, and an estimate of the costs thereof and (ii) provide to Agent a supplemental report of such engineer whenever the scope of such violation, or such Borrower's or Guarantor's response thereto or the estimated costs thereof, shall change in any material respect.

(d) Each Borrower and Guarantor shall indemnify and hold harmless Agent and Lenders and their respective directors, officers, employees, agents, invitees, representatives, successors and assigns, from and against any and all losses, claims, damages, liabilities, costs, and expenses (including reasonable attorneys' fees and expenses) directly or indirectly arising out of or attributable to the use, generation, manufacture, reproduction, storage, release, threatened release, spill, discharge, disposal or presence of a Hazardous Material, including the costs of any required or necessary repair, cleanup or other remedial work with respect to any property of any Borrower or Guarantor and the preparation and implementation of any closure, remedial or other required plans ("Losses") except to the extent it is determined pursuant to a final non-appealable order of a court of competent jurisdiction that the Losses were the result of acts or omissions constituting gross negligence or willful misconduct of Agent or any Lender. All representations, warranties, covenants and indemnifications in this Section 9.3 shall survive the payment of the Obligations and the termination of this Agreement.

9.4 Payment of Taxes and Claims. Each Borrower and Guarantor shall, and shall cause any Subsidiary to, duly pay and discharge when due all material taxes, assessments, contributions and governmental charges upon or against it or its properties or assets, except for taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower, Guarantor or Subsidiary, as the case may be, and with respect to which adequate reserves have been set aside on its books. Each Borrower and Guarantor shall be liable for any tax or penalties imposed on Agent or any Lender as a result of the financing arrangements provided for herein and each Borrower and Guarantor agrees to indemnify and hold Agent harmless with respect to the foregoing, and to repay to Agent, for the benefit of Lenders, on demand the amount thereof, and until paid by such Borrower or Guarantor such amount shall be added and deemed part of the Loans, provided, that, nothing contained herein shall be construed to require any Borrower or Guarantor to pay any income or franchise taxes attributable to the income of Lenders from any amounts charged or paid hereunder to Lenders. The foregoing indemnity shall survive the payment of the Obligations and the termination of this Agreement.

9.5 Insurance. Each Borrower and Guarantor shall, at all times, maintain with financially sound and reputable insurers insurance with respect to the Collateral against loss or damage and all other insurance of the kinds and in the amounts customarily insured against or carried by corporations of established reputation engaged in the same or similar businesses and similarly situated. Said policies of insurance shall be reasonably satisfactory to Agent as to form, amount and insurer. Borrowers and Guarantors shall furnish certificates, policies or endorsements to Agent as Agent shall reasonably require as proof of such insurance, and, if any

231201-7                                    71