# EXHIBIT "C"

### INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT ("Intercreditor Agreement") dated November 5, 2003 is by and between CONGRESS FINANCIAL CORPORATION (FLORIDA), a Florida corporation, in its capacity as agent pursuant to the Revolving Loan Agreement (as hereinafter defined) acting for and on behalf of the financial institutions from time to time party thereto as lenders (in such capacity, "Revolving Loan Agent" as hereinafter further defined) and THE BANK OF NEW YORK, a New York banking corporation, in its capacity as agent pursuant to the Trade Creditor Security Agreement (as hereinafter defined) acting for and on behalf of the Trade Creditors (as hereinafter defined) and the other vendors from time to time party thereto, (in such capacity, "Trade Agent" as hereinafter further defined). Revolving Loan Agent, Revolving Loan Creditors (as hereinafter defined), Trade Agent and Trade Creditors are sometimes individually referred to herein as a "Creditor" and collectively as "Creditors."

### W I T N E S S E T H :

WHEREAS, Musicland Holding Corp. ("Musicland") has acquired all of the issued and outstanding capital stock of Musicland Group, Inc. and Musicland Stores Corporation;

WHEREAS, Musicland owns all of the capital stock of each of Suncoast Motion Picture Company, Inc., Suncoast Group, Inc., Suncoast Retail, Inc., TMG Caribbean, Inc., The Musicland Group, Inc., Musicland Purchasing Corp., Musicland Retail, Inc., TMG-Virgin Islands, Inc., MLG Internet, Inc., Media Play, Inc., Request Media, Inc., Musicland Holding Corp., MG Financial Services, Inc., Sam Goody Holding Corp. and Suncoast Holding Corp. (each, a "Debtor" and collectively, "Debtors", as hereinafter further defined);

WHEREAS, each Trade Creditor may from time to time extend certain trade credit to Debtors on the terms and conditions agreed to by the Debtors and such Trade Creditor;

WHEREAS, pursuant to the terms of the Trade Creditor Security Agreement, Debtors have granted security interests in the Trade Collateral (as hereinafter defined) to the Trade Agent for the benefit of Trade Creditors;

WHEREAS, Revolving Loan Agent, Revolving Loan Creditors and Debtors have entered into financing arrangements pursuant to which Revolving Loan Agent and Revolving Loan Creditors may make loans and advances and provide other financial accommodations to certain of the Debtors as set forth in the Revolving Creditor Agreements (as hereinafter defined); and

WHEREAS, Revolving Loan Creditors and Trade Creditors wish to cause each of the Revolving Loan Agent and the Trade Agent to enter into this Intercreditor Agreement to (i) confirm the relative priority of the security interests of Revolving Loan Creditors and Trade Creditors in the assets and properties of Debtors and (ii) provide for the orderly sharing among Revolving Loan Creditors and Trade Creditors, in accordance with such priorities, of proceeds of such assets and properties upon any foreclosure thereon or other disposition thereof.

NOW, THEREFORE, in consideration of the mutual benefits accruing to Creditors hereunder and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

1.    DEFINITIONS

As used above and in this Intercreditor Agreement, the following terms shall have the meanings ascribed to them below:

1.1    "Agreements" shall mean, collectively, the Revolving Creditor Agreements, the Trade Creditor Security Agreement and the Collateral Agent Agreement.

1.2    "Collateral Agent Agreement" shall mean the Collateral Agent Agreement, dated on or about the date hereof, by and among Trade Agent, Debtors and Trade Creditors, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.3    "Creditors" shall mean, collectively, Revolving Loan Agent, Revolving Loan Creditors, Trade Agent, Trade Creditors and their respective successors and assigns.

1.4    "Debtors" shall mean, collectively, each of the companies listed on Schedule 1.3 attached hereto, together with their respective successors and assigns, including, without limitation, a receiver, trustee or debtor-in-possession on behalf of such person or on behalf of any such successor or assign; each of the foregoing sometimes being referred to herein individually as a "Debtor".

1.5    "Default Notice" shall mean written notice of a Trade Default by Trade Agent at the direction of the Trade Creditor Majority.

1.6    "Enforcement Action" shall mean any action by Trade Creditor Majority or Trade Agent to: (a) exercise any right, remedy or power with respect to, or otherwise take any action to enforce, any lien on or security interest in, or realize upon Trade Collateral; (b) seek to have a trustee, receiver, liquidator or similar official appointed for or over Trade Collateral; or (c) pursue any judicial action or otherwise enforce any rights or remedies in or to Trade Collateral.

1.7    "Insolvency Proceeding" shall mean, as to any Person, any of the following: (a) any case or proceeding with respect to such Person under the U.S. Bankruptcy Code or any other Federal or State bankruptcy, insolvency, reorganization or other law affecting creditors' rights or any other or similar proceedings seeking any stay, reorganization, arrangement, composition or readjustment of all or substantially all of the obligations and indebtedness of such Person, including all converted or succeeding cases in respect thereof or (b) any proceeding seeking the appointment of any receiver, trustee, administrator, liquidator, custodian or other insolvency official with similar powers with respect to such Person or all or substantially all of its assets or (c) any proceeding for liquidation, dissolution or other winding up of the business of such Person

or (d) any general assignment for the benefit of creditors or any general marshalling of all or substantially all of the assets of such Person.

1.8    "Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance (including, but not limited to, easements, rights of way and the like), lien (statutory or other), security agreement or transfer intended as security, including without limitation, any conditional sale or other title retention agreement, the interest of a lessor under a capital lease or any financing lease having substantially the same economic effect as any of the foregoing.

1.9    "Permitted Affiliate Refinancing" shall mean an amendment, modification, supplement, extension, renewal, restatement, refinancing, replacement or restructuring of the Revolving Creditor Agreements (a "Refinancing") in which an affiliate of the Debtors makes Revolving Loan Debt available to the Debtors or participates in Revolving Loan Debt made available to the Debtors provided, that, (a) such affiliate does not own or hold more than twenty-five (25%) percent of the Revolving Loan Debt subject to such Refinancing and (b) at any time that such affiliate is a lender in respect of such Refinancing, Musicland Holding Corp. shall not pay to such affiliate any dividend or any amount in redemption of any equity interest.

1.10    "Person" or "person" shall mean any individual, sole proprietorship, partnership, corporation (including, without limitation, any corporation which elects subchapter S status under the Internal Revenue Code of 1986, as amended), limited liability company, limited liability partnership, business trust, unincorporated association, joint stock company, trust, joint venture, or other entity or any government or any agency or instrumentality or political subdivision thereof.

1.11    "Revolving Creditor Agreements" shall mean, collectively, the Revolving Loan Agreement and all agreements, documents and instruments at any time executed and/or delivered by Debtors or any other person to, with or in favor of Revolving Loan Creditors in connection therewith or related thereto, as all of the foregoing now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders (which lenders or group of lenders shall not be affiliates of Debtors, except that Trade Agent and Trade Creditors shall have no objection to any Permitted Affiliate Refinancing) that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt).

1.12    "Revolving Loan Agent" shall mean Congress Financial Corporation (Florida), a Florida corporation, in its capacity as Revolving Loan Agent on behalf of Revolving Loan Creditors pursuant to the Revolving Loan Agreement (and not in its individual capacity), and any successor or replacement agent for and on behalf of such Revolving Loan Creditors under the Revolving Loan Agreement.

1.13    "Revolving Loan Agreement" shall mean the Loan and Security Agreement, dated August 11, 2003, by and among Revolving Loan Agent, Revolving Loan Creditors and Debtors (as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured).

3

1.14 "Revolving Loan Collateral" shall mean the assets of Debtors described in Schedule 1.12 and which includes, without limitation, all of the Trade Collateral.

1.15 "Revolving Loan Creditors" shall mean, individually and collectively, Revolving Loan Agent, each of the financial institutions from time to time party to the Revolving Loan Agreement as lenders, and their respective successors and assigns (and including any other lender or group of lenders that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise party to the Revolving Creditor Agreements).

1.16 "Revolving Loan Debt" shall mean any and all obligations, liabilities and indebtedness of every kind, nature and description owing by Debtors to Revolving Loan Creditors and/or their respective affiliates or participants, including principal, interest, charges, fees, premiums, indemnities and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Revolving Creditor Agreements, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the Revolving Creditor Agreements or after the commencement of any case with respect to Debtors under the U.S. Bankruptcy Code or any state insolvency law or similar statute (and including, without limitation, any principal, interest, fees, costs, expenses and other amounts, which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in any such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and whether arising directly or howsoever acquired by Revolving Loan Creditors.

1.17 "Trade Agent" shall mean, The Bank of New York, a New York banking corporation, in its capacity as agent on behalf of Trade Creditors pursuant to the Trade Creditor Security Agreement, and any successor or replacement agent for and on behalf of such Trade Creditors under the Trade Creditor Security Agreement.

1.18 "Trade Collateral" shall mean the assets of Debtor described in Schedule 1.16.

1.19 "Trade Creditors" shall mean, individually and collectively, BMG Distribution; Buena Vista Home Entertainment, Inc.; Caroline Records, Inc.; EMI Music Marketing; Metro-Goldwyn-Mayer Home Entertainment, Inc.; Paramount Pictures, Home Video Division; RED Distribution, Inc.; Sony Music Entertainment, Inc.; Twentieth Century Fox Home Entertainment, Inc.; Universal Music and Video Distribution; Warner Home Video, Inc.; Warner/Elektra/Atlantic Corporation and such other entities that are added pursuant to the Trade Creditor Security Agreement, and their respective successors and assigns.

1.20 "Trade Creditor Majority" shall mean the holders of at least sixty-six and two-thirds (66 2/3%) percent, in dollar amount, of the Trade Debt outstanding at any time.

1.21 "Trade Creditor Security Agreement" shall mean the Security Agreement, dated of even date herewith, by and among the Debtors and Trade Agent, as the same now exists or

may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured.

1.22    "Trade Debt" shall mean all obligations, liabilities and indebtedness of every kind, nature and description owing by Debtors to Trade Creditors, including principal, interest, charges, fees, premiums, indemnities and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, with respect to the delivery of goods or rendition of services by Trade Creditors to Debtors in the ordinary course of business, whether arising before or after the commencement of any case with respect to Debtors under the U.S. Bankruptcy Code or any similar statute (and including, without limitation, any principal, interest, fees, costs, expenses and other amounts, whether or not such amounts are allowable in whole or in part, in any such case or similar proceeding), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured.

1.23    "Trade Default" shall mean a failure by Debtors to pay to Trade Creditors twenty-five (25%) percent or more of the then outstanding dollar amount of the Trade Debt owed by Debtors to Trade Creditors in the aggregate, measured on a daily basis, for a period of more than thirty (30) days after the original due date therefor.

1.24    All terms defined in the Uniform Commercial Code as in effect in the State of New York, unless otherwise defined herein shall have the meanings set forth therein. All references to any term in the plural shall include the singular and all references to any term in the singular shall include the plural.

2.      SECURITY INTERESTS; PRIORITIES; REMEDIES

2.1     Acknowledgment of Liens.  Revolving Loan Agent hereby acknowledges and agrees that Trade Agent, acting for and on behalf of the Trade Creditors, has a Lien upon the Trade Collateral.  Trade Agent hereby acknowledges and agrees that Revolving Loan Agent, acting for and on behalf of the Revolving Loan Creditors, has a Lien upon the Trade Collateral and all of the Revolving Loan Collateral.  Revolving Loan Agent and Trade Agent hereby acknowledge and agree that Trade Agent and Trade Creditors do not have a Lien upon any of the assets of any Debtor other than the Trade Collateral.

2.2     Priority of Liens.  Notwithstanding the order or time of attachment, or the order, time or manner of perfection, or the order or time of filing or recordation of any document or instrument, or other method of perfecting a security interest in favor of each Creditor in any Trade Collateral, and notwithstanding any conflicting terms or conditions which may be contained in any of the Agreements, the Liens upon the Trade Collateral for the benefit of Revolving Loan Creditors has and shall have priority over the Liens upon the Trade Collateral of Trade Agent for the benefit of Trade Creditors and such Liens of Trade Creditors are and shall be, in all respects, subject and subordinate to the Liens of Revolving Loan Creditors therein to the full extent of the Revolving Loan Debt.

2.3     Priorities Unaffected by Action or Inaction.  The lien priorities provided in Section 2.2 above, shall not be altered or otherwise affected by any amendment, modification,

supplement, extension, renewal, restatement or refinancing of either the Revolving Loan Debt or the Trade Debt, nor by any action or inaction which any Creditor may take or fail to take in respect of the Trade Collateral.

2.4    Rights of Third Parties; No Contest of Lien.   Each Creditor shall be solely responsible for perfecting and maintaining the perfection of its Lien in and to each item constituting the Trade Collateral. The foregoing provisions of this Intercreditor Agreement are intended solely to govern the respective lien priorities as between the Creditors and shall not impose on Revolving Loan Creditors any obligations in respect of the disposition of proceeds of foreclosure on any Trade Collateral which would conflict with prior perfected claims therein in favor of any other person or any order or decree of any court or other governmental authority or any applicable law. Trade Creditors agree that they will not contest the validity, perfection, priority or enforceability of the Liens of Revolving Loan Agent in and to the Revolving Loan Collateral or the Trade Collateral for the benefit of Revolving Loan Creditors, and Revolving Loan Creditors agree that they will not contest the validity, perfection, priority or enforceability of the Liens of Trade Agent in and to the Trade Collateral for the benefit of Trade Creditors. As between Revolving Loan Agent and Revolving Loan Creditors, on the one hand, and Trade Creditors, on the other hand, the terms of this Intercreditor Agreement shall govern even if part or all of the Revolving Loan Debt or the Liens securing payment and performance thereof are not perfected or are avoided, disallowed, set aside or otherwise invalidated in any judicial proceeding or otherwise.

2.5    Right to Enforce Agreement.  Revolving Loan Agent shall have the exclusive right to manage, perform and enforce the terms of the Revolving Creditor Agreements with respect to its liens upon the assets of Debtors (including, without limitation, the Trade Collateral), to exercise and enforce all privileges and rights thereunder according to its discretion and the exercise of its business judgment, including, without limitation, the exclusive right to take or retake control or possession of Trade Collateral and to hold, prepare for sale, process, sell, lease, dispose of, or liquidate such Trade Collateral. Trade Creditors shall not have any right to direct Revolving Loan Agent or any Revolving Loan Creditor to exercise any right, remedy or power arising under the Revolving Creditor Agreements with respect to the Trade Collateral and Trade Creditors consent to the exercise by Revolving Loan Agent or any Revolving Loan Creditor of any such right, remedy or power. Trade Creditors shall not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against Revolving Loan Creditors seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to, and Revolving Loan Creditors shall not be liable for, any action taken or omitted to be taken by Revolving Loan Creditors with respect to the Trade Collateral.

2.6    Sale and Release of Trade Collateral.  Notwithstanding anything to the contrary contained in any of the Agreements, only Revolving Loan Agent shall have the right to restrict or permit, or approve or disapprove, the sale, transfer or other disposition of any assets of Debtors (including, without limitation, the Trade Collateral). Trade Creditors shall (a) be deemed to have automatically and without further action released and terminated any Liens they may have on the Trade Collateral to the extent such Trade Collateral is sold or otherwise disposed of either by Revolving Loan Agent, its agents or Debtors with the consent of Revolving Loan Agent, (b) be

deemed to have authorized Revolving Loan Agent to file UCC amendments and terminations covering the Trade Collateral so sold or otherwise disposed of as to UCC financing statements between Debtors and Trade Creditors to evidence such release and termination, (c) promptly upon the request of Revolving Loan Agent execute and deliver such other release documents and confirmations of the authorization to file UCC amendments and terminations provided for herein, in each case as Revolving Loan Agent may require in connection with such sale or other disposition by Revolving Loan Agent, its agents or Debtors with the consent of Revolving Loan Agent to evidence and effectuate such termination and release, provided, that, any such release or UCC amendment or termination by Trade Creditors shall not extend to or otherwise affect any of the rights, if any, of Trade Creditors to the proceeds from any such sale or other disposition of Trade Collateral and (d) be deemed to have consented under the Trade Creditor Security Agreement to such sale or other disposition. Without limitation upon the foregoing, Revolving Loan Agent shall use commercially reasonable efforts to provide prompt notice to Trade Agent of any sale or disposition of Trade Collateral referred to in the preceding sentence in respect of which an amendment to or waiver under the Loan Agreement was executed and delivered. In the event that for any reason Trade Creditors shall fail to promptly execute and deliver to Revolving Loan Agent any such release documents, Revolving Loan Agent is hereby irrevocably authorized to execute and deliver such release documents on behalf of Trade Creditors as its attorney-in-fact.

2.7     Limitation on Remedies. Notwithstanding any rights or remedies available to a Creditor under any of the Agreements, applicable law or otherwise, except as set forth in Section 2.8, Trade Creditors shall not, directly or indirectly, (a) seek to foreclose or realize upon (judicially or non-judicially) its Lien on any Trade Collateral or assert any claims or interests therein, or (b) take any other action against the Trade Collateral. The foregoing shall not in any way limit or impair (i) the right of Trade Creditors from bidding for and purchasing Trade Collateral at any private or judicial foreclosure upon such Trade Collateral initiated by Revolving Loan Creditors or (ii) the right of any Trade Creditor to accept returns of goods sold by such Trade Creditor and included in the Trade Collateral in accordance with the trade terms between such Trade Creditor and the Debtors provided, however, that no Trade Creditor may accept the return of goods (A) not yet in transit upon and after Revolving Loan Agent notifying Trade Agent in writing to cease accepting such returns following the occurrence of a default under the Revolving Creditor Agreements (other than a default under the Revolving Creditor Agreements solely due to the occurrence of a Trade Default declared by the Trade Creditor Majority) and (B) not yet in transit or then in transit and received by a Trade Creditor more than forty-eight (48) hours after Revolving Loan Agent notifying Trade Agent in writing to cease accepting such returns following the occurrence of a default under the Revolving Creditor Agreements solely due to the occurrence of a Trade Default declared by the Trade Creditor Majority.

2.8     Standstill Provision. Notwithstanding anything to the contrary contained in Section 2.7 of this Intercreditor Agreement, Trade Creditors shall have the right to institute an Enforcement Action, or exercise any other similar remedies with respect thereto upon the occurrence and during the continuation of a Trade Default, subject at all times to the provisions of Section 2.2 of this Intercreditor Agreement, commencing one hundred and fifty (150) days after the date of the receipt by Revolving Loan Agent of written notice from Trade Agent of the

declaration by Trade Creditor Majority of such a Trade Default and the written demand by Trade Creditor Majority for the immediate payment of all of the Trade Debt under the Trade Creditor Security Agreement or the trade credit agreements between the Debtors and the Trade Creditors, so long as Revolving Loan Agent on behalf of Revolving Loan Creditors is not diligently pursuing in good faith the exercise of its enforcement rights or remedies against Debtors and/or the Revolving Loan Collateral or Trade Collateral (including, without limitation, commencement of any action to foreclose on its Liens on all or any portion of the Revolving Loan Collateral or Trade Collateral, entering into a forebearance agreement or similar arrangement with Debtors, any action to take possession of, or dispose of, all or any portion of the Revolving Loan Collateral or Trade Collateral or commencement of any legal proceedings or actions against or with respect to Debtors or all or any portion of the Revolving Loan Collateral or Trade Collateral).

2.9   Revolving Loan Creditor Option to Cure.   Revolving Loan Agent on behalf of Revolving Loan Creditors shall have the right, but not any obligation, to cure for the account of Debtors any default by Debtors under the Trade Creditor Security Agreement or the trade credit agreements between the Debtors and the Trade Creditors at any time during the one hundred and fifty (150) day period provided for in Section 2.8 above. In the event that the Trade Default shall be cured (it being understood that cure shall be deemed to have been effected upon payment of such amount as shall cause a Trade Default no longer to exist), whether by Revolving Loan Agent for the benefit of Revolving Loan Creditors, Debtors or any other person, or shall be waived or otherwise cease to exist, the rights of Trade Creditors under Section 2.8 above shall cease until the occurrence of any other Trade Default. In no event shall Revolving Loan Agent or Revolving Loan Creditors by virtue of the payment of amounts, or performance of any obligation required to be paid or performed by Debtors, be deemed to have assumed any obligation of Debtors to Trade Creditors or any other person.

2.10   Notice of Default.   The Revolving Loan Agent shall give to the Trade Agent, and the Trade Agent shall give to the Revolving Loan Agent, in each case concurrently with the giving thereof to Debtors, (a) a copy of any written notice by such Creditor of either a default or an event of default under its Agreements or trade credit arrangements with the Debtors, or written notice of demand of payment from Debtors (or, as to Trade Agent, receipt of a notice from a Trade Creditor with respect to a default by any Debtor under its trade credit arrangements with such Trade Creditor), and (b) any written notice sent by such Creditor to Debtors at any time an event of default under such Creditor's Agreements or trade credit arrangements with Debtors exists stating such Creditor's intention to exercise any of its enforcement rights or remedies, including written notice pertaining to any foreclosure on any of the Trade Collateral or other judicial or non-judicial remedy in respect thereof, and any legal process served or filed in connection therewith; provided, that, the failure of any party to give notice as required hereby shall not affect the relative priorities of Creditor's respective Liens as provided herein or the validity or effectiveness of any such notice as against Debtors. Debtors hereby authorize and consent to each of Creditors sending any such notices.

3.    PROCEEDS OF TRADE COLLATERAL

3.1    Distributions.

(a)    With respect to all payments from proceeds of any of the Trade Collateral, in the event of any Insolvency Proceeding involving Debtors, or upon the sale of all or substantially all of Debtors' assets, then, and in any such event, (i) Revolving Loan Agent for the ratable benefit of Revolving Loan Creditors shall first receive indefeasible payment in full in cash of all of the Revolving Loan Debt prior to the payment of all or any part of the Trade Debt, and (ii) Revolving Loan Creditors shall be entitled to receive any payment or distribution of any kind or character, whether in cash, securities or other property, which is payable or deliverable in respect of any or all of the Trade Debt.

(b)    To the extent necessary for Revolving Loan Agent and the other Revolving Loan Creditors to realize the benefits of the subordination of the Trade Debt provided for herein (including the right to receive any payment and distributions which might otherwise be payable or deliverable in respect of the Trade Debt in any proceeding described in Section 3.1(a) above or otherwise), Trade Creditors shall execute and deliver to Revolving Loan Agent such instruments or documents (together with such assignments or endorsements as Revolving Loan Agent shall deem necessary), as may be reasonably requested by Revolving Loan Agent.

3.2    <u>Trade Collateral Payments Received by Trade Creditors</u>.  Should any payment or distribution or security or instrument or proceeds thereof be received by Trade Creditors as proceeds of any action to foreclose or realize upon its Lien on any Trade Collateral in violation of Section 2.7 hereof, Trade Creditors shall receive and hold the same in trust, as trustee, for the benefit of Revolving Loan Agent and the Revolving Loan Creditors, segregated from other funds and property of Trade Creditors and shall forthwith deliver the same to Revolving Loan Agent for the benefit of Revolving Loan Creditors (together with any endorsement or assignment of Trade Creditors where necessary), for application to any of the Revolving Loan Debt.  In the event of the failure of the Trade Creditors to make any such endorsement or assignment to Revolving Loan Agent and the Revolving Loan Creditors, Revolving Loan Agent or any of its officers or employees, are hereby irrevocably authorized on behalf of Trade Creditors to make the same.

## 4.    COVENANTS, REPRESENTATIONS AND WARRANTIES

4.1    <u>Additional Representations</u>.

(a)    Trade Agent represents and warrants to Revolving Loan Creditors that Trade Agent has been duly and validly appointed by Trade Creditors as their agent under this Intercreditor Agreement and the Trade Creditor Security Agreement and this Intercreditor Agreement constitutes the valid, binding and enforceable obligation of Trade Agent for and on behalf of each of the Trade Creditors;

(b)    Trade Creditors represent and warrant to Revolving Loan Creditors and Trade Agent that this Intercreditor Agreement constitutes the legal, valid and binding obligations of Trade Creditors, enforceable in accordance with its terms.

(c)    Revolving Loan Agent represents and warrants to Trade Creditors that this Intercreditor Agreement constituted the valid, binding and enforceable obligations of Revolving Loan Agent, enforceable in accordance with its terms.

4.2    Additional Covenant.  Trade Creditors and Debtors agree in favor of Revolving Loan Creditors that each of them shall execute and deliver to Revolving Loan Agent such additional agreements, documents and instruments and take such further actions as may be reasonably necessary to effectuate the provisions and purposes of this Intercreditor Agreement.

4.3    Waivers.   Notice of acceptance hereof, the making of loans, advances and extensions of credit or other financial accommodations to, and the incurring of any expenses by or in respect of, Debtors by Revolving Loan Creditors, and presentment, demand, protest, notice of protest, notice of nonpayment or default and all other notices to which Trade Creditors and Debtors are or may be entitled are hereby waived (except as expressly provided for herein or as to Debtors, in the Revolving Creditor Agreements).  Trade Creditors also waive notice of, and hereby consent to, (a) any amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements, including, without limitation, extensions of time of payment of or increase or decrease in the amount of any of the Revolving Loan Debt, the interest rate, fees, other charges, or any collateral, (b) the taking, exchange, surrender and releasing of Trade Collateral or guarantees now or at any time held by or available to Revolving Loan Agent or any of the Revolving Loan Creditors for the Revolving Loan Debt, (c) the exercise of, or refraining from the exercise of any rights against Debtors or any other obligor on any Trade Collateral, (d) the settlement, compromise or release of, or the waiver of any default with respect to, any of the Revolving Loan Debt, and/or (e) Revolving Loan Creditors' election, in any proceeding instituted under the U.S. Bankruptcy Code, of the application of Section 1111(b)(2) of the U.S. Bankruptcy Code. Any of the foregoing shall not, in any manner, affect the terms hereof or impair the obligations of Trade Creditors hereunder.  All of the Revolving Loan Debt shall be deemed to have been made or incurred in reliance upon this Intercreditor Agreement.

4.4    Subrogation; Marshalling.  Trade Creditors shall not be subrogated to, or be entitled to any assignment of any Revolving Loan Debt or Trade Debt or of any Trade Collateral or guarantees or evidence of any thereof.  Trade Creditors hereby waive any and all rights to have Trade Collateral or any part thereof granted to Revolving Loan Agent for the benefit of Revolving Loan Creditors marshalled upon any foreclosure or other disposition of such collateral by Revolving Loan Agent for the benefit of Revolving Loan Creditors or Debtors.

5.    MISCELLANEOUS

5.1    Amendments.  Any waiver, permit, consent or approval by any Creditor of or under any provision, condition or covenant to this Intercreditor Agreement must be in writing and shall be effective only to the extent it is set forth in writing and as to the specific facts or circumstances covered thereby.  Any amendment of this Intercreditor Agreement must be in writing and signed by each of the Revolving Loan Agent and the Trade Agent and, in the case of

243162 v-4

10

any reduction of the one hundred fifty (150) day period specified in Section 2.8 of this Intercreditor Agreement, the Debtors.

    5.2    Successors and Assigns.

    (a)    This Intercreditor Agreement shall be binding upon the parties hereto and their respective successors and permitted assigns and shall inure to the benefit of each of Creditors and its respective successors, participants and assigns.

    (b)    Each Revolving Loan Creditor reserves the right to grant participations in, or otherwise sell, assign, transfer or negotiate all or any part of, or any interest in, the Revolving Loan Debt and the Trade Collateral securing same; provided, that, Trade Creditors shall not be obligated to give any notices to or otherwise in any manner deal directly with any participant in the Revolving Loan Debt and no participant shall be entitled to any rights or benefits under this Intercreditor Agreement except through Revolving Loan Agent. In connection with any participation or other transfer or assignment, each Revolving Loan Creditor (i) may disclose to such assignee, participant or other transferee or assignee all documents and information which Revolving Loan Creditor now or hereafter may have relating to the Revolving Loan Debt or the Trade Collateral and (ii) shall disclose to such participant or other transferee or assignee the existence and terms and conditions of this Intercreditor Agreement.

    (c)    Trade Creditors agree to execute and deliver an agreement containing terms substantially identical to those contained herein in favor of any assignee or transferee of any or all rights of Revolving Loan Agent and the other Revolving Loan Creditors in the property of Debtors (other than pursuant to a participation) or any third person who otherwise refinances, succeeds to or replaces any or all of Revolving Loan Creditors' financing of Debtors.

    5.3    Insolvency. This Intercreditor Agreement shall be applicable both before and after the filing of any petition by or against Debtors under the U.S. Bankruptcy Code and all converted or succeeding cases in respect thereof, and all references herein to Debtors shall be deemed to apply to a trustee for Debtors and Debtors as debtors-in-possession. The relative rights of Revolving Loan Creditors and Trade Creditors in or to any distributions from or in respect of any Trade Collateral or proceeds of Trade Collateral, shall continue after the filing thereof on the same basis as prior to the date of the petition, subject to any court order approving the financing of, or use of cash collateral by, Debtors as debtor-in-possession.

    5.4    Bankruptcy Financing. If Debtors shall become subject to a proceeding under the U.S. Bankruptcy Code and if Revolving Loan Agent desires to permit the use of cash collateral or to provide financing to Debtors under either Section 363 or Section 364 of the U.S. Bankruptcy Code, Trade Creditors agree as follows: (a) adequate notice to Trade Creditors shall have been provided for such financing or use of cash collateral if Trade Creditors receive notice five (5) business days prior to the entry of the order approving such financing or use of cash collateral and (b) no objection will be raised by Trade Creditors to any such financing or use of cash collateral on the ground of a failure to provide "adequate protection" for Trade Creditor's junior Liens on the Trade Collateral or any other grounds, provided Trade Creditors retain a Lien on the post-petition Trade Collateral with the same priority as existed prior to the

commencement of the proceeding under the U.S. Bankruptcy Code. For purposes of this Section, notice of a proposed financing or use of cash collateral shall be deemed given when given, in the manner prescribed by Section 5.5 hereof, to Trade Creditors.

5.5    No Constraint on Trade Creditors and Trade Agent. Nothing contained in this Intercreditor Agreement shall preclude any Trade Creditor from discontinuing its extension of trade financing to any Debtor or from taking (without notice to Revolving Loan Agent or any Debtor or any other Person) any other action in respect of the Trade Debt which such Trade Creditor is otherwise entitled to take as an unsecured creditor or from taking any action which such Trade Creditor or the Trade Agent, subject to this Intercreditor Agreement, may take with respect to the Trade Collateral.

5.6    Notices. All notices, requests and demands to or upon the respective parties hereto shall be in writing and shall be deemed duly given, made or received: if delivered in person, immediately upon delivery; if by telex, telegram or facsimile transmission, immediately upon sending and upon confirmation of receipt; if by nationally recognized overnight courier service with instructions to deliver the next business day, one (1) business day after sending; and if mailed by certified mail, return receipt requested, five (5) days after mailing to the parties at their addresses set forth below (or to such other addresses as the parties may designate in accordance with the provisions of this Section):

If to Revolving Loan
Agent or Revolving
Loan Creditors:

    Congress Financial Corporation (Florida), as Agent
    777 Brickell Avenue
    Miami, Florida 33131
    Attention: Portfolio Manager
    Telephone No.: 305-371-6671
    Telecopy No.: 305-371-9456

If to Trade Agent
or Trade Creditors:

    The Bank of New York
    101 Barclay Street
    New York, New York 10286
    Attention: Mary LaGunina, Corporate Trust Administration
    Telephone No.: 212-815-4812
    Telecopy No.: 212-815-5707

with a copy to:

    Morgan, Lewis & Bockius LLP
    1701 Market Street
    Philadelphia, Pennsylvania 19103-2921
    Attention: Michael J. Pedrick, Esq.
    Telephone No.: 215-963-4808
    Telecopy No.: 215-963-5299

243162 v-4

If to Debtors:

Musicland Holding Corp.
10400 Yellow Circle Drive
Minnetonka, Minnesota 55343-9143
Attention: Chief Executive Officer
Telephone No.: 952-931-8899
Telecopy No.: 952-931-8583

with a copy to:

Sun Capital Partners, Inc.
5200 Town Center Circle, Suite 470
Boca Raton, Florida 33486
Attention: Marc J. Leder, Rodger R. Krouse
   and C. Deryl Couch, Esq.
Telephone No.: (561) 394-0550
Telecopy No.: (561) 394-0540

with a copy to:

Kirkland & Ellis LLP
200 East Randolph
Chicago, Illinois 60601
Attention: Jocelyn A. Hirsch, Esq.
Telephone No.: (312) 861-2301
Telecopy No.: (312) 861-2200

Either Creditor may change the address(es) to which all notices, requests and other communications are to be sent by giving written notice of such address change to the other Creditor in conformity with this Section 5.6, but such change shall not be effective until notice of such change has been received by the other Creditors.

5.7   Counterparts. This Intercreditor Agreement may be executed in any number of counterparts, each of which shall be an original and all of which shall together constitute but one and the same agreement. In making proof of this Intercreditor Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto. Delivery of an executed counterpart of this Intercreditor Agreement by telefacsimile shall have the same force and effect as delivery of an original executed counterpart of this Intercreditor Agreement. Any party delivering an executed counterpart of this Intercreditor Agreement by telefacsimile also shall deliver an original executed counterpart of this Intercreditor Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Intercreditor Agreement as to such party or any other party.

5.8   Governing Law. The validity, interpretation and enforcement of this Agreement and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York.

243162 v-4

13

5.9    Consent to Jurisdiction; Waiver of Jury Trial.

Each of the parties hereto hereby irrevocably consent and submit to the non-exclusive jurisdiction of the Circuit Court of New York County and the United States District Court for the Southern District of New York, whichever Revolving Loan Creditors may elect, and waives trial by jury in any action or proceeding with respect to this Intercreditor Agreement.

5.10    Complete Agreement.  This written Intercreditor Agreement is intended by the parties as a final expression of their agreement and is intended as a complete statement of the terms and conditions of their agreement.  In the event of any conflict between the provisions of this Intercreditor Agreement and any of the Agreements, the provisions of this Intercreditor Agreement shall prevail.

5.11    No Third Parties Benefited.  Except as expressly provided in Section 5.2 above, this Intercreditor Agreement is solely for the benefit of the Creditors and their respective successors, participants and assigns, and no other person shall have any right, benefit, priority or interest under, or because of the existence of, this Intercreditor Agreement.

5.12    Disclosures; Non-Reliance.  Each Creditor has the means to, and shall in the future remain, fully informed as to the financial condition and other affairs of Debtors and no Creditor shall have any obligation or duty to disclose any such information to any other Creditor.  Except as expressly set forth in this Intercreditor Agreement, the parties hereto have not otherwise made to each other nor do they hereby make to each other any warranties, express or implied, nor do they assume any liability to each other with respect to:  (a) the enforceability, validity, value or collectability of any of the Trade Debt or Revolving Loan Debt or any guarantee or security which may have been granted to any of them in connection therewith; (b) Debtors' title to or right to transfer any of the Trade Collateral; or (c) any other matter except as expressly set forth in this Intercreditor Agreement.

5.13    Term.  This Intercreditor Agreement is a continuing agreement and shall remain in full force and effect until the indefeasible satisfaction in full of all Revolving Loan Debt and the termination of the financing arrangements between Revolving Loan Creditors and Debtors.

5.14    Acknowledgment.  Revolving Loan Agent hereby acknowledges that Debtors have agreed to indemnify Trade Agent pursuant to Section 8.1 of the Collateral Agency Agreement in accordance with the terms thereof as in effect on the date hereof.  The foregoing acknowledgment does not give rise to any obligations of any kind on the part of Revolving Loan Agent hereunder, under the Collateral Agency Agreement or otherwise.


[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have caused this Intercreditor Agreement to be duly executed as of the day and year first above written.

CONGRESS FINANCIAL CORPORATION
(FLORIDA), as Agent

By: _____

Title: _____

THE BANK OF NEW YORK, as Trade Agent

By: _____

Title: _____

Each of the undersigned hereby acknowledges and agrees to the foregoing terms and provisions. By its signature below, the undersigned agrees that it will, together with its successors and assigns, be bound by the provisions hereof.

Each of the undersigned agrees that any Creditor holding Trade Collateral does so as bailee (under the UCC) for the other and is hereby authorized to and may turn over to such other Creditor upon request therefor any such Trade Collateral, after all obligations and indebtedness of the undersigned to the bailee Creditor have been fully paid and performed.

Each of the undersigned acknowledges and agrees that: (i) although it may sign this Intercreditor Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Intercreditor Agreement, (ii) in the event of a breach by the undersigned or Trade Creditors of any of the terms and provisions contained in the foregoing Intercreditor Agreement, such a breach shall constitute an "Event of Default" as defined in and under the Revolving Creditor Agreements and (iii) it will execute and deliver such additional documents and take such additional action as may be reasonably necessary or desirable in the opinion of any Creditor to effectuate the provisions and purposes of the foregoing Intercreditor Agreement.

MUSICLAND PURCHASING CORP.

By: _____

Title: _____

[SIGNATURES CONTINUE ON NEXT PAGE]

243162 v-4

15

IN WITNESS WHEREOF, the parties have caused this Intercreditor Agreement to be duly executed as of the day and year first above written.

CONGRESS FINANCIAL CORPORATION
(FLORIDA), as Agent

By: _____

Title: _____

THE BANK OF NEW YORK, as Trade Agent

By: _____
　　　MARY LaGUMINA
Title: _____
　　　Vice President

Each of the undersigned hereby acknowledges and agrees to the foregoing terms and provisions. By its signature below, the undersigned agrees that it will, together with its successors and assigns, be bound by the provisions hereof.

Each of the undersigned agrees that any Creditor holding Trade Collateral does so as bailee (under the UCC) for the other and is hereby authorized to and may turn over to such other Creditor upon request therefor any such Trade Collateral, after all obligations and indebtedness of the undersigned to the bailee Creditor have been fully paid and performed.

Each of the undersigned acknowledges and agrees that: (i) although it may sign this Intercreditor Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Intercreditor Agreement, (ii) in the event of a breach by the undersigned or Trade Creditors of any of the terms and provisions contained in the foregoing Intercreditor Agreement, such a breach shall constitute an "Event of Default" as defined in and under the Revolving Creditor Agreements and (iii) it will execute and deliver such additional documents and take such additional action as may be reasonably necessary or desirable in the opinion of any Creditor to effectuate the provisions and purposes of the foregoing Intercreditor Agreement.

MUSICLAND PURCHASING CORP.

By: _____

Title: _____

[SIGNATURES CONTINUE ON NEXT PAGE]

243162 v-4

15

IN WITNESS WHEREOF, the parties have caused this Intercreditor Agreement to be duly executed as of the day and year first above written.

CONGRESS FINANCIAL CORPORATION (FLORIDA), as Agent

By: _____

Title: _____

THE BANK OF NEW YORK, as Trade Agent

By: _____

Title: _____

Each of the undersigned hereby acknowledges and agrees to the foregoing terms and provisions. By its signature below, the undersigned agrees that it will, together with its successors and assigns, be bound by the provisions hereof.

Each of the undersigned agrees that any Creditor holding Trade Collateral does so as bailee (under the UCC) for the other and is hereby authorized to and may turn over to such other Creditor upon request therefor any such Trade Collateral, after all obligations and indebtedness of the undersigned to the bailee Creditor have been fully paid and performed.

Each of the undersigned acknowledges and agrees that: (i) although it may sign this Intercreditor Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Intercreditor Agreement, (ii) in the event of a breach by the undersigned or Trade Creditors of any of the terms and provisions contained in the foregoing Intercreditor Agreement, such a breach shall constitute an "Event of Default" as defined in and under the Revolving Creditor Agreements and (iii) it will execute and deliver such additional documents and take such additional action as may be reasonably necessary or desirable in the opinion of any Creditor to effectuate the provisions and purposes of the foregoing Intercreditor Agreement.

MUSICLAND PURCHASING CORP.

By: _~~E. A. Williams~~_

Title: _____ CEO _____

[SIGNATURES CONTINUE ON NEXT PAGE]

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

SUNCOAST MOTION PICTURE COMPANY, INC.

By: _Ez S Wiame_

Title: _____CEO_____

SUNCOAST GROUP, INC.

By: _Ez W Wan_

Title: _____CEO_____

SUNCOAST RETAIL, INC.

By: _Ez W Wan_

Title: _____CEO_____

TMG CARIBBEAN, INC.

By: _E S W Wan_

Title: _____CEO_____

THE MUSICLAND GROUP, INC.

By: _Ez W Ws_

Title: _____CEO_____

[SIGNATURES CONTINUE ON NEXT PAGE]

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

MUSICLAND RETAIL, INC.

By: _____

Title: _____    CEO

TMG-VIRGIN ISLANDS, INC.

By: _____

Title: _____    CEO

MLG INTERNET, INC.

By: _____

Title: _____    CEO

MEDIA PLAY, INC.

By: _____

Title: _____    CEO

REQUEST MEDIA, INC.

By: _____

Title: _____    CEO

MUSICLAND HOLDING CORP.

By: _____

Title: _____    CEO

[SIGNATURES CONTINUE ON NEXT PAGE]

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

MG FINANCIAL SERVICES, INC.

By: _____

Title: _____ CEO _____


SAM GOODY HOLDING CORP.

By: _____

Title: _____ CEO _____


SUNCOAST HOLDING CORP.

By: _____

Title: _____ CEO _____

SCHEDULE 1.12
TO
INTERCREDITOR AGREEMENT

<u>Revolving Loan Collateral</u>

Revolving Loan Collateral includes all of the following property and interests in property of Debtors, whether now owned or hereafter acquired or arising, and wherever located (collectively, the "Revolving Loan Collateral"):

1.     all rights of the Debtors to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a secondary obligation incurred or to be incurred, or (d) from any credit card issuer, credit card processor or other third party arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and from any credit card issuer, credit card processor or other third party in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any credit card issuer or credit card processor under all agreements now or hereafter entered into by Debtors with any credit card issuer or any credit card processor or otherwise (all of the foregoing being referred to herein collectively as the "Accounts");

2.     all general intangibles, including, without limitation: patents, patent rights, patent applications, copyrights, works which are the subject matter of copyrights, copyright registrations, trademarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the foregoing; all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing; all rights to sue for past, present and future infringement of any of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards; goodwill (including any goodwill associated with any trademark or the license of any trademark); customer and other lists in whatever form maintained; and trade secret rights, copyright rights, rights in works of authorship, domain names and domain name registrations; software and contract rights relating to software, in whatever form created or maintained;

3.     all goods, including, without limitation, all now owned and hereafter existing or acquired (a) goods, wherever located, which (i) are leased by Debtors as lessor; (ii) are held by Debtors for sale or lease or to be furnished under a contract of service; (iii) are furnished by Debtors under a contract of service; or (iv) consist of raw materials, work in process, finished goods or materials used or consumed in its business and (b) equipment, wherever located, including machinery, data processing and computer equipment and computer hardware and software, whether owned or licensed, and including embedded software, vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located;

4. all fixtures and real property, including leasehold interests, together with all buildings, structures, and other improvements located thereon and all licenses, easements and appurtenances relating thereto, wherever located;

5. all chattel paper, including, without limitation, all tangible and electronic chattel paper;

6. all instruments, including, without limitation, all promissory notes;

7. all documents and all credit card sales drafts, credit card slips or charge slips or receipts and other forms of store receipts;

8. all deposit accounts;

9. all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

10. all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables (defined below) and other Revolving Loan Collateral, including (a) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Revolving Loan Collateral; (b) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party; (c) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Revolving Loan Collateral, including returned, repossessed and reclaimed goods; and (d) deposits by and property of account debtors or other persons securing the obligations of account debtors;

11. all investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and all monies, credit balances, deposits and other property of Debtors now or hereafter held by or in transit to Revolving Loan Agent or its affiliates or at any other depository or other institution from or for the account of Debtors, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

12. all commercial tort claims;

13. to the extent not otherwise described above (a) all interest, fees, late charges, penalties, collection fees and other amounts due or to become due or otherwise payable in connection with any Account; (b) all payment intangibles of Debtors; (c) letters of credit, indemnities, guarantees, security or other deposits and proceeds thereof issued payable to Debtors or otherwise in favor of or delivered to Debtors in connection with any Account; or (d) all other accounts, contract rights, chattel paper, instruments, notes, general intangibles and other forms of obligations owing to Debtors, whether from the sale and lease of goods or other property, licensing of any property (including intellectual property or other general intangibles), rendition of services or from loans or advances by Debtors to or for the benefit of any third

person (including loans or advances to any affiliates or subsidiaries of Debtors) or otherwise associated with any Accounts, inventory or general intangibles of Debtors (including, without limitation, choses in action, causes of action, tax refunds, tax refund claims, any funds which may become payable to Debtors in connection with the termination of any employee benefit plan and any other amounts payable to Debtors from any employee benefit plan, rights and claims against carriers and shippers, rights to indemnification, business interruption insurance and proceeds thereof, casualty or any similar types of insurance and any proceeds thereof and proceeds of insurance covering the lives of employees on which Debtors are a beneficiary) (all of the foregoing being referred to herein collectively as the "Receivables");

14.     all books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to any of the Revolving Loan Collateral or any account debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of Debtors with respect to the foregoing maintained with or by any other person); and

15.     all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Revolving Loan Collateral.

SCHEDULE 1.16
TO
INTERCREDITOR AGREEMENT

Trade Collateral

All of Debtors' now owned or hereafter existing Inventory (as defined below) and all products and proceeds of Inventory, in any form, including, without limitation, insurance proceeds and all claims against third parties for loss or damage to or destruction of any or all of the Inventory.

For purposes of this description: (i) "Inventory" shall mean tangible personal property held for sale and raw materials, work in process and materials used, produced or consumed in business, and shall include tangible personal property sold on a sale or return basis, tangible personal property returned by the purchaser following a sale thereof and tangible personal property represented by Documents of Title; and (ii) "Documents of Title" shall mean a bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers.

243162 v-4

22

## SCHEDULE 1.3
## TO
## INTERCREDITOR AGREEMENT

### Debtors

Media Play, Inc.
MG Financial Services, Inc.
MLG Internet, Inc.
Musicland Holding Corp.
Musicland Purchasing Corp.
Musicland Retail, Inc.
Request Media, Inc.
Sam Goody Holding Corp.
Suncoast Group, Inc.
Suncoast Holding Corp.
Suncoast Motion Picture Company, Inc.
Suncoast Retail, Inc.
The Musicland Group, Inc.
TMG Caribbean, Inc.
TMG Virgin Islands, Inc.