```
 1                 UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF NEW YORK
 2
                                      .
 3   IN RE:                           .   Case No. 06-10064
                                      .   Jointly Administered
 4   MUSICLAND HOLDING CORPORATION,.
     et al.                           .
 5               Debtors.     .   New York, New York
     MUSICLAND HOLDING CORPORATION,.   Thursday, August 9, 2007
 6   . . . . . . . . . . . . . .   10:17 a.m.
     BUENA VISTA HOME                  .
 7   ENTERTAINMENT, INC., et al.,  .
                                      .
 8               Plaintiffs, .
                                      .
 9           vs.              .   Adv. Pro. No. 07-01705
                                      .
10   WACHOVIA BANK, N.A., et al.,  .
                                      .
11               Defendants. .
     . . . . . . . . . . . . . .
12   MEDIA PLAY, INC.,                 .
                                      .
13               Plaintiff, .
                                      .   Adv. Pro. No. 07-01688
14           vs.              .
                                      .
15   HOB-LOB, L.P.,               .
                                      .
16               Defendant. .
     . . . . . . . . . . . . . .
17                  TRANSCRIPT OF HEARING
18       BEFORE THE HONORABLE STUART M. BERNSTEIN
                UNITED STATES BANKRUPTCY JUDGE
19

20   Audio Operator:          Electronically Recorded
                              by Court Personnel
21
     Transcription Company:   Rand Transcript Service, Inc.
22                            80 Broad Street, Fifth Floor
                              New York, New York 10004
23                            (212) 504-2919
                              www.randtranscript.com
24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.
```

```
 1   APPEARANCES:  (Continued)

 2   For the Debtors:              James A. Stempel, Esq.
                                   KIRKLAND & ELLIS, LLP
 3                                 200 East Randolph Drive
                                   Chicago, Illinois 60601
 4
     For the Official Committee
 5   of Unsecured Creditors:       Edward L. Schnitzer, Esq.
                                   HAHN & HESSEN, LLP
 6                                 488 Madison Avenue
                                   New York, New York 10022
 7
     For Harris, N.A.:             Frederick V. Lochbihler, Esq.
 8                                 CHAPMAN & CUTLER, LLP
                                   111 West Monroe Street
 9                                 Chicago, Illinois 60603

10                                 Robert D. Piliero, Esq.
                                   PILIERO, GOLDSTEIN, KOGAN
11                                  & MILLER, LLP
                                   10 East 53rd Street
12                                 New York, New York 10022

13   For Media Play, Inc.:         L. P. Harrison, III, Esq.
                                   Loren E. Friedman, Esq.
14                                 CURTIS, MALLET-PREVOST,
                                    COLT & MOSLE, LLP
15                                 101 Park Avenue
                                   New York, New York 10178
16
     For the Buena Vista Home
17   Entertainment, Inc., et al,:  Alan J. Kornfeld, Esq.
                                   Marc A. Beilinson, Esq.
18                                 Beth E. Levine, Esq.
                                   PACHULSKI, STANG, ZIEHL,
19                                  YOUNG, JONES & WEINTRAUB
                                   780 Third Avenue
20                                 36th Floor
                                   New York, New York 10017
21
     For Wachovia Bank, N.A.:      Richard G. Haddad, Esq.
22                                 Andrew M. Kramer, Esq.
                                   OTTERBOURG, STEINDLER,
23                                  HOUSTON & ROSEN, P.C.
                                   230 Park Avenue
24                                 New York, New York 10169

25
```

```
 1  APPEARANCES:   (Continued)

 2  For Hob-Lob, Inc.:              Michelle McMahon, Esq.
                                    BRYAN CAVE, LLP
 3                                  1290 Avenue of the Americas
                                    New York, New York 10022
 4
    For the Informal Committee
 5  of Secured Trade Creditors:    Andrew N. Rosenberg, Esq.
                                    PAUL, WEISS, RIFKIND,
 6                                   WHARTON & GARRISON, LLP
                                    1285 Avenue of the Americas
 7                                  New York, New York 10019

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

<pre>
1                              INDEX

2

3                                                      Page

4   ADJOURNED MATTERS                                    5

5   20th CENTURY FOX CASE                                8

6   MEDIA PLAY V. HOB-LOB PRETRIAL CONFERENCE            9

7   BUENA VISTA HOME ENTERTAINMENT, INC.,
    V. WACHOVIA BANK & HARRIS, N.V.
8
        Argument by Mr. Haddad                         10,49
9       Argument by Mr. Lochbihler                     25,51
        Argument by Mr. Kornfeld                       33,52
10      Argument by Mr. Beilinson                        44

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

Colloquy                                    5

1    (Proceedings commence at 10:17 a.m.)

2            THE COURT:  Musicland.  You lost your seat?

3            MR. STEMPEL:  Yeah.  Well, I'm hopefully only going to

4    speak a little bit, and then get out of everybody's way.

5            THE COURT:  That says something about the debtors' role

6    in this case.

7            MR. STEMPEL:  Yes, it does.  At this point.

8            Just, Your Honor, before we -- I know you have the

9    agenda.

10           THE COURT:  Yeah.  Why don't we go through what's being

11   adjourned first.

12           MR. STEMPEL:  Okay.  The first one on the list that's

13   being adjourned is plan confirmation.

14           THE COURT:  All right.  Let me just find that on my

15   calendar.  Oh, okay.

16           MR. STEMPEL:  And we received the date, as I understand

17   it, for September 27th, if I remember correctly, and just by way

18   of the status, the debtor is ready to proceed.

19           THE COURT:  Is the only thing that's holding it up this

20   issue about Wachovia's administrative claim?

21           MR. STEMPEL:  Wachovia's objections.  Exactly right.

22   So the claims pool that Your Honor wanted us to do more work on

23   to make sure we could walk you through exactly why there's no

24   cash.  That's ready to go, and before the 27th, we'll submit an

25   affidavit and the Wachovia objection is the lone obstacle.

Colloquy                                              6

1          THE COURT:  Okay.

2          MR. STEMPEL:  And that's essentially what I wanted to

3   report.  That's why we adjourned it, because depending on what

4   transpires with the motions to dismiss today, that will impact

5   how we move forward.

6          THE COURT:  But the Wachovia objection really raises a

7   different issue.

8          MR. STEMPEL:  It raises an indemnification issue and

9   can be debated, if you've seen some of the responses already, as

10  to whether they, in fact, have that right.

11         THE COURT:  But that's under that termination

12  agreement.

13         MR. STEMPEL:  Correct.

14         THE COURT:  But assuming the termination agreement is

15  valid and they're right, that they have a right of

16  indemnification under it, win or lose in the adversary

17  proceeding, aren't they entitled to indemnification?

18         MR. STEMPEL:  With that assumption, yes, but the dollar

19  figure will be the germane fact for feasibility.

20         THE COURT:  Okay.

21         MR. STEMPEL:  And if you were to dismiss the case and

22  all that remained was a potential appeal, we would be in front

23  of you on the 27th with an estimation motion to argue that their

24  right of indemnification is going to have a limited dollar

25  figure associated with it, essentially the legal fees, because

Colloquy

1    of a likelihood that the case of a dismissal is upheld.  And so,

2    we would be asking you to fix it at a dollar figure that still

3    allowed us to prove feasibility.

4           THE COURT:  I understand that.  Okay.

5           MR. STEMPEL:  So that one's moved to the 27th of

6    September.

7           The Item 4, which is the second omnibus objection by

8    the debtors to claims.  Item 5, the third omnibus objection, and

9    Item 6, the fifth omnibus objection, with only one exception on

10   the fifth omnibus objection.  Those would be moved, if it's

11   okay, to that same September date.

12          THE COURT:  Okay.

13          MR. STEMPEL:  With respect to the fifth omnibus

14   objection, there was one reconciliation with the New York City

15   Department of Finance, for which an affidavit was submitted and

16   the form we've been submitting to make sure that it was clear

17   that it was a reconciliation, not a settlement, Your Honor, and

18   so we're happy to submit an order to chambers at the end of the

19   proceedings today.  And those three would be carried to the

20   September 27th date.

21          Then you have -- I think the committee's Examination

22   Item 9 on the agenda -- I'm looking for committee counsel --

23   would also move to the 27th.

24          MR. SCHNITZER:  That's correct, Your Honor.

25          THE COURT:  Okay.

Colloquy                                    8

1        MR. STEMPEL:  And the rest, I believe, are either

2   status -- pretrial conference and the adversary proceeding in

3   the motion to dismiss.

4        THE COURT:  All right.  What's happening with the 20th

5   Century Fox matter?

6        MR. STEMPEL:  The Committee is handling that, so I'll

7   let committee counsel speak.

8        THE COURT:  Okay.  Thanks.

9        MR. SCHNITZER:  Your Honor, good morning.  Edward

10  Schnitzer, from Hahn & Hessen, for the Committee.

11       The last occasion we were here, Your Honor, I reported

12  that the matter was settling or was settled, and we were just

13  trying to finalize it at this point.  We do have a settlement

14  agreement, both in principal and form.  I'm just trying to get

15  one remaining signature to it.  Once I am able to get that

16  signature, we expect to file a 9019.  I would hope to say the

17  9019 will be filed in two weeks.  My only reason to use the word

18  "hope" is it depends.  I need a signature from an attorney

19  representing Credit Suisse.  If I get that signature today, the

20  9019 will be filed next week.  If I get it later, I have to

21  obviously wait until I have that signature, but I expect to get

22  that shortly.

23       THE COURT:  Okay.  You can do it by notice of

24  presentment, or just put it on the calendar for the 27th.

25  Either way.

Pretrial Conference                                      9

1        MR. SCHNITZER:  Thank you, Your Honor.

2        THE COURT:  Okay.  Next is the Hob-Lob.

3        MR. HARRISON:  Your Honor, if it pleases the Court,

4   Lynn Harrison of Curtis, Mallet-Prevost, Colt & Mosle, conflicts

5   counsel to the debtor, Your Honor.

6        Your Honor, this is a pretrial conference in this

7   adversary proceeding, <u>Media Play v. Hob-Lob</u>.  The pretrial

8   conference was originally scheduled for July 12th and was

9   adjourned pursuant to the order of the Court and pursuant to a

10  letter by firm dated July 20th, to allow the parties to explore

11  settlement negotiations, and also allow the defendant to secure

12  counsel.

13       Your Honor, I do not know whether or not you're

14  interested in the details of the adversary proceeding, but --

15       THE COURT:  Well, I've read the complaint and the

16  answer and counterclaim.

17       MR. HARRISON:  Your Honor, we are in the process of

18  exchanging the pretrial stipulations for purposes of discovery.

19  I think we're going to be in a position, Your Honor, to submit

20  that in the next couple of days --

21       THE COURT:  Okay.

22       MR. HARRISON:  -- and get that to chambers, so we can

23  move this process along.

24       THE COURT:  All right.  I'll adjourn it, for holding

25  purposes, to September 27th in case I don't have the

1   stipulation.  Assuming I have the stipulation, it provides for a

2   final pretrial conference, we'll just adjourn it to the final

3   pretrial conference date.

4          MR. HARRISON:  Thank you very much, Your Honor.

5          THE COURT:  Thanks.  All right.  Then the only

6   remaining matter is the lawsuit against Wachovia and Harris.

7          MR. HADDAD:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. HADDAD:  Richard Haddad, from Otterbourg,

10  Steindler, Houston & Rosen, along with my colleague, Andrew

11  Kramer, for Wachovia Bank, which is sued here as agent.

12  Wachovia was formerly known as Congress Financial Corporation,

13  so the name Congress appears in many of the documents.

14         THE COURT:  Yes, sir?  You're standing.

15         MR. LOCHBIHLER:  Your Honor, my name is Fred

16  Lochbihler.  I represent Harris Bank.  We're movants, as well,

17  on here --

18         THE COURT:  Okay.

19         MR. LOCHBIHLER:  -- with co-counsel, Mr. Piliero.

20         THE COURT:  How do you do?  Go ahead, Mr. Haddad.

21         MR. HADDAD:  Thank you, Your Honor.

22         Wachovia is moving to dismiss this complaint,

23  specifically the first, second, fourth and sixth claims, which

24  are asserted against Wachovia.  The other claims in the

25  complaint are asserted against Harris, and Harris can speak to

1   those.

2       We are moving, Your Honor, to dismiss based upon the

3   documentary evidence that was attached to the complaint and

4   specifically, the unambiguous contracts conclusively establish

5   that the conduct that is complained of in this complaint was

6   expressly authorized in the very contract sued upon, that is the

7   inter-creditor agreement.

8       THE COURT:  Well, I guess the argument is that there

9   was some -- not explicit -- implicit limitation on what you

10  could do, or the amendments that you, in essence, could force on

11  the trade creditors.  What's your response to that?

12      MR. HADDAD:  That is a suggestion that it is an

13  implicit, that is not-stated restriction.

14      THE COURT:  Well, that's kind of what their breach of

15  good faith and fair dealing argument is.

16      MR. HADDAD:  Right.  Well, they did indicate in the

17  footnote to their brief that they're withdrawing the covenant of

18  good-faith claim.

19      THE COURT:  It's a rule of construction more than a

20  cause of action.

21      MR. HADDAD:  It is.  And I think, however, it, as a

22  rule of construction, cannot be used to contradict unambiguous

23  express terms of the agreement.  And the agreement expressly

24  says that it can be amended.  The agreement expressly says that

25  the banks could make loans of any kind, and that's at Section

1  1.16.

2       Section 4.3 of the agreement expressly says that they

3  consent to any such amendment, or a modification, or a

4  supplement, and you can't use the implied covenant of good faith

5  to suggest that there are additional obligations that need to be

6  complied with, or to give a cause of action where the contract

7  itself expressly states that this particular conduct is

8  authorized.

9       THE COURT:  At the end of the next-to-last sentence in

10 4.3, it says, "Any of the foregoing shall not, in any manner,

11 affect the terms hereof or impair the obligations of trade

12 creditors hereunder."  What does that mean?

13      MR. HADDAD:  That it doesn't change the rights that

14 they have, the right that they recognized when they entered into

15 this agreement, that they were going to be a silent second -- I

16 mean, recognize what is the agreement.  It sets forth in the

17 very first, in the whereas clauses, what this was.  Well, the

18 banks were already in place as the secured lenders, and the

19 suppliers were unsecured.  They wanted to become secured so that

20 they would have a preference over the general mass of unsecured

21 creditors.  They couldn't do that.  The debtor couldn't give

22 them a lien because that would have violated their senior

23 secured loan agreement.  Therefore, in order to accommodate the

24 trade, in order to accommodate those members of the secured

25 trade who wanted liens, the parties entered into a very

1  detailed, lengthy inter-creditor agreement that provided very

2  few rights to the secured trade, vis-a-vis the lenders, and that

3  the --

4          THE COURT:  Under the agreement, was there anything

5  that the lenders could not do?

6          MR. HADDAD:  Yes.

7          THE COURT:  What?

8          MR. HADDAD:  There were a few things the lenders could

9  not do.  We could not bring into the loan, as a new lender, an

10 affiliate of the debtor for more than twenty-five percent of the

11 loan.  We could not do that.

12         THE COURT:  Okay.  Anything else?

13         MR. HADDAD:  That's the one that jumps --

14         THE COURT:  Okay.

15         MR. HADDAD:  That just jumps to mind, but what that

16 says is, and what that not just implies, but what that actually

17 demonstrates is that when the parties wanted to restrict the

18 lenders --

19         THE COURT:  That's why I asked the question.

20         MR. HADDAD:  So that's the one.  They would know how to

21 do that.  They didn't restrict the definition of revolving loan

22 debt just to a collateral-based formula, which is what they're

23 now suggesting, that they intended.  In fact, a lot of what

24 they're arguing in their complaint and in their brief, goes to

25 an unexpressed intent.  And not only is it unexpressed, it's

1   contradicted by the documents.  And we pointed out in our papers

2   --

3            THE COURT:  So you're saying that basically, 4.3 gave

4   you carte blanche to do anything you wanted --

5            MR. HADDAD:  No, it didn't give us --

6            THE COURT:  -- subject to not taking -- that affiliated

7   restriction you mentioned.

8            MR. HADDAD:  It didn't give us carte blanche.

9            THE COURT:  Well, what couldn't you do?  Because this

10  seems to --

11           MR. HADDAD:  Well, that's one thing.  That's -- that's

12  one thing right there that we couldn't do.

13           THE COURT:  This seems to say you could do anything

14  else, so that's what you're really arguing.

15           MR. HADDAD:  We could generally do a lot of other

16  things, yes, but we --

17           THE COURT:  You could do anything else.

18           MR. HADDAD:  Well, I don't know about anything else.

19           THE COURT:  You could change all the definitions --

20           MR. HADDAD:  We could change -- yes.

21           THE COURT:  -- and the revolving -- and the underlying

22  revolving credit agreement.

23           MR. HADDAD:  Yes, we could, and they expressly

24  acknowledged that in the agreement itself, not only through the

25  waiver and consent of 4.3, but in the definition itself of

Argument - Haddad                              15

1   revolving loan debt.  It's not just a formula-based borrowing
2   base formula that resolved -- that's the defined term, revolving
3   loan debt in Section 1.16.  It's a far more broader definition,
4   to include obligations of any kind.  Had they wanted to exclude
5   certain kinds of obligations, that could have been a subject of
6   negotiation and agreement, but that was not reflected in the
7   document, and the document does say that it contains the entire
8   agreement of the parties, so it does have an integration clause,
9   which I think is very important here.  Because you can't look to
10  what they were thinking that is not expressed.

11        In fact, what they are suggesting, that they intended
12  there to be a cushion, an equity cushion, because they thought
13  we would lend eighty percent against receivables and a certain
14  percentage against inventory and so, therefore, they felt there
15  would always be something there for the secured trade.  Well,
16  that's absolutely contradicted by the document itself.  When the
17  document itself says we could give over advances.  We could give
18  -- we could lend beyond the collateral and give unsecured loans
19  if we wanted to, and that would have put them out of the money,
20  and they knew that going in.

21        Now that, in fact, is not what happened here.  In fact,
22  what happened here is that there was some equity remaining for
23  the secured trade.  They did get a significant distribution in
24  the case, which they would not have otherwise gotten but for the
25  fact that they entered into this inter-creditor agreement and

1  but for the fact that the debtors gave them a junior lien.  Had

2  this not happened, they would be sitting here being represented

3  by the counsel for the unsecured committee right now, and would

4  have a much lower recovery.

5        THE COURT:  Let me ask you another question.  If you

6  look at the definition of priority of liens, they are

7  subordinating their liens to the revolving loan creditors.  See

8  that?

9        MR. HADDAD:  Yes.  Which section are you referring to?

10        THE COURT:  It's 2.2.  That's what we're really talking

11  about here, the priority of the liens.  They don't care how much

12  is loaned, as long as they keep their lien.

13        MR. HADDAD:  Yes.

14        THE COURT:  And it's limited to the revolving loan

15  creditors.  And then, if you look at the definition of revolving

16  loan creditors, it seems to read, "those people who are the

17  initial parties to the revolving loan agreement and their

18  successors and assigns, including any group of lenders that at

19  any time refinances, replaces or succeeds all or a portion of

20  the revolving loan debt," and I know it says "orders otherwise a

21  party to the revolving credit agreements."  Are you saying that

22  Amendment 8 made Harris a party to the revolving loan agreement?

23        MR. HADDAD:  Yes.  It absolutely did, and that falls

24  under the context of "is otherwise a party to the revolving

25  creditor agreement."  And, in fact, this was known from the

1   outset because if you look at the original loan agreement,

2   there's only two lenders that are set forth in that original

3   loan agreement.  By the time the case proceeded and was in

4   bankruptcy, there was more than a half-a-dozen members of the

5   bank group.

6           THE COURT:  Were they participants in the original

7   loan?

8           MR. HADDAD:  No.  Excuse me?

9           THE COURT:  Were they lenders, or just participants --

10          MR. HADDAD:  No, they were --

11          THE COURT:  -- in the original loan?

12          MR. HADDAD:  They were co-lenders, Your Honor.  They

13  were not participants, but actual lenders, and that is something

14  that was known to the party at the time that they entered into

15  the agreement.

16          And we go beyond that when you say they're subordinate

17  to the liens in favor of the revolving loan creditors.  For

18  that, then, you look at what is the debt of the revolving loan

19  creditors, and when you look to the next -- take it to the next

20  step, what's the debt that is subject to the lenders' liens,

21  it's not just the debt that was existing at the time the inter-

22  creditor agreement was signed, but it's any debt that was then

23  existing or thereafter arising.

24          And I think, when I read the very first sentence of the

25  plaintiffs' memorandum of law in opposition to our motion, I

1   said, gee, that's -- there's a fundamental flaw in their entire

2   argument, which says that -- they argue, in the very first

3   sentence, plaintiffs bargain for a lien that was subordinate

4   only to obligations under Musicland's existing revolving credit

5   facility.  Well, that's just not true.  That's not what that

6   document says, and if that's what they believed they were

7   getting, they're mistaken.

8          And we put in our papers a very powerful quote from

9   Judge Learned Hand nearly a hundred years ago in the <u>Hotchkiss</u>

10  case.

11         THE COURT:  Well, I don't think it could be a hundred

12  years ago, Learned Hand.

13         MR. HADDAD:  Excuse me?

14         THE COURT:  A hundred years ago?

15         MR. HADDAD:  Judge Learned Hand.  Nearly a hundred

16  years ago.

17         THE COURT:  Okay.

18         MR. HADDAD:  The early part of the twentieth century.

19  Judge Learned Hand said --

20         THE COURT:  I guess we're in the early part of the

21  twenty-first century, so that qualifies.

22         MR. HADDAD:  Excuse me?

23         THE COURT:  Go ahead.  (Laughter.)

24         MR. HADDAD:  Yeah, so that's -- I did that --

25         THE COURT:  Close enough.  Close enough.

1    MR. HADDAD:  I did that math in my head, without the

2  calculator.

3    THE COURT:  Maybe you should bring the calculator.

4    MR. HADDAD:  1911, I believe.

5    THE COURT:  Okay.

6    MR. HADDAD:  And what Judge Learned Hand said is that a

7  contract has nothing to do with the personal or individual

8  intent of the parties, but is an obligation attached by the

9  force of law, based upon the words.  The words are what

10 controls.  And what Judge Learned Hand said, "If it were proved

11 by twenty bishops that either party when used the words intended

12 something else, then the usual meaning which the law imposes

13 upon them, he would still be held."

14    And whether it's twenty bishops or twenty rabbis or

15 twenty members of the secured trade, it doesn't matter when the

16 document says it's not limited to the existing terms of a loan

17 agreement.

18    THE COURT:  I think what you're saying is that you

19 can't create an ambiguity with intrinsic evidence if the

20 agreement is otherwise ambiguous.  That's kind of what Judge

21 Hand was saying, I guess.

22    MR. HADDAD:  I would say that, and I would suggest to

23 Your Honor that they're not contending that the agreement is

24 ambiguous.  This is not a claim saying this is an ambiguous

25 contract, Judge, let's go and introduce parol evidence.  That's

1   not what they're saying, and they can't say it because there's

2   nothing ambiguous in a contract that says revolving loan debt

3   includes obligations of any kind owing to the parties, owing to

4   the banks.  That is not an ambiguous term.  That is not an

5   ambiguous concept.  It is not an ambiguous clause.  And those

6   are the reasons why dismissal of the contract claims is

7   appropriate here.  Because when the contract says you can do

8   something and you do it, that doesn't give you a breach of

9   contract claim.

10         And we look beyond that.  There's no dispute that had

11  Wachovia, at the exact same date that the Harris advanced its

12  $25 million, had Wachovia, on that day, advanced the $25

13  million, and on that -- the day that Harris was repaid had

14  Wachovia been repaid the $25 million, it would have no cause of

15  action because there would be -- it would be no economic

16  difference to them.  There would be no damages.

17         THE COURT:  How was the repayment made?

18         MR. HADDAD:  How was the repayment made?  They had --

19  actually, it defeats the argument of they were expecting a

20  collateral cushion.  There was excess availability to the

21  borrower at the time of the payment, and it paid the $25

22  million.

23         THE COURT:  The debtor made the payment?

24         MR. HADDAD:  The debtor made the payment.

25         THE COURT:  Okay.

1       MR. HADDAD:  And whether that payment's made to

2   Wachovia or to Harris, it really doesn't make a difference.  And

3   those were the --

4       THE COURT:  Unless Harris is unsecured.

5       MR. HADDAD:  It would make a difference to Harris.

6       THE COURT:  Yes.

7       MR. HADDAD:  Not to Wachovia.  And I don't believe that

8   Harris was unsecured because I think that they validly became a

9   party to the loan agreement under the eighth amendment, and

10  let's recall that the eighth amendment, which was a pre-petition

11  amendment, was among the documents that were ratified by the

12  debtor, approved by Your Honor as part of the financing in the

13  case.  So I think that, of itself, might be enough, but that's

14  not the primary focus of the argument.

15      The primary focus of the argument is the contract

16  governs the conduct of the parties, not what they wish was in

17  the contract.  You can't come to Court and say, Judge, I'd like

18  a do-over.  I wish I had a loan where it was guaranteed that I'd

19  be in a formula.  I wish I had a loan where they could only make

20  one kind of transaction.

21      THE COURT:  Let me interrupt.  Suppose that I disagree

22  with you on that.  What's Wachovia's position regarding these

23  other claims of tortious interference, aiding and abetting or

24  whatever that stuff is?

25      MR. HADDAD:  I believe that those additional claims, I

1   think they opened up the torts book to look for them, but --

2           THE COURT:  In other words, is it inconsistent to

3   conclude that the agreement doesn't say what you say it says,

4   but you're nonetheless not liable for tortious interference with

5   the contract, for example?

6           MR. HADDAD:  Well, I think that --

7           THE COURT:  Well, you'd be a party to that agreement,

8   so you couldn't be liable for tortious interference, I guess.

9           MR. HADDAD:  We're not liable for the various -- for

10  the two tort claims that are asserted against Wachovia, the

11  tortious interference and the conversion, for a couple of

12  different reasons.

13          First and foremost is there's no independent duty that

14  establishes a tort -- that could give rise to tort liability as

15  between the parties.  The parties' duties here are governed by

16  the contract between us, and if the contract says we can do

17  something and we do it, that doesn't create -- that can't create

18  a tort.

19          THE COURT:  My assumption is that you couldn't do it,

20  though.

21          MR. HADDAD:  If the assumption --

22          THE COURT:  Essentially, it was a breach of the inter-

23  creditor agreement to do what you did.

24          MR. HADDAD:  Okay.  I disagree with that conclusion,

25  but I would say that --

1          THE COURT:  I know, but, you know, I can ask you to

2    assume it.

3          MR. HADDAD:  -- they still have not -- please, and I'll

4    answer.  They still have not pleaded the causes of action

5    sufficiently, for several reasons.

6          First, because it's based upon the same conduct and,

7    therefore, the tort claim is just then redundant of the contract

8    claim.  The act that is alleged to constitute the tort is

9    entering into the eighth amendment, which is the allegation that

10   constitutes the breach.  And so you cannot have a tort that

11   arises out of that same contractual conduct.

12         Also, with respect to the conversion claim, and we're

13   accused of aiding and abetting a conversion, I had to look that

14   one up, so I thought that was more of a fraud concept, but --

15         THE COURT:  No, it applied to any court.

16         MR. HADDAD:  I looked it up.  I agree.  It could,

17   theoretically, apply, if --

18         THE COURT:  I had to look it up once, also.  I thought

19   the same thing as you.

20         MR. HADDAD:  Well, I did.  But what you do need in

21   order to have a conversion claim, particularly with respect to

22   money, which is what they're talking about, is a specifically

23   identifiable res, a specifically identifiable fund, and that

24   they don't plead, and they can't plead that because they don't

25   have that.

1       This was through the date of the bankruptcy and then,

2   thereafter, revolving credit.  There was money coming in.  There

3   was money going out.  It was being paid.  And you can't say what

4   was converted was that particular payment to Harris, because

5   they didn't have a property interest in that particular piece of

6   collateral.  It was commingled.  It was intermixed, and it

7   wasn't identified.

8       And the cases that they've cited to try and support

9   this claim, the Badillo case and the other case, they dealt with

10  a particular fund, but it was proceeds of a particular insurance

11  policy.  It was a very specifically identifiable fund.  Not, as

12  here, all the assets, of Musicland, or all the cash of

13  Musicland, or all the collateral of Musicland, in which they

14  were trying to claim a conversion, so the conversion claim would

15  fail.

16      Also, Section 2.5 of the agreement contains a covenant

17  not to sue Wachovia for conduct with respect to the collateral,

18  so I think that that would bar all of the tort claims, as well.

19  So I think that there are a number of reasons why the tort

20  claims should be dismissed, in addition to the reason that the

21  conduct was expressly authorized by the contract and by the

22  specific clauses that we've referenced.

23      For the plaintiff to prevail today, or even in this

24  case, what they're going to need to do is have Your Honor take

25  your pen and excise from that contract all of those clauses that

1  they no longer like, and we'd submit that that is not an

2  appropriate basis for a cause of action, and that is not an

3  appropriate basis to sustain a complaint.

4        So for those reasons, Your Honor, we would ask that the

5  complaint be dismissed in its entirety, with prejudice.  Thank

6  you.

7        THE COURT:  I'll hear from Harris next, and then you

8  can respond to both.

9        MR. LOCHBIHLER:  Thank you very much, Your Honor.

10  Obviously, Mr. Haddad has talked about oh, ninety percent of the

11  things I was going to cover.

12        THE COURT:  Have you considered the possibility that if

13  you don't have -- if you didn't get the lien, you could be

14  liable to the secured debt, and also be liable to the debtor for

15  receiving a preference?

16        MR. LOCHBIHLER:  Yes, yes.

17        THE COURT:  Has the debtor considered -- what's the

18  debtors' position?  Because if they're --

19        MR. LOCHBIHLER:  Well --

20        THE COURT:  Let me just --

21        MR. LOCHBIHLER:  Sure.

22        THE COURT:  -- because if they were unsecured, Harris

23  got a preference and Sun Capital got a preference because it

24  guaranteed the debt, right?

25        MR. LOCHBIHLER:  There you have it.

1    THE COURT:  It sounds like a preference to me, if they

2  were unsecured.

3        MR. STEMPEL:  If they were unsecured, Your Honor.

4        MR. LOCHBIHLER:  If we were unsecured.

5        MR. STEMPEL:  But the debtor -- again, we're treading

6  on --

7        THE COURT:  All right.

8        MR. STEMPEL:  -- tough issues for me, as a Kirkland

9  lawyer, because of our Sun relationship.  So --

10        THE COURT:  Oh, so we have conflict -- sit down.  We

11  have a conflicts counsel.  I knew there was a reason for

12  conflicts counsel in these cases.

13        MR. HARRISON:  Let him go, Your Honor.

14        THE COURT:  Yes, sir?

15        MR. HARRISON:  Your Honor, my understanding is that at

16  the time, Harris Bank was secured, so under those

17  circumstances --

18        THE COURT:  Okay.

19        MR. HARRISON:  -- we don't believe there would have

20  been a preference.

21        THE COURT:  Because if you lose, they're going to turn

22  around and sue you and you can pay 25 million twice.

23        MR. LOCHBIHLER:  That's precisely what we understand is

24  the outcome of this if we lose.

25        THE COURT:  Okay, okay.

1          MR. LOCHBIHLER:  Your Honor, I'd like to touch on three

2    things that Mr. Haddad hasn't, and one is draftsmanship; the

3    second is precedent, that hasn't been discussed on this implied

4    covenant business; and the third is trade creditor expectations.

5          On draftsmanship, Your Honor, I agree with Mr. Haddad.

6    If you look at Section 4.3, nobody who reads the words of 4.3

7    can miss their import.  Plaintiffs are agreeing to broad and

8    unfettered amendment.  They knew that.  They consented to it,

9    and it's not only amendment of the debt, it's like no matter

10   what you guys want to loan, that's fine with us.  Unlimited. And

11   why is that, of course, something the trade creditors want?

12   Because they want money to be lent, so their stuff can be

13   bought.

14          THE COURT:  Right.

15          MR. LOCHBIHLER:  Okay?  Now, Your Honor, if plaintiffs

16   and their predecessors, as they claim in their brief, truly

17   wanted to freeze everything as of 2003, what would they do?

18   Your Honor, I submit that a second-year lawyer could have

19   provided them with boilerplate to-do so, boilerplate.

20          THE COURT:  Maybe they have too much experience.

21          MR. LOCHBIHLER:  Section 4.3 -- (Laughter.)  Section

22   4.3 would have said this -- and this is what they want the

23   agreement to say.  This is what they want 4.3 to say.  The

24   revolving loan agreement shall not be amended, to any material

25   extent, without the written approval of the trade creditors.

1  That would have frozen the thing in time, or better yet, the

2  revolving loan agreement shall not be amended without the

3  written agreement of the trade creditors, which agreement shall

4  not be unreasonably withheld.  That is standard boilerplate

5  that's found in anything that -- where you do not want an

6  amendment to occur.  Everybody knows that.  You cannot

7  reasonably claim to be a sophisticated group of people, as they

8  are, as I will submit that they are, and say that this Section

9  4.3 was intended to convey the boilerplate that I've just read.

10  It's just not there.

11          They go on that they're shocked about how a term loan

12  could be considered revolving loan debt, but I don't see why

13  they're shocked when you look at 115 -- I'm sorry -- 116, the

14  critical definition of revolving loan debt means:

15          "Any and all obligations, liability, an indebtedness of

16          every kind, nature and description, owing by debtors to

17          revolving loan creditors, whether not existing or

18          hereafter arising."

19          Now, let's say that you're the second-year lawyer.  If

20  you're the second-year lawyer and you're drafting that and you

21  want to say what revolving loan debt is, you go to their brief,

22  where they define revolving loan debt, and you say, oh, well,

23  revolving loan debt shall mean a formula-based indebtedness with

24  a revolving feature and built-in collateral cushion.  It didn't

25  take them long to define it in their brief, but it's not in the

1   agreement.

2          Similarly, they could have changed the definition of

3   revolving loan creditor, too.  Quote:

4          "A financial institution providing the debtor with a

5          formula-based loan with a revolving feature."

6          In other words, all of these definitions, every one of

7   these definitions, had they wanted to freeze the 2003 agreement

8   in place, would have been written totally differently.

9          Now, I'd like to turn a bit to precedent.  There's two

10  cases that I've cited, Your Honor, that I think bear closely on

11  this case.  The first is Hartford Fire v. Federated Department

12  Stores.  In that case, which is half of a security case and half

13  of a breach-of-contract case, Hartford Fire has an indenture,

14  their investors in Federated Department Store.  Federated

15  Department Stores decides to go into a merger.  To do the

16  merger, they take on additional debt, and Hartford Fire says,

17  "Hold on.  You were a cute, little, conservative company.  We

18  made an investment in you, thinking you were a cute,

19  conservative company.  That's the basis on which we do it.  And

20  now you're doing this merger, you're taking on huge debt and

21  things are going to hell in a handbasket."

22         Now, the Court said, "Look, we're looking at the

23  indenture, Hartford Fire, and we see, A, that a merger is

24  permitted.  It says so.  And the second thing it says is that

25  you can take on more debt.  So you might have had expectations,

1  but the documents say those expectations can be changed via

2  amendment, or change of events." And that's the same situation

3  we have here.

4          Another case that does involve amendment is that <u>Bailey</u>

5  -- and the <u>Hartford</u> case is a Southern District of New York

6  case, I believe in 1989. The other case is <u>Bailey v. Fish &</u>

7  <u>Neave</u>, which is a 2007 First District of New York case. Now,

8  that's an interesting case because here, you have a partnership

9  in a law firm, and Bailey is a guy that's getting out of the

10 partnership after years of service, and they all labored under

11 this partnership agreement for many years. At the last minute,

12 the majority of the partners changed the manner in which

13 withdrawals could be made, and Bailey felt neglected, to say the

14 least. And so, he sues. And he says, look, we grew up, we had

15 this agreement, there's all this expectation. There's nothing

16 in there that talks about, you know, this is written in stone,

17 this is what I lived with.

18         And the Court says, well, hold it. There is a

19 provision that says amendments can be made by majority of

20 partners. Now, it doesn't say what the amendments concern, but

21 it does say amendments. And what they did to do this, they

22 changed something that, by a majority of the partners, and

23 that's what everybody agreed to. It might not have been what

24 you lived with. It might not have been what you expected.

25 Indeed, it dramatically dampened your expectation, and you say

1   there's an implied covenant of good faith and fair dealing that

2   protects your expectations.  Well, then you guys shouldn't have

3   entered into an agreement that permits broad and unfettered

4   amendments by a majority of the partnership.  That's it.  You

5   guys lose.

6           The same situation here, Your Honor.  They prepared

7   these agreements.  If Harris comes and looks at the document,

8   and that's really what it comes down to, how can you tortiously

9   interfere with something that's clear on its face that you're

10  doing just what is permitted?  You don't have to go back and go

11  back into history and try to see what's going on.  That's not

12  what the law says.  The law says you look at the document.

13  That's the expectations of the parties, set forth.  That is the

14  criteria for an outsider coming in and looking at expectations.

15          And I should point out that Bailey was a member of this

16  group.  He wasn't an outsider coming in and he had to get a past

17  sense of history.  He was there, and he knew what this agreement

18  was all about, and he's an insider.  Harris is an outsider.

19  They could only look to the inter-creditor agreement, Your

20  Honor, and anybody reading it, on its face, would say, hey, the

21  Amendment No. 8, it was worked, and which changed everything, is

22  permitted by these documents.

23          The third thing I'd like to talk about, Your Honor, is,

24  of course, just the practical matter of expectations.  You know,

25  this is not -- this is something that you see every day.  Trade

1  creditors want loans to be made.  They want loans to be made, so

2  that trade goods can be bought.

3         The complaint talks about a set of circumstances that

4  are supposedly horrible and vile, but This Honor can take

5  judicial notice that Musicland is involved in retail sales, and

6  these -- and according to the complaint, all of this is coming

7  in ripe for buying at the Christmas season, and trade creditors

8  love this kind of stuff.  Harris came in, lent money.  It went

9  to help Musicland.  And now, they're Monday-morning quarter-

10 backing because something that was done and benefitted them, it

11 was the last chance.  No revolving loan creditor, it's alleged

12 in the complaint, would lend these guys money, and this is the

13 Christmas season.  The money is lent.  It doesn't work, and they

14 go into bankruptcy in January, okay?

15        But this is -- you look at 4.3 and it says any amount

16 of money up to -- anything can be loaned.  It's an unlimited

17 ceiling.  They wanted money to be lent.  This is just a Monday-

18 morning quarter-backing case where the Christmas season didn't

19 work out for Musicland, we got our loan repaid, we were secured,

20 Your Honor, we were secured.  We had a right to be secured.  We

21 were a part of this revolving loan group, and a revolving loan

22 group under an agreement, under an inter-creditor agreement that

23 said revolving loan debt can be not only revolver debt, but any

24 kind of indebtedness, any kind, as long as it's a revolving loan

25 creditor that does it.

1     Your Honor, I don't get this -- I don't get where these

2  people were damaged.  I don't get how they read the

3  documentation.  I believe this is a Mickey Mouse complaint and

4  should be dismissed.

5     THE COURT:  Well, they're about to tell us how they

6  read the document.

7     MR. LOCHBIHLER:  Yes, Your Honor.

8     THE COURT:  Thank you.

9     MR. LOCHBIHLER:  Thank you very much.

10     THE COURT:  Go ahead.

11     MR. KORNFELD:  Good morning, Your Honor.  Alan

12  Kornfeld, Pachulski, Stang, Ziehl, Young, Jones & Weintraub for

13  the plaintiff.  With me is Marc Beilinson and Beth Levine.

14     MS. LEVINE:  Good morning, Your Honor.

15     MR. KORNFELD:  Your Honor, it sounds to me that

16  according to both Harris and Wachovia, the only meaning of the

17  inter-creditor agreement, which happens to be a twenty-two page

18  document, is that you, trade creditors, are behind the Wachovia

19  group, and the Wachovia group can do whatever it wants.

20     THE COURT:  Isn't that what 4.3 says?  At least that's

21  what they say it says.

22     MR. KORNFELD:  That's exactly what they say 4.3 says.

23     THE COURT:  Why doesn't it say that?

24     MR. KORNFELD:  Well, first of all, what 4.3 says is the

25  point that Your Honor raised, that the last two sentences talk

Argument - Kornfeld

1  about any of the foregoing, and the foregoing being amendment,

2  modification, supplement, et cetera, shall not, in any manner,

3  affect the terms hereof, or impair the obligations of trade

4  creditors hereunder.  All of the revolving loan debt shall be

5  deemed to have been made or incurred with a reliance upon this

6  inter-creditor agreement.

7       What they say further, Your Honor, is that any

8  amendment language means an amendment that can eviscerate the

9  basic meaning of every document in the case that has any

10 relevance.

11      THE COURT:  Well, couldn't you have contracted -- in

12 other words, is there anything in the agreement, aside from the

13 two sentences that you just read, that limits the ability to

14 enter into any amendment?

15      MR. KORNFELD:  I would say 4.3, Clause (a) provides an

16 example of what everybody was talking about when they said

17 amendment.  In the parenthetical, I'll read the sentence and

18 emphasize the parenthetical, it says:

19           "Any amendment, modification, supplement, extension,

20           renewal or restatement of any of the revolving load

21           debt or the revolving creditor agreements, including,

22           without limitation --"

23           And here are the examples of what amendment can mean:

24           "-- extensions of time of payment of, or increase or

25           decrease in the amount of any of the revolving loan

1    debt, the interest rate, fees, other charges, or any

2    collateral."

3    It doesn't say there that we can amend the agreement to

4    put a term loan in front of the revolving loan.  It doesn't say

5    we can magically transform a revolving loan by saying it's now a

6    term loan.

7    Your Honor, if you go to the documents, and we make the

8    textural arguments during the course of the brief, every time we

9    talk about priority in the inter-creditor agreement --

10    THE COURT:  Well, let me just stop you there, then.

11    Why didn't 1.16 say that revolving loan debt shall mean any and

12    all obligations, liabilities, indebtedness, instead of every

13    kind and nature -- only those kinds of indebtedness which are

14    formula-based or consistent with the existing revolving credit

15    agreement?

16    MR. KORNFELD:  Well, it does, in fact, say that, Your

17    Honor.

18    THE COURT:  Where?

19    MR. KORNFELD:  1.16 talks about any type of debt

20    arising under the revolving creditor agreements.

21    THE COURT:  And why isn't -- why isn't Amendment 8,

22    revolving creditor agreement?

23    MR. KORNFELD:  If you take a look at what the revolving

24    creditor agreement was in 2003, when the inter-creditor

25    agreement and plaintiffs' security agreement was entered into,

1  in 2003, revolving loan debt meant revolving loan debt.  It was

2  --

3      THE COURT:  But 1.13 days the revolving loan agreement

4  means any -- the existing agreement for any amendments, at any

5  time.

6      MR. KORNFELD:  Well, Your Honor, the amendments don't

7  mean that -- if you look at what revolving loan debt means, the

8  existing agreement is a revolving loan agreement with borrowing

9  based calculations, with reserve calculations, which means, in

10  essence, that you don't advance unless there's collateral

11  sufficient to --

12      THE COURT:  That's certainly what the existing

13  agreement meant.

14      MR. KORNFELD:  And an amendment modification or

15  supplement means the type of thing that's mentioned in 4.3.  If

16  we have to change the borrowing base.  If we have to enter into

17  DIP financing.

18      THE COURT:  But that's not what it says.  The only

19  limitation, as I understand it, on an amendment has to do with

20  affiliates, right?  So if you put that limitation in, why didn't

21  you put the limitation you're now discussing?

22      MR. KORNFELD:  Because everywhere we were talking about

23  what the agreements were and how to define agreements, we were

24  talking about that were subordinate revolving loan agreements.

25      THE COURT:  See, I think, before you get into that, you

1   have to show ambiguities in the document.  What you're really

2   doing is you're bringing in extrinsic evidence to create -- to

3   try and create a bolster of what you contend is an ambiguity, or

4   what the document really means.  I don't even know if you're

5   arguing as an ambiguity, although it's not necessary for both of

6   you or either of you to argue that there's an ambiguity to find

7   an ambiguity.

8        But you first have to show that the agreement is

9   ambiguous before I'll even listen to any of this, and that's the

10  point I raised with Mr. Haddad, I think.

11       MR. KORNFELD:  Well, I mean, the agreement certainly

12  can be interpreted in two ways.  You could point to as amended,

13  and talk about what that means.  Our response is, look to 4.3 as

14  examples of what the parties intended when they're talking about

15  amendment.  And they're not talking about --

16       THE COURT:  But it says including, but not limited to.

17       MR. KORNFELD:  Well, that's why you would need

18  testimony to show the reasonable expectations of the parties.

19       THE COURT:  Why do I need testimony if it says

20  including, without limitation?

21       MR. KORNFELD:  Well, because the testimony of the

22  parties, Your Honor, would be that you can't put a term loan

23  that would otherwise be unsecured or in third priority, between

24  the second priority --

25       THE COURT:  My point is, you don't get to that until

1  you point out why the agreement is ambiguous.  What I understand

2  you to be saying is because Subsection (a) of 4.3 gave an

3  example of the type of change that they could do, which is

4  prefaced by the language "including, without limitation." That

5  creates an ambiguity.  That's what your argument is.

6         MR. KORNFELD:  Well, on one hand, it could be an

7  ambiguity.

8         THE COURT:  Well, do you have any case law that says

9  that when something says "including, without limitation," it

10  reflects the parties' intention that the changes are limited to

11  that type of change?

12         MR. KORNFELD:  No, I don't have that case.

13         THE COURT:  I don't think you're going to find it.

14         MR. KORNFELD:  No, I don't have that case law, Your

15  Honor, but looking at the whole agreement, you look at 2.22, and

16  2.22 talks about us being subordinated only to the extent of the

17  revolving loan debt.  Revolving loan debt is defined as the debt

18  owed to the revolving loan creditors under the revolving

19  creditor agreements.  That's 1.16 --

20         THE COURT:  Right.

21         MR. KORNFELD:  -- as you discussed with Mr. Haddad.

22  The revolving creditor agreements, as they existed at the time,

23  provided solely for the extension of the revolving loans, and

24  were defined to provide such credit exclusively.  And that's the

25  revolving loan agreement at 1.29.

1      THE COURT:  I think it really comes down to 4.3, which

2  seems to give, I used the phrase carte blanche, but it seems to

3  give carte blanche authority to adversely affect your rights.

4      MR. KORNFELD:  But, Your Honor, in that case, there

5  would be no meaning for the revolving -- there would be no

6  meaning of the inter-creditor agreement, and there would be no

7  meaning for our security agreement, which is attached as Exhibit

8  B, which says we're only subordinated to permitted encumbrances,

9  and defining permitted encumbrances, those are the encumbrances

10 existing under the revolving loan agreement at the time.

11     THE COURT:  Let me turn to the conversion claim.  The

12 argument has been made, among other things, that there's no race

13 here to convert, that basically, I guess Wachovia paid from the

14 debtors' liquidated collateral.  Is that what happened, $25

15 million?  Wachovia actually cut the check, I assume, and --

16 maybe it doesn't matter.  So what's the race?

17     MR. KORNFELD:  Well, Your Honor, that all gets into can

18 we prove there's a race at trial?  Maybe, if that's what

19 happened and there was notice --

20     THE COURT:  Well, do you allege -- but they're saying

21 you didn't allege that there's a race that could be converted.

22 That's a pleading issue, isn't it?

23     MR. KORNFELD:  Yeah.  That would be an issue that could

24 easily be solved by amendment, and we would allege that, and/or

25 we would allege that they were on notice of our rights to that

1  collateral, and under the case law that we cite, the insurance

2  proceeds cases, we would say that those cases bring us squarely

3  within the law of conversion, where a party has notice of

4  another party's rights to collateral.

5          THE COURT:  Okay.

6          MR. KORNFELD:  And that is, indeed, a pleading issue.

7          Your Honor, I think if you stand back and look at the

8  reasonable expectations of the parties, of the trade and of the

9  revolving creditors at the time this agreement was entered into

10  in 2003, they want the money.  We're hesitant about whether

11  we're going to give them the money.  We want to be secure and

12  the question is, what priority do we get and to what do we get

13  that priority?  And what is outstanding, at that time, is a

14  revolving loan that has borrowing base calculations that we know

15  there's going to be a collateral cushion for us to always be

16  secured on, so we say we're willing to be secured because we're

17  behind this collateral-based loan.  We don't say we're willing

18  to be secured to anything.

19          THE COURT:  The question is, did you do that, or

20  consent to that by agreeing to 4.3?

21          MR. KORNFELD:  I think that's an issue for discovery.

22  They're going to say you absolutely agreed to that, as they do.

23          THE COURT:  But what would I take evidence on if --

24  assuming that I interpret 4.3 to give them the right to enter

25  into any amendment subject to express limitations in the

1  agreement, what would the discovery be?

2      MR. KORNFELD:  Well, I think the discovery would be you

3  would go to the people who drafted the agreement, and if their

4  version is to be believed, they're going to have a witness who's

5  going to say that what we meant when we drafted this is anything

6  can be done with this agreement, that you have no rights, other

7  than to be second to whatever we want you to be second to.  And

8  we're going to have a witness who says that given the reality at

9  the time, in 2003, we intended that you could only be second to

10 a revolving loan and this as-amended language means you can make

11 borrowing base changes, you can make interest rate changes.  It

12 doesn't mean you can change the fundamental characteristics of

13 this agreement and basically eviscerate what this agreement is,

14 because otherwise, we wouldn't have needed an inter-creditor

15 agreement.  We would have needed two lines that say, "You're

16 behind Wachovia.  Wachovia can do what it wants."

17     THE COURT:  And just to sum up, tell me the language in

18 the inter-creditor agreement which you contend limited

19 Wachovia's and Harris's ability to enter into Amendment No. 8?

20     MR. KORNFELD:  I would say, first of all, the

21 definition of debt in 1.16.  The definition of revolving

22 creditor agreements in 1.11.  The definition of revolving loan

23 agreement in 1.13.  The definition of 1.14, the definition of

24 revolving loan collateral.  And in 1.15, the definition of

25 revolving loan creditors.  And in 2.2, the priority of lien

1  language, saying that there is only priority to the full extent

2  of the revolving loan debt.  It says, "revolving loan debt," not

3  any other type of debt.  And then, in 2.3, the language that

4  says "priorities are unaffected by action or inaction," which

5  2.3, which we haven't discussed, provides that "The lien

6  priorities provided in Section 2.2 above shall not be altered or

7  otherwise affected by any amendment, modification, supplement,

8  extension, renewal, restatement, or refinancing of either the

9  revolving loan debt or the trade debt, nor by any action or

10 inaction which any creditor may take or fail to take in respect

11 to the trade collateral.

12         I think also, Your Honor, the inter-creditor agreement

13 we've spent a lot of time talking about, we need to talk a

14 little bit about the security agreement that plaintiffs entered

15 into, that is attached to the complaint as Exhibit B, and by the

16 security agreement, which was executed contemporaneously with

17 the inter-creditor agreement, we have Musicland granting

18 plaintiffs the inventory lien, subject only to the terms of that

19 certain inter-creditor insubordination agreement dated as of

20 November 5, 2003, which is Section 2 of the security agreement,

21 which then goes on to provide that the inventory lien was junior

22 only to permitted encumbrances, which is at Page 4, Section

23 4(b), defined as "the security interest and liens of Congress

24 for itself and for the benefits of the lenders, pursuant to the

25 Congress facility."  The Congress facility, at the time, with

1   the revolving loan agreement, it wasn't anything else.

2          So that, Your Honor, is the textual support over two

3   documents for our argument that the reasonable expectations of

4   the party was that we would be secured only behind revolving

5   loan debt, and not revolving loan debt that became term debt.

6          THE COURT:  Which was the provision you were just

7   reading from in the security agreement?

8          MR. KORNFELD:  Section -- on Page 4.  Section 4(b),

9   which provides, in total:

10         "Upon receipt of copies of the appropriate filed UCC-1

11         financing statements, with the appropriate filing

12         jurisdictions, the collateral agent will have a fully

13         perfected second priority security interest in all

14         right, title and interest of the pledging parties in

15         the collateral, subject to the permitted encumbrances."

16         THE COURT:  All right.

17         MR. BEILINSON:  Your Honor, if I could make a few

18  comments on -- Alan, could you --

19         THE COURT:  Who do you represent?

20         MR. BEILINSON:  Marc Beilinson, on behalf of the

21  plaintiffs.  I'm Alan Kornfeld's partner.

22         THE COURT:  Very, very brief, because we've had

23  extensive argument.

24         MR. BEILINSON:  Your Honor, I get to the ambiguity at

25  the very start of this agreement with the term amendment.  What

Argument - Beilinson                    44

1   do we really have here?  We have Harris, and Harris is not even

2   a participant to the senior facility.  They have no credit risk.

3   It's subordinate, within its own Wachovia facility, to existing

4   people who are participants in the revolving credit facility.

5   It's a termed loan that they made themselves, not as part of a

6   group.  They have the guarantee of Sun, who is the corporate

7   parent of Musicland, so they had no risk in giving this loan.

8           In essence, this is a new loan, Your Honor, and the

9   problem with making this new loan was, it couldn't get

10  collateral, and they weren't willing to do it without getting

11  collateral.  So they had to figure out a way to put that within

12  the existing revolving credit facility, and they did it by using

13  a word, "amendment."  So they took a new loan, where the

14  participants in the senior revolving facility aren't

15  participants in the term loan, and Harris isn't a participant in

16  the revolving credit facility.

17          THE COURT:  Harris had made the loan, though, as a

18  formula-based loan, in accordance with the terms of the

19  revolving credit agreement.  Do you still need an amendment to

20  the revolving credit agreement?

21          MR. BEILINSON:  Say that one more time.  I'm having

22  problems hearing.

23          THE COURT:  In other words, if Harris, instead of

24  making the loan this way, simply agreed to make a loan in

25  accordance with the existing agreement, wouldn't --

1          MR. BEILINSON:  I think that they became a

2   participant --

3          THE COURT:  -- you need an amendment to --

4          MR. BEILINSON:  -- to the senior credit facility, and

5   they increased it by $25 million.  Given that they had --

6   potentially had availability, they could have been there, yes.

7          THE COURT:  But wouldn't you need an amendment of the

8   existing agreement to do that?

9          MR. BEILINSON:  Your Honor, they would have had to make

10  an amendment to do that.

11         THE COURT:  So your argument is this is not an

12  amendment because the loan was made, not pursuant to the

13  existing facility, but pursuant to this agreement, which they've

14  called an amendment?

15         MR. BEILINSON:  That's correct, Your Honor.  So it's a

16  new loan.  They have nothing in common with the existing or pre-

17  existing 2003 credit facility.  Nothing in common.  They don't

18  share risk.  They don't have the same priorities.

19         THE COURT:  Well, I think we're all agreed that it's

20  different from the loans that were covered under the revolving

21  credit agreement.  The question is whether they could have done

22  it that way under 4.3.  That's what it comes down to.

23         MR. BEILINSON:  Well, Your Honor, what they had to do

24  to fit Harris in was bastardize the very definitions of the

25  revolving credit agreement.  They had to make completely new

Argument - Beilinson                          46

1  definitions for purposes of trying to create the illusion that

2  they could fit within the revolving credit facility and be

3  senior.

4              THE COURT:  Is there any case law which says, in

5  substance, that not withstanding your prior consent or parties'

6  prior consent to any changes in an agreement, there's some

7  limitation on the changes that can be made?

8              MR. BEILINSON:  Your Honor, I don't have any case law

9  that says it.

10             THE COURT:  Because that's really what this comes down

11 to.

12             MR. BEILINSON:  But the reality is, you can't change

13 the very essence of the underlying agreement to include parties

14 that didn't exist --

15             THE COURT:  Well, you can if you consent to it

16 beforehand.  That's the whole point.

17             MR. BEILINSON:  Your Honor, if you believe that the

18 term amendment allows an amendment modifying the very nature of

19 the agreement, Wachovia could have gone out and bought -- loaned

20 $25 million for bananas, and that would have been acceptable,

21 and clearly, that wasn't --

22             THE COURT:  Well, your agreement doesn't even limit --

23 there's no limitation on how they use the money.  It's not just

24 to buy inventory.

25             MR. BEILINSON:  Well, Your Honor, I believe definitions

Argument - Beilinson                          47

1  of revolving credit -- creditor, by its very nature, talks about

2  creditors who are existing at the time the revolver was entered

3  into, or becomes a participant to those loans.  And I don't

4  believe that Harris ever became a true participant to those

5  loans because it doesn't share in any of the rest of those loans

6  as completely subordinate.

7          So I believe the very term "revolving creditor," within

8  the definitions, contemplates people who are participants in the

9  loan facility, which Harris is not, on the day that they filed -

10 - they day that they made this loan, they weren't a participant,

11 they had never been a participant, okay?  And they only become a

12 revolving loan creditor by virtue of a modification of that

13 definition in the amendment.

14         So you can't amend it to make yourself a member by

15 virtue of changing the definition.  That just takes it --

16         THE COURT:  That's the question, isn't it?

17         MR. BEILINSON:  That really is the question.

18         THE COURT:  Okay.

19         MR. BEILINSON:  But I think it really eliminates any

20 concept of contract law, if you can amend a definition to be

21 inclusive of yourself, and then make a loan of a type and nature

22 which is completely different than what was anticipated in 2003.

23         THE COURT:  That's why I asked you whether there were

24 any implicit limitations on what they could do, notwithstanding

25 the consent, if there's any authority for that.

1      MR. BEILINSON:  I think that this --

2      THE COURT:  Because most of the cases that are cited,

3  saying if you consent, you consent, and you're just out of luck.

4      MR. BEILINSON:  I think the implicit limitation is that

5  it's a revolving facility.

6      THE COURT:  I don't mean to interrupt you.  I

7  understand what your argument is.  I'm asking you a different

8  question.  Is there any authority that you're aware of that says

9  that there are implicit limitations if you give your consent in

10 an agreement, basically, an unfettered consent to make any

11 change?

12     MR. BEILINSON:  But amendment suggests that you're

13 modifying something.  You're not creating a brand-new loan and

14 shoving it in.

15     THE COURT:  What's the authority for that?  I'm not

16 asking you for any more argument.  I know what the argument is.

17     MR. BEILINSON:  Your Honor, it's an argument.  I think

18 it's just contractually -- I think it's a definitional argument.

19     THE COURT:  Okay.  I got it.  I'll reserve decision.

20     MR. HADDAD:  One has comment, Your Honor?

21     THE COURT:  Sure.  Oh, actually, I did want to ask you

22 what 2.3 meant in the agreement.

23     MR. HADDAD:  Just on the very last point that was made

24 about it, it's a definitional concept.  Well, looking at the

25 definitions, 1.11, 1.13, revolving creditor agreement, revolving

1   loan agreement, it doesn't just say amendments, Judge.  It says

2   a lot more than that.  It says amended, modified, supplemented

3   or restructured, and I think the word restructured there is very

4   significant because restructuring means that it will become a

5   different kind of facility.  That is what restructuring means.

6   It means it will be restructured.  Whether you call it an

7   amendment, a restructuring, you can call it anything you want.

8   They've already consented to that, and with respect --

9            THE COURT:  You really want to hang your hat on the

10  word "restructuring," because that sounds ambiguous to me.

11           MR. HADDAD:  No, Your Honor.  I don't want to -- I do

12  not want to hang my hat on restructuring.  That's why I reserved

13  that for at the end.  I want to hang my hat on what I started

14  with.

15           THE COURT:  You still said, right?

16           MR. HADDAD:  I was responding to Counsel's argument.

17           THE COURT:  I think you'd better stick with amendment.

18  You're better off there, since that's what you called it,

19  anyway.  You didn't call it a restructuring.

20           MR. HADDAD:  Well, that is why we -- that's why I said

21  we did call it that, Your Honor.

22           THE COURT:  What does 2.3 mean?

23           MR. HADDAD:  It means we're first and they're second,

24  no matter what happens.  We don't have to take any more actions

25  to be -- to preserve our priority.  They come after -- after us.

1  And that's what they bargained for.  Counsel has said, look at

2  this, it's a big, long agreement.  It's eleven pages. Well, a

3  lot of what's in that agreement is to protect the banks from

4  things that they might do.  We wanted to be sure that if there

5  was a default, that they wouldn't take any action, and they

6  agreed to that.  They agreed to a standstill.  They agreed to a

7  hundred-and-fifty-day standstill, where they wouldn't go after

8  the collateral in the event of default, because we wanted to

9  protect our senior rights, to be in a position to exercise

10 rights with respect to the collateral ahead of them.

11      So the document is larger because there were additional

12 rights that we were bargaining for for ourselves in that

13 document.

14      THE COURT:  I'm not sure eleven pages is a very long

15 loan agreement.

16      MR. HADDAD:  Well, he said it was eleven pages.

17      THE COURT:  Okay.

18      MR. HADDAD:  I think that my firm, and I'm sure the --

19      THE COURT:  Or twenty-three, whatever.

20      MR. HADDAD:  -- Pachulski firm could come up with more

21 pages if we wanted.

22      THE COURT:  I'm confident you could.  Thank you very

23 much.  I'll reserve decision.

24      MR. LOCHBIHLER:  Judge, one last thing.  One last

25 thing.  It's a technical point you raised.  Could I direct your

1    attention to 4.3, that sentence that you saw at the end, that

2    you made a comment on?

3            THE COURT:  Right.

4            MR. LOCHBIHLER:  Any of the foregoing shall not affect

5    the terms hereof or impair.  Do you see that, Your Honor?

6            Your Honor, I think you -- I think that it has to be

7    understood that that is something that is in favor of the

8    revolving loan creditors --

9            THE COURT:  Yeah, I know.  It says impair the

10   obligations.

11           MR. LOCHBIHLER:  Impair not their rights --

12           THE COURT:  Their obligations.

13           MR. LOCHBIHLER:  It says their obligations.  Because

14   what it's saying is, this is a waiver provision, Your Honor, and

15   it's saying if we waive that, no matter what we waive, that

16   doesn't impair your obligations.  It has nothing to do with

17   their rights.  That's my only point.  Thank you.

18           MR. KORNFELD:  Your Honor, I have one last technical

19   point, if I may.

20           THE COURT:  This is it.  Go ahead.

21           MR. KORNFELD:  Okay.  You asked my partner about how

22   does one become a party to the loan, and he was talking about a

23   separate loan.  I think the answer is, in the revolving loan

24   agreement, Section 13.6 talks about how a lender becomes a

25   party, and it becomes a party by either assignment or

Argument - Kornfeld                          52

1   participation or passing a participant interest, and that's not

2   what happened here.  The term loan was a completely separate

3   agreement.  Harris never became a party, under 13.6, to the

4   revolving loan agreement.

5         THE COURT:  Okay.  Thank you.  I'll reserve decision.

6   Thanks.

7      (Proceedings concluded at 11:20 a.m.)

8                        *  *  *  *  *

9                          CERTIFICATION

10        I certify that the foregoing is a correct transcript

11  from the electronic sound recording of the proceedings in the

12  above-entitled matter.

13

14  *Jennifer Linnartz*

15  _____        August 11, 2007

16  Jennifer Linnartz, AAERT Cert No. 339
    Certified Court Transcriptionist
17  Rand Transcript Service, Inc.

18

19

20

21

22

23

24

25