UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

In re                            )

MUSICLAND HOLDING CORP., et al.,   )  07-cv-08423 (RWS)

                               )

                  Debtors,   )  Case No. 06-10064 (SMB)

- - - - - - - - - - - - - - - - - - - - - - - - - - )

                               )  Chapter 11

BUENA VISTA HOME             )

ENTERTAINMENT, INC., ET AL.,     )  Jointly Administered

                               )

               Plaintiffs,  )  Adv. Proc. No. 07-01705 (SMB)

                               )

                               )  On Appeal from the Order and

             - against -      )  Judgment of the United States

                               )  Bankruptcy Court of the Southern

                               )  District of New York Granting

WACHOVIA BANK, N. A., ET AL.,    )  Defendants' Motions to

                               )  <u>Dismiss the Complaint</u>

                               )

               Defendants.  )

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW OF APPELLEE HARRIS N.A. IN OPPOSITION TO APPELLANTS' APPEAL OF THE DISMISSAL OF THEIR COMPLAINT

November 28, 2007

## TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................1

II. ARGUMENT ......................................................................................4

    A.    The Applicable Standards .......................................................4

    B.    This Case Admits of a Simple and Straightforward Contractual Interpretation Showing That the Harris Term Loan Was Entitled to Priority over Appellants' Trade Creditor Liens.. .........................5

    C.    The Complaint's Faulty Interpretations of the Intercreditor Agreement Should Be Given Short Shrift. .................................15

    D.    The Third And Fourth Claims Of The Complaint Fail To State A Claim For Tortious Interference With Contract. ..........................20

    E.    Appellants Have No Viable Claim for Conversion. ...................21

    F.    Appellants Have No Viable Claim for Unjust Enrichment. ........22

III. CONCLUSION ................................................................................22

# TABLE OF AUTHORITIES

**Cases**

Page(s)

*Bailey v. Fish & Neave,*
    8 N.Y.3d 523, 837 N.Y.S.2d 600, 868 N.E.2d 956 (2007) ....................................11

*Brass v. American Film Technologies, Inc.,*
    987 F.2d 142 (2d Cir. 1993) .................................................................................4

*Bridgeport Music, Inc. v. Universal Music Group, Inc.,*
    440 F. Supp.2d 342 (S.D.N.Y. 2006) ...................................................................5

*Cal Distributor Inc., v. Cadbury Schweppes Americas Beverages, Inc.*
    2007 WL 54534 (S.D.N.Y. Jan. 5, 2007) .............................................................5

*Clark-Fitzpatrick, Inc. v. Long Island Railroad,*
    70 N.Y.2d 382, 516 N.Y.S.2d 653, 516 N.E.2d 190 (1987) ...............................22

*Conley v. Gibson,*
    335 U.S. 41 (1957) ..............................................................................................4

*De Jesus v. Sears, Roebuck & Co.,*
    87 F.3d 65 (2d Cir. 1996) .....................................................................................5

*Ehrlich v. Howe,*
    842 F. Supp.2d 482 (S.D.NY. 1994) ...................................................................22

*Hartford Fire Ins. Co. v. Federated Dept. Stores, Inc.,*
    723 F. Supp. 976 (S.D.N.Y. 1989) .................................................................12, 15

*Ilco Toy Co. ISA v. Block,*
    1991 WL 64203 (S.D.N.Y. Apr. 18, 1991) .........................................................14

*Lama Holding Company v. Smith Barney Inc.,*
    88 N.Y.2d 413, 88 N.Y.S.2d 76, 668 N.E.2d 1370 (1996) ...............................21

*MA-ST Corp. v. Henson Assoc., Inc.,*
    1992 WL 5867 (S.D.N.Y. Jan. 9, 1992) ...............................................................5

*Peters Griffin Woodward, Inc. v. WCSC, Inc.,*
    88 A.D.2d 883, 452 N.Y.S.2d 599 (1st Dept 1982) ...........................................21

*Readco, Inc. v. Marine Midland Bank,*
    81 F.3d 295 (2d Cir. 1995) .................................................................................12

*R/S Assocs. v. New York Job Dev. Authority,*
    98 N.Y.2d 29, 744 N.Y.S.2d 358, 771 N.E.2d 240 (2002) .................................................12

*Scholastic, Inc. v. Harris,*
    259 F.3d 73 (2d Cir. 2001) ..........................................................................................12

*Statland Holliday, Inc. v. Stendig Development Corp.,*
    46 A.D.2d 135, 362 N.Y.S.2d 2 (1st Dep't 1974).........................................................12, 13

*Thayer v. Dial Indus. Sales, Inc.,*
    85 F. Supp.2d 263 (S.D.N.Y. 2000) ...............................................................................5

*United Republic Ins. Co. v. Chase Manhattan Bank,*
    168 F. Supp.2d 8 (N.D.N.Y. 2001)................................................................................22

## <u>Statutes</u>                                                    <u>Page(s)</u>

*Fed R. Civ. P. 8*...............................................................................................................5

*Fed. R. Civ. P. 10(c)* ........................................................................................................4

Defendant Harris N.A. (*"Harris"*), by and through its attorneys, Piliero Goldstein, LLP and Chapman and Cutler LLP, respectfully requests that the Court affirm the Bankruptcy Court's dismissal of Appellants' Complaint for failure to state a claim upon which relief may be granted. In support of its Motion, Harris respectfully submits this Response Brief.[1]

## I.

### INTRODUCTION

Appellants and their predecessors, trade creditors of Musicland Holding Corp. and its affiliates (collectively, *"Musicland"*), entered into an Intercreditor Agreement dated November 5, 2003 (the *"Intercreditor Agreement"*) with the lenders who extended credit to Musicland under a certain "Revolving Loan Agreement." (Compl, ¶¶ 1, 28.)[2]  The Intercreditor Agreement was executed by Bank of New York (*"BONY"*) as agent for the Appellants and their predecessors, and Congress Financial Corporation (Florida) (*"Congress"*) as agent for the "Revolving Loan Creditors." (*Id.*, Ex. C.)  Co-Appellee Wachovia, N.A. (*"Wachovia"*) is the successor to Congress. (*Id.*, ¶ 21.)

**Importantly, the Intercreditor Agreement did not contain any limitations respecting amendment of the Revolving Loan Agreement and it also did not contain any restrictions as to: 1) who could extend credit or loan money to Musicland under the Revolving Loan Agreement at any time after it was executed; and 2) the types of loans or extensions of credit which could be extended to Musicland under the Revolving Loan Agreement.  Thus,**

---

[1]  Harris adopts and incorporates by reference the additional arguments made by Co-Appellee Wachovia, N.A., as successor to Congress Financial Corporation, as agent.

[2]  For the Court's convenience, true and correct copies of the Intercreditor Agreement and Amendment No. 8 (Attached as Exhibits C and D to Plaintiffs' Complaint) are attached hereto as Exhibits "A" and "B".

the terms of the Intercreditor Agreement are applicable to future parties to the Revolving Loan Agreement and to any type of credit that might be extended to Musicland under the Revolving Loan Agreement, whether on a revolving, term or other basis. In particular, the Intercreditor Agreement, as here relevant, made it clear that the liens of the Revolving Loan Creditors--a defined term which, as we shall see, contemplated and encompassed entities beyond the original lenders--had priority over and trumped the liens of the Plaintiffs and their agent BONY under a certain "Security Agreement" in "Trade Collateral." (Compl., Ex. C., §2.2.)

On August 31, 2005, Harris loaned $25 million for the benefit of Musicland under "Amendment No. 8" to the Revolving Loan Agreement. (*Id.*, ¶¶ 6, 35, Ex. D.) Amendment No. 8 was signed by Harris, the other then current lenders under the Revolving Loan Agreement, and Musicland. (*Id.*) Harris' loan was later repaid in accordance with the terms of Amendment No. 8. (*Id.*, ¶¶ 6, 35-37.) At the time of the execution of the Intercreditor Agreement, the Loan Agreement, as amended, provided that the maximum amount that could be outstanding at any time could not exceed $300,000,000, so the Plaintiffs and their predecessors knew at all times that their liens could be subordinate to up to $300,000,000 of bank loans. Amendment No. 8 to the Loan Agreement did not increase this amount, so it could not have changed the economic position of the Appellants.

The repayment to Harris could not have constituted a breach of the Intercreditor Agreement, as alleged in the Complaint's First and Second Claims. On the face of the Intercreditor Agreement, which has been incorporated in the Complaint, neither Harris nor Wachovia committed a breach of that agreement, because the repayment of Harris' loan was proper under the terms of that agreement. The Intercreditor Agreement's §2.2 provides that the

2

liens of the "Revolving Loan Creditors" in the Trade Collateral have priority over the liens held in that collateral by the Trade Creditors. Harris was a Revolving Loan Creditor within the terms of the Intercreditor Agreement and, therefore, was entitled to payment priority over Appellants.

**Nothing in the Intercreditor Agreement prohibits an amendment of the Revolving Loan Agreement or the extension of term loan credit under that Agreement. Similarly, nothing in the Intercreditor Agreement prohibits a third party lender, such as Harris, from extending credit to Musicland under the Revolving Loan Agreement.** The repayment Harris received was consistent, and made in accordance with, Amendment No. 8 and the terms of the Intercreditor Agreement; thus, neither Wachovia nor Harris breached the Intercreditor Agreement by making that payment.

The Third, Fourth, Fifth and Seventh Claims of the Complaint are directed at Harris. The Third and Fourth Claims, respectively, assert tortious interference by Harris with the Intercreditor Agreement and the Security Agreement between Musicland and the Trade Creditors. The Fifth and Seventh Claims, respectively, assert that Harris converted Appellants' collateral and was unjustly enriched. Each of those claims is contradicted by the clear and unambiguous terms of the contracts attached to the Complaint and fails to state viable causes of action. Harris' receipt of payment was not in contravention of the Intercreditor Agreement or the priorities created under that agreement. Similarly, Harris cannot have tortiously interfered with Wachovia's performance of any contract because Amendment No. 8 was permitted under its terms of the Intercreditor Agreement, and there was no breach. Similarly, neither Harris nor Wachovia could have tortiously interfered with the Security Agreement between Musicland and the Trade Creditors (the "Trade Security Agreement") because the payment made to Harris was authorized

3

by and consistent with the terms of the Intercreditor Agreement and therefore was permitted by the Trade Security Agreement. As a matter of law, there could have been no conversion because Harris was entitled by the contract provisions discussed herein to receive the payment that it obtained. Finally, Harris' receipt of payment cannot constitute unjust enrichment because it received what it was entitled to receive under Amendment No. 8 and the Intercreditor Agreement executed by Plaintiffs' agent.

Although Harris has other dispositive defenses to the Complaint,[3] the case was ripe for dismissal under Bankruptcy Rule 7012 and Federal Rule 12(b)(6), and the Bankruptcy Court acted properly in ordering the case dismissed.

## II.

### ARGUMENT

**A.    THE APPLICABLE STANDARDS.**

Appellants' Opening Brief (the "Brief") correctly recognizes (pp. 1-2) that this Court is reviewing the dismissal of Appellants' Complaint *de novo*.

The legal standard for dismissal pursuant to Rule 12(b)(6) is well-established. Dismissal is proper where it is clear that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Conley v. Gibson*, 335 U.S. 41, 45-46 (1957). In assessing the legal sufficiency of a claim, the Court may consider not only the facts alleged in the Complaint, but also any document attached as an exhibit to the Complaint. *Fed. R. Civ. P.* 10(c); *Brass v.*

---

[3]  If the case progresses to full discovery, the facts will show, among other things, that the Harris loan's critical infusion of cash into Musicland was known to and welcomed by Appellants, and indeed made for their benefit, as it gave Musicland the chance to experience a successful 2005 Holiday Season and a hoped-for turnaround in fortunes. That the Season proved disappointing for Musicland and a bankruptcy soon followed is no excuse for this sour grapes lawsuit.

*American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice to prevent a motion to dismiss. *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996); *Thayer v. Dial Indus. Sales, Inc.*, 85 F. Supp.2d 263, 268 (S.D.N.Y. 2000).

Moreover, where factual allegations or legal conclusions are flatly contradicted by documentary evidence, they are not presumed to be true, or even accorded a favorable inference. *Cal Distributor Inc., v. Cadbury Schweppes Americas Beverages, Inc.* 2007 WL 54534, *5, *17 (S.D.N.Y. Jan. 5, 2007). Thus, where (as here) the plaintiffs' cause of action arises out of a contract which has been attached to the complaint as an exhibit, and where (as here) such contract shows unambiguously on its face that the relief prayed for is not merited, dismissal is both justified and appropriate. *Id.*; *Bridgeport Music, Inc. v. Universal Music Group, Inc.*, 440 F. Supp.2d 342, 344 (S.D.N.Y. 2006); *MA-ST Corp. v. Henson Assoc., Inc.*, 1992 WL 5867, *2 (S.D.N.Y. Jan. 9, 1992).

**B.    THIS CASE ADMITS OF A SIMPLE AND STRAIGHTFORWARD CONTRACTUAL INTERPRETATION SHOWING THAT THE HARRIS TERM LOAN WAS ENTITLED TO PRIORITY OVER APPELLANTS' TRADE CREDITOR LIENS.**

Appellants' rejection of *Fed. R. Civ. P.* 8's call for a "short and plain statement of the claim" in their Complaint and briefs thereafter in favor of a "Sturm und Drang" approach is a deliberate attempt to obfuscate the fact that Harris is plainly entitled to priority treatment under the Intercreditor Agreement. Indeed, the interpretation involved is simple and straightforward. All this Court has to do is look at four sections of the Intercreditor Agreement to perceive Harris' entitlement to judgment in its favor:

1. Under Section 2.2, Revolving Loan Creditors have a priority lien over Trade Creditors.

**Everybody is in agreement with that.**

2. Under Section 1.15, "Revolving Loan Creditors" is defined to include each of the financial institutions from time to time party to the Revolving Loan Agreement as lenders.

**This is undisputed.**

3. Under Section 1.13, the Revolving Loan Agreement was defined to include the 2003 Loan Agreement as the same now exists or may hereafter be amended, modified, supplemented, etc.

4. Under Section 4.3 of the Intercreditor Agreement, Plaintiffs expressly consented to the amendment, modification, and restructuring of Revolving Creditor Agreements that includes the 2003 Loan Agreement.

**The Complaint admits (¶¶ 6, 35) that the 2003 Loan Agreement was indeed amended, and Harris became a party thereto.**

In sum, on the face of the documentation, Harris by virtue of "Amendment No. 8" became entitled to priority treatment.

Appellants, of course, argue that sinister things occurred. However, under any review or analysis of the documentation, the manner in which Harris advanced money and received repayment, was totally proper. The documentation supports the propriety of everything that was done. Appellants (or their predecessors) are sophisticated entities that were fully capable of understanding that the Intercreditor Agreement was drafted in a way that would facilitate future changes and even increases in the credit facility to which their liens were subordinated. It is highly unlikely that Appellants were not aware of the import of these terms. If not, Appellants have only themselves or their predecessors to blame for the approval of this documentation.

That the documentation permitted the Harris term loan to acquire seniority over Appellants' Trade Creditor liens under the subordination provisions of the Intercreditor

Agreement is clear from a straightforward analysis. In a nutshell, Section 2.2 of the Intercreditor Agreement (Compl., Ex. C §2.2) provides that the liens of the Revolving Loan Creditors shall have priority over the liens of the [Appellant] Trade Creditors upon Musicland's Trade Collateral to the full extent of the Revolving Loan Debt. Under the express terms of the Intercreditor Agreement, Harris is a "Revolving Loan Creditor," and its term loan met the definition of "Revolving Loan Debt." Additionally, Appellants expressly consented in the Intercreditor Agreement to subsequent amendments of the Revolving Loan Agreement and Revolving Creditor Agreements to include loans such as the one made by Harris under Amendment No. 8. The plain terms of the Intercreditor Agreement eviscerate Appellants' contentions that the loan made by Harris was not contemplated by the agreement, and that Harris was not entitled to the repayment it received.

The implicit heart of Appellants' argument is that the Harris term loan could never fit within the provisions of the Intercreditor Agreement. That position is belied by the documentation. The very definition of "Revolving Loan Debt" to which Appellants or their predecessors assented in the Intercreditor Agreement made room for term loans to be included in the future. Instead of defining "Revolving Loan Debt" as formula-based loans with a revolver feature -- as Appellants could have insisted (but did not insist!) be done -- the Intercreditor Agreement's Section 1.16 provided for broader categories of loans, **dependent not upon the type of lending, but upon whether or not one is a "Revolving Loan Creditor:"**

> 1.16   "Revolving Loan Debt" shall mean **any and all obligations, liabilities and indebtedness of every kind, nature and description owing by Debtors to Revolving Loan Creditors** and/or their respective affiliates or participants, including principal, interest, charges, fees, premiums, indemnities and expenses, however evidenced, whether as principal, surety, endorser,

7

> guarantor or otherwise, arising under the Revolving Creditor Agreements, **whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the Revolving Creditor Agreements** . . . whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and whether arising directly or howsoever acquired by Revolving Loan Creditors. [Emphasis added.] (Compl., Ex. C, §1.16).

In other words, as long as one was a "Revolving Loan Creditor" one could make term loans, and those would be considered "Revolving Loan Debt."[4]   Could Harris fit within the definition of "Revolving Loan Creditor" in the Intercreditor Agreement?  Of course.  Section 1.15 of the agreement provides the clear affirmative answer to that question:

> "Revolving Loan Creditors" shall mean, individually and collectively, Revolving Loan Agent, each of the financial institutions from time to time party to the Revolving Loan Agreement as lenders , and their respective successors and assigns **(and including any other lender or group of lenders that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise party to the Revolving Creditor Agreements)**." [Emphasis added.] (Compl., Ex. C §1.15).

Plainly, Harris falls within the parenthetical, which in proper grammatical analysis yields two categories, the latter of which clearly includes Harris:

> including any other lender or group of lenders that at any time [category 1] refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or [category 2] is otherwise party to the Revolving Creditor Agreement.

---

[4]   The words "Arising under the Revolving Creditor Agreements" in Section 1.16 are significantly modified by the language following and modifying that phrase, "whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the Revolving Creditor Agreements."  That language directly supports Harris' assertion that by virtue of a later amendment -- enabled by Appellants' assent to broad and unfettered amendment -- the Revolving Creditor Agreement could be modified, and indebtedness reflected under the amended agreement would be "Revolving Loan Debt."

Thus, Section 1.15 specifically contemplates that the definition of "Revolving Loan Creditors" would encompass entities such as Harris that -- *a la'* category 2 -- at any time, became parties to the Revolving Creditor Agreements in any respect.  Nothing in Section 1.15 or any other part of the Intercreditor Agreement restricts third party, unaffiliated lending institutions such as Harris from extending credit to Musicland.  While the Intercreditor Agreement contains certain provisions related to extensions of credit by "Affiliates" of Musicland, those provisions are not applicable because Harris was not (and was not alleged to be) an affiliate of Musicland.

The question becomes whether Harris ever became a party to any of the Revolving Creditor Agreements.  **The Complaint admits (¶¶ 6, 35) that the 2003 Loan Agreement was amended via Amendment No. 8, and Harris became a party thereto.[5]  This ends the inquiry in Harris' favor.**

This admission was unnecessary, because the documentation proves it to be so.  As discussed above (and further below), as defined under the Intercreditor Agreement, a Revolving Creditor Agreement includes (within the express terms of the definition of Revolving Loan Agreement in Section 1.13 of the Intercreditor Agreement) the 2003 Loan Agreement as that agreement may thereafter be amended, modified, or restructured.  It is irrelevant whether the 2003 Loan Agreement used the phrase "term loans" when the Intercreditor Agreement was first entered, because the parties agreed expressly in Section 4.3 that it could be amended, modified or restructured without any limitation on the nature, type or scope of any such change.  Section 1.13

---

[5]    Moreover, Paragraph 35 (and, of course, the exhibit) makes it clear that Amendment No. 8 incorporated by its terms the Harris term loan into the Revolving Credit Facility, by which Harris was sheltered under the umbrella of Wachovia's UCC-1 financing statement, permitting the first priority Revolver Lien to cover the repayment of the Harris term loan.

of the Intercreditor Agreement (Compl., Ex. C, §1.13) clearly includes both the 2003 Loan Security Agreement and any subsequent amendment, modification or restructuring. Section 1.13 defines the "Revolving Loan Agreement" to mean:

> the Loan and Security Agreement, dated August 11, 2003, by and among Revolving Loan Agent, Revolving Loan Creditors and Debtors (as same now exists or **may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured)"** *Id.* (emphasis added).

Similarly, Section 1.11 of the Intercreditor Agreement defines "Revolving Creditor Agreements" to mean:

> collectively, the Revolving Loan Agreement and all agreements, documents and instruments at any time executed and/or delivered by Debtors or any other person to, with or in favor of Revolving Loan Creditors in connection therewith or related thereto, **as all of the foregoing now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, or restructured (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders . . . that at any time refinances, succeeds to all or any portion of the Revolving Loan Debt).**" [Emphasis added.] (Compl., Ex. C §1.11).

Plaintiffs' claim that the Intercreditor Agreement did not contemplate that a subsequent term loan could be made in connection with the Revolver Credit Agreements, is finally refuted by Appellants' consent in Section 4.3 of the Intercreditor Agreement to any subsequent amendments, modifications, or supplements to the Revolving Creditor Agreements or the Revolving Loan Debt. Section 4.3 provides, in relevant part:

> Trade Creditors also waive notice of, and hereby consent to, (a) any amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements, including, without limitation, extensions of time of payment of or increase or decrease in the amount of any of the Revolving Loan Debt, the interest rate, fees, other charges, or

> any collateral, (b) the taking, exchange, surrender and releasing of Trade Collateral or guarantees now or at any time held by or available to Revolving Loan Agent or any of the Revolving Loan Creditors for the Revolving Loan Debt . . . (Compl., Ex. C. §4.3)

Section 4.3 clearly evidences Appellants' agreement that the terms of the Intercreditor Agreement would apply to a term loan subsequently made pursuant to an amendment or other modification to the Revolving Loan Agreement (or any other credit agreement falling under the definition of Revolving Credit Agreements) as well as Appellants' consent to an increase in the amount of indebtedness to which their liens would be subordinated. (*Id.*) Plainly, Section 4.3's clear language provides the basis for Amendment No. 8, and through it Harris' entitlement to the rights of a Revolving Loan Creditor.

Appellants' line of argument raises two questions: (1) Is there anything that should prevent this Court from deciding, on a motion to dismiss, whether the Intercreditor Agreement could properly have been amended as it was? (2) Was there anything intrinsically bad or wrong about the amendment? Because both of these questions can be readily answered in the negative, there is no reason that this Court cannot grasp the bull by the horns, and affirm the dismissal of the Complaint for its failure to state a claim pursuant to the plain, unambiguous terms of the documentation incorporated into the Complaint.

As to the first question, Appellants' Brief offers absolutely nothing of substance to suggest that this Court need look beyond the four corners of the Complaint and its accompanying exhibits (the Intercreditor Agreement, the Revolving Loan Agreement, and Amendment No. 8) in order to reach an immediate decision on a motion to dismiss. The provisions that control the disposition of this case are, as has been shown, few in number, and painfully clear. Thus, a recourse to parol evidence would be inappropriate. *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528,

11

837 N.Y.S.2d 600, 868 N.E.2d 956 (2007); *R/S Assocs. v. New York Job Dev. Authority*, 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 771 N.E.2d 240 (2002); *Hartford Fire Ins. Co. v. Federated Dept. Stores, Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989).

Appellants, who would love to postpone the Day of Judgment by having a trier of fact needlessly consider what was going through the minds of each of the Appellants, their predecessors, and their draftsman years ago, have argued ambiguity, but where (as here) the language of the agreements is unambiguous, the law prohibits such a frolic and detour. *R/S Assocs.*, 98 N.Y.2d at 32-33.

Appellants' ambiguity argument is contrived, at best. While their Brief is now peppered with the words "ambiguity" and "ambiguous" (compare their Complaint, in which the words are never found), their argument about ambiguity boils down to nothing more than:

1.   An ambiguity exists if someone is capable of perceiving two meanings.
2.   The opposing counsel in this case have offered different interpretations.
3.   *Ergo*, there must be an ambiguity.

This sort of analysis, of course, would result in a finding in ambiguity in every lawsuit involving the interpretation of a contract and clearly mis-states the applicable standards. *See, e.g., Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1995) (under New York law a contract is ambiguous only where reasonable minds could differ as to what a term means, but parol evidence is not admissible to create an ambiguity regarding facially clear terms); *Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001) (same).

In arguing the ambiguity point, Appellants' reliance on *Statland Holliday, Inc. v. Stendig Development Corp.*, 46 A.D.2d 135, 362 N.Y.S.2d 2, (1st Dep't 1974), is misplaced. That suit, between a mortgagor and a mortgagee, was sparked when the holder of a first mortgage refused

to subordinate to a second development loan, where that holder had agreed only to subordinate to an initial development loan and "renewals, modifications, consolidations and replacements and extensions" thereof. Although the court used the word "ambiguous" in dicta, it did not hold, as Appellants suggest, that the mortgagee was not required to subordinate because the cited clause was ambiguous; instead, it held that the clause was enforceable and subordination was required because the factual situation could be construed as effecting a "consolidation." *Statland*, therefore, actually helps Harris, because Section 4.3 of the Intercreditor Agreement expressly permitted an "amendment," so that the factual situation in this case dovetailed with the language of agreement.

*Statland*, indeed, supports Harris not only because Amendment No. 8 was expressly permitted by Section 4.3, but also because the Harris term loan fit the definition of "Revolving Loan Debt." The definitional language of such permitted debt in Section 1.16 of the Intercreditor Agreement is **crystal clear that Revolving Loan Debt could encompass the Harris term loan**: the definition is not, as Appellants urge, limited to formula-based lending with a revolver feature and a collateral cushion, but literally embraces indebtedness **"of every kind, nature and description"** (plainly including term loans) as long as the loan was made by a "Revolving Loan Creditor." (emphasis added). With the Harris term loan, the amount of outstanding debt under the Revolving Credit Agreement, as amended, was well within the maximum indebtedness expressly provided for in the Agreement at all relevant times, including when the Intercreditor Agreement was executed. If, as they did, Appellants and their predecessors approved the concept that Revolving Loan Debt could encompass term loans, they have no legitimate basis to argue that Amendment No. 8, permitting the Harris term loan, was beyond their expectations.

Moreover, was there anything in the definition of "Revolving Loan Creditor" that suggested Harris could not become one? Absolutely not! The definition again made it clear that membership was not limited to only those making revolving loans. Harris was not required to guess that Appellants' agreements were somehow different than what the Intercreditor Agreement provided on its face. The *Statland* ambiguity as to whether a second loan is a modification of a first loan is not an issue here, where term loans plainly fall within the broad definition of Revolving Loan Debt and modification are expressly permitted by the Intercreditor Agreement.[6]

The Bankruptcy Court found nothing ambiguous about the language, and of course the extensive word-for-word analysis of the language offered above shows that there is no ambiguity. The words are crystal clear, they make mincemeat out of Appellants' arguments, and they lead inexorably to the interpretation offered by Appellees.[7]

As their ambiguity argument failed to convince the Bankruptcy Court, so too did Appellants' attempted recourse to the old saw of an implied covenant of good faith and fair

---

[6] Appellants' reliance on *Ilco Toy Co. ISA v. Block*, 1991 WL 64203 (S.D.N.Y. Apr. 18, 1991), is wildly inapposite, involving royalties on Mickey Mouse play gyms, and the citation is inexplicable but for the lead Appellant's tie to the Disney corporate family.

[7] Indeed, the high-priced business and legal talent involved in preparing, reviewing and negotiating the language would be shocked to hear that a document designed to control the flow of millions upon millions of dollars was susceptible to multiple interpretations.

dealing to avoid an immediate dismissal under a strict contractual interpretation.[8]  That covenant plainly cannot be used -- as Plaintiffs would use it here -- to vary or contradict express terms of an agreement.  *Hartford Fire*, 723 F. Supp. at 991 ("[T]he implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement.  Thus, a court cannot imply a covenant inconsistent with terms expressly set forth in the contract").

Thus, the express terms of the provisions at issue made mincemeat out of both the ambiguity and the implied covenant arguments urged by Appellants below.

## C.    THE COMPLAINT'S FAULTY INTERPRETATIONS OF THE INTERCREDITOR AGREEMENT SHOULD BE GIVEN SHORT SHRIFT.

As noted, the Complaint never argues ambiguity, as Appellants at the get go were fully confident that the clear language of the documentation guaranteed them victory.  Instead, they made other arguments in their Complaint, arguments that, however, simply do not withstand scrutiny.

The Complaint argues that the Harris transaction is a subterfuge because the term loan that Harris made is not covered by the Intercreditor Agreement.  However, as discussed above, the clear terms of the Intercreditor Agreement show that Harris met the definition of a "Revolving Loan Creditor" under Subsection 1.15 of the Intercreditor Agreement, and Harris' term loan met the broad definition of "Revolving Loan Debt" in Subsection 1.16 of that

---

[8]  The claims made by Appellants each should be dismissed as a matter of law based on the express and clear provisions of the Intercreditor Agreement.  It is worth noting, however, that their indications that discovery will somehow reveal some clandestine plot or overreaching by Appellees are disingenuous.  To the contrary, the evidence would show, among other things, that:  (i) Appellants were aware of the Harris term loan and did not object to it; (ii) even after the term loan by Harris, pursuant to Amendment No. 8, the indebtedness outstanding under the 2003 Agreement was within the maximum amount provided for under the 2003 Loan Agreement (even as it existed in 2003); and (iii) the funds advanced were used to purchase inventory for the Christmas season and afforded Musicland the ability to give it one more go at staying in business -- and eventually be able to pay off the Trade Creditors.

Agreement. Moreover, the interpretive nits attempted to be picked by Appellants may all be disposed of readily.

Appellants try to argue that Harris should not be considered a Revolving Loan Creditor and its term loan should not be considered Revolving Loan Debt -- even though Harris and its loan easily fall within the definitions of these terms in the Intercreditor Agreement -- because Harris' loan was not a Permitted Affiliate Refinancing as defined in Section 1.9 of the Intercreditor Agreement. Harris obviously agrees that this is indeed the case. Harris is not an affiliate of Musicland, and its loan is not affiliate refinancing. But, "So what?" Harris and its loan fall within other definitions, and there is nothing in the Intercreditor Agreement that *prohibits* loans unless they are "Permitted Affiliate Refinancing" (the agreement says only in Section 1.11 that Appellants have no objection to Permitted Affiliate Refinancing). Appellants' argument is akin to arguing that a goose cannot be considered part of a flock of geese because it is not a duck: a complete *non sequitur*.

Appellants have also implied that Harris and its loan fall without the bounds of the Intercreditor Agreement because, while Harris is not an affiliate of a Debtor, the fact that its obligation was guaranteed by a parent of a Debtor somehow makes it an affiliate. Of course, this argument would be stillborn, because Harris is simply not an affiliate of a Debtor, and there is no principle of law that magically transforms a national bank into an affiliate of a debtor by receipt of a parent guaranty from an affiliate of Debtor. Moreover, if Appellants, entering into the Intercreditor Agreement, wanted to prohibit lenders from receiving guarantees from their Debtors' corporate parent or other affiliates, they should have inserted that prohibition into the agreement. But they did not.

16

Next, Appellants tortuously argue in the Complaint that the lien provided to the Revolving Loan Creditors can only secure revolving debt, and not term loans, because (a) under Section 5.1 of the 2003 Revolving Credit Agreement the lien for the benefit of the Revolving Loan Creditors (the definition of which Harris fits) secures only "Obligations," (b) under Section 1.80 "Obligations" is only limited to "Loans," and (c) "Loans" are defined in Section 1.70 to include only loans made "on a revolving basis." The weak link in this flawed chain is (b): under Section 1.80, contrary to Appellants' position, "Obligations" are *not* limited to "Loans." "Obligations" are defined in that subsection to include:

> [A]ny and all Loans, Letters of Credit, Accommodations **and all other obligations, liabilities and indebtedness of every kind, nature and description** . . .. [Emphasis added.]

Appellants' argument fails -- *and in failing, hoists Appellants upon their own petard* -- because clearly the "Obligations" that can be secured expressly includes not only "Loans" that under Section 1.70 are "made . . . on a revolving basis," but also "all other obligations, liabilities and indebtedness of every kind, nature and description," *which clearly embraces term loans of the sort Harris made*! It boggles the mind that Appellants can argue with a straight face that term loans are somehow not embraced by the language "all other obligations, liabilities and indebtedness of every kind, nature and description."

Lastly, Appellants argue that the Harris term loan does not fall within "Revolving Loan Debt" and therefore is not entitled to the benefit of the Intercreditor Agreement's subordination provision (§2.2). According to Appellants, the Harris term loan is not Revolving Loan Debt because (a) under Section 1.16 of the Intercreditor Agreement, Revolving Loan Debt only embraces debt to Revolving Loan Creditors "arising under the Revolving Creditor Agreements,"

17

(b) under the parenthetical at the end of Section 1.11, "Revolving Creditor Agreements" include only amendments that "refinance, replace or succeed to all or any portion of the Revolving Loan Debt," and (c) Amendment No. 8 by which Harris became a Revolving Loan Creditor did not "refinance, replace or succeed to any portion of the Revolving Loan Debt."

There are at least four fatal flaws with Appellants' argument. First, term loans are well within the broad scope of indebtedness included within the definition of Revolving Loan Debt in Section 1.16. Although the parenthetical at the end of Section 1.16 contains a reference to Revolving Creditor Agreements, the definition of that term in Section 1.11 does not preclude term loans of the type made by Harris. Indeed, that parenthetical is tied to "Revolving Loan Debt" and term loans are encompassed by the explicit terms of the Section 1.16 definition of that term (which includes "any and all obligations, liabilities, and indebtedness of **every kind or nature and description** owing by Debtors to Revolving Loan Creditors . . ." (emphasis added)). Appellants' argument cannot be squared with that definition.

Second, the Section 1.11 definition of Revolving Creditor Agreements includes the defined term "Revolving Loan Agreement" and that definition consists of the Loan and Security Agreement dated August 11, 2003 **"as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured."** (emphasis added). Amendment No. 8 is a modification to the Loan and Security Agreement dated August 11, 2003 that falls within that definition. Accordingly, the cross-reference to Revolving Creditor Agreements in the Section 1.16 definition of "Revolving Loan Debt" does not support Plaintiffs.

18

The third fatal flaw in Appellants' argument is that it is at odds with Section 4.3 of the Intercreditor Agreement, which contains Appellants' express consent to the "amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements," including but not limited to an increase in the amount of that indebtedness. Appellants' argument would render the Section 4.3 consent a nullity because, according to them, the effect of the parenthetical in Section 1.11 is to limit Revolving Creditor Agreements to only revolving credit arrangements in place when the Intercreditor Agreement was signed.

The fourth fatal flaw in Appellants' argument is that the terms of the parenthetical at the end of Section 1.11 are expansively broadening, not limiting. It reads: "in whole or in part and *including* any agreements . . . that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt." (Emphasis added.) "Including" is a broadening and expanding term, not a term of limitation. If Appellants had intended to make the parenthetical a limitation on the indebtedness that to which Trade Creditor liens would be subordinated, they should have used the phrase "*only* including". But Appellants did not use that phrase in the Intercreditor Agreement, but instead ask this Court to rewrite Section 1.11 in a way that would change the agreement reflected in the Intercreditor Agreement.

When all is said and done, Appellants, who are sophisticated trade creditors, entered into an Intercreditor Agreement that *on its face* contemplated the possibility of Harris and its loan, and affirmatively consented to possible amendments, modifications and restructurings of the Revolving Credit Agreements of the very type that were encompassed in Amendment No. 8. Harris meets the Section 1.15 definition of Revolving Loan Creditor. Harris' term loan meets the

Section 1.16 definition of Revolving Loan Debt.   There is nothing in the agreement that prohibited Harris from obtaining a guaranty of the Debtors' affiliate.  Appellants may be upset, but they should be upset with no one but themselves for entering into an Intercreditor Agreement that permitted Harris and its term loan.[9]

Harris lent $25 million to the Debtors, and received repayment under the priorities afforded Revolving Loan Creditors under the Intercreditor Agreement.  No one breached the contract, no one tortiously interfered with the contract, no one converted anything, and no one was unjustly enriched.  The complained of transactions were contemplated and permitted under the clear language of the Intercreditor Agreement, which bound Appellants.  Dismissal is warranted.

**D.    THE THIRD AND FOURTH CLAIMS OF THE COMPLAINT FAIL TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT.**

As a matter of law, Appellants have failed to state a claim against Harris for tortious interference with the Intercreditor Agreement (the Third Claim) or the Security Agreement (the Fourth Claim) because, as discussed above, Amendment No. 8 was permitted under the Intercreditor Agreement and the payment to Harris did not breach that agreement by which Appellants bound themselves.  Tortious interference with contract requires the existence of a

---

[9]  This recognition makes mincemeat out of Appellants' argument (Brief, pp. 23-24) that Harris' proffered interpretation somehow "'defeats and contravenes' the fundamental purpose of the Intercreditor Creditor Agreement's protection of Appellants' lien priority."  The fundamental purpose of the Intercreditor Agreement was not to protect only one side or the other, but to make clear to signatories *and those who, like Harris, would later contemplate becoming either "Revolving Loan Creditors" and Trade Creditors* the respective rights and obligations of the parties.  It accomplished this goal of "making clear" by and through expressing mutual intent via the language within the documentation.  Trade Creditors quite obviously wanted to lure in new loans from Revolving Loan Creditors, so that Musicland, receiving the loans, would buy goods from the Trade Creditors.  Thus, the operative assumption would be that the Appellant Trade Creditors would make absolutely certain through the express language of the documentation what could and could not be done.  They agreed to the language, knowing that newcomers like Harris could rely on it, and have no one but themselves to blame if the language is read by this Court as meaning just what it says, no more and no less.

20

valid contract between a plaintiff and a third party, the defendants' knowledge of that contract, the defendant's procurement of the third party's breach of that contract without justification, actual breach of the contract, and damages resulting therefrom. *Lama Holding Company v. Smith Barney Inc.*, 88 N.Y.2d 413, 425, 88 N.Y.S.2d 76, 82, 668 N.E.2d1370, 1375 (1996).    In this case, there can be no tortious interference by Harris when, under the clear terms of the Intercreditor Agreement, Amendment No. 8 to the Revolving Loan Agreement was authorized by Appellants.    Therefore, Harris was entitled to the benefits of the Intercreditor Agreement and the payment it received did not constitute a breach of that or any related agreement.

Furthermore, under the terms of Trade Security Agreement, Musicland granted Appellants and their predecessors a lien against Musicland's inventory that was at all times subject and subordinated to the liens of Wachovia and the Lenders under the Revolving Loan Agreement.    Trade Security Agreement ¶¶ 2, 6.    As permitted by Section 4.3 of the Intercreditor Agreement, the Revolving Loan Agreement was amended to include the Harris Term Loan. Accordingly, the priority liens of Wachovia and the Lenders extended to the Harris, making them a "Permitted Encumbrance" under the Trade Security Agreement.    Trade Security Agreement ¶ 1. Because the liens granted Harris were specifically permitted by the Intercreditor Agreement and the Trade Security Agreement, there can be no breach of the Trade Security Agreement and the claim for tortious interference should be dismissed.    The Third and Fourth Claims should be dismissed.

### E.    APPELLANTS HAVE NO VIABLE CLAIM FOR CONVERSION.

Appellants' Fifth Claim, for conversion, is also totally deficient as a matter of law. Conversion is the "unauthorized assumption and exercise of the right of ownership over goods

belonging to another to the exclusion of the owner's rights." *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 452 N.Y.S.2d 599 (1st Dept 1982). On the face of the Complaint, no conversion took place. Harris, which made a $25 million term loan, was entitled to repayment under the terms of the documentation. It never exercised any wrongful ownership over Appellants' "goods." Appellants, bound by the Intercreditor Agreement that afforded that repayment priority, have no cause for complaint, and the Fifth Claim should be dismissed.

Appellants' conversion claim is also fatally flawed because the Complaint does not allege (and Appellants cannot truthfully allege) that the money allegedly converted was part of separate, identifiable and tangible fund of which Appellants were the owner and had the right to immediate possession. *United Republic Ins. Co. v. Chase Manhattan Bank*, 168 F. Supp.2d 8 (N.D.N.Y. 2001); *Ehrlich v. Howe*, 842 F. Supp. 482, 492 (S.D.N.Y. 1994). Under New York law, a claim for conversion of money cannot be sustained in the absence of such allegations. *Id.*

### F.    APPELLANTS HAVE NO VIABLE CLAIM FOR UNJUST ENRICHMENT.

The existence of a valid and enforceable contract precludes recovery for unjust enrichment for events or actions arising from the same subject matter. *Clark-Fitzpatrick, Inc. v. Long Island Railroad*, 70 N.Y.2d 382, 388-89, 516 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987). A claim for unjust enrichment can only arise in the absence of an express contract. *Id.* As discussed above, the payment to Harris in regard to the loan made by it in connection with Amendment No. 8 was entirely consistent with the terms of the Intercreditor Agreement and Harris was entitled to receive payment of the debt owed to it. Accordingly, a claim for unjust enrichment cannot be maintained against Harris and it was not unjustly enriched in any regard. Therefore, the Seventh Claim of the Complaint also should be dismissed.

## III.

## CONCLUSION

Appellants are bound by the terms of the Intercreditor Agreement into which they freely entered.  Harris lent $25 million to the Debtors under a term loan and through an amendment to the Revolving Loan Agreement.   Under the definitions of the Intercreditor Agreement, Harris was a Revolving Loan Creditor, and its term loan was Revolving Loan Debt allowed for under the Revolving Loan Agreement and the Intercreditor Agreement. It was accordingly entitled to priority in repayment over Plaintiffs and their trade debt.

There is absolutely nothing in the documentation that would support, through the exercise of reason, a conclusion that Amendment No. 8 was prohibited, and so the only way that this Court can ever hold that the documentation forbade such an amendment is through a sheer leap of faith.

Unfortunately for Appellants, the law of contractual interpretation is based not upon non-rational guesswork, mysticism or mind reading, but upon what is written by draftsmen charged with clearly and expressly conveying the mutual intentions of the parties. Harris was a good faith lender that was entitled to rely on the clear and unambiguous language of the Intercreditor Agreement -- drafted years before Harris came into the picture -- in reaching its decision to advance $25 million to Musicland pursuant to Amendment No. 8.   Here, the most cursory reading of the Intercreditor Agreement shows -- contrary to Appellants' position -- that (a) amendments to the Revolving Loan Agreement were broadly permitted; indeed, **there is nothing in any of the relevant documentation that would have given Harris any notion that it could not have entered into Amendment No. 8,** (b) there was nothing that limited the definition of

23

"Revolving Loan Debt" to formula-based lending with a revolver feature; indeed, **the definition considered "Revolving Loan Debt" to include indebtedness "of every kind, nature and description," as long as the loan was made by a "Revolving Loan Creditor"**, and (c) there was no bar to Harris becoming a party to the evolving Loan Agreement via amendment; indeed, **nothing in the definition of "Revolving Loan Creditor" suggests that membership was limited to only those making revolving loans.** Harris was not required to guess that Appellants' intentions were somehow different than what the Intercreditor Agreement provided on its face.

Appellants never come to grips with the ultimate question facing any party who argues that a particular interpretation of a contract runs contrary to its expectations: "If you really, really wanted to protect or prohibit something, why did you not craft language doing just that?" Here, Appellants claim that they and their predecessors wanted to protect the *status quo* (that Revolving Loan Debt included nothing but revolving loans). However, the language to which they agreed in the Intercreditor Agreements expressly permitted the actions to which they now object. If they truly wished to preserve the *status quo*, why did they agree to permit broad and unfettered amendments of the Revolving Loan Agreement? If they genuinely wished to limit Revolving Loan Debt to just revolving loans, why did they not do so? If they really, really wished to limit Revolving Loan Creditors to only those making revolving loans, why did they not place that limitation in the definition?

Appellants' assertions of what they intended and expected ring hollow, and are belied by the plain language of the Intercreditor Agreement. The documentation they negotiated and signed permitted Amendment No. 8, and it permitted Harris to gain the protection of the

24

Revolving Loan Agreement.    Because Appellants or their predecessors freely enabled the situation of which they now complain, this Court should flatly reject Appellants' attempt to have it rewrite the Intercreditor Agreement.

No one breached the Intercreditor Agreement, no one tortiously interfered with any agreement, no one converted anything here, and no one was unjustly enriched. The transactions described in the Complaint were either authorized or not prohibited under the applicable loan documents and clear language of the Intercreditor Agreement, which bound Appellants. Dismissal is warranted, and the Bankruptcy Court's decision should be affirmed.

Dated: New York, New York          Respectfully submitted,
        November 28, 2007

                                   **CHAPMAN AND CUTLER LLP**
                                   Fredrick V. Lochbihler *(pro hac vice motion pending)*
                                   David S. Barritt *(pro hac vice motion pending)*
                                   Michael T. Benz *(pro hac vice motion pending)*
                                   111 West Monroe Street
                                   Chicago, Illinois  60603
                                   Tel: (312) 845-3000
                                   Fax: (312) 701-2361

                                           -and-

                                   **PILIERO GOLDSTEIN, LLP**

                                   By: _____
                                       Robert D. Piliero (RP 6898)
                                       Richard B. Brosnick (RB 0005)
                                   10 East 53rd Street
                                   New York, New York  10022
                                   Tel: (212) 478-8500
                                   Fax: (212) 478-8584

                                   *Attorneys for Defendant Harris N.A.*

                                           25

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Memorandum of Law of Appellee Harris N.A. in Opposition to Appellants' Appeal of the Dismissal of their Complaint was served on behalf of Appellee Harris N.A., upon the parties listed below via Federal Express, overnight delivery on November 28, 2007:

_____
Richard B. Brosnick

Robert J. Feinstein, Esq.
Alan J. Kornfeld, Esq.
Pachulski Stang Ziehl Young
   Jones & Weintraub LLP
780 Third Avenue, 36th Floor
New York, New York 10017
   *Attorneys for Appellants*


Jonathan N. Helfat, Esq.
Otterbourg, Steindler, Houston
   & Rosen, P.C.
230 Park Avenue
New York, New York 10169
   *Attorneys for Appellee Wachovia Bank, N.A*