UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | ) 07-CV-08423 (RWS) |
| MUSICLAND HOLDING CORP., *et al.*, | ) |
| Debtors. | ) Chapter 11 |
| | ) |
| BUENA VISTA HOME ENTERTAINMENT, INC., a California corporation; CARGILL FINANCIAL SERVICES INTERNATIONAL, INC., a Delaware corporation; HAIN CAPITAL GROUP, LLC, a Delaware limited liability company; PARAMOUNT PICTURES CORPORATION, a Delaware corporation; TWENTIETH CENTURY FOX HOME ENTERTAINMENT LLC, a Delaware limited liability company; UBS WILLOW FUND LLC, a Delaware limited liability company; and VÄRDE INVESTMENT PARTNERS, L.P., a Delaware limited partnership, | ) Bk. Case No. 06-10064 (SMB) Jointly Administered ) ) Adv. Proc. No. 07-01705 (SMB) ) ) On Appeal from the Order ) and Judgment of the United States ) Bankruptcy Court of the ) Southern District of New York ) Granting Defendants' ) Motions to Dismiss Complaint ) ) ) ) |
| Appellants, | ) |
| v. | ) |
| WACHOVIA BANK, N.A., a national banking association, in its capacity as Agent; and HARRIS N.A., a national banking association, | ) ) ) |
| Appellees. | ) ) ) |

## BRIEF OF APPELLEE WACHOVIA BANK, N.A.

Richard G. Haddad  (RH 6438)
Stuart J. Wells  (SW 2186)
OTTERBOURG, STEINDLER, HOUSTON
& ROSEN, P.C.
230 Park Avenue
New York, New York 10169
Telephone:  (212) 661-9100
Facsimile:  (212) 682-6104

Attorneys for Appellee
Wachovia Bank, N.A., as Agent

## TABLE OF CONTENTS

Page

ISSUE PRESENTED ..................................................................1

STANDARD OF APPELLATE REVIEW ...............................................1

STATEMENT OF THE CASE ........................................................3

    A.    Introduction ...............................................................3

    B.    Course of Proceedings ......................................................4

    C.    The Bankruptcy Court's Decision .............................................6

STATEMENT OF FACTS ..........................................................9

    A.    The Wachovia Loan Agreement .................................................9

    B.    The Intercreditor Agreement and Wachovia's Right to Amend the Loan Agreement ........................................................9

    C.    Amendment No. 8 ..........................................................15

    D.    Chart:  The Appellants' Themes Are Refuted by the Express Terms of the Intercreditor Agreement and the Loan Agreement...............................17

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT ...................................................................23

    POINT I    THE BANKRUPTCY COURT PROPERLY DISMISSED APPELLANTS' CLAIM FOR BREACH OF THE INTERCREDITOR AGREEMENT BECAUSE THE CLAIM IS REFUTED BY THE CLEAR AND UNAMBIGUOUS TERMS OF THE INTERCREDITOR AGREEMENT ..................................23

        A. Wachovia Was Authorized to Enter into Amendment No. 8 by the Express Provisions of the Intercreditor Agreement and the Appellants Expressly Agreed to be Subordinate to All of the Obligations Owed to the Lenders, Whenever Incurred ...................24

        B. This Court Should Reject the Appellants' Unexpressed Intent Argument ...................27

        C. This Court Should Not Rewrite the Intercreditor Agreement Under the Implied Covenant of Good Faith and Fair Dealing .........................29

i

D. This Court Should Not Rewrite the Intercreditor Agreement
   Under the Guise of Interpretation.................................................................31

E. The Word "Amendment" Is Unambiguous
   and Specifically Includes, Without Limitation,
   Amendments That Increase the Amount of the Senior Debt...........................33

F. Harris Was Not a Musicland Affiliate and Therefore the
   Harris Loan Could Not Be an "Affiliate Refinancing" ..................................37

POINT II    THE APPELLANTS' TORT CLAIMS
            SHOULD ALSO BE DISMISSED....................................................39

A. The Aiding and Abetting Claims Are Without Merit......................................39

   1.    Appellants fail to identify the specific proceeds converted. ..................40

   2.    Appellants allege no independent facts establishing
         a claim for aiding and abetting conversion. ........................................40

B. Plaintiffs Fail to State a Claim for Tortious Interference
   with the Trade Security Agreement................................................................41

CONCLUSION.................................................................................................42

## TABLE OF AUTHORITIES

Page

Cases

Banco Espanol v. Sec. Pac. Nat'l Bank, 763 F. Supp. 36 (S.D.N.Y. 1991) ...............................29

Bank of China v. Chan, 937 F.2d 780 (2d Cir. 1991).................................................................30

Barleo Homes, Inc. v. Tudomawr Corp., 214 A.D.2d 694, 625 N.Y.S.2d 599
   (2d Dep't 1995) ............................................................................................................ 31-32

Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955 (2007)...................................2, 38

Blue Tree Hotels Investment (Canada), Ltd. v. Starwood Hotels & Resorts,
   369 F.3d 212 (2d Cir. 2004) ...............................................................................................2

Calcutti v. SBU, Inc., 273 F. Supp. 2d 488 (S.D.N.Y. 2003) ....................................................39

Carvel Corp. v. Baker, 79 F. Supp. 2d 53 (D. Conn. 1997)........................................................30

Ehrlich v. Howe, 848 F. Supp. 482 (S.D.N.Y. 1994) .................................................................40

Employers' Fire Ins. Co. v. Cotten, 245 N.Y. 102, 156 N.E. 629 (1927) .................................39

Energy Transport, Ltd. v. M.V. San Sebastian, 348 F. Supp. 2d 186 (S.D.N.Y. 2004) ...............23

Essex Ins. Co. v. Pingley, 41 A.D.3d 774, 839 N.Y.S.2d 208 (2d Dep't 2007)...................... 34-35

Fesseha v. TD Waterhouse Inverstor Services, Inc., 305 A.D.2d 268,
   761 N.Y.S.2d 22 (1st Dep't 2003) .....................................................................................41

Frank B. Hall & Co. v. Orient Overseas Assocs., 65 A.D.2d 424,
   411 N.Y.S.2d 233 (1st Dep't), aff'd, 48 N.Y.2d 958, 425 N.Y.S.2d 66 (1979) ......................28

Frutico S.A. v. Baners Trust Co., 833 F. Supp. 288 (S.D.N.Y. 1993)........................................29

Galli v. Metz, 973 F.2d 145 (2d Cir. 1992) ..............................................................................32

Gruppo, Levey & Co. v. ICOM Info. & Communications, Inc., 2003 U.S. Dist.
   LEXIS 11213 (S.D.N.Y. 2003) ..........................................................................................32

High View Fund L.P. v. Hall, 27 F. Supp. 2d 420 (S.D.N.Y. 1998) ..........................................40

Hotchkiss v. Nat'l City Bank of New York, 200 F. 287 (S.D.N.Y. 1911),
   aff'd, 201 F. 664 (2d Cir. 1912), aff'd, 231 U.S. 50, 34 S. Ct. 20 (1913)..........................28, 29

Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274 (2d Cir. 1989) ..................................24

Illco Toy Co. U.S.A. v. Block, 1991 WL 64203 (S.D.N.Y. 1991)................................35

In re Pinelawn Cemetery, 117 A.D.2d 274, 575 N.Y.S.2d 851 (1991) ........................34

Independence Discount Corp. v. Bressner, 365 N.Y.S.2d 44,
    47 A.D.2d 756 (2d Dep't 1975) ..............................................................................39

Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007) ..............................................................2, 38

Keene Corp. v. Bogan, 1990 U.S. Dist. LEXIS 220 (S.D.N.Y. 1990) ...................... 29-30

Kham & Nate's Shoes No. 2 v. First Bank, 908 F.2d 1351 (7th Cir. 1990)...................30

Kinek v. Paramount Communications, Inc., 22 F.3d 503 (2d Cir. 1994) .......................23

Klos v. Polskie Linie Lotnice, 133 F.3d 164 (2d Cir. 1997)...........................................28

Lama Holding Co. v. Smith Barney, 88 N.Y.2d 413, 646 N.Y.S.2d 76 (1996) ............41

LaSalle Bank Nat'l Ass'n v. Lend Lease Asset Mgmt., L.P., 424 F.3d 195
    (2d Cir. 2005) .........................................................................................................23

Madison Avenue Leasehold, LLC v. Madison Bentley Assoc., 30 A.D.3d 1,
    811 N.Y.S.2d 47 (2006) ..........................................................................................34

Marine Assocs. v. New Suffolk Dev. Corp., 125 A.D.2d 649,
    510 N.Y.S.2d 175 (2d Dep't 1986) .........................................................................32

MA-ST Corp. v. Henson Assoc., Inc., 1992 U.S. Dist. LEXIS 178
    (S.D.N.Y. 1992) ........................................................................................................3

Matusovsky v. Merill Lynch, 186 F. Supp. 2d 397 (S.D.N.Y. 2002)..........................2-3

Metropolitan Life Ins. Co. v. RJR Nabisco, 716 F. Supp. 1504
    (S.D.N.Y. 1989) .............................................................................................. 29, 30-31

Milgard Corp. v. E.E. Cruz/NAB/Frontier-Kemper, 2003 U.S. Dist.
    LEXIS 20928 (S.D.N.Y. 2003) ...........................................................................23, 31

Miller v. Vanderlip, 285 N.Y. 116 (1941) ....................................................................42

Pamilla v. Hospital for Special Surgery, 223 A.D.2d 508, 637 N.Y.S.2d 689
    (1st Dep't 1995) .......................................................................................................41

Primex Intern. Corp. v. Wal-Mart Stores, Inc., 89 N.Y.2d 594,
    657 N.Y.S.2d 385 (1997) .........................................................................................33

Reiss v. Financial Performance Corp., 97 N.Y.2d 195, 738 N.Y.S.2d 658
    (2001) ......................................................................................................................24

iv

RJE Corp. v. Northville Indus. Corp., 329 F.3d 310 (2d Cir. 2003)..............................38

Statland Holliday, Inc. v. Stendig Development Corp., 46 A.D.2d 135,
    362 N.Y.S.2d 2 (1st Dep't 1974) ...........................................................................36

Stone v. Golden Wexler & Sarnese, 341 F. Supp. 2d 189 (E.D.N.Y. 2004) .........................35, 36

Subaru Distributors Corp. v. Subaru of America, 425 F.3d 119 (2d Cir. 2005)............................1

Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, 127 S. Ct. 2499
    (2007) ..............................................................................................................2, 9

Times Mirror Magazines, Inv. v. Field & Stream Licenses Co., 294 F.3d 383
    (2d Cir. 2002) ...................................................................................................30, 34

Tougher Heating & Plumbing Co., Inc., 73 A.D.2d 732, 423 N.Y.S.2d 289
    (3d Dep't 1979) .................................................................................................34, 35

United Republic Ins. Co. v. Chase Manhattan Bank, 168 F. Supp. 2d 8
    (N.D.N.Y. 2001)...................................................................................................40

Vigilant Insurance Co. v. Housing Authority of the City of El Paso, Texas,
    87 N.Y.2d 36, 637 N.Y.S.2d 342 (1995) ...............................................................39

W.W.W. Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 565 N.Y.S.2d 440
    (1990) ...............................................................................................................23, 24

Yeterian v. Heather Mills, N.V., 183 A.D.2d 493, 583 N.Y.S.2d 439
    (1st Dep't 1992) ..................................................................................................41

Statutes and Rules

11 U.S.C. § 101(2) ................................................................................................38

Fed. R. Civ. P. 12(b)(6).....................................................................................1, 2, 5

## ISSUE PRESENTED

This is an appeal from a written Memorandum Decision and Order by Chief Bankruptcy Judge Stuart M. Bernstein of the Southern District of New York and a final Judgment dismissing the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Complaint asserts breach of contract and related claims arising out an agreement (the "Intercreditor Agreement") between senior and junior secured creditors of the bankrupt debtor Musicland Holding Corp. (together with its affiliates, "Musicland"). Under the Intercreditor Agreement, the junior creditor Appellants agreed that their liens and claims would always be subordinated to the liens and claims of Appellee Wachovia Bank, N.A. ("Wachovia") under a senior loan agreement, as then in effect or thereafter amended. The Intercreditor Agreement expressly provided that Wachovia could amend the loan agreement and that the Appellants consented to any amendment thereto. The Appellants sued, alleging that Wachovia had improperly amended the loan agreement, in breach of the Intercreditor Agreement. Accordingly, the issue on appeal is:

Whether the Bankruptcy Court correctly dismissed the Complaint where the express language of the contract attached to the Complaint authorized amendments, and contained the Appellants' consent to such amendments?

## STANDARD OF APPELLATE REVIEW

The dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is subject to de novo review. Subaru Distributors Corp. v. Subaru of America, 425 F.3d 119, 122 (2d Cir. 2005).

The Supreme Court has recently commented on the standard of review of a pleading under Rule 12(b)(6). This standard requires a plaintiff to do more than simply speculate about circumstances that might conceivably give rise to a claim for relief. As the Supreme Court explained:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, . . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . .

Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1964-65 (2007) (citations and quotations omitted). That is, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face" in order to state a claim that survives scrutiny under Rule 12(b)(6). Bell Atlantic, 127 S. Ct. at 1974. See Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (the Bell Atlantic standard "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible"). Thus, a claim may be sustained only if the plaintiff has "nudged [its] claims across the line from conceivable to plausible . . . ." Bell Atlantic, 127 S. Ct. at 1974.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must look not only to the allegations in the complaint, but also to the documents attached as exhibits or incorporated by reference in the pleadings. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., ___ U.S. ___, 127 S. Ct. 2499, 2509 (2007); Blue Tree Hotels Investment (Canada), Ltd. v. Starwood Hotels & Resorts, 369 F.3d 212, 217 (2d Cir. 2004). Where, as here, a plaintiff's allegations are flatly contradicted by the documentary evidence attached to the Complaint, they are not presumed to be true, or even accorded a favorable inference. Matusovsky v. Merill Lynch, 186

2

F. Supp. 2d 397, 400 (S.D.N.Y. 2002). Thus, "where the plaintiff's cause of action arises out of a contract which has been attached to the complaint as an exhibit, and where such contract shows unambiguously on its face that the relief prayed for is not merited, dismissal is both justified and appropriate." MA-ST Corp. v. Henson Assoc., Inc., 1992 U.S. Dist. LEXIS 178, at *7 (S.D.N.Y. 1992).

Because, as correctly held by the Bankruptcy Court, the claims for relief pleaded are rejected by the express terms of the contract attached to the Complaint, affirmance is warranted.

## STATEMENT OF THE CASE

### A.    Introduction

Pursuant to a Loan and Security Agreement dated as of August 11, 2003 (the "Loan Agreement"),[1] by and among Musicland, Congress Financial Corporation (Florida), now known as Wachovia, in its capacity as agent for itself and certain other lenders (together with Wachovia, the "Lenders") and certain other parties, the Lenders agreed to provide Musicland with loans and other financial accommodations up to, at that time, a maximum amount of $200 million. Musicland's obligations under the Loan Agreement (collectively, the "Obligations") were secured by its grant to the Lenders of a first priority lien in substantially all of Musicland's assets, including, without limitation, all inventory and proceeds thereof. The Loan Agreement prohibited Musicland from granting any further liens or encumbrances on its assets except in certain instances not applicable here. [App. 1, Ex. A, § 9.8]

---

[1]    Appellants continuously (and confusingly) refer to the Loan Agreement as a "Revolving Credit Agreement," when, in fact, its name is "Loan and Security Agreement" [App. 1, Ex. A.], and by the express terms of Section 1.80 governs obligations of every kind, nature and description, not just "revolving loans."

In order to permit certain of Musicland's suppliers (including Appellants) to receive a junior lien in Musicland's inventory and the proceeds thereof (the "Collateral"), Wachovia entered into the Intercreditor Agreement with the Appellants and/or their predecessors. The Intercreditor Agreement confirms the priority of liens between Wachovia and the Appellants, and provides a mechanism for the orderly distribution of the Collateral as between the two lien holders. [App. 1, Ex. C, p. 1]

Under the express terms of the Intercreditor Agreement, Appellants and/or their predecessors agreed that their liens in the Collateral would always be subordinate to the liens of the Lenders to the full extent of any debt or Obligations of "every kind, nature and description" owing to the Lenders under the Loan Agreement as it then existed, or was subsequently amended. Indeed, in the Intercreditor Agreement, the Appellants specifically recognized that the Loan Agreement could be amended and consented to any future amendments of the Loan Agreement. [App. 1, Ex. C, § 4.3]

In August 2005, the Loan Agreement was amended for the eighth time, no objection having been made to any of the previous seven amendments. Under Amendment No. 8, Harris N.A. ("Harris"), a national bank, became a party to the Loan Agreement and agreed to make an additional $25 million (the "Harris Loan") available to Musicland on a term loan basis, all in accordance with the provisions of the Intercreditor Agreement. [App. 1, Ex. D] On December 5, 2005, the Harris Loan was repaid.

**B.     Course of Proceedings**

On January 25, 2007, Appellants filed a complaint (the "Original Complaint") in the United States District Court for the Southern District of New York (the "District Court")

alleging the same claims as in this action, specifically, breach of contract claims against Wachovia arising out of its entering into Amendment No. 8 and Musicland's repayment of the Harris Loan. No. 07-595 (DAB). After Wachovia moved to dismiss the Original Complaint for, among other reasons, lack of diversity jurisdiction, the Appellants voluntarily dismissed the action under Rule 41 and re-filed their claims as an adversary proceeding in the Bankruptcy Court alleging federal question jurisdiction. The Complaint in this action, filed in the Bankruptcy Court on May 15, 2007 [App. A], asserts multiple claims for relief against Wachovia, each of which is predicated on the same alleged breach of contract arising out Wachovia's entering into Amendment No. 8 and Musicland's repayment of the Harris Loan.

On June 15, 2007, Wachovia and Harris filed motions to dismiss the Complaint for failure to state a cause of action under Federal Rule of Civil Procedure 12(b)(6) which were each accompanied by a separate memorandum of law. The Appellants filed a single opposing memorandum of law on July 13, 2007. Notably, in their opposing memorandum of law [Record on Appeal, Item No. 6], the Appellants did not argue that the Intercreditor Agreement was ambiguous in any way. Instead, Appellants set forth a series of arguments based upon their unstated expectations as to what they (or their predecessors) bargained for. As Wachovia pointed out in its Reply Memorandum, not only were these expectations unstated, they were directly contrary to the unambiguous, express terms of the contracts sued upon, and could not, therefore, form the basis of any valid claim for relief.

The Bankruptcy Court heard oral argument on the Motions on August 9, 2007. [App. 4] On August 24, 2007, Chief Judge Bernstein issued a sixteen-page Memorandum Decision and Order Granting Motion to Dismiss Complaint (the "Memorandum Order").

[App. 2]  Final Judgment was entered against the Appellants on August 27, 2007.  [App. 3]
Thereafter, the Appellants filed their appeal.

C.    **The Bankruptcy Court's Decision**

As the transcript of the oral argument demonstrates, [App. 4] the Bankruptcy
Court heard the parties for more than one hour.  The argument quite properly focused on (a) the
contract terms, (b) the broad scope of "Revolving Loan Debt," which <u>as expressly defined in the
contract</u>, means more than just loans made pursuant to a formula, and (c) the Appellants' consent
in the Intercreditor Agreement to any amendments to the Loan Agreement, expressly including
any amendment that would increase the amount of the underlying debt.  [App. 1, Ex. C, § 4.3]

The Bankruptcy Court held that "the Intercreditor Agreement unambiguously
authorized Wachovia to amend the Revolving Credit Agreement to bring in a term lender."
[App. 2, p. 14]  There being no breach of the Intercreditor Agreement, the Court also dismissed
the conversion and tortious interference claims that were related to the breach of contract claim.

The Bankruptcy Court's decision was properly based upon its construction of the
words of the Intercreditor Agreement as whole, giving meaning to all of its unambiguous terms.
First, the Bankruptcy Court looked to Section 2.2 of the Intercreditor Agreement which provides
for the subordination of the Appellants' liens to the "Liens of the Revolving Loan Creditors
therein to the full extent of the Revolving Loan Debt."  [App. 2, p. 5]  Next, the Bankruptcy
Court turned to the agreements' definitions, "the net effect of which," observed the Bankruptcy
Court, "provided that the Lenders' priority extended to debts under the current Revolving Credit
Agreement, and any amended agreement, including any new loans of any type made under any

amended agreement." Id.  Beginning with the definition of "Revolving Loan Creditors," the

Bankruptcy Court traced the language of the Intercreditor Agreement to support its conclusions:

> For example, the "Revolving Loan Creditors" referred to the
> Lenders under the Revolving Creditor Agreement, their successors
> and assigns and 'any other lender or group of lenders that at any
> time refinances, replaces or succeeds to all or any portion of the
> Revolving Loan Debt or is otherwise a party to the Revolving
> Creditor Agreements.'    ([Intercreditor Agreement], at § 1.15)
> (emphasis added)  The "Revolving Creditor Agreements" meant
> the "Revolving Loan Agreement" and all agreements subsequently
> executed by "the Debtors or any other person to, with or in favor of
> Revolving Loan Creditors in connection therewith or related
> thereto" as now exist "or may hereafter be amended, modified,
> supplemented, extended, renewed restated, refinanced, replaced or
> restructured," (Id. at §1.11.)  The "Revolving Loan Debt" referred
> to "any and all obligations, liabilities and indebtedness of every
> kind, nature and description" owed by the Debtors "whether now
> or existing or hereafter arising" under the Revolving Creditor
> Agreements.

[App. 2, p. 5-6] [emphasis supplied]  Based on these clear and unambiguous definitions, the

Bankruptcy Court properly concluded that the Intercreditor Agreement contemplated future

amendments to the Loan Agreement that could include loans or obligations of any kind.  [Id.

at 6]

     The Bankruptcy Court further relied upon Section 4.3 of the Intercreditor

Agreement, which expressly held that the Appellants and/or their predecessors gave their prior

consent to all such amendments and placed only one restriction on what the Lenders could and

could not do with respect to amendments.  Specifically, the Debtors' affiliates could not be made

Lenders to the Loan Agreement except in certain instances.  [Id. at 6]  This one restriction

demonstrated that the parties were able to effect limitations on the right to amend and the one

limitation agreed upon was indeed incorporated into the Intercreditor Agreement.  There being

no other restrictions on the right to amend, the Bankruptcy Court appropriately found Amendment No. 8 to be proper.

Construing the above-cited provisions as a whole, the Bankruptcy Court concluded that there was no restriction in the Intercreditor Agreement limiting the obligations to revolving debt. As the Bankruptcy Court observed, "'Revolving Loan Debt' included 'any and all obligations, liabilities and indebtedness of every kind, nature and description' owing to Musicland 'whether now existing or hereafter arising' under the Revolving Creditor Agreements." [Id. at 14]  This defeated the Appellants' argument that they were only subordinated to formula-based loans.  Nor was such debt limited to that owing to the original Lenders, but included debt owing to any entity that "'is otherwise a party to the Revolving Creditor Agreements.'" [Id. at 14] This defeated the Appellants' argument that it was improper to add a new lender to the Loan Agreement.  Again, the Bankruptcy Court observed that the Appellants consented to any amendments to the Loan Agreement.  This defeated the Appellants' argument that Amendment No. 8 was unauthorized.  Accordingly, the Bankruptcy Court ruled that "the Intercreditor Agreement unambiguously authorized Wachovia to amend the Revolving Credit Agreement to bring in a term lender." [Id.]

In reaching its holding, the Bankruptcy Court rejected the contention, as again advanced by Appellants on this appeal, that the Appellants "'bargained for a lien that was subordinate only to obligations under Musicland's existing revolving credit facility.'" [Id. at 15] "That bargain," ruled the Bankruptcy Court, "is not reflected in the terms of the Intercreditor Agreement, which gave Wachovia a broad right to amend the Revolving Credit Agreement to cover any type of loan.  If the Plaintiffs harbored such an expectation, it remained a secret one, contradicted by the language they agreed to in their contract." [Id.] This holding defeated the

8

Appellants' argument that they had an unstated intention, which, even though contradicted by the words of the agreements, gave them a cause of action. The Bankruptcy Court properly refused to rewrite the terms of the Intercreditor Agreement for the Appellants' benefit.

## STATEMENT OF FACTS

The following statement of facts is based upon the allegations contained in the Complaint and the documents attached thereto as exhibits which were properly considered by the Bankruptcy Court in dismissing the Complaint. See Tellabs v. Makor Issues & Rights, Ltd., ___ U.S. ___, 127 S. Ct. 2499, 2509 (2007).

### A.    The Wachovia Loan Agreement

Pursuant to the terms of the Loan Agreement, the Lenders agreed to provide loans and other financial accommodations to Musicland not to exceed a maximum available credit of $200 million. The Loan Agreement was subsequently amended and, at the time of the Eighth Amendment, the maximum available credit was $300 million. All of Musicland's obligations under the Loan Agreement were secured by Musicland's grant to Wachovia of a priority lien upon substantially all of Musicland's assets including, without limitation, all of Musicland's inventory and the proceeds thereof. Except for certain specific types of liens not relevant to this appeal, Section 9.8 of the Loan Agreement prohibited Musicland from granting any further encumbrances on the pledged assets.

### B.    The Intercreditor Agreement and Wachovia's
### Right to Amend the Loan Agreement

So that Musicland could grant a junior lien in the Collateral to certain of its suppliers, and thereby afford those suppliers (i.e., the Appellants) secured creditor status ahead

9

of all other general unsecured creditors, Wachovia entered into the Intercreditor Agreement with the Appellants and/or their predecessors.  [App. 1, Ex. C]  Without the Lenders' consent and entry into the Intercreditor Agreement, the Appellants would not have been able to get any lien or to receive the $26 million they acknowledged receiving in the Musicland bankruptcy case.  [App. 1, ¶ 38]  Thus, as the Complaint confirms, the Appellants bargained for a junior lien and received at least a $26 million payment in the bankruptcy case as the benefit of their bargain, a recovery they would not have received but for the Intercreditor Agreement.

The Intercreditor Agreement contains a merger clause which expressly provides that the entire agreement is set forth in the written contract and that the provisions of the Intercreditor Agreement control over any conflicting provision in the Loan Agreement:

> <u>Complete Agreement.</u>   This written Intercreditor Agreement is intended by the parties as a final expression of their agreement and is intended as a complete statement of the terms and conditions of their agreement.   <u>In the event of any conflict between the provisions of this Intercreditor Agreement and any of the Agreements, the provisions of the Intercreditor Agreement shall prevail</u>. [App. 1, Ex. C, § 5.10]

Thus, in construing its terms, the parties expressly agreed to be limited by what was provided in the Intercreditor Agreement, and not by reference to any unexpressed intention.

The Intercreditor Agreement confirms the priority of liens between Wachovia and the Appellants, and provides a mechanism for the orderly distribution of the Collateral as between the two lien holders. Under the Intercreditor Agreement, Appellants and/or their predecessors agreed that their liens were to always be "subordinate to the Liens of Revolving Loan Creditors . . . to the full extent of the Revolving Loan Debt." <u>Id.</u> at § 2.2.  The parties recognized that the "Revolving Loan Debt" would not be stagnant and could change over time. Thus, the definition of "Revolving Loan Debt" in Section 1.16 of the Intercreditor Agreement,

10

by its express terms, includes debts and obligations of every kind and nature (necessarily including term loans) whether such obligations existed at the time the parties entered into the Intercreditor Agreement or arose thereafter. This definition defeats Appellants' argument that they intended there would only be one kind of debt, namely, formula-based revolving loans. If that were the intention or expectation, the document should and would have said so, given that the Appellants were themselves major movie studios represented by a leading national law firm (which is not representing them in this litigation). Instead the definition says the opposite. In this regard, Section 1.16 of the Intercreditor Agreement provides in relevant part:

> "<u>Revolving Loan Debt</u>" shall mean **any and all obligations, liabilities and indebtedness of every kind, nature and description owing by Debtors to Revolving Loan Creditors and/or their respective affiliates or participants,** including principal, interest, charges, fees, premiums, indemnities and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Revolving Creditor Agreements, **whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the Revolving Creditor Agreements . . . , whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and whether arising directly or howsoever acquired** by Revolving Loan Creditors. [App. 1, Ex. C, § 1.16] [emphasis supplied]

This Section conclusively defeats Appellants' contention at page 17 of their Brief, that they bargained for a situation where there would only be revolving loans by the Lenders and their contention at page 15 of their Brief that "there would normally be an equity cushion in the collateral." In other words, Appellants' argument on this appeal, that they thought there would be extra collateral (an "equity cushion") available to pay their loan is defeated by Section 1.16 of the Intercreditor Agreement, which expressly recognizes that their claims would even be subordinate to <u>unsecured</u> obligations owed to the Lenders -- a situation that by definition could

only occur if there was insufficient collateral to pay the Lenders in full, leaving no collateral for the Appellants.

The parties' recognition that the nature of Wachovia's senior debt might change from what existed when they first entered into the Intercreditor Agreement is further evidenced by the definition of "Revolving Creditor Agreements," which specifically acknowledges that any such agreements, including the Loan Agreement, could be amended in the future. Section 1.11 of the Intercreditor Agreement defines "Revolving Creditor Agreements" to mean:

> collectively, **the Revolving Loan Agreement and all agreements, documents and instruments at any time executed and/or delivered by Debtors . . . to, with or in favor of Revolving Loan Creditors in connection therewith or related thereto, as all of the foregoing now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders** (which lenders or group of lenders shall not be affiliates of Debtors, except that Trade Agent and Trade Creditors shall have no objection to any Permitted - Affiliate Refinancing) that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt). [App. 1, Ex. C. § 1.11] [emphasis supplied]

Similarly, Section 1.13 of the Intercreditor Agreement also evidences the Plaintiffs' agreement that the Revolving Loan Agreement could be amended, modified or restructured, by defining the term "Revolving Loan Agreement" to mean:

> the Loan and Security Agreement, dated August 11, 2003, by and among Revolving Loan Agent, Revolving Loan Creditors and Debtors (**as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured**). [App. 1, Ex. C, § 1.13] [emphasis supplied]

The Appellants carefully avoid any references to Section 1.13 in their Brief, obviously because this definition is fatal to their strained arguments.

While recognizing that the Loan Agreement could be amended or modified, the Intercreditor Agreement grants Wachovia broad discretion in the types of amendments that could be entered into with respect to the Loan Agreement and places no restrictions on the types of loans that could be provided under any such amendments. Indeed, in the second sentence of Section 4.3 of the Intercreditor Agreement, the Appellants and their predecessors expressly consented to subsequent amendments of the Loan Agreement:

> **Trade Creditors [i.e., Appellants]** also waive notice of, and *hereby consent to*, (a) **any amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements**, including, without limitation, extensions of time of payment of or increase or decrease in the amount of any of the Revolving Loan Debt, the interest rate, fees, other charges, or any collateral. [App. 1, Ex. C § 4.3] [emphasis supplied]

The only restriction imposed on Wachovia and Musicland's ability to amend the Loan Agreement was that a Musicland affiliate could not be a Lender or become a participant in the Revolving Loan Debt except as a "Permitted Affiliate Refinancing." Section 1.9 defines "Permitted Affiliate Refinancing" as follows:

> Permitted Affiliate Refinancing shall mean an amendment, modification, supplement, extension, renewal, restatement, refinancing, replacement or restructuring of the Revolving Creditor Agreements (a "Refinancing") in which an affiliate of the Debtors makes Revolving Loan Debt available to the Debtors, or participates in Revolving Loan Debt made available to the Debtors, provided, that, (a) such affiliate does not own or hold more than twenty-five (25) percent of the Revolving Loan Debt subject to such Refinancing and (b) at any time that such affiliate is a lender in respect of such Refinancing, Musicland Holding Corp. shall not pay to such affiliate any dividend or any amount in redemption of any equity interest. [App. 1, Ex. C, § 1.9]

13

Importantly, while Section 1.9 restricts the circumstances under which an affiliate of the Debtors could become a Lender, Section 4.3 expressly provides the unlimited consent of the Appellants to any <u>guarantee</u> by any entity. In this regard, Section 4.3(b) provides:

> Trade Creditors also waive notice of, and <u>hereby consent to</u>, . . . (b) the *taking*, exchange, surrender and releasing of *Trade Collateral or guarantees* now or at any time held by or available to Revolving Loan Agent or any of the Revolving Loan Creditors for the Revolving Loan Debt. [App. 1, Ex. C, § 4.3]

Thus, when read together, as they must be, Section 1.9 and 4.3(b) of the Intercreditor Agreement defeat Appellants' contention that there was anything improper with the guarantee by a Musicland affiliate. Indeed, these sections demonstrate that precisely what is alleged was already contemplated by, and consented to, in the Intercreditor Agreement.

Other than the limited restriction in Section 1.9 as to loans made by affiliates of Musicland, any entity could become a Revolving Loan Creditor so long as it became a party to the Loan Agreement. Section 1.15 of the Intercreditor Agreement defines the term "Revolving Loan Creditors" as follows:

> <u>"Revolving Loan Creditors"</u> shall mean, individually and collectively, Revolving Loan Agent, **each of the financial institutions from time to time party to the Revolving Loan Agreement as lenders, and their respective successors and assigns** (and including any other lender or group of lenders that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt **or is otherwise party to the Revolving Creditor Agreements)**. [App. 1, Ex. C. § 1.15] [emphasis supplied]

Thus, Section 1.15 specifically contemplates that the definition of "Revolving Loan Creditors" would encompass entities that, at any time, became parties to the "Revolving Loan Agreements" in any respect, necessarily including new lenders such as Harris.

Other important sections of the Intercreditor Agreement are: Section 5.8, which calls for the application of New York law; Section 5.10, which confirms that the Intercreditor Agreement as written is the final expression of the parties' agreement, and is intended to be a complete statement of the terms and conditions of their agreement, and which also provides that in the event of any conflict between the provisions of the Intercreditor Agreement and the Loan Agreement, the provisions of the Intercreditor Agreement shall prevail; and Section 5.6, which confirms that Appellants were represented by the nationally-recognized law firm of Morgan, Lewis & Bockins LLP in connection with the Intercreditor Agreement. What this means is that to the extent Appellants now claim on this appeal (which they did not argue below), there is some ambiguity between the Loan Agreement and the Intercreditor Agreement, such a claim must fail as a matter of law because the parties already agreed that the terms of the Intercreditor Agreement prevail. These clauses also defeat any claim of unexpressed intent, because Section 5.10 expressly provides that the parties' entire agreement is set forth in the Intercreditor Agreement.

## C.    **Amendment No. 8**

On or about August 31, 2005, Amendment No. 8 to the Loan Agreement was executed by Musicland, its existing Lenders and Harris, pursuant to which Harris became a Lender, all in accordance with the provisions of the Loan Agreement and the Intercreditor Agreement. Contemporaneously, the Lenders advanced an additional $25 million loan to Musicland which was funded by Harris (most of which, ironically, was used to buy goods from the Appellants and their predecessors, sales which they would not have made but for the additional funding). It is undisputed that on or about December 5, 2005, in accordance with the terms of the documents, the $25 million was repaid. There was no net effect on Musicland's

creditors or the order of priority of the Musicland creditors.   In other words, $25 million was advanced to Musicland on August 31, 2005 in accordance with the Loan Agreement, and was repaid by Musicland on December 5, 2005.

On January 12, 2006, Musicland filed for Chapter 11 relief in the United States Bankruptcy Court for the Southern District of New York.   More than a year later, the action was filed.

Throughout their Brief, the Appellants take substantial liberties with the facts as pleaded and as established by the express and unambiguous words of the contracts attached to the Complaint.   The chart set forth on the next page highlights how the Appellants' themes and factual contentions on this appeal are refuted by the Intercreditor Agreement.

16

**THE APPELLANTS' THEMES**
**ARE REFUTED BY THE EXPRESS TERMS OF**
<u>**THE INTERCREDITOR AGREEMENT AND THE LOAN AGREEMENT**</u>

| What the Appellants Claim | What the Intercreditor Agreement Actually Says and the Specific Provisions That Say It |
|---|---|
| "Bargained for a lien that was subordinated only to obligations under Musicland's existing revolving credit facility." (Br. at 16). | Appellants Agreed to be subordinated to debt of "every kind, nature and description" arising under the Loan Agreement as then in effect or as subsequently amended. (Sections 2.2 and 1.16) |
| Wachovia was "not free to add a term lender" to the Loan Agreement. (Br. at 21). | Any entity (other than an affiliate of Musicland) can be a lender so long as it is made a party to the Loan Agreement by amendment or otherwise. (Section 1.15) |
| Appellants consented to only "routine" amendments to the Loan Agreement. (Br. at 8, 35) | Appellants consented to all amendments to the Loan Agreement except those that would make a Musicland affiliate a lender. (Sections 4.3(a) and 1.16) |
| Loan Agreement prohibited Lenders from making term loans. (Br. at 16) | Lenders under Loan Agreement could make loans of "every kind, nature and description." There is no restriction that would prohibit term loans. (Section 1.16). |
| Intercreditor Agreement definitions are "interconnected" with the definitions in Loan Agreement. (Br. at 22, 23) | Intercreditor Agreement is a fully integrated agreement and the terms therein prevail over any conflicting terms in Loan Agreement. (Section 5.10) |
| Intercreditor Agreement provided that Appellants would only be subordinated to "revolving loans." (Br. at 17) | Intercreditor Agreement expressly provides that Appellants will be subordinated to debt of "every kind, nature and description," there is no limitation to revolving loans. (Sections 2.2 and 1.16) |
| Loan Agreement insured that there would be a "built-in cushion of excess collateral" to secure Appellants' debt. (Br. at 17) | The senior debt could include "unsecured" obligations meaning that there would be no "excess collateral" to secure Appellants' debt. (Section 1.16) |

17

## SUMMARY OF THE ARGUMENT

This appeal is nothing more than another attempt by the Appellants to have a Court rewrite the terms of an Intercreditor Agreement that are clear and unambiguous and that, on their face, refute the claims asserted in the Complaint. Four years ago, Wachovia entered into the Intercreditor Agreement so that Musicland could grant the Appellants (and/or their predecessors) a junior lien in Musicland's inventory without violating the terms of the Loan Agreement. The junior lien gave the Appellants' priority over all of Musicland's other general unsecured creditors, which is what they bargained for and received (and, as acknowledged in paragraph 38 of the Complaint, resulted in at least a $26 million bankruptcy recovery to them, that otherwise would not have been available). But the junior lien did not affect the senior priority of the Lenders' liens or restrict or impair the Lenders' rights to amend the underlying Loan Agreement.

Importantly, as set forth in the Intercreditor Agreement, the subordination was not limited to debt arising under the existing Loan Agreement, but extended to all "Revolving Loan Debt" which, as expressly defined, included any debts or obligations of "every kind, nature and description" arising under the Loan Agreement as then in effect or as thereafter amended. [App. 1, Ex. C, §§ 2.2, 1.11, and 1.13] The Appellants and/or their predecessors also expressly consented to any amendments to the Loan Agreement. [App. 1, Ex. C., § 4.3]

Only one limitation was placed on what the Lenders could and could not do in amending the Loan Agreement. As explained in Section 1.9 of the Intercreditor Agreement, the Musicland's affiliates could not be Lenders thereunder except in certain specific situations. Significantly, no restrictions were placed on the types of loans that could be made under the

18

Loan Agreement or how non-affiliates could become Lenders. Thus, the Lenders were free to amend the Loan Agreement to cover any type of loan and to add any entity, other than a Musicland affiliate, as a Lender thereunder. This is exactly what they did in August 2005 when Harris was made a Lender and an additional $25 million loan was advanced to Musicland pursuant to the terms of Amendment No. 8. The significance of this is that it demonstrates that where the parties actually intended to place restrictions on Wachovia's right to amend the Loan Agreement, they knew how to do so. The absence of any such limitation on the actual amendments confirms that they were not prohibited.

On appeal, the Appellants once again rest their claims upon the unexpressed expectation, flatly contradicted by the express terms of the Intercreditor Agreement, that they "bargained for a lien that was subordinate only to obligations under Musicland's existing revolving credit facility." [Appellants' Br. at 16] "That bargain," concluded the Bankruptcy Court, "is not reflected in the terms of the Intercreditor Agreement, which gave Wachovia a broad right to amend the [Loan Agreement] to cover any type of loan." [App. 2, p. 15] The Appellants can cite to no provision in the Intercreditor Agreement to support their unstated expectation or to refute the Bankruptcy Court's conclusions, because there are no such provisions.

Similarly, the express language of the Intercreditor Agreement refutes the Appellants' argument that the Bankruptcy Court misconstrued the consent provisions of Section 4.3 pursuant to which the Appellants and/or their predecessors consented to any amendment of the Loan Agreement "including, without limitation, extensions of time of payment of or increase or decrease in the amount of any of the Revolving Loan Debt, the interest rate, fees, other charges, or any collateral." [App. 1, Ex. C., § 4.3] The Appellants contend that

19

Section 4.3 did not contemplate consent to amendments that changed the type of loans provided under the Loan Agreement. That argument is flatly contradicted by the definition of Revolving Loan Debt which includes any debts or obligations of "every kind, nature and description" arising under and any amended Loan Agreement. [App. 1, Ex. C, § 1.16]

The Appellants further contend the Bankruptcy Court misconstrued the "amendment, modification" language of Section 4.3 by "ignor[ing] the list of examples of permitted amendments and modifications to the Revolving Loan Debt." [Appellants' Br. at 18] The Bankruptcy Court did no such thing. Indeed, at oral argument, the Bankruptcy Court recognized that the list was prefaced by the term "without limitation," and refused to adopt a construction that would negate such language. Notably, Appellants conceded at argument below that they had no case that would limit the right to amend in the face of contractual language that says "including, without limitation." [App. 4, p. 38, lines 8-14] Moreover, Amendment No. 8 actually falls within the Section 4.3 list because at most it increased the amount of the debt, as expressly permitted.

The Appellants also contend that the Bankruptcy Court failed to address their claim that Amendment No. 8 violated the affiliate financing restrictions in the Intercreditor Agreement. While the Appellants argue the transaction was structured to circumvent the prohibition, they actually admit that Harris was not an affiliate of Musicland or Musicland's parent, Sun Capital ("Sun"), but was rather a banker. [App. 1, ¶ 6] Harris is a separate entity (a national bank) that became a Lender and advanced $25 million to Musicland, all in accordance with the terms of the Intercreditor Agreement. The fact that Sun may have separately guaranteed the Harris Loan does not magically elevate the transaction from one between an independent third-party bank and its borrower to an insider financing, particularly where, as here, the

20

Appellants consented to guarantees in Section 4.3(b) of the Intercreditor Agreement, without limitations related to affiliates or otherwise. Who else but an affiliate would issue a guarantee? Importantly, the fact that the parties included a restriction on affiliate loans, but did not include any restriction on affiliate guarantees (and actually contained a consent to guarantees), demonstrates that there could be nothing improper about the guarantee.

In a final attempt to find reversible error, the Appellants now argue (although they did not make this argument in the Complaint or in their memorandum in opposition to the motion to dismiss), that the Intercreditor Agreement is ambiguous because, while it did not prevent Wachovia from entering into Amendment No. 8, it did not expressly permit it. This argument simply ignores the numerous provisions allowing Wachovia to amend the Loan Agreement and the Appellants' agreement set forth in Section 2.2 to be subordinated to the Lenders' liens to the full extent of whatever debt was owing to them by Musicland under any amended Loan Agreement. The Appellants cannot create an ambiguity merely by stating a strained construction that contradicts the words of the contract.

Essentially, the Appellants, who were represented by experienced counsel in negotiating and entering into a fully integrated Intercreditor Agreement, want a "do over" on the contract because the contract refutes each and every claim they assert:

- The Appellants signed a contract that says, at Section 1.16, that the Lenders could make loans of any kind. Now the Appellants complain that the Lenders did just that.

- The Appellants signed a contract that says, at Section 4.3, that the Lenders can modify, amend or supplement the Loan Agreement, and that the Plaintiffs

consented all such amendments. Now the Appellants complain that the Lenders made such an amendment, and they wish they had not consented.

- The Appellants signed a contract that acknowledges, at Section 1.15, that a new Lender could be brought into the Bank Group. Now the Appellants complain that the Lenders did just that.

- The Appellants signed a contract that expressly defined, at Section 1.16, "Revolving Loan Debt" as broader than just formula-based revolving loans. Now the Appellants complain that they do not like that definition, and wish it said something else.

- The Appellants signed a contract that acknowledged, at Section 1.16, that the Lenders' loans could even be unsecured, and that the Appellants would still be subordinated to the Lenders. Yet now, the Appellants argue that they *hoped* for there to be an equity or collateral cushion to secure their junior debt. But that's just not what the contract says.

- The Appellants signed a contract that did put some restrictions on the Lenders' ability to take certain specified acts in the future. Yet now they complain that they secretly intended other, unexpressed restrictions. But, as a matter of law, such unexpressed intentions can neither be implied nor enforced.

For the legal reasons set forth below, we will show why, as a matter of law, each of the Appellants' claims for relief against Wachovia was properly dismissed.

**ARGUMENT**

**POINT I**

**THE BANKRUPTCY COURT PROPERLY DISMISSED APPELLANTS'
CLAIM FOR BREACH OF THE INTERCREDITOR AGREEMENT
BECAUSE THE CLAIM IS REFUTED BY THE CLEAR AND
UNAMBIGUOUS TERMS OF THE INTERCREDITOR AGREEMENT**

It is well-settled law that "when parties set down their agreement in a clear,

complete document, their writing should as a rule be enforced according to its terms." W.W.W.

Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443 (1990). See also

LaSalle Bank Nat'l Ass'n v. Lend Lease Asset Mgmt., L.P., 424 F.3d 195, 206 (2d Cir. 2005)

("In interpreting a contract under New York law, 'words and phrases . . . should be given their

plain meaning . . .'") (citation omitted). In doing so, a court must consider the contract as a

whole so as to construe it "in a manner that confers meaning upon all of its terms." Energy

Transport, Ltd. v. M.V. San Sebastian, 348 F. Supp. 2d 186, 203 (S.D.N.Y. 2004); see also

Kinek v. Paramount Communications, Inc., 22 F.3d 503, 509 (2d Cir. 1994) (noting the well-

established principle of contract construction that "all provisions of a contract be read together as

a harmonious whole").

A court should not add or excise terms to "make a new contract for the parties

under the guise of interpreting the writing." Milgard Corp. v. E.E. Cruz/NAB/Frontier-Kemper,

2003 U.S. Dist. LEXIS 20928, at *11 (S.D.N.Y. 2003). Importantly, extrinsic or parol evidence,

which is what Appellants suggest they hope to find in a discovery fishing expedition, is not

admissible to create an ambiguity in a written agreement which is clear and unambiguous on its

face. W.W.W. Assoc., supra, 77 N.Y.2d at 163, 565 N.Y.S.2d at 443; Reiss v. Financial

Performance Corp., 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 661 (2001). Indeed, parties to a

contract may not create an ambiguity merely by urging conflicting interpretations of the same agreement. <u>Hunt Ltd. v. Lifschultz Fast Freight, Inc.</u>, 889 F.2d 1274, 1277 (2d Cir. 1989).

The Bankruptcy Court applied these cardinal rules of contract construction, reached a result that is mandated by the intentions of the parties as expressed by the contract's clear and unambiguous language and, for these reasons, the Decision should be affirmed.

**A. Wachovia Was Authorized to Enter into Amendment No. 8 by the Express Provisions of the Intercreditor Agreement and the Appellants Expressly Agreed to be Subordinate to <u>All of the Obligations Owed to the Lenders, Whenever Incurred</u>**

In arguing that the Intercreditor Agreement did not authorize Wachovia and Musicland to amend the Loan Agreement, the Appellants ask this Court, just as they asked the Bankruptcy Court, to disregard the words of the contract that authorize amendments and establish the Appellants' consent thereto. An analysis of those terms confirms the Bankruptcy Court's conclusion. Under Section 2.2 of the Intercreditor Agreement, the Appellants and/or their predecessors agreed that their liens would always be "subordinate to the Liens of Revolving Loan Creditors . . . to the full extent of the Revolving Loan Debt." The express definition of the term "Revolving Loan Debt" completely undermines the Appellants' case. Specifically, Section 1.16 of the Intercreditor Agreement unambiguously states:

> "<u>Revolving Loan Debt</u>" shall mean **<u>any and all obligations, liabilities and indebtedness of every kind, nature and description owing by Debtors to Revolving Loan Creditors and/or their respective affiliates or participants</u>**, . . . arising under the Revolving Creditor Agreements, **<u>whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the Revolving Creditor Agreements</u>** . . . , whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and whether

arising directly or howsoever acquired by Revolving Loan
Creditors. [App. 1, Ex. C, § 1.16] [emphasis supplied]

Importantly, as the Bankruptcy Court found, this definition demonstrates that the Appellants

and/or their predecessors agreed and expected to be subordinated to any kind of indebtedness

owing to the Lenders whenever the indebtedness arose and not just the indebtedness arising

under a particular type (e.g., revolving) of loan arrangement.  Had the parties intended to limit

the agreement to just formula-based revolving loans, they and their sophisticated counsel

certainly could and should have done so.  That simply was not the deal, and it is improper to look

behind the document to try to divine the Appellants' unstated intentions.

The Bankruptcy Court further found that, other than prohibiting affiliated

financing, the Intercreditor Agreement contained no restrictions on who could become a Lender

or how they could become one.  Indeed, Section 1.15 of the Intercreditor Agreement defines

"Revolving Loan Creditors" as:

> **each of the financial institutions from time to time party to the
> Revolving Loan Agreement as lenders, and their respective
> successors and assigns** (and including any other lender or group
> of lenders that at any time refinances, replaces or succeeds to all or
> any portion of the Revolving Loan Debt **or is otherwise party to
> the Revolving Creditor Agreements**).  [App. 1, Ex. C, § 1.15]
> [emphasis supplied]

Thus, Section 1.15 specifically contemplates that Revolving Loan Creditors would encompass

entities that, at any time, could become parties to the Loan Agreement in any respect, necessarily

including new Lenders such as Harris.

Finally, Section 1.13 of the Intercreditor Agreement expressly recognized what

would occur here -- namely, that the Loan Agreement could be "amended, modified,

supplemented, extended, renewed, restated, refinanced, replaced or restructured," without

limitation. Notably, contrary to the argument now advanced on this appeal (but not pleaded in the Complaint), there is no language that limits amendments to matters that are "routine." [Appellants' Br. at 35] To the contrary, the words of the Intercreditor Agreement demonstrate that amendments could well be non-"routine" because they could involve increasing the debt, taking guarantees, changing the interest rate, releasing collateral -- all without restriction on the Lenders.

Indeed, under section 4.3, the Appellants and/or their predecessors consented to all amendments to the Loan Agreement without regard to the types of loans that could be provided or who (other than an affiliate) could provide them:

> **Trade Creditors** also waive notice of, and **hereby consent to, (a) any amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements**, including, without limitation, extensions of time of payment of or increase or decrease in the amount of any of the Revolving Loan Debt, the interest rate, fees, other charges, or any collateral. [App. 1, Ex. C, § 4.3] [emphasis supplied]

Because, as discussed above, the term "Revolving Loan Debt" is defined to include debt or obligations of any kind or nature, Section 4.3 of the Intercreditor Agreement unambiguously evidences Appellants' agreement that the terms of the Intercreditor Agreement would apply to any loan subsequently made pursuant to an amendment to the Loan Agreement, such as the loan advanced by Harris. There can be no doubt that the Loan Agreement and the Intercreditor Agreement would have permitted the existing Lenders to increase their loans by $25,000,000 and, similarly, there can be no doubt that the documents permitted an amendment allowing a new lender to provide such funds.

**B. This Court Should Reject the Appellants'**
   **Unexpressed Intent Argument**

This appeal, like the Appellants' case before the Bankruptcy Court, is completely undermined by the Appellants' erroneous contention that they "bargained for a lien that was subordinated only to obligations under Musicland's <u>existing</u> revolving credit facility." [Appellants' Br. at 16] [emphasis supplied]  As the Bankruptcy Court concluded, "[t]hat bargain is not reflected in the terms of the Intercreditor Agreement, which gave Wachovia a broad right to amend the Revolving Credit Agreement to cover any type of loan," including the Harris Loan. [Memorandum Order at 15]  If the Appellants had harbored a contrary expectation, it remained a secret one, refuted by the clear and unambiguous language of the Intercreditor Agreement, which the Bankruptcy Court properly refused to rewrite to meet the Appellants' unspoken expectation.

On appeal, the Appellants once again press forward with a construction of the Intercreditor Agreement based solely upon their alleged, albeit unstated, expectation that the Loan Agreement would not be amended except for "routine" matters, [Appellants' Br. at 8, 35], and that the "fundamental purpose" of the Intercreditor Agreement was the "protection of Appellants' lien priority" [Appellants' Br. at 25] and preservation of an "equity cushion in the collateral." [Appellants' Br. at 15]  <u>Nowhere does the Intercreditor Agreement express such an intent or purpose.</u>  Instead, the Intercreditor Agreement sets forth the purpose of the agreement, which is to (i) confirm the relative priority of the security interests of Wachovia and the Appellants, and (ii) provide for the orderly sharing of Collateral proceeds among Wachovia and the Appellants. [App. 1, Ex. C, p. 2]

The Intercreditor Agreement contains no covenants limiting the maximum credit that the Lenders could extend under the Loan Agreement or restricting the types of loans that

could be extended thereunder. Moreover, Section 1.16 of the Intercreditor Agreement expressly defines the priority "Revolving Loan Debt" to include, among other things, all obligations owed to Wachovia and the other Lenders by Musicland under the Loan Agreement whether "secured or unsecured." Thus, Wachovia and the Lenders were free to extend credit to Musicland beyond the value of the collateral securing Musicland's repayment obligations. Under such a scenario, there may well have been no collateral available to "cover" the Appellants' debt or any "equity cushion." Accordingly, based on the plain language of the Intercreditor Agreement, Appellants could not have had any contractual expectation, let alone a reasonable expectation, that they would always be fully secured, so their claim rings hollow.

The Bankruptcy Court properly refused to rewrite the contract to conform with the Appellants' unexpressed intent as must this Court. It is a fundamental maxim of contractual construction that a contract must be construed according to the <u>expressed</u> intent of the parties. <u>Hotchkiss v. Nat'l City Bank of New York</u>, 200 F. 287, 293 (S.D.N.Y. 1911), <u>aff'd</u>, 201 F. 664 (2d Cir. 1912), <u>aff'd</u>, 231 U.S. 50, 34 S. Ct. 20 (1913); <u>Frank B. Hall & Co. v. Orient Overseas Assocs.</u>, 65 A.D.2d 424, 411 N.Y.S.2d 233 (1st Dep't), <u>aff'd</u>, 48 N.Y.2d 958, 425 N.Y.S.2d 66 (1979). That intention is found in the language of the contract, not in the minds of the parties (or here, in the minds of the Appellants, many of whom bought their claims after-the-fact from the original contracting parties). <u>Klos v. Polskie Linie Lotnice</u>, 133 F.3d 164, 168 (2d Cir. 1997). Thus, when construing contracts, "it is the objective intent of the parties that controls. The secretive or subjective intent of the parties is irrelevant." <u>Id.</u>

> As cogently stated nearly one hundred years ago by Judge Learned Hand:
>
> A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties,

28

usually words, which ordinarily accompany and represent a known intent. **If, however, it were proved by twenty bishops that either party, when used the words intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there was some mutual mistake or something else of the sort.** Of course, if it appear[s] by other words, or acts, of the parties, that they attribute a particular meaning to such words as they use in the contract, that meaning will prevail, but only by the virtue of the other words, and not because of their unexpressed intent. Hotchkiss, 200 F. at 293 [emphasis supplied].

The Appellants ask this Court to rewrite nearly one hundred years of legal precedent, just as freely as they would have this Court rewrite the terms of the Intercreditor Agreement. Like the Bankruptcy Court, this Court should not engage in such revisionism.

## C. This Court Should Not Rewrite the Intercreditor Agreement under the Implied Covenant of Good Faith and Fair Dealing

The Appellants urge this Court, like they did the Bankruptcy Court, to use the implied covenant of good faith and fair dealing to rewrite the Intercreditor Agreement and retroactively impose new restrictions on the types of loans that Wachovia could extend under the Loan Agreement. However, the duty of good faith and fair dealing is a tool of interpretation that cannot be used to rewrite a contract and impose new terms. Metropolitan Life Ins. Co. v. RJR Nabisco, 716 F. Supp. 1504, 1519 (S.D.N.Y. 1989); see also Frutico S.A. v. Baners Trust Co., 833 F. Supp. 288, 300 (S.D.N.Y. 1993) ("the duty of good faith . . . cannot be used to create new contractual rights between the parties"); Banco Espanol v. Sec. Pac. Nat'l Bank, 763 F. Supp. 36, 44 (S.D.N.Y. 1991) ("The implied covenant does not . . . 'operate to create new contractual rights.'") (quotation omitted). Thus, "[c]ourts have generally been reluctant to find a breach of the implied covenant of good faith when doing so reads so much into the contract as to create a

29

new term or when alleged misconduct is expressly allowed by the contract." <u>Keene Corp. v.</u> <u>Bogan</u>, 1990 U.S. Dist. LEXIS 220, at *43 (S.D.N.Y. 1990).

While the Appellants attempt to circumvent the import of this well-settled case law by asserting that the Intercreditor Agreement is silent on whether a term loan can be added to the Loan Agreement, the express terms of the Intercreditor Agreement say otherwise. As noted above, the Intercreditor Agreement's interlocking definitions expressly allow Wachovia to amend the Loan Agreement to include a term loan since the Appellants agreed to be subordinate to all obligations "<u>of every kind, nature and description</u>" owing to the Lenders by Musicland under an amended Loan Agreement. This Court cannot now imply obligations that are inconsistent with the express terms of the Intercreditor Agreement. <u>Times Mirror Magazines,</u> <u>Inv. v. Field & Stream Licenses Co.</u>, 294 F.3d 383, 394-95 (2d Cir. 2002).

In this regard, the <u>Carvel Corp. v. Baker</u>, 79 F. Supp. 2d 53 (D. Conn. 1997), <u>Bank of China v. Chan</u>, 937 F.2d 780 (2d Cir. 1991) and <u>Kham & Nate's Shoes No. 2 v. First</u> <u>Bank</u>, 908 F.2d 1351 (7th Cir. 1990) are of no help to Appellants. In none of those cases did the contracts at issue permit the conduct allegedly breaching the implied covenant of good faith and fair dealing. Rather, as those cases hold, where a contract is "silent," the court may, in a proper case, fill a gap. Here, however, the Intercreditor Agreement specifically permitted Wachovia to enter into amendments, and the Appellants' contrary arguments are nothing more than a belated and impermissible attempt to rewrite the Intercreditor Agreement by asking this Court to ignore their consent to amendments contained in Section 4.3.

More instructive is <u>Metropolitan Life</u>, <u>supra</u>. There, this Court rejected the very argument advanced by Appellants. In <u>Metropolitan Life</u>, this Court held that even if there was

30

no explicit provision in the contract either permitting or prohibiting the allegedly offending conduct, such contractual silence could not create an ambiguity so as to avoid the dictates of the parol evidence rule, particularly where the contract imposed no debt limitations. 716 F. Supp. at 1515-16. Here, just as in Metropolitan Life, the Intercreditor Agreement contained no debt limitation. But even more significantly, here, Section 4.3 of the Intercreditor Agreement expressly recognized the right of the Lenders to increase the underlying debt -- and contained the Appellants' consent thereto. In Metropolitan Life, the Court properly refused to create new, not bargained-for rights, under the guise of the implied covenant of good faith, precisely the same result that is warranted here.

**D. This Court Should Not Rewrite the Intercreditor Agreement Under the Guise of Interpretation**

The Court should not countenance the sophistry of Appellants embodied in this appeal, which is contrary to the express definitions and terms of the contract sued upon. The Plaintiffs would have this Court re-write the parties' contract by: (a) deleting the words "debts and obligations of any kind" from § 1.16 of the Intercreditor Agreement, (b) deleting §4.3 of the Intercreditor Agreement in its entirety, (c) ignoring §1.15 of the Intercreditor Agreement, and (d) deleting §2.6 of the Intercreditor Agreement. However, it is well-settled that a court may not, under the guise of contractual interpretation, re-write the parties' agreement, or interpret a contract so as to omit any clause. Thus, this Court should reject the Plaintiffs' request to rewrite the contract. See, e.g., Milgard Corp. v. E.E. Cruz/NAB/Frontier-Kemper, 2003 U.S. Dist. LEXIS 20928, at *11 (S.D.N.Y. 2003) ("'courts may not by construction add or excise terms . . . and thereby make a new contract for the parties under the guise of interpreting the writing.'"); Barleo Homes, Inc. v. Tudomawr Corp., 214 A.D.2d 694, 695, 625 N.Y.S.2d 599, 599 (2d Dep't

1995) ("'A court may not rewrite into a contract conditions the parties did not insert, or under the guise of construction, add or excise terms.'"), quoting, Marine Assocs. v. New Suffolk Dev. Corp., 125 A.D.2d 649, 652, 510 N.Y.S.2d 175, 178 (2d Dep't 1986).    A court should also interpret a contract so as to give meaning to every clause therein. Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'"); Gruppo, Levey & Co. v. ICOM Info. & Communications, Inc., 2003 U.S. Dist. LEXIS 11213, at *18 (S.D.N.Y. 2003) ("Every clause in a contract is important and a court must be certain to refrain from interpreting a contract so as to render a clause in the contract meaningless."). In order to rule in favor of the Appellants, this Court would have to violate these fundamental tenets of contract law, a result that cannot be tolerated in commerce or contract interpretation.

In an attempt to rewrite the Intercreditor Agreement, the Appellants claim the Bankruptcy Court "overlooked" the Loan Agreement's definition of "Lender" which, according to the Appellants, restricts who can be a "Revolving Loan Creditor" under the Intercreditor Agreement. This argument rings hollow because the definitions in the Loan Agreement and the Intercreditor Agreement are not interconnected. Indeed, the Intercreditor Agreement specifically states that: "As used above and in this Intercreditor Agreement, the following terms shall have the meanings ascribed to them below." [App. 1, Ex. C, p. 2] Furthermore, Section 5.10 of the Intercreditor Agreement acknowledges that it is a fully-integrated agreement whose terms prevail over any conflicting provision in the Loan Agreement or any related contract.

New York law recognizes that merger provisions, such as the one above, are intended to "require full application of the parol evidence rule in order to bar the introduction of

extrinsic evidence to vary or contradict the terms of the writing." Primex Intern. Corp. v. Wal-Mart Stores, Inc., 89 N.Y.2d 594, 599, 657 N.Y.S.2d 385, 388 (1997). They accomplish this objective by "establishing the parties' intent that the Agreement is to be considered a completely integrated writing." Id. "A completely integrated contract," such as the Intercreditor Agreement, "precludes extrinsic proof to add to or vary its terms." Id. Thus, the Bankruptcy Court correctly focused on and applied the Intercreditor Agreement definitions independent of how similar terms may have been defined in the Loan Agreement. Indeed, that result is dictated by the final sentence of Section 5.10 wherein the Appellants agreed that the broader definitions of the Intercreditor Agreement would control the relationship between Musicland's inventory lien holders.

**E. The Word "Amendment" Is Unambiguous and Specifically Includes, Without Limitation, <u>Amendments That Increase the Amount of the Senior Debt</u>**

The Appellants cite a litany of cases at pages 24-25 of their Brief standing for the unremarkable proposition that contract terms should be construed to give effect to the parties' intentions as manifested by the entire contract. Quite remarkably, however, the Appellants utterly ignore the very principles they cite by isolating the word "amendment" in Section 4.3 from the sentence, the paragraph and the whole Intercreditor Agreement in an effort to have this Court give effect to the Appellants' unexpressed intent, or to try in vain to find an ambiguity where none exists or was even pleaded.

Under Section 4.3, the Appellants and/or their predecessors consented to "any amendment, modification, supplement, extension, renewal, or restatement of any Revolving Loan Debt or the Revolving Creditor Agreements, including without limitation, extensions of

time of payment of or increase or decrease in the amount of any of the Revolving Loan Debt, the interest rate, fees, other charges or any collateral . . . ."  The Appellants now contend that Amendment No. 8 was not contemplated by the use of the term "amendment" or any other term in Section 4.3.  Again, the Appellants' construction is based upon the unfounded belief that the "fundamental purpose" of the Intercreditor Agreement was to protect their lien rights.  As is set forth above, such a purpose is nowhere to be found in the language of the agreement and, indeed, is inconsistent with its express provisions.  Under New York law, "no obligation can be implied that would be inconsistent with other terms of the contractual relationship."  <u>Times Mirrors Magazines, Inc. v. Field & Stream Licenses Co.</u>, 294 F.3d 383, 395 (2d Cir. 2002) (quotations omitted).  Accordingly, this Court cannot adopt the limitations upon Section 4.3 that the Appellants ask that this Court read into the Intercreditor Agreement.

In this regard, this case differs materially from <u>Essex Ins. Co. v. Pingley</u>, 41 A.D.3d 774, 839 N.Y.S.2d 208 (2d Dep't 2007), <u>Tougher Heating & Plumbing Co., Inc.</u>, 73 A.D.2d 732, 423 N.Y.S.2d 289 (3d Dep't 1979), <u>In re Pinelawn Cemetery</u>, 117 A.D.2d 274, 575 N.Y.S.2d 851 (1991) and <u>Madison Avenue Leasehold, LLC v. Madison Bentley Assoc.</u>, 30 A.D.3d 1, 811 N.Y.S.2d 47 (2006).  In each of these cases, the Courts found (a) an ambiguity in the terms of the documents, and (b) a conflict between the express intentions of the parties and a narrow construction of the subject terms, two factors which are not present here, nor even alleged in the Complaint.  For example, in <u>Essex</u>, the liability policy excluded coverage for bodily injury "to any person removing parts from an auto, or any person allowed in the yard area unless accompanied by an employee for the purpose of looking at parts only."  <u>Essex</u>, 41 A.D.3d at 775, 423 N.Y.S.2d at 209.  An independent contractor who worked on the property was injured while changing a tire on a front loader and sued.  The contractor was "a person in the

yard who was not accompanied by an employee" but the Court found the exclusion to be ambiguous because a junk yard owner would reasonably believe that the exception would only apply to customers entering the yard rather than employees or contractors who would normally be left alone.    Id. at 210.    Similarly, in Tougher, the Court found a cost-saving incentive feature in a construction contract to be ambiguous and conflicting where it provided for less incentive payments the more a contractor saved.    Tougher, 73 A.D.2d at 734,  423 N.Y.S.2d at 291.    There is no such confusion here.    The Intercreditor Agreement clearly and ambiguously subordinated the Appellants' debt to any debt of the Lenders regardless of whether it was a revolver, term or otherwise and the Appellants' consented to any amendments to the Loan Agreement.

The Appellants' citation to Illco Toy Co. U.S.A. v. Block, 1991 WL 64203 (S.D.N.Y. 1991) and Stone v. Golden Wexler & Sarnese, 341 F. Supp. 2d 189 (E.D.N.Y. 2004) does not help them.  In Illco, the Court construed a provision that was used as a "descriptive term and not one of limitation" in a two paragraph letter agreement that the Court recognized was not "a detailed manifestation of the parties' intent." Illco, 1991 WL 64203 at *4.  Here, the Appellants' are doing the opposite, seeking to construe words of description as ones of limitation while disregarding express provisions elsewhere in the Intercreditor Agreement.  Further, the Intercreditor Agreement, unlike the letter agreement in Illco, is a fully integrated agreement representing the "final expression" of the parties' agreement which was negotiated by sophisticated parties with the assistance of skilled counsel and those terms unambiguously allow Wachovia to enter into Amendment No. 8.

The Stone case similarly offers no support for Appellants' attempts to forge an ambiguity where none exists.  In Stone, decided under Virginia law, the Court rejected a credit card company's argument that a "change-in-terms" provision allowed it to unilaterally change

the terms of a consumer's credit card as it saw fit. Stone, 342 F. Supp. 2d at 197-98. Here, we are not dealing with consumers, Wachovia did not change the terms of its contract with the Appellants. Moreover, its changes to the Loan Agreement were done with the consent of Musicland, consistent with the Loan Agreement and the Intercreditor Agreement. Finally, unlike in Stone, the Intercreditor Agreement did, in fact, place a limitation on Wachovia's ability to amend the Intercreditor Agreement, indicating that if the parties wanted to restrict Wachovia's ability to amendment, they knew how to and did.

The Appellants' reliance upon Statland Holliday, Inc. v. Stendig Development Corp., 46 A.D.2d 135, 362 N.Y.S.2d 2 (1st Dep't 1974), is also misplaced. Indeed, the Statland decision (which has never been cited in any reported decision) actually supports Wachovia because that case construed particular terms of the contract in order to give effect to the contract as whole in accordance with the parties' express intentions. In Statland, the holder of a purchase money mortgage agreed to subordinate its lien to the buyer's development loan, recognizing that development of the property would require a substantial sum of money and that a lender would not make such a loan unless it would be recognized as the prime lien on the property. Id. at 362 N.Y.S.2d at 3. When the buyer needed to secure an additional development loan, the seller refused to subordinate a second time. The contract provided that the mortgagee would subordinate its lien to "a lien of any first mortgage . . . and to any and all renewals, modifications, consolidations, replacements and extensions of any such mortgage . . . ." Statland, supra, at 362 N.Y.S.2d at 4. The buyer argued that the additional loan was a modification of the original loan and mortgage. While the Court addressed whether the term "modification" was ambiguous, it found that the term "consolidation" to imply additional funding, consistent with the recognized need to obtain sufficient funding to develop the property.

36

It rejected the seller's narrow construction of the mortgage to preclude subordination to further funding just as this Court must reject the Appellants' narrow construction of Section 4.3 to prohibit Amendment No. 8.

Furthermore, Amendment No. 8 actually falls within the non-exclusive list of amendment examples contained in Section 4.3. That list includes "without limitation, extensions of time of payment of or increase or decrease in the amount of any of the Revolving Loan Debt." [App. 1, Ex. C, § 4.3] Notwithstanding the language necessary to effect Amendment No. 8, the amendment did nothing more than increase availability under the Loan Agreement and, upon advance of the additional $25 million loan, increase the amount of the debt owing to the Lenders which is entirely consistent with the Appellants' agreement to be subordinated to debt of "every kind, nature and description" owing to the Lenders. Thus, even under the Appellants' restrictive interpretation of Section 4.3, Amendment No. 8 was entirely appropriate and consented to by the Appellants and/or their predecessors.

**F. Harris Was Not a Musicland Affiliate and Therefore the Harris Loan Could Not Be an "Affiliate Refinancing"**

Appellants have pleaded no factual basis to sustain their bald assertion that the Harris Loan was an improper "Affiliated Refinancing." Harris is not an affiliate of Musicland nor of its corporate parent Sun, nor did the Appellants even allege such an affiliation. Indeed, Appellants repeatedly acknowledge that Harris was "one of [Sun's] banks," not an affiliate. [App. A, pp. 2, 6] While Harris may have had a working relationship with Sun (as alleged in paragraph 8 of the Complaint), the Complaint alleges no facts to support even an inference that Harris was, in any way, related to Musicland or Sun in terms of its corporate structure so as to

37

even potentially be considered an affiliate.[2]  Accordingly, there is no factual basis to support Appellants' contention that the Harris Loan was an impermissible affiliate loan.

The Appellants have also failed to sufficiently plead a factual basis for the conclusory allegation that the Harris Loan was a "charade."  As was recognized by the Bankruptcy Court, a plaintiff must plead more than "labels and conclusions," and "a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic, supra, 127 S. Ct. at 1965.  Instead, the plaintiff "must amplify a claim with some factual allegations in those contexts were such amplification is needed to render the claim plausible."  Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).  Here, the only fact asserted in the Complaint to support the alleged "charade" is that Sun guaranteed the Harris Loan.  The Appellants, however, expressly consented to the "taking" of "guarantees" in Section 4.3 and while affiliate loans may have been limited, there is no such limitation in the Intercreditor Agreement against guarantees.  Indeed, as set forth on the very first page of the Loan Agreement, numerous Musicland affiliates, including Suncoast Holding Corp., guaranteed the Obligations arising thereunder.  [App. 1, Ex. A]  If the Appellants wanted to limit guarantees in the future, they could and should have expressly done so just as they did with respect to affiliate loans.  See RJE Corp. v. Northville Indus. Corp., 329 F.3d 310 (2d Cir. 2003) (the inclusion of certain requirements in one section of a contract but not another manifests the intention that such requirements would not be part of the latter section).  They did not.  Instead, in Section 4.3 of the Intercreditor Agreement, the Appellants agreed that the Lenders could take guarantees.  Thus, the granting of a guarantee by Sun cannot now form the basis for a claim against Wachovia.

---

[2]  See 11 U.S.C. § 101(2), where the Bankruptcy Court defines an affiliate as an entity having at least twenty (20) percent control of another.  There is no allegation that Harris owns 20% of Musicland (or vice-versa).

38

## POINT II

## THE APPELLANTS' TORT CLAIMS SHOULD ALSO BE DISMISSED

The Appellants make no separate argument in support of their tort claims for relief. We suspect that is because they realize that where, as here, a contract governs the parties' relationship, tort claims cannot lie. In any case, the tort claims based on the same allegations were properly dismissed for at least three reasons: (a) because there is no merit to the contract claims, the tort claims based on the same allegations must fail, (b) because where, as here, the parties' relationship is governed by contract, the tort claims must fail, and (c) because the tort claims are without independent merit.

### A. The Aiding and Abetting Claims Are Without Merit

It is axiomatic that to allege a claim for aiding and abetting a conversion, Appellants must sufficiently allege that a conversion has occurred. Calcutti v. SBU, Inc., 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003). A "conversion is the 'unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" Vigilant Insurance Co. v. Housing Authority of the City of El Paso, Texas, 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 347 (1995), quoting Employers' Fire Ins. Co. v. Cotten, 245 N.Y. 102, 105, 156 N.E. 629, 630 (1927). Thus, to state a claim for conversion, a plaintiff must allege (1) legal ownership or an immediate superior right of possession to a specific identifiable thing; and (2) that the defendant exercised an unauthorized dominion over the thing in question. Independence Discount Corp. v. Bressner, 365 N.Y.S.2d 44, 46, 47 A.D.2d 756, 757 (2d Dep't 1975). Appellants here have failed to sufficiently allege either of these two key elements.

### 1.  Appellants fail to identify the specific proceeds converted.

Appellants allege that Harris was improperly paid from proceeds of inventory constituting Appellants' collateral.  (Complaint ¶ 63).  While factually inaccurate (Harris was actually repaid by a $25,000,000 advance under the Loan Agreement), the allegation, even if assumed to be true, is insufficient on its face to state a claim for conversion because it fails to identify the specific proceeds or <u>res</u> that were allegedly converted.

It is well-settled New York law that an action for the conversion of monies is "insufficient as a matter of law unless it is alleged that the money converted was in specific tangible funds of which claimant was the owner and entitled to immediate possession." <u>Ehrlich v. Howe</u>, 848 F. Supp. 482, 492 (S.D.N.Y. 1994).  In other words, the "money must be part of a separate, identifiable, segregated fund in order to bring an action for conversion." <u>United Republic Ins. Co. v. Chase Manhattan Bank</u>, 168 F. Supp. 2d 8, 19 (N.D.N.Y. 2001).  The Complaint contains no such allegations (likely because Harris was not repaid with inventory proceeds but rather with a $25,000,000 advance by the Lenders under the Loan Agreement). Accordingly, the claims, together with their aiding and abetting claims, should be dismissed. <u>See High View Fund L.P. v. Hall</u>, 27 F. Supp. 2d 420, 429 (S.D.N.Y. 1998) ("Because plaintiffs do not claim ownership of a specifically identifiable segregated [fund], they fail to state a claim for conversion of money." (internal citations omitted)).

### 2.  Appellants allege no independent facts establishing a claim for aiding and abetting conversion.

Appellants' aiding and abetting claim is in actuality, merely a restatement of its breach of contract claim and should be dismissed.  Appellants allege that Wachovia aided and abetted Harris' conversion by "the devising and implementing of Amendment No. 8 and

participation in causing Musicland to pay off the Harris Term Loan" which is the alleged predicate for the breach of contract claims. (Complaint ¶ 68). It is well-settled New York law that "a cause of action for conversion cannot be predicated on a mere breach of contract." Fesseha v. TD Waterhouse Inverstor Services, Inc., 305 A.D.2d 268, 269, 761 N.Y.S.2d 22, 24 (1st Dep't 2003). Here, Appellants' conversion claim "allege[s] no independent facts sufficient to give rise to tort liability." Yeterian v. Heather Mills, N.V., 183 A.D.2d 493, 494, 583 N.Y.S.2d 439, 440 (1st Dep't 1992). Accordingly, the claims for conversion and aiding and abetting a conversion should be dismissed.

**B.  Plaintiffs Fail to State a Claim for Tortious Interference
     with the Trade Security Agreement**

Absent a breach of contract, there can be no claim that a defendant tortiously interfered with the contract. Lama Holding Co. v. Smith Barney, 88 N.Y.2d 413, 646 N.Y.S.2d 76 (1996); Pamilla v. Hospital for Special Surgery, 223 A.D.2d 508, 637 N.Y.S.2d 689 (1st Dep't 1995). There was no breach of the Appellants' security agreement. Pursuant to the terms of the Trade Security Agreement [App. 1, Ex. B], Musicland granted Plaintiffs and their predecessors a lien against Musicland's inventory that was at all times subject and subordinated to the liens of Wachovia and the Lenders under the Loan Agreement. [App. 1, Ex. B, paras. 2, 6] When Amendment No. 8 to the Loan Agreement was executed, the priority liens of Wachovia and the Lenders extended to the Harris Loan, making them a "Permitted Encumbrance" under the Trade Security Agreement. [App. 1, Ex. B. para. 1] Since the liens granted in favor of Harris were specifically permitted by the Trade Security Agreement, there can be no breach of the Trade Security Agreement and the claim for tortious interference should be dismissed.

41

Additionally, here, the claim for tortious interference is really nothing more than a restatement of the breach of contract claim, relying upon the same factual premise, namely, that Wachovia interfered with the Trade Security Agreement by entering into Amendment No. 8 and permitting repayment of the Harris Loan. When read fairly, the tortious interference claim merely "seeks to restate as a conspiracy . . . which amounts to nothing more than the breach of contract alleged in the first cause of action." Miller v. Vanderlip, 285 N.Y. 116, 125 (1941). The tortious interference claim "adds nothing by way of legal liability, and only seeks to explain the possible motives of [Appellants] for their failure to perform the agreement sued upon in the first cause of action. Since [Appellants'] cause of action for breach of contract is [their] entire grievance against the [Lenders], [Appellants] may not split [their] causes of action based upon a single grievance and, therefore, the second cause is bad and should be dismissed." Id.

## CONCLUSION

For the reasons set forth above, it is respectfully submitted that the Bankruptcy Court's Order and Judgment be affirmed in their entirety, with costs.

Dated: New York, New York
November 30, 2007

OTTERBOURG, STEINDLER, HOUSTON
& ROSEN, P.C.

By:    /s/ Richard G. Haddad
Richard G. Haddad (RH-6438)
A Member of the Firm
230 Park Avenue
New York, New York 10169
Tel. No.:  (212) 661-9100
Attorneys for Appellee
Wachovia Bank, N.A., as Agent

Of Counsel:
Richard G. Haddad
Stuart J. Wells

925990.1