UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | 07-CV-08423-(RWS) |
| | ) | |
| MUSICLAND HOLDING CORP., *et al.*, | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | Bk. Case No. 06-10064 (SMB) |
| BUENA VISTA HOME ENTERTAINMENT, INC., a California corporation; CARGILL FINANCIAL SERVICES INTERNATIONAL, INC., a Delaware corporation; HAIN CAPITAL GROUP, LLC, a Delaware limited liability company; PARAMOUNT PICTURES CORPORATION, a Delaware corporation; TWENTIETH CENTURY FOX HOME ENTERTAINMENT LLC, a Delaware limited liability company; UBS WILLOW FUND, LLC, a Delaware limited liability company; and VÄRDE INVESTMENT PARTNERS, L.P., a Delaware limited partnership, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Jointly Administered Adv. Proc. No. 07-01705 (SMB) On Appeal from the Order and Judgment of the United States Bankruptcy Court of the Southern District of New York Granting Defendants' Motions to Dismiss Complaint |
| Appellants, | ) ) | |
| v. | ) ) | |
| WACHOVIA BANK, N.A., a national banking association, in its capacity as Agent; and HARRIS N.A., a national banking association, | ) ) ) ) | |
| Appellees. | ) ) | |

## REPLY BRIEF OF APPELLANTS

Robert J. Feinstein (RF 2836)
Alan J. Kornfeld (AK 5647)
Beth E. Levine (BL 6715)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:   (212) 561-7700
Facsimile:   (212) 561-7777

Counsel for Appellants

# TABLE OF CONTENTS

**Page Nos.**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 6

    I.     Under the Intercreditor Agreement, the Harris Term Loan Can Be
Justified, If At All, Only as an "Amendment" to the Revolving Creditor
Agreements ........................................................................................................ 6

    II.    The Harris Term Loan Was Not Authorized as an "Amendment" to the
Revolving Creditor Agreements .......................................................................... 12

    III.   Wachovia Breached the Implied Covenant of Good Faith and Fair Dealing ...... 20

    IV.   Amendment No. 8 Was Disguised Affiliate Financing That Violated the
Intercreditor Agreement ..................................................................................... 22

    V.    The Disposition of the Remaining Claims Hinges on the Outcome of the
Appeal From Dismissal of the Claim for Breach of Contract. ........................... 23

CONCLUSION ................................................................................................................... 24

# TABLE OF AUTHORITIES

Page Nos.

## CASES

*Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's*
    136 F.3d 82 (2d Cir. 1998)................................................................................ 18

*Ari & Co. v. Regent Int'l Corp.*
    273 F. Supp. 2d 518 (S.D.N.Y. 2003)............................................................. 21

*Carvel Corp. v. Baker*
    79 F. Supp. 2d 53 (D. Conn. 1997)................................................................. 21

*Eighth Ave. Coach Corp. v. City of New York*
    286 NY 84 (1941) ............................................................................................ 19

*Essex Ins. Co. v. Pingley*
    839 N.Y.S.2d 208, 41 A.D.3d 774 (2007) ................................................ 18, 19

*International Audiotext Network, Inc. v. American Telephone & Telegraph Co.*
    62 F.3d 69 (2d Cir. 1995) ................................................................................ 20

*International Equity Investments, Inc. v. Opportunity Equity Partners Ltd.*
    472 F. Supp. 2d 544 (S.D.N.Y 2007)............................................................. 20

*Kham & Nate's Shoes No. 2 v. First Bank*
    908 F.2d 1351 (7th Cir. 1990) ........................................................................ 21

*Lightfoot v. Union Carbide Corp.*
    110 F.3d 898 (2d Cir. 1997)............................................................................ 20

*Metropolitan Life Ins. Co. v. RJR Nabisco*
    716 F. Supp. 1504 (S.D.N.Y. 1989)............................................................... 21

*Statland Holiday, Inc. v. Stendig Development Corp.*
    362 N.Y.S.2d 2, 46 A.D.2d 135 (1974) ......................................................... 20

*Times Mirrors Magazines, Inc. v. Field & Stream Licenses Co.*
    294 F.3d 383 (2d Cir. 2002)............................................................................ 21

*TVT Records and TVT Music Inc. v. Island Def Jam Music Group*
    244 F. Supp. 2d 263 (S.D.N.Y. 2003)............................................................ 21

*Zodiac Enterprises, Inc. v. American Broadcasting Cos.*
    440 N.Y.S.2d 240, 81 A.D.2d 337 (1981), *aff'd*, 56 N.Y.2d 738 (1982) ............................ 19

# INTRODUCTION

The stated purpose of the Intercreditor Agreement[1] was to confirm the relative priority of the security interests of the Appellants and the Revolving Loan Creditors. Wachovia revised the Revolving Loan Agreement so that a term loan could be called Revolving Loan Debt, even though the pseudo-Revolving Loan Debt was functionally *subordinated* to the real Revolving Loan Debt. This name game was clearly done for the purpose of priming the Appellants' Inventory Lien, to make a loan that contravened the spirit and letter of the Intercreditor Agreement.

The clumsy grafting of the Harris Term Loan onto the Revolving Loan Agreement and the failure to ask the Appellants for their consent suggest that the Appellees were aware of the risk that the Appellants might not approve. The use of Harris to make a loan that Sun could not make, that Harris would not have made without a guaranty from Sun, evidence the intent to circumvent the Intercreditor Agreement's restriction on insider financing, and the repayment to Harris of $25 million from Musicland's rapidly diminishing funds, for the benefit of Sun, demonstrate why insider financing was permitted under the Intercreditor Agreement only on specific, pre-approved terms.

All this was said to be justified on the basis that the Appellants had consented in the Intercreditor Agreement to "amendments" of the Revolving Loan Agreement. The Bankruptcy Court agreed that the contract must be interpreted in this manner as a matter of law. That ruling was erroneous. The law is that contract terms must be interpreted in their context. In this

---

[1] Capitalized terms not otherwise defined herein have the meaning assigned to them in the Opening Brief of Appellants ("Appellants' Br."). "Harris Br." means the Memorandum of Law of Appellee Harris N.A. in Opposition to Appellants' Appeal of the Dismissal of Their Complaint. "Wachovia Br." means Brief of Wachovia Bank, N.A.

context, reasonably intelligent people, versed in commercial finance, would disagree that the term "amendment" manifested an unambiguous intent to permit such an arrangement.

In their responsive briefs, Wachovia and Harris make the following arguments:

1.    The Intercreditor Agreement manifests, clearly and unambiguously, the intent of the parties that Wachovia could use its senior Revolver Lien in any manner and for any purpose but one,[2] regardless of its impact on Appellants' Inventory Lien.

2.    This is because when Appellants subordinated to Musicland's revolving credit facility, they consented in advance to *any amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements.*

3.    Based on this language, Wachovia was free to use the Revolver Lien to secure a new and different type of loan at a lower level of priority (but above the Inventory Lien), even if it shared nothing with the revolving credit facility but a label.  As the Bankruptcy Court held, Wachovia had *carte blanche*, so long as the new lender was not an insider.  By that logic, Wachovia could create multiple junior liens, with multiple priorities, in favor of anyone that Wachovia agreed to call a Revolving Loan Creditor.  Wachovia's discretion was limited only by its imagination.

4.    Any intent or understanding that Wachovia could not do what it did was secret and subjective, and thus ineffective.  The Intercreditor Agreement so clearly permits this result that, if Appellants had really wished to prevent their Inventory Lien from being primed in this manner, they needed to bargain for an express prohibition.  In arguing that the definitional

---

[2] The only limitation was that Wachovia could not allow affiliates of the Debtor to be part of a group of lenders that refinances, replaces or succeeds to any of the Revolving Loan Debt, unless it were a Permitted Affiliate Refinancing.

framework of the relevant agreements did not authorize this result, Appellants must (and do) resort to taking liberties with the facts and the express terms of the agreements.

Though Wachovia and Harris hammer these points relentlessly, sheer repetition cannot replace common sense and careful analysis. Appellants subordinated their Inventory Lien to a revolving credit facility in which lenders make advances only when there is collateral to support them. Harris did not join that club. In fact, Wachovia did not even "share" its lien, which would imply that Harris was at least under the same roof as the revolving lenders. What Wachovia did, in effect, was clone the Revolver Lien, and use the clone to secure a lower priority term loan that had nothing in common with the senior credit facility except a label. Common sense tells us that Appellants did not bargain for that risk when they subordinated to the Revolver Lien. Wachovia could not just pin the label "Revolving Loan Debt" on a term loan that was actually *subordinated* to Revolving Loan Debt.

Carefully analyzed, the technical definitions are consistent with this common sense proposition. Appellees quote portions of the agreements *verbatim* when they are helpful, but paraphrase them when they are not. This deliberate imprecision, and some circular logic, permits them to suggest contractual bases for Wachovia's actions that are unsupported by the precise text of the agreements. When all definitions are traced in linear fashion to their source, and all words are given the meaning assigned to them by the English language and by law, Appellees' position that the Intercreditor Agreement permitted Wachovia to use the Revolver Lien for Harris's benefit hangs on the interpretation of a single word: "amendment."[3]

The definitions provide for the subordination of the Inventory Lien to the liens of (1) Revolving Loan Creditors and (2) to the extent of the Revolving Loan Debt. As might be

---

[3] "Amendment" or "modification," as those terms are used in the Intercreditor Agreement, appear to be equally non-descriptive and interchangeable. Since Appellees cast Amendment No. 8 as an "amendment," that word is used as the basis for analysis.

guessed from their title, the pre-existing definitions did not provide for term loans.  The definitions had to be changed.  Wachovia redefined them so that Harris could be called a Revolving Loan Creditor and the Harris Term Loan could be called Revolving Loan Debt, though it was not revolving credit and was subordinated to the real Revolving Loan Debt. Appellants had consented in advance to "*any amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements, including without limitation, extensions of time of payment of or increase or decrease in the amount of any of the Revolving Loan Debt, the interest rate, fees, other charges, or any collateral.*"[4] (Exh. C (Intercreditor Agreement) § 4.3).  The Harris Term Loan did not affect the Revolving Credit Facility, much less supplement, extend, renew, or restate it, so the only cover for the definitional changes can be the less descriptive noun "amendment" or, to the same effect, "modification."

The question, then, is this:  Did changing the definitions so that a term loan could be called Revolving Loan Debt and a term lender could be a Revolving Loan Creditor, solely to secure the term loan behind the Revolver Lien but ahead of the Inventory Lien, constitute the kind of "amendment" that the parties intended Appellants were required to accept?  Moreover, for purposes of this appeal from dismissal under Rule 12(b)(6), the pertinent issue is even narrower:  Was it so obvious that Appellants' consent to "amendments" authorized such changes that no reasonably intelligent person, knowledgeable in commercial finance, could disagree that this was the mutual intent of the parties?  Only if the answer is yes, can the complaint be dismissed as a matter of law.

---

[4] Citations to exhibits refer to exhibits to the Complaint (Docket No. 1).  A copy of the Complaint is included in Appellants' Appendix, which was filed concurrently with Appellants' Opening Brief.

The answer is patently "no."   It can only be "yes" if the word "amendment" must be interpreted literally as "any change whatsoever."   That is what the Bankruptcy Court held, but that is not the law.  Words are interpreted in their context within the contract and in the context of the contract as a whole and its purpose.  The stated purpose of the Intercreditor Agreement was, *inter alia*, to "confirm the relative priority of the security interests of Revolving Loan Creditors and Trade Creditors in the assets and properties of Debtors…." (Exh. C, pg. 1, 6th "Whereas" clause.)  The "Revolving Loan Creditors" were just that – banks with participation interests in a revolving credit facility.  Interpreting "amendment" of the Revolving Creditor Agreements to include a change in wording so that a term loan could be called "Revolving Loan Debt," when the term loan was actually *subordinated* to the Revolving Loan Debt, is absurd.  Indeed, what was the point of a fifteen-page agreement when Wachovia's only fixed obligation was to bar insiders from joining the credit facility except on approved terms?  Appellees draw attention to the high-level legal talent involved in drafting the document.  Which is more likely: (a) that sophisticated counsel drafted an agreement that is inefficacious or superfluous in significant part due to the primacy of a clause that appears to have a far more limited purpose; or (b) that Appellees' ingenuity in circumventing the Intercreditor Agreement was a scenario that was not anticipated even by sophisticated counsel?  Appellants submit it is the latter.

Reasonably intelligent persons, knowledgeable in the field of commercial finance, would agree that the Intercreditor Agreement's consent to "amendments" in the Revolving Creditor Agreements did *not* permit the arrangement embodied in Amendment No. 8.  At minimum, such persons could disagree.  In either event, the Bankruptcy Court's ruling dismissing the complaint as a matter of law is erroneous, and should be reversed.

## ARGUMENT

**I.**     **Under the Intercreditor Agreement, the Harris Term Loan Can Be Justified, If At All, Only as an "Amendment" to the Revolving Creditor Agreements**

The correct analytical framework is this: (1) did the Revolving Creditor Agreements, as they existed when the Intercreditor Agreement was entered, contain provisions for a subordinated term loan, or for a term lender to become a party to such agreements, or did they need to be changed; (2) if they needed to be changed, did the changes come within the scope of the provision in the Intercreditor Agreement that provided for Appellants' consent to certain changes in the Revolving Creditor Agreements?

Appellees collapse this analysis, offering variants of the following arguments: (1) the Revolving Creditor Agreements permitted term loans because the agreements provided they could be amended; or (2) Harris could be a Revolving Loan Creditor because it became a party to the Revolving Creditor Agreements, or because the agreement could be amended to make that permissible.  Both types of arguments are circular, *i.e.*, they assume the conclusion that calling Harris a Revolving Loan Creditor makes it so, or that by consenting to "amendments" Appellants agreed to any changes of any kind or magnitude.

Under the Intercreditor Agreement, the Inventory Lien is subordinated only to the "Liens of the *Revolving Loan Creditors* therein *to the full extent of the Revolving Loan Debt*."  (Exh. C § 2.2 (emphasis added).)

1.     "Revolving Loan Creditors" are defined in the Intercreditor Agreement as "individually and collectively, Revolving Loan Agent, each of the financial institutions from time to time party to the Revolving Loan Agreement as lenders, and their respective successors and assigns (and including any other lender or group of lenders that at any time refinances,

replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise party to the Revolving Creditor Agreements)."  (*Id.* § 1.15.)

      a.      Harris was not a successor or assign of any other lender.

      b.      Harris did not refinance, replace, or succeed any of the Revolving Loan Debt.

      c.      Harris could not otherwise become a party to the Revolving Creditor Agreements as they were written.  As befits a revolving credit facility, only institutions acquiring participation interests in the facility could become parties.  The only provision in the Revolving Credit Agreement that provides for the addition of new parties is section 13.6:

> 13.6  <u>Assignments; Participations</u>.
>
>     (a)    Each Lender may assign all or, if less than all, a portion equal to at least $5,000,000 in the aggregate for the assigning Lender, of such rights and obligations under this Agreement to one or more Eligible Transferees . . . each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Acceptance. . .
>
>     (c)    Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and to the other Financing Agreements and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations . . . of a Lender hereunder and thereunder. . . .

(Exh. A § 13.6.)  Accordingly, because only revolving loan participants could become parties to the Revolving Loan Agreement, the definitions needed to change in order for Harris to become a "Revolving Lien Creditor."  This being one of the two independent requirements for subordination under the Intercreditor Agreement, the analysis of whether the Revolving Creditor Agreements needed to be changed in order to put the Harris Term Loan ahead of the Inventory Lien may end here.  As shown below, however, definitions also needed to change in order for the Harris Term Loan to be called Revolving Loan Debt.

2.      "<u>Revolving Loan Debt</u>" is defined in the Intercreditor Agreement as "any and all obligations . . . arising under the Revolving Creditor Agreements. . . ."  (Exh. C § 1.16.)

a.      Though the term "obligations" is not expressly cross-referenced to the Revolving Loan Agreement, that agreement defines "Obligations" in a manner that includes only revolving loans.  "Obligations" is defined as:

> "any and all *Loans*, Letters of Credit Accommodations and all other obligations, liabilities and indebtedness of every kind, nature and description . . . *arising under this Agreement or any of the other Financing Agreements. . . .*"

(Exh. A. § 1.80 (emphasis added).)  "Loans" were defined as loans made "on a revolving basis."  (*Id.* § 1.70.)   Appellees focus on the phrase "all other obligations … of every kind," but the Revolving Creditor Agreements provided solely for revolving credit.  The Revolving Loan Agreement established a "Credit Facility" that was defined to consist in relevant part of the "Loans," which were in turn defined as loans made "on a revolving basis."  (*Id.* §§ 1.29, 1.70.)   Hence, the only loan obligations that could arise under the Revolving Loan Agreement were revolving loans.

b.      Obligations under the Revolving Creditor Agreements had to be in favor of Revolving Loan Creditors. "Revolving Creditor Agreements" were defined in the Intercreditor Agreement as:

> "the revolving Loan Agreement and all agreements, documents and instruments at any time executed and/or delivered by Debtors or any other person to, with or *in favor of Revolving Loan Creditors* in connection therewith or related thereto, as all of the foregoing now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders . . . that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise a party to the Revolving Creditor Agreements)."

(Exh. C § 1.11 (emphasis added).)

c.     As a term lender, Harris was not and could not be a "Revolving Loan Creditor," in whose favor such documents must be executed.

d.     Harris did not refinance, replace, or succeed to any of the Revolving Loan Debt, and could not otherwise become a party to the Revolving Creditor Agreements without acquiring a participation interest.

e.     The documents defined as "Revolving Creditor Agreements" would continue to be so defined in the event they were "amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured."  Appellees proclaim that this language authorized term loans, but the language as used in this context does not even purport to constitute authorization for Wachovia to actually make such changes. That is the province of section 4.3, which, as discussed immediately below, governs what Appellees did or did not consent to.

In sum, the subordination contained in the Intercreditor Agreement would not extend to Harris and the Harris Term Loan under the relevant definitions in the Intercreditor Agreement and Revolving Creditor Agreements, as they existed when the Intercreditor Agreement was executed.  The definitions needed to be changed.  To what changes did Appellants consent? Under section 4.3 of the Intercreditor Agreement, Appellants gave their consent in advance to "*any amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements, including without limitation, extensions of time of payment of or increase or decrease in the amount of any of the Revolving Loan Debt, the interest rate, fees, other charges, or any collateral.*"  (Exh. C § 4.3 (emphasis added).)

What Amendment No. 8 did, functionally, was to change the definitions of the Revolving Creditor Agreements so that Harris and the Harris Term Loan could be called a Revolving Loan Creditor and Revolving Loan Debt, respectively, while actually having no substantive effect on either the Revolving Loan Debt or the Revolving Creditor Agreements.  The Harris Term Loan was a stand-alone, structurally subordinated short-term loan that did not impair or prejudice the Revolving Loan Creditors or their collateral.  It was not paid *pari passu* with the revolving loans; rather, loan payments were applied first to the Revolving Loan Debt, including all interest and principal, and only then to interest and principal on the Harris Term Loan.  (Exh. D § 4 (amending § 6.4 of the Revolving Loan Agreement).)  Harris could be paid early only if Musicland had excess availability under the Revolving Credit Facility (*i.e.*, if payment presented no risk to the Revolving Loan Creditors).  (*Id.* ¶ 35.)  Substantively, what Wachovia achieved with Amendment No. 8 was to place a layer of debt between it and the Appellants' Inventory Lien, with no effect on the real Revolving Loan Creditors or Revolving Loan Debt.  All it had to do was agree to call Harris a Revolving Loan Creditor.

On these facts, the Harris Term Loan clearly did not "supplement, extend, renew or restate" the Revolving Loan Debt or Revolving Creditor Agreements.  If the consent clause of section 4.3 is to be construed to authorize Amendment No. 8, it must be as an "amendment" or "modification" of the Revolving Creditor Agreements, two equally non-descriptive and interchangeable words.

Appellees' efforts to justify the Harris Term Loan on any basis other than as an amendment all fail, either because they are imprecise or because they employ circular reasoning.  Harris argues that there is a "simple and straight-forward contractual interpretation" that defeats Appellants' claims.  It asserts: (1) "Under Section 2.2, Revolving Loan Creditors have a priority

lien over Trade Creditors"; (2) "Under Section 1.15, 'Revolving Loan Creditors' is defined to include each of the financial institutions from time to time party to the revolving Loan Agreement as lenders"; (3) "Under Section 1.13, the Revolving Loan Agreement was defined to include the 2003 Loan Agreement as the same now exists or may hereafter be amended, modified, supplemented, etc."; (4) "Under Section 4.3 of the Intercreditor Agreement, Plaintiffs expressly consented to the amendment, modification, and restructuring of Revolving Creditor agreements that includes the 2003 Loan Agreement"; and thus (5) "on the face of the documentation, Harris by virtue of 'Amendment No. 8' became entitled to priority treatment." Harris Br. at 6.

In short, the argument is that because Harris only needed to be a party to the loan agreement, and because Appellants consented to amendments, and because the loan agreement was amended to make Harris a party, Appellees must prevail. The argument is deficient. First, it ignores that under its then-existing terms, one could not become a party to the Revolving Loan Agreement except as a revolving lender, and thus it assumes its conclusion, *i.e.*, that calling Harris a Revolving Loan Creditor made it so. Second, it begs the ultimate question of whether the so-called "Amendment No. 8" was an "amendment" within the meaning of section 4.3 of the Intercreditor Agreement. Harris's argument presupposes that "amendment" means "any change whatsoever," but that is the very issue on appeal. The logic is circular. Such circular reasoning is pervasive in both Appellees' briefs. *See, e.g.*, Harris Br. at 9 ("The complaint admits … that the 2003 Loan Agreement was amended via Amendment No. 8, and Harris became a party thereto. This ends the inquiry in Harris's favor."). Finally, Harris's argument ignores completely the other requirement for subordination, that the debt be "Revolving Loan Debt."

Harris also argues that Appellants' cross-reference to the definition of "Obligations" in the Revolving Loan Agreement actually "hoists Appellants upon their own petard," because "Obligations" is defined therein to include not just Loans (defined to mean revolving loans), but *also* includes "**all other obligations, liabilities and indebtedness of every kind, nature and description**." Harris Br. at 17 (emphasis in original). To Harris, this means that the Revolving Loan Agreement "clearly embraces term loans of the sort Harris made!" Harris's enthusiasm is unfounded. Its problem is that the Revolving Loan Agreement creates a "Credit Facility" that provides only for "Loans," which is defined to include revolving loans only. There is no provision for term loans. It is a far more plausible interpretation that the broad definition of "Obligations" is intended to ensure that such non-Loan debts as fees, costs or indemnification, etc., are covered.

Similarly, Harris argues that the inclusion of the identical broad language in the Intercreditor Agreement's definition of "Revolving Loan Debt" meant that term loans were authorized or contemplated therein. Again, however, this argument ignores the requirement in the very same definition that such debt must be owed to Revolving Loan Creditors under the Revolving Creditor Agreements, *i.e.*, it must be owed to banks issuing revolving credit on account of such revolving credit. This returns us to the question at hand: Definitions needed to be changed to accommodate term loans and make Harris a "Revolving Loan Creditor." Such changes were authorized, if at all, only as an "amendment."

## II.    The Harris Term Loan Was Not Authorized as an "Amendment" to the Revolving Creditor Agreements

Appellants' consent to "amendment" of the Revolving Loan Agreement, as that term was used in the Intercreditor Agreement, did not manifest the intent of the parties to pre-authorize

changes of the nature embodied in "Amendment No. 8." At minimum, reasonably intelligent persons cognizant of uses and practices in commercial finance could disagree.

What was the Harris Term Loan? Pertinent hereto, it was not a loan that paid off, refinanced, replaced, or restructured any of the existing Revolving Loan Debt. It was a short-term cash advance. Further, it was not part of the Revolving Credit Facility in any substantive respect. Besides the obvious – it was a term loan grafted onto a revolving loan agreement, with a separate interest rate and payment terms – it was carefully designed to have no adverse impact on the existing Revolving Loan Debt under the Revolving Creditor Agreements. To say that Wachovia "shared" the Revolver Lien with Harris actually overstates the relationship between the Revolving Credit Facility and the Harris Term Loan. "Sharing" a lien implies that Wachovia brought Harris on board at the same level as the Revolver Lenders, notwithstanding the different nature of their loans. That is not the case here. The Harris Term Loan was structurally subordinated to the Revolving Loan Debt. Payments were applied first to the Revolving Loan Debt, including all interest and principal, and only then to interest and principal on the Harris Term Loan. Harris could be repaid earlier only if the Debtor stayed within its borrowing formula under the Revolving Credit Agreement, *i.e*, payment posed no risk to real Revolving Loan Creditors. Because of this junior payment priority, Harris's right of recourse to its collateral was effectively junior to that of the real Revolving Loan Creditors. As detailed in the Appellants' Opening Br., this meant that the collateral for the Harris Term Loan was effectively whatever equity exceeded the amount of the real Revolving Loan Debt – exactly the tranche of assets that secured Appellants' claims. Harris was a Revolving Loan Creditor under a Revolving Creditor Agreement in name only. Wachovia did not "share" the Revolver Lien, it only shared the name so that Harris could jump ahead of Appellants.

Appellees attempt to seize the high rhetorical ground by repeatedly characterizing this action as an effort to rewrite the Intercreditor Agreement to give effect to a secret, unexpressed intention that there would be some limits on the uses to which Wachovia could put the Revolver Lien. They contend that the intent to give Wachovia *carte blanche* to do as it wished, except permit affiliate financing, is so clear and unequivocal on the face of the agreement that an express prohibition was required if Appellants had really expected to prevent what happened here.

Appellants' expectations were not secret at all. They were patent from the purpose and content of the Intercreditor Agreement and the agreements it references. The Inventory Lien was to be subordinate to the Debtor's senior, revolving credit facility. Reasonably intelligent persons versed in commercial finance would concur that in the context of a subordination agreement, the nature of the senior debt is material, because it affects the manner in which a subordinating lienholder's collateral margin is preserved or eroded. In this case, the senior debt was a classic revolving credit facility. A revolver lender would not make the loan that Harris did (and neither would Harris without a guaranty from Sun). The Harris Term Loan encroached on the cushion of equity in the Debtor's inventory that secured the Inventory Lien. When Wachovia asserts that "at most [Amendment No. 8] increased the amount of the debt, as expressly permitted" (Wachovia Br. at 20), and that there is "no doubt that the Loan Agreement and the Intercreditor Agreement would have permitted the existing Lenders to increase their loans by $25,000,000" (*id*. at 26), it turns a blind eye to this reality of commercial finance. Revolving credit is not typically increased unless collateral levels have increased proportionately.

Wachovia concludes that because it could have advanced funds without collateral, "Appellants could not have had any contractual expectation, let alone a reasonable expectation,

that they would always be fully secured, so their claim rings hollow." Wachovia Br. at 28. Appellants do not contend they had a contractual right to be fully secured. Appellants contend they had a contractual right to be subordinated only to the Revolving Credit Facility, which would make it likely that there would be surplus collateral to secure their claims. There is no basis to contend that such an expectation is not reasonable, and certainly not on a motion to dismiss under Rule 12(b)(6).

Wachovia asserts "the amendment did nothing more than increase availability under the Loan Agreement. . . ." Wachovia Br. at 37. The statement is incorrect. "Availability" is a revolving credit concept. This was not revolving credit, but subordinated term debt. Wachovia notes correctly that it and the Revolving Loan Creditors *could* have made advances beyond the borrowing base and rendered Appellants' claims unsecured (*id*. at 28). But they *did not*, and that just reinforces Appellants' point: The Revolving Loan Creditors would not and did not agree to advance funds without collateral to support it. It took a term lender with a relationship with Sun and a guaranty in hand to do so.

Conversely, the contractual foundation of Wachovia's professed expectation that it could use the Revolver Lien for almost any purpose is shakier than represented. It is remarkable how emphatically Appellees insist that the Intercreditor Agreement and Revolving Credit Agreement so obviously contemplated term loans, when the expression is not used once in the agreements. Without exception, the asserted contractual bases for such authority are passages of broadly applicable words that, while certainly not boilerplate, appear intended to capture all possibilities within a given context. Appellants disagree that "all liabilities or indebtedness of any kind arising under the Revolving Creditor Agreements" presages that stand-alone subordinated term loans will be spun out of a revolving credit facility. Appellants submit that it is a more

reasonable expectation that such broad language in that context was intended to assure that no kind of liabilities under the revolver lose their priority by escaping the coverage of the definition, *e.g.*, indemnity obligations for third party claims, etc.  Appellees' exclusive reliance on such passages as *post facto* justification for this unorthodox transaction belies their posture of righteous indignation.

Wachovia's effort to make these definitional excerpts appear more robust stretches past the breaking point when it contends that Appellants' position "is flatly contradicted by the definition of Revolving Loan Debt which includes any debts or obligations of 'every kind, nature and description' arising under and [sic] any amended Loan Agreement."  Wachovia Br. at 20.  In fact, the Intercreditor Agreement's definition of Revolving Loan Debt (Exh. C § 1.16) makes no reference to obligations under "any amended Loan Agreement."  It refers only to obligations to Revolving Loan Creditors arising under the Revolving Creditor Agreements, whether now existing or hereafter arising…."  Wachovia's paraphrasing of the Intercreditor Agreement in this instance is materially inaccurate.

Wachovia accuses Appellants of taking similar liberties with the facts and agreements, and sets out a chart that purports to demonstrate it.  In fact, Wachovia's accusations are themselves rather deceptive.  The following chart reproduces Wachovia's chart in the first two columns, and sets forth Appellants' responses in the third column.

| [Wachovia] What the Appellants Claim | [Wachovia] What the Intercreditor Agreement Actually Says and the Specific Provisions that Say It | Appellants' Response |
|---|---|---|
| "Bargained for a lien that was subordinated only to obligations under Musicland's existing revolving credit facility." (Appellants' Br. at 16.) | Appellants agreed to be subordinated to debt of "every kind, nature and description" arising under the Loan Agreement as then in effect or as subsequently amended. (Exh. C §§ 2.2, 1.16.) | Wachovia not only assumes its desired conclusion, but it does so relying on the same deceptive mischaracterization of § 1.16 described above. Section 1.16 does not say or imply "then in effect or as subsequently amended." |

| [Wachovia] What the Appellants Claim | [Wachovia] What the Intercreditor Agreement Actually Says and the Specific Provisions that Say It | Appellants' Response |
|---|---|---|
| Wachovia was "not free to add a term lender" to the Loan Agreement. (Appellants' Br. at 21.) | Any entity (other than an affiliate of Musicland) can be a lender so long as it is made a party to the Loan Agreement by amendment or otherwise. (Exh. C § 1.15.) | Also deceptive: § 1.15 says nothing about becoming a party to the Loan Agreement by amendment, and under § 13.6 of the Loan Agreement, lenders become parties by acquiring participation interests in the revolving credit facility. |
| Appellants consented to only "routine" amendments to the Loan Agreement. (Appellants' Br. at 8, 35.) | Appellants consented to all amendments to the Loan Agreement except those that would make a Musicland affiliate a lender. (Exh. C §§ 4.3(a) and 1.16.) | Wachovia begs the question on appeal: whether "amendments" in this context manifests an unequivocal intent to subordinate to the transaction at issue. |
| Loan Agreement prohibited Lenders from making term loans. (Appellants' Br. at 16.) | Lenders under Agreement could make loans of "every kind, nature and description." There is no restriction that would prohibit term loans. (Exh. C § 1.16.) | Deceptive characterization of § 1.16, which does *not* state or imply that 'Lenders may make loans of every kind, nature and description.' It states that Revolving Loan Debt includes obligations of "every kind, nature and description" *arising under the Revolving Creditor Agreements. . .*" |
| Intercreditor Agreement definitions are "interconnected" with the definitions in Loan Agreement. (Appellants' Br. at 22, 23.) | Intercreditor Agreement is a fully integrated agreement and the terms therein prevail over any conflicting terms in Loan Agreement. (Exh. C § 5.10.) | Both uses of "interconnected" refer to cross-references and do not involve conflicting terms. |
| Intercreditor Agreement provided that Appellants would only be subordinated to "revolving loans." (Appellants' Br. at 17.) | Intercreditor Agreement expressly provides that Appellants will be subordinated to debt of "every kind, nature and description," there is no limitation to revolving loans. (Exh. C §§ 2.2 and 1.16.) | Each is a statement of the parties' respective positions. Wachovia subtly mis-characterizes what Appellants' brief states, but not in a manner that warrants discussion. |

| [Wachovia] What the Appellants Claim | [Wachovia] What the Intercreditor Agreement Actually Says and the Specific Provisions that Say It | Appellants' Response |
| --- | --- | --- |
| Loan Agreement insured that there would be a "built-in cushion of excess collateral" to secure Appellants' debt. (Appellants' Br. at 17.) | The senior debt could include "unsecured" obligations meaning that there would be no "excess collateral" to secure Appellants' debt.  (Exh. C § 1.16.) | Mischaracterizes position. Revolving credit is normally supported by excess collateral. But the Loan Agreement did not insure it, and an unlucky or imprudent revolving lender may have unsecured claims. |

None of this matters, of course, if the Court were required as a matter of law to interpret "amendment" literally, as a change of any kind whatsoever.  But that is not the law.  It is error to adopt dictionary definitions of terms without considering their meaning in the customs and practices of the relevant industry.  *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998); *Essex Ins. Co. v. Pingley*, 839 N.Y.S.2d 208, 210, 41 A.D.3d 774 (2007) ("In construing the meaning of an agreement, courts must accord words their 'fair and reasonable meaning,' rather than their mere literal meaning.'")

Appellees seek to distinguish *Essex Ins. Co. v. Pingley* and similar cases as cases in which the disputed term was ambiguous and there was a conflict between the express intentions of the parties and a narrow construction of contract terms.  That is not the case.  In *Essex Ins. Co. v. Pingley*, there was no ambiguity in the language itself, which was crystal clear; rather the "ambiguity" was derived solely from what the court decided was a reasonable expectation of the insured that there would be coverage.  The definition in the policy excluded coverage for injuries "[t]o any person removing parts from an auto, or any person allowed in the yard area unless accompanied by an employee for the purpose of looking at parts only."  839 N.Y.S.2d at 209. An independent contractor who worked on the premises was injured and sued.  The court did not apply the words literally but instead gave them a "fair and reasonable" interpretation in order to override the exclusion.  There was no express statement of intent that required such a result.  It

was in the nature of the agreement and the reasonable expectations of a party in connection therewith.  That is exactly the case here.

*Essex Ins. Co. v. Pingley* is consistent with the maxim that contract terms are not interpreted in isolation.  "In a written document, the word obtains its meaning from the sentence, the sentence from the paragraph, and the latter from the whole document, all based upon the situation and circumstances existing at its creation."  *Zodiac Enterprises, Inc. v. American Broadcasting Cos.*, 440 N.Y.S.2d 240, 241-42, 81 A.D.2d 337 (1981), *aff'd*, 56 N.Y.2d 738 (1982) (quoting *Eighth Ave. Coach Corp. v. City of New York*, 286 NY 84, 88-89 (1941)).

The "situation and circumstances" that existed when the Intercreditor Agreement was created have been described.  The contract was made for the stated purpose of confirming the relative priorities of the Revolver Lien and the Inventory Lien.  The Revolver Lien secured obligations under a revolving credit facility that provided only for revolving credit and that made no express reference to term loans.  The Intercreditor Agreement contained Appellants' consent to "amendments" of the Revolving Loan Agreement.  Amendment No. 8 was unorthodox, at minimum.  It changed basic definitions so that a term lender could qualify as a senior Revolving Loan Creditor and a term loan as senior Revolving Loan Debt for subordination purposes.  It did so for labeling purposes only, because the new lender was not treated by other Revolving Loan Creditors as having the same rights, and the new term loan was not treated as Revolving Loan Debt in any manner.  The only reason for the charade was to trump the Inventory Lien.  The contractual acrobatics that were required to accomplish this, and the facially clumsy product of such efforts, belie Appellees' protestations that their authority to do this was unambiguous and obvious.

Was it so obvious that Appellants' consent to "amendments" authorized such changes that no reasonably intelligent person, knowledgeable in commercial finance, could disagree that this was the mutual intent of the parties?  If not, the contract is ambiguous and reversal is required.  *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997) (ambiguity exists where the terms of a contract are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.").  On a motion to dismiss, contractual ambiguities must be resolved in favor of the plaintiff.  *International Audiotext Network, Inc. v. American Telephone & Telegraph Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *International Equity Investments, Inc. v. Opportunity Equity Partners Ltd.*, 472 F. Supp. 2d 544, 547 (S.D.N.Y 2007).  An "amendment" or "modification," taken literally, means any change at all.  Yet "modification" has been held to describe "*an alteration or change in an incidental or subordinate feature*."  *Statland Holiday, Inc. v. Stendig Development Corp.*, 362 N.Y.S.2d 2, 46 A.D.2d 135, 137 (1974) (emphasis added).  Can a court decide otherwise now in the defendants' favor?  Can it do so without an expert opinion?  If not, the dismissal must be vacated.  Appellants submit that it cannot.[5]

## III.    Wachovia Breached the Implied Covenant of Good Faith and Fair Dealing

This is a classic example of a breach of the implied covenant of good faith and fair dealing, which serves to "further an agreement by protecting a promise against the 'breach of the reasonable expectations and inferences derived from the agreement.'"  *Ari & Co. v. Regent Int'l*

---

[5]  Appellees note cynically that Appellants did not allege in the Complaint that the Intercreditor Agreement is ambiguous, as if that were a telling admission.  It is not.  Appellants allege that the contract did not authorize the Harris Term Loan, not that it was ambiguous!  But if reasonably intelligent people versed in commercial finance would not all agree that the Harris Term Loan violated the Intercreditor Agreement, at least some of them would interpret it in that manner.  That alone precludes dismissal of the Complaint.

*Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) (quoting *TVT Records and TVT Music Inc. v. Island Def Jam Music Group*, 244 F. Supp. 2d 263, 278 (S.D.N.Y. 2003)).

Appellees argue that the Intercreditor Agreement expressly permitted them to enter Amendment No. 8, and that courts cannot imply terms that are inconsistent with the other terms of the contract. *Times Mirrors Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 394-95 (2d Cir. 2002). Again, Appellees assume their desired conclusion, to wit, that the contract expressly allowed them to agree to label the Harris Term Loan as Revolving Loan Debt.

In fact, the Intercreditor Agreement does not address these facts. That is precisely when the covenant applies. "When the contract is silent, principles of good faith . . . fill the gap." *Kham & Nate's Shoes No. 2 v. First Bank*, 908 F.2d 1351, 1357 (7th Cir. 1990). Appellees try to distinguish *Kham & Nate's Shoes No. 2*, as well as *Carvel Corp. v. Baker*, 79 F. Supp. 2d 53, 62 (D. Conn. 1997), as cases where the contract is silent, when here the contract permitted their actions. Again, they simply assume their desired result.

Wachovia states that *Metropolitan Life Ins. Co. v. RJR Nabisco*, 716 F. Supp. 1504 (S.D.N.Y. 1989), "rejected the very argument advanced by Appellants." Wachovia Br. at 30. The opposite is true. *Metropolitan Life* holds that extrinsic evidence *can* be relevant to determine the scope of the implied covenant, but *not* where the language is *boilerplate* in a publicly traded bond indenture. "Under certain circumstances . . . courts will, as plaintiffs note, consider extrinsic evidence to evaluate the scope of an implied covenant of good faith. [citation omitted] However, the Second Circuit has established a different rule for customary, or boilerplate, provisions of detailed indentures used and relied upon throughout the securities market, such as those at issue. . . . [P]laintiffs would have this Court vary what they themselves have admitted is indenture boilerplate, . . . to comport with collateral representations and their

subjective understandings." 716 F. Supp. at 1515-16. This case does not involve a publicly traded indenture. Moreover, if the pertinent language is "boilerplate," this vindicates Appellants' position that it was not intended to have the dramatic import attributed to it by Appellees.

The clumsy terminology of Amendment No. 8 (reflecting the incompatibility of the Harris Term Loan and the Revolving Credit Facility), the objectively manifest intent of Amendment No. 8 to define the Harris Term Loan as Revolving Loan Debt without actually affecting the Revolving Loan Debt (solely to prime the Inventory Lien), and the failure to seek consent from or notify Appellants' agent, all point to the conclusion that Wachovia's actions were inconsistent with good faith and fair dealing.

## IV.    Amendment No. 8 Was Disguised Affiliate Financing That Violated the Intercreditor Agreement

As set forth in Appellants' Opening Br., the Bankruptcy Court's decision ignores a set of facts and corresponding theory of liability that was pled by Appellants and that would entitle them to relief. Wachovia breached the Intercreditor Agreement's affiliate financing restriction. The Intercreditor Agreement prohibited any Musicland affiliate from becoming a Revolving Loan Creditor except as part of a "Permitted Affiliate Refinancing." This was the one limit on Wachovia's discretion in the Intercreditor Agreement that all parties agreed stands up to Wachovia's asserted ability to amend the Revolving Creditor Agreements at will.

Appellees argue that Harris was not an affiliate, that guaranties are allowed under the Intercreditor Agreement, and that "Appellants have . . . failed to sufficiently plead a factual basis for the conclusory allegation that the Harris Loan was a 'charade.'" Wachovia Br. at 38. While it is conceded that Harris is not an affiliate, it is unclear how it can possibly be said that the Complaint lacks allegations to support a conclusion that Amendment No. 8 was a sham, utilizing Harris as a shill for Sun to make a loan that Sun could not make directly under the Intercreditor

Agreement.  It is untrue that the only supporting allegation in the Complaint is that Sun guaranteed the loan.  The Complaint alleges that Sun was willing to make the loan, but only if it were secured by a lien senior to Appellants, and since it could not, it had one of its own bankers, Harris, make the loan instead with a guaranty from Sun.  (Exh. C ¶ 8.)

Though Wachovia argues that the Intercreditor Agreement permitted guaranties, and that any guaranty would likely be made only by an insider, it is not the guaranty, *per se*, that is the issue.  Insider financing is the issue, and the guaranty was only a part of the scheme to circumvent the Intercreditor Agreement's limitations on insider financing.   As elaborated in Appellants' Opening Br., the lack of arms-length negotiations raises numerous issues, one of which is early repayment of an insider financing irrespective of the debtor's financial condition, without regard to its impact on the debtor and its junior creditors.  Harris would not have made the loan without Sun's guaranty, and Musicland would not have repaid it shortly before its bankruptcy, given its dire straits, but for its desire to protect Sun.  The clumsy manner in which the Revolving Loan Agreement was revised so that a term lender would be called a Revolving Loan Creditor suggests that the parties were aware of the risk that Appellants would object to such an arrangement.

Even if a restriction on insider financing, except on pre-approved terms, was really the only protection that Appellants received in the Intercreditor Agreement, it was breached.  For this reason alone, dismissal of the Complaint was erroneous.

**V.    The Disposition of the Remaining Claims Hinges on the Outcome of the Appeal From Dismissal of the Claim for Breach of Contract.**

Appellees attack the remaining claims for tortious interference with Appellants' rights under the Intercreditor Agreement and under the Security Agreement, for conversion, aiding and abetting, and unjust enrichment.  The Bankruptcy Court's dismissal of these claims was based

solely on its conclusion that the conduct was permitted under the Intercreditor Agreement.

Accordingly, reversal of the Bankruptcy Court's dismissal of the breach of contract claims

requires reversal of the remaining claims as well.

## **CONCLUSION**

For all of the foregoing reasons, Appellants respectfully request that the Court reverse the

Memorandum Order and Judgment, and grant such other and further relief as the Court may

deem just and proper.

Dated:  New York, New York
         December 21, 2007

                                          _/s/ Alan J. Kornfeld_____
                                          Robert J. Feinstein (RF 2836)
                                          Alan J. Kornfeld (AK 5647)
                                          Beth E. Levine (BL 6715)
                                          PACHULSKI STANG ZIEHL & JONES LLP
                                          780 Third Avenue, 36th Floor
                                          New York, New York 10017
                                          Telephone:   (212) 561-7700
                                          Facsimile:   (212) 561-7777

                                          Counsel for Appellants