UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

In re

MUSICLAND HOLDING CORP., et al.,

               Debtors.

BUENA VISTA HOME ENTERTAINMENT, INC.,
a California corporation; CARGILL
FINANCIAL SERVICES INTERNATIONAL,
INC., a Delaware corporation; HAIN
CAPITAL GROUP, LLC, a Delaware limited
liability company; PARAMOUNT PICTURES
CORPORATION, a Delaware corporation;
TWENTIETH CENTURY FOX HOME
ENTERTAINMENT LLC, a Delaware limited
liability company; UBS WILLOW FUND,
LLC, a Delaware limited liability
company; and VARDE INVESTMENT PARTNERS,
L.P., a Delaware limited partnership,

               Appellants,

     v.

WACHOVIA BANK, N.A., a national
banking association, in its capacity
as Agent; and HARRIS N.A., a
national banking association,

               Appellees.

----------------------------------------X

07 Civ. 8423

OPINION



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/22/08

A P P E A R A N C E S:

### Attorneys for Appellants

PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, NY  10017
By:  Robert J. Feinstein, Esq.

### Attorneys for Appellee

OTTERBOURG, STEINDLER, HOUSTON
  & ROSEN, P.C.
230 Park Avenue
New York, NY  10169
By:  Richard G. Haddad, Esq.

**Sweet, D.J.**

The Appellants, trade creditors of Musicland, have
appealed from the August 24, 2007 Memorandum Decision and
Order Granting Motion to Dismiss Complaint (the "Memorandum
Order") of Chief Judge Stuart Bernstein of the Bankruptcy
Court for the Southern District of New York ("Bankruptcy
Court") dismissing their complaint in the above-captioned
adversary proceeding (the "Complaint") pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure.  This Court
has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

The Complaint asserted seven causes of action,
including a breach of contract claim arising out of an
agreement (the "Intercreditor Agreement") between senior and
junior secured creditors of the bankrupt debtor, Musicland
Holding Corp. (together with its affiliates, "Musicland").
The Appellants, as junior creditors, alleged in their
Complaint that Appellee Wachovia Bank, N.A. ("Wachovia"), as
agent for the senior creditors, improperly amended the
Intercreditor Agreement to include a term loan to Musicland by
Appellee Harris N.A. ("Harris").

Upon the record presented and the conclusions set forth below, the Memorandum Order is affirmed.

## Prior Proceedings

On January 25, 2007, Appellants filed a complaint (the "Original Complaint") in the United States District Court for the Southern District of New York (the "District Court") alleging the same claims as in this action. After Wachovia moved to dismiss the Original Complaint, the Appellants voluntarily dismissed the action and re-filed their claims as an adversary proceeding in the Bankruptcy Court, alleging federal question jurisdiction. The Complaint, filed in the Bankruptcy Court on May 15, 2007, asserts multiple claims for relief against Wachovia.

On June 15, 2007, Wachovia and Harris filed motions to dismiss the Complaint for failure to state a cause of action under Federal Rule of Civil Procedure 12(b)(6). The motions were heard on August 9, 2007, and on August 24, 2007, the Memorandum Order was issued. Final Judgment was entered against the Appellants on August 27, 2007.

This appeal from the Memorandum Order was heard on January 16, 2008.

## The Complaint

Pursuant to a loan and security agreement dated August 11, 2003 (the "Revolving Credit Agreement"), Fleet Retail Finance, Inc. and Congress Financial Corporation (Wachovia's predecessor-in-interest), as the agent for the Revolver Lenders, agreed to provide Musicland with revolving credit of, at that point, up to $200 million (the "Revolving Credit Facility"). The obligations thereunder were secured by a first priority lien in substantially all of Musicland's assets, including inventory and proceeds (the "Revolver Lien"). Compl. ¶ 23, Ex. A.

The Revolving Credit Agreement provided exclusively for revolving credit. It defines the "Credit Facility" as, in relevant part, the "Loans," and "Loans" are, in turn, defined as "the loans now or hereafter made by or on behalf of Lenders or by Agent for the account of Lenders on a revolving basis pursuant to the Credit Facility . . . ." Compl. Ex. A §§ 1.29, 1.70. The Revolver Lien secured the "Obligations," id. § 5.1, which are defined as "[a]ny and all Loans, Letters of

4

Credit accommodations and all other obligations, liabilities
and indebtedness of every kind, nature and description . . .
arising under this Agreement or any of the other Financing
Agreements . . . .," id. § 1.80.


In 2003, Musicland was experiencing substantial
financial difficulties.  To induce Appellants to continue to
supply music CDs, DVDs and similar inventory, Musicland
granted them a lien on inventory and proceeds thereof (the
"Inventory Lien"), pursuant to a security agreement dated
November 5, 2003 (the "Security Agreement").  The Bank of New
York acted as Appellants' collateral agent.  Compl. ¶ 25, Ex.
B.


Pursuant to the Security Agreement, the Inventory
Lien was "subject only to the terms of that certain
Intercreditor and Subordination Agreement, dated as of
November 5, 2003 . . . ."  Compl. Ex. B § 2.  The Inventory
Lien was junior only to "Permitted Encumbrances," id. § 4(b),
which include only "the security interests and liens of
Congress for itself and the benefit of the Lenders pursuant to
the Congress Facility" and certain other limited, inapplicable
liens, id. § 1(i).

5

Concurrently with the Security Agreement, Wachovia, as agent for the Revolver Lenders, and Bank of New York, as Appellants' collateral agent, entered into the Intercreditor Agreement. Compl. ¶ 28, Ex. C.

The definitions of the Intercreditor Agreement provide for the subordination of the Inventory Lien solely to the loans made under the Revolving Credit Agreement. Section 2.2 of the Intercreditor Agreement states that the Inventory Lien is subordinated only to the "Liens of the Revolving Loan Creditors therein to the full extent of the Revolving Loan Debt." Compl. Ex. C. § 2.2. "Revolving Loan Creditors" are defined as parties to the Revolving Credit Agreement, id. § 1.15. "Revolving Loan Debt" is defined as "any and all obligations . . . arising under the Revolving Creditor Agreements . . . ." Compl. Ex. C § 1.16.

"Revolving Creditor Agreements" are defined as the original revolving loan documents, as they "now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders (which lenders

6

or group of lenders shall not be affiliates of Debtors, except that Trade Agent and Trade Creditors shall have no objection to any Permitted Affiliate Refinancing) that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise a party to the Revolving Creditor Agreements)." Id. § 1.11.  Under Section 1.9, a "Permitted Affiliate Refinancing" is one in which an affiliate, inter alia, "makes Revolving Loan Debt available to the Debtors . . . provided, that, (a) such affiliate does not own or hold more than twenty-five (25%) percent of the Revolving Loan Debt subject to such Refinancing . . . ." Compl. ¶ 31, Ex. C § 1.9.

"Lenders," as defined in the Revolving Credit Agreement, comprised (a) the original Revolver Lenders, and (b) lenders that acquired a participation interest in the Credit Facility from an original Lender.  Compl. Ex. A §§ 1.66, 13.6.

Finally, the Intercreditor Agreement provides, in relevant part, under the heading "Waivers":

> The Trade Creditors also waive notice of, and hereby consent to, (a) any amendment, modification, supplement, extension, renewal, or

7

> restatement of any of the Revolving Loan Debt or
> the Revolving Creditor Agreements, including,
> without limitation, extensions of time of payment
> of or increase or decrease in the amount of the
> Revolving Loan Debt, the interest rate, fees,
> other charges, or any collateral, (b) the taking,
> exchange, surrender and releasing of Trade
> Collateral or guarantees now or at any time held
> by or available to Revolving Loan Agent or any of
> the Revolving Loan Creditors for the Revolving
> Loan Debt   . . . . Any of the foregoing shall
> not, in any manner, affect the terms hereof or
> impair the obligations of Trade Creditors
> hereunder.

Id. § 4.3.

In the fall of 2005, Musicland asked the Revolver
Lenders to increase availability under the Revolving Credit
Facility, but they refused. Musicland's parent, Sun, also
refused to provide additional capital on a subordinated debt or
equity basis. Compl. ¶ 32.

Harris had a banking relationship with Sun. At Sun's
request, Harris agreed to make a $25 million term loan to
Musicland (the "Harris Term Loan"), on materially different
terms from those of the existing credit facility: (i) it was a
term loan, not revolving credit; (ii) Sun guaranteed repayment
to Harris (but not to the Revolver Lenders); and (iii) it was
short-term financing designed to meet Musicland's liquidity
needs during the peak shopping season and would be repaid

8

shortly, regardless of its stated maturity date, whether or not
other Revolver Lenders were paid.  Compl. ¶ 33.

The Security Agreement prohibited Musicland from
granting any lien encumbering Appellants' collateral, other than
the Revolver Lien.  Compl. ¶ 34.  Wachovia and Harris devised
Amendment No. 8, dated August 31, 2005, to the Revolving Credit
Agreement, to incorporate the Harris Term Loan into the
Revolving Credit Facility for the purpose of affording it a
senior lien, superior to Appellants' Inventory Lien.  Compl. ¶
35, Ex. D.

The definition of "Obligations" in the Revolving
Credit Agreement, which effectively limited the scope of the
security interest to revolving loans, was amended so that "[a]ll
references to the term 'Obligations' herein and in the Loan
Agreement and the other Financing Agreements shall be deemed
. . . to include . . . indebtedness of Borrowers in respect of
the Term Loan."  Compl. ¶ 36, Ex. D. § 1(b)(ix).  Whereas before
there had been only "Lenders" and all nomenclature ultimately
referred to revolving loans and revolver lenders, Amendment No.
8 changed:  (1) the definition of Loan (to mean the Revolving
Loans and the Term Loan), id. § 1(b)(vii); (2) the definition of
"Lenders" (to mean the Revolving Loan Lenders and the Term Loan

9

Lender), id. § 1(b)(vii); and (3) the definition of "Commitments" (to mean the Revolving Loan Commitments and the Term Loan Commitment), id. § 1(b)(v).

The Harris Term Loan had its own interest rate, id. § 1(b)(ii), and was not paid pari passu with the revolving loans. Rather, loan payments were applied first to the Revolving Loan Debt, including all interest and principal, and only then to interest and principal on the Harris Term Loan. Id. § 4 (amending § 6.4 of the Intercreditor Agreement). Although the stated maturity date of the Harris Term Loan was co-terminous with the Revolving Credit Facility, Amendment No. 8 permitted early prepayment at anytime after November 2005, provided that Musicland then had certain excess availability under the Revolving Credit Facility (i.e., if it presented no risk to the Revolver Lenders). Compl. ¶ 35, Ex. D.

The maximum amount of the Revolving Loan Debt was limited under Section 2.1 of the Revolving Credit Agreement to the amount of the borrowing base, regardless of the stated maximum amount of the credit facility (and thus there would normally be an equity cushion in the collateral). Compl. Ex. A § 2.1(c). Amendment No. 8 retains that limitation. Compl. Ex.

D § 2. The Harris Term Loan, however, was limited by the
maximum credit limit of the Revolving Credit Facility. Id.

On December 5, 2005, the Harris Term Loan was repaid
in full. Shortly thereafter, the Revolver Lenders changed the
borrowing base calculations and/or reserve requirements under
the Revolving Credit Facility, and Musicland was thrust into a
liquidity crisis. On January 12, 2006, Musicland filed for
relief under Chapter 11 of the Bankruptcy Code. Compl. ¶ 37.

The Appellants' claims were substantially under-
secured by their Inventory Lien. Pursuant to an order dated
March 24, 2006, the Court approved the sale of substantially all
of Musicland's remaining assets to a third-party purchaser,
which sale was consummated on or about March 27, 2006. Out of
the sale proceeds, the Revolver Lenders' claims were paid in
full, and pursuant to a subsequent Court order entered on August
11, 2006, approximately $26 million was paid by Musicland to
certain secured trade creditors on account of their secured
claims, which aggregated to no less than between $170-$173
million (as estimated by Musicland). As of November 27, 2006,
Musicland held $28.35 million in cash. By order entered
December 2, 2006, the secured trade creditors were authorized to
foreclose on $15.7 million of such funds. Based on information

11

and belief, and the Debtor's filed Monthly Operating Statement
for January 2007, Musicland holds no more than approximately
$11.9 million in cash, with combined current assets (including
cash) totaling approximately $22.1 million.  Compl. ¶ 38.

Based on these allegations, the Complaint alleges
seven causes of action: (i) breach of the Intercreditor
Agreement, Compl. ¶¶ 39-43; (ii) breach of the covenant of good
faith and fair dealing arising out of the Intercreditor
Agreement, id. ¶¶ 44-48; (iii) tortious interference with
contractual relations, with regard to the Intercreditor
Agreement, id. ¶¶ 49-54 and (iv) with regard to the Security
Agreement, id. ¶¶ 55-60; (v) conversion, id. ¶¶ 61-66; (vi)
aiding and abetting conversion, id. ¶¶ 67-70; and (vii) unjust
enrichment, id. ¶¶ 71-75.

## The Opinion Below

The Bankruptcy Court held that "the Intercreditor
Agreement unambiguously authorized Wachovia to amend the
Revolving Credit Agreement to bring in a term lender." Buena
Vista Home Entm't, Inc. v. Wachovia Bank, N.A. (In re Musicland
Holding Corp.), 374 B.R. 113, 121 (2007).  There being no breach
of the Intercreditor Agreement, the Court also dismissed the

12

conversion and tortious interference claims, which were related
to the breach of contract claim. Id.

In reaching its decision, the Bankruptcy Court looked
to Section 2.2 of the Intercreditor Agreement, which provides
for the subordination of the Appellants' liens to the "Liens of
the Revolving Loan Creditors therein to the full extent of the
Revolving Loan Debt." Id. at 116. Next, the Bankruptcy Court
turned to the agreements' definitions, "the net effect of
which," observed the Bankruptcy Court, "provided that the
Lenders' priority extended to debts under the current Revolving
Credit Agreement, and any amended agreement, including any new
loans of any type made under any amended agreement." Id.
Beginning with the definition of "Revolving Loan Creditors," the
Bankruptcy Court traced the language of the Intercreditor
Agreement to support its conclusions:

> For example, the "Revolving Loan Creditors"
> referred to the Lenders under the Revolving
> Creditor Agreement, their successors and assigns
> and 'any other lender or group of lenders that
> any time refinances, replaces or succeeds to all
> or any portion of the Revolving Loan Debt or is
> otherwise a party to the Revolving Creditor
> Agreements.' ([Intercreditor Agreement] at §
> 1.15). The 'Revolving Creditor Agreements' meant
> the 'Revolving Loan Agreement' and all agreements
> subsequently executed by 'the Debtors or any
> other person to, with or in favor of Revolving
> Loan Creditors in connection therewith or related

> thereto' as now exist 'or may hereafter be
> amended, modified, supplemented, extended,
> renewed, restated, refinanced, replaced or
> restructured,' (Id. at § 1.11.) The 'Revolving
> Loan Debt' referred to 'any and all obligations,
> liabilities and indebtedness of every kind,
> nature and description' owed by the Debtors
> 'whether now or existing or hereafter arising'
> under the Revolving Creditor Agreements.

Buena Vista, 374 B.R. at 116.  Based on these definitions, the

Bankruptcy Court concluded that the Intercreditor Agreement

contemplated future amendments to the Revolving Credit Agreement

that could include loans or obligations of any kind.


        The Bankruptcy Court further relied upon Section 4.3

of the Intercreditor Agreement, which stated that the Appellants

and/or their predecessors gave their prior consent to all

amendments of the Revolving Credit Agreement and placed only one

restriction on what the Lenders could and could not do with

respect to amendments.  Specifically, the Debtors' affiliates

could not be made Lenders under the Revolving Credit Agreement,

except in certain instances.  Id. at 117 (citing § 1.1 of the

Intercreditor Agreement).


        Construing the above-cited provisions as a whole, the

Bankruptcy Court concluded that there was no restriction in the

Intercreditor Agreement limiting the obligations to revolving

                                14

debt.  The Bankruptcy Court observed that the Appellants

consented to any amendments to the Revolving Credit Agreement

and, accordingly, the Bankruptcy Court ruled that "the

Intercreditor Agreement unambiguously authorized Wachovia to

amend the Revolving Credit Agreement to bring in a term lender."

Id. at 121.

The Bankruptcy Court rejected the contention that the

Appellants "'bargained for a lien that was subordinate only to

obligations under Musicland's existing revolving credit

facility.'"  Id.  "That bargain," ruled the Bankruptcy Court,

"is not reflected in the terms of the Intercreditor Agreement,

which gave Wachovia a broad right to amend the Revolving Credit

Agreement to cover any type of loan.  If the Plaintiffs harbored

such an expectation, it remained a secret one, contradicted by

the language they agreed to in their contract."  Id.

## Standard of Appellate Review

A district court reviews a bankruptcy court's

conclusions of law de novo, while findings of fact are reviewed

for clear error.  Gulf States Exploration Co. v. Manville Forest

Prods. (In re Manville Forest Prods. Corp.), 896 F.2d 1384, 1388

(2d Cir. 1990); Fed. R. Bankr. P. 8103.  The dismissal of a

complaint under Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim is subject to de novo review. See

Mosello v. Ali, Inc. (In re Mosello), 193 B.R. 147, 149

(S.D.N.Y. 1996) (citing In re Ionosphere Clubs, Inc., 922 F.2d

984, 988 (2d Cir. 1990), cert. denied, Air Line Pilots Ass'n,

Int'l, AFL-CIO v. Shugrue, 502 U.S. 808 (1991)). Contract

interpretation, in particular, is generally a matter of law,

subject to de novo review. United States v. Barrow, 400 F.3d

109, 117 (2d Cir. 2005); Nowak v. Ironworkers Local 6 Pension

Fund, 81 F.3d 1182, 1192 (2d Cir. 1996) ("[W]hether a written

contract is ambiguous is a question of law for the trial court

whose determinations will be reviewed de novo"); cf. In re

Ionosphere Clubs, Inc., 922 F.2d at 988 ("This court exercises

the same review over the district court's decision that the

district court may exercise [over the bankruptcy court's

decision].") (citation omitted).

## Amendment No. 8 Was Authorized by the Intercreditor Agreement

The Bankruptcy Court accurately centered on the

principal issue, the propriety of Amendment No. 8 in extending

the Lenders' priority to the Harris Loan. In concluding that

that Amendment No. 8 was proper, the Memorandum Opinion properly

construed the Intercreditor Agreement.

16

In Section 2.2 of the Intercreditor Agreement, the
Appellants and/or their predecessors agreed that their liens
would always be "subordinate to the Liens of Revolving Loan
Creditors . . . to the full extent of the Revolving Loan Debt."
Section 1.16 of the Intercreditor Agreement stated:

> Revolving Loan Debt shall mean any and all
> obligations, liabilities and indebtedness of
> every kind, nature and description owing by
> Debtors to Revolving Loan Creditors and/or their
> respective affiliates or participants . . .
> arising under the Revolving Creditor Agreements,
> whether now existing or hereafter arising,
> whether arising before, during or after the
> initial or any renewal term of the Revolving
> Creditor Agreements . . . whether direct or
> indirect, absolute or continent, joint or
> several, due or not due, primary or secondary,
> liquidated or unliquidated, secured or unsecured,
> and whether arising directly or howsoever
> acquired by Revolving Loan Creditors.

Compl. Ex. C § 1.16.

Other than prohibiting affiliated financing, the
Intercreditor Agreement contained no restrictions on who could
become a lender or how one could become a lender.  Indeed,
Section 1.15 of the Intercreditor Agreement defined "Revolving
Loan Creditors" as:

> Each of the financial institutions from time to
> time party to the Revolving Loan Agreement as
> lenders, and their respective successors and

17

assigns (and including any other lender or group
of lenders that at any time refinances, replaces
or succeeds to all or any portion of the
Revolving Loan Debt or is otherwise party to the
Revolving Creditor Agreements).

Compl. Ex. C § 1.15.

The Intercreditor Agreement states: "As used above
and in this Intercreditor Agreement, the following terms shall
have the meanings ascribed to them below." Compl. Ex. C at 2.
Furthermore, Section 5.10 of the Intercreditor Agreement
acknowledges that it is a fully-integrated agreement whose terms
prevail over any conflicting provision in the Revolving Credit
Agreement or any related contract. Compl. Ex. C at 14.

Section 1.13 of the Intercreditor Agreement
recognized, without limitation, that the underlying loan
agreement could be "amended, modified, supplemented, extended,
renewed, restated, refinanced, replaced or restructured."
Compl. Ex. C § 1.13.

Under Section 4.3, the Appellants and/or their
predecessors consented to all amendments to the Revolving Credit
Agreement without any limitation on the loans that could be
provided or who (other than an affiliate) could provide them:

18

> Trade Creditors also waive notice of, and hereby
> consent to, (a) any amendments, modification,
> supplement, extension, renewal, or restatement of
> any of the Revolving Loan Debt or the Revolving
> Creditor    Agreements,    including,    without
> limitation, extensions of time of payment of or
> increase or decrease in the amount of any of the
> Revolving Loan Debt, the interest rate, fees,
> other charges, or any collateral.

Under these provisions, the Revolving Credit Agreement

and the Intercreditor Agreement permitted an amendment allowing

a new lender to provide funds such as those provided by Harris.

The Appellants contend that Amendment No. 8 was not

contemplated by the use of the term "amendment" or any other

term in Section 4.3 and urge a construction of the Intercreditor

Agreement based upon their alleged expectation that the

Revolving Credit Agreement would not be amended except for

"routine" matters, Appellants' Br. at 8, 35, since the

"fundamental purpose" of the Intercreditor Agreement was the

"protection of Appellants' lien priority," id. at 25, and

preservation of an "equity cushion in the collateral," id. at

15.

However, the Intercreditor Agreement fails to express

such an intent or purpose. Instead, the Intercreditor Agreement

sets forth the purpose of the agreement as to (i) confirm the

19

relative priority of the security interests of Wachovia and the
Appellants, and (ii) provide for the orderly sharing of
collateral proceeds among Wachovia and the Appellants.  Compl.
Ex. C. at 1.

Section 1.16 of the Intercreditor Agreement defines
the priority "Revolving Loan Debt" to include, among other
things, all obligations owed to Wachovia and the other Lenders
by Musicland under the Revolving Credit Agreement, whether
"secured or unsecured."  Wachovia and the Lenders were free to
extend credit to Musicland beyond the value of the collateral
securing Musicland's repayment obligations.

As the Bankruptcy Court noted, "if the unambiguous
terms of the Intercreditor Agreement gave Wachovia the right to
enter into Amendment No. 8, both defendants are entitled to an
order dismissing the complaint."  Buena Vista, 374 B.R at 120.
Whether or not a contract is ambiguous is a matter of law,
properly decided on a motion to dismiss.  See Crane Co. v.
Coltec Indus., Inc., 171 F.3d 733, 737 (2d Cir. 1999).  "An
ambiguity exists where the terms of a contract could suggest
'more than one meaning when viewed objectively by a reasonably
intelligent person who has examined the context of the entire
integrated agreement and who is cognizant of the customs,

practices, usages and terminology as generally understood in the
particular trade or business.'" Alexander & Alexander Servs. v.
These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir.
1998) (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898,
906 (2d Cir. 1997)).  In the absence of any ambiguity, it is a
maxim of contractual construction that a contract must be
construed according to the expressed intent of the parties.
See, e.g., British Int'l Ins. Co. v. Seguros la Republica, S.A.,
342 F.3d 78, 82 (2d Cir. 2003).


          Under New York law, "before looking to evidence of
what was in the parties' minds, a court must give due weight to
what was in their contract." Van Kipnis v. Van Kipnis, 840
N.Y.S.2d 36, 41 (App. Div. 2007) (quoting W.W.W. Assocs., Inc.,
v. Giancontieri, 77 N.Y.2d 157, 162 (1990)).  "An omission or
mistake in a contract, such as a failure to include a specific
contingency, does not itself create an ambiguity."  Id. (citing
Reiss v Financial Performance Corp., 97 N.Y.2d 195, 199 (2001).
While Appellants could have, and perhaps should have, included
language specifically restricting Wachovia's ability to
incorporate a term loan into the Revolving Credit Agreement by
amendment, "courts may not by construction add or excise terms,
nor distort the meaning of those used and thereby make a new
contract for the parties under the guise of interpreting the

                              21

writing." Reiss, 97 N.Y.2d at 199 (internal quotation marks and citations omitted).

The Appellants have cited Illco Toy Co. U.S.A. v. Block, No. 90 Civ. 1919 (CSH), 1991 WL 64203 (S.D.N.Y. 1991) and Stone v. Golden Wexler & Samese, 341 F. Supp. 2d 189 (E.D.N.Y. 2004) to support their assertion that the terms of the contract are ambiguous. In Illco, the Court construed a provision that could reasonably be understood as a "descriptive term and not one of limitation" in a two paragraph letter agreement that the Court recognized was not "a detailed manifestation of the parties' intent." Illco, 1991 WL 64203, at *4. The Intercreditor Agreement, unlike the letter agreement in Illco, is a fully-integrated agreement representing the "final expression" of the parties' agreement, which was negotiated by sophisticated parties with the assistance of skilled counsel, and its terms allow Wachovia to enter into Amendment No. 8.

In Stone, decided under Virginia law, the Court rejected a credit card company's argument that a "change-in-terms" provision allowed it to unilaterally change the terms of a consumer's credit card as it saw fit. Stone, 341 F. Supp. 2d at 197-98. Wachovia did not change the terms of its contract with the Appellants. The changes to the Revolving Credit

22

Agreement were made with the consent of Musicland, consistent
with the Revolving Credit Agreement and the Intercreditor
Agreement. The Intercreditor Agreement did, in fact, place a
limitation on Wachovia's ability to amend the Intercreditor
Agreement, indicating that the parties knew how to restrict
Wachovia's ability to amend if they so desired.

Appellants have failed to establish that the
Bankruptcy Court was in error with respect to its construction
of the agreements relating to the authority to enter into the
Amendment. The Bankruptcy Court correctly concluded that the
language of the Intercreditor Agreement was unambiguous and
according to its express terms, the Intercreditor Agreement
authorized Wachovia to amend the Revolving Credit Agreement as
it did in Amendment No. 8.

## Good Faith and Fair Dealing Requirements Do Not Alter the Intercreditor Agreement

The duty of good faith and fair dealing is a tool of
interpretation that cannot be used to rewrite a contract and
impose new terms. Metropolitan Life Ins. Co. v. RJR Nabisco,
716 F. Supp. 1504, 1519 (S.D.N.Y. 1989); see also Frutico S.A.
v. Bankers Trust Co., 833 F. Supp. 288, 300 (S.D.N.Y. 1993)

23

("[T]he duty of good faith . . . cannot be used to create new contractual rights between the parties"); Banco Espanol de Credito v. Sec. Pac. Nat'l Bank, 763 F. Supp. 36, 44 (S.D.N.Y. 1991) ("The implied covenant does not 'operate to create new contractual rights.'") (quoting Don King Productions, Inc. v. Douglas, 742 F. Supp. 741, 767 (S.D.N.Y. 1990)).  Thus, "[c]ourts have generally been reluctant to find a breach of the implied covenant of good faith when doing so reads so much into the contract as to create a new term or when alleged misconduct is expressly allowed by the contract."  Keene Corp. v. Bogan, No. 88 Civ. 0127 (MBM), 1990 U.S. Dist. LEXIS 220, at *43 (S.D.N.Y. 1990).

As correctly noted by the Bankruptcy Court, and as set forth above, the Intercreditor Agreement's interlocking definitions allowed Wachovia to amend the Revolving Credit Agreement to include a term loan, since the Appellants agreed to be subordinate to all obligations "of every kind, nature and description" owing to the Lenders by Musicland under an amended Revolving Credit Agreement.  The Court cannot employ the covenant of good faith and fair dealing to impose on the parties obligations that are inconsistent with the express terms of the Intercreditor Agreement.  See Times Mirror Magazines, Inc. v.

Field & Stream Licenses Co., 294 F.3d 383, 394-95 (2d Cir. 2002).

Carvel Corp. v. Baker, 79 F. Supp. 2d 53 (D. Conn. 1997), Bank of China v. Chan, 937 F.2d 780 (2d Cir. 1991), and Kham & Nate's Shoes No. 2 v. First Bank, 908 F.2d 1351 (7th Cir. 1990), cited by Appellants, do not require a different result. In none of those cases did the contracts at issue permit the conduct allegedly breaching the implied covenant of good faith and fair dealing. Those cases demonstrate that where a contract is "silent," the court may, in a proper case, fill a gap. See Carvel Corp., 79 F. Supp. 2d at 62 & n.6; Bank of China, 937 F.2d at 789; Kham & Nate's Shoes No. 2, 908 F.2d at 1357. Here, the Intercreditor Agreement was not silent, but rather, it permitted Wachovia to enter into amendments, as provided in Section 4.3.

## Affiliated Refinancing Has Not Been Established

Appellants have contended that the Harris Loan was an improper "Affiliated Refinancing." Appellants did not allege that Harris is an affiliate of Musicland or of its corporate parent Sun. While Harris is alleged to have had a working relationship with Sun, Compl. ¶ 8, the Complaint alleges no facts to establish that Harris was, in any way, related to

Musicland or Sun in terms of its corporate structure so as to be considered an affiliate.

The Appellants have also failed to sufficiently plead a factual basis for the conclusory allegation that the Harris Loan was a "charade." As was recognized by the Bankruptcy Court, a plaintiff must plead more than "labels and conclusions," and "a formulaic recitation of the elements of a cause of action will not do." Buena Vista, 374 B.R. at 119 (citing Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007)). Instead, the plaintiff "must amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). Here, the only fact asserted in the Complaint to support the alleged "charade" is that Sun guaranteed the Harris Loan. The Appellants, however, expressly consented to the "taking" of "guarantees" in Section 4.3 and, while affiliate loans may have been limited, there is no such limitation in the Intercreditor Agreement against guarantees. Numerous Musicland affiliates, including Suncoast Holding Corp., guaranteed the Obligations arising thereunder. If the Appellants wanted to limit guarantees in the future, they could and should have expressly done so, as they did with respect to affiliate loans. See, e.g., RJE Corp. v. Northville Indus.

Corp., 329 F.3d 310, 315 (2d Cir. 2003) (concluding that the inclusion of certain requirements in one section of a contract but not another manifested the intention that such requirements would not be part of the latter section).  Instead, in Section 4.3 of the Intercreditor Agreement, the Appellants agreed that the Lenders could take guarantees.

The Appellants have failed to establish that the Harris loan was affiliated financing.

## The Bankruptcy Court Did Not Err in Dismissing the Tort Claims

To allege a claim for aiding and abetting a conversion, Appellants must sufficiently allege that a conversion has occurred. Calcutti v. SBU, Inc., 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003).  A "conversion is the 'unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" Vigilant Ins. Co. v. Housing Auth., 87 N.Y.2d 36, 44 (1995) (quoting Employers' Fire Ins. Co. v. Cotten, 245 N.Y. 102, 105 (1927)).  Thus, to state a claim for conversion, a plaintiff must allege (1) legal ownership or an immediate superior right of possession to a specific identifiable thing; and (2) that the

defendant exercised an unauthorized dominion over the thing in question, to the exclusion of the plaintiff's rights. See Independence Disc. Corp. v. Bressner, 365 N.Y.S.2d 44, 46 (App. Div. 1975).

Appellants have alleged that Harris was improperly paid from proceeds of inventory constituting Appellants' collateral. Compl. ¶ 63. The allegation, even if assumed to be true, is insufficient on its face to state a claim for conversion, because it fails to identify the specific proceeds that were allegedly converted.

It is well-settled New York law that an action for the conversion of monies is "insufficient as a matter of law unless it is alleged that the money converted was in specific tangible funds of which claimant was the owner and entitled to immediate possession." Ehrlich v. Howe, 848 F. Supp. 482, 492 (S.D.N.Y. 1994). In other words, the "money must be part of a separate, identifiable, segregated fund in order to bring an action for conversion." United Republic Ins. Co. v. Chase Manhattan Bank, 168 F. Supp. 2d 8, 19 (N.D.N.Y. 2001) (citing High View Fund L.P. v. Hall, 27 F. Supp. 2d 420, 429 (S.D.N.Y. 1998)). The Complaint contains no such allegations (perhaps because Harris was not repaid with inventory proceeds but rather with a

$25,000,000 advance by the Lenders under the Revolving Credit Agreement), as claimed by Appellees. Appellees' Br. at 40. The tort claims, together with their aiding and abetting allegations, were appropriately dismissed.

In addition, Appellants' aiding and abetting claim is a restatement of its breach of contract claim. Appellants allege that Wachovia aided and abetted Harris' conversion by "the devising and implementing of Amendment No. 8 and participation in causing Musicland to pay off the Harris Term Loan," which is the alleged predicate for the breach of contract claims. Compl. ¶ 68. Under New York law, "a cause of action for conversion cannot be predicated on a mere breach of contract." Fesscha v. TD Waterhouse Investor Servs., Inc., 761 N.Y.S.2d 22, 24 (App. Div. 2003). Here, Appellants' conversion claim "allege[s] no independent facts sufficient to give rise to tort liability." Yeterian v. Heather Mills, N.V. Inc., 583 N.Y.S.2d 439, 440 (App. Div. 1992). Accordingly, the claims for conversion and aiding and abetting a conversion were appropriately dismissed.

Similarly, the claim for tortious interference is essentially a restatement of the breach of contract claim, relying upon the same factual premise, namely, that Wachovia

29

interfered with the Trade Security Agreement by entering into

Amendment No. 8 and permitting repayment of the Harris Loan.

"It is a well-established principle that a simple breach of

contract is not to be considered a tort unless a legal duty

independent of the contract itself has been violated.  This

legal duty must spring from circumstances extraneous to, and not

constituting elements of, the contract, although it may be

connected with and dependent upon the contract."  MCI WorldCom

Commc'ns, Inc. v. HSG/ATN, Inc. (In re WorldCom, Inc.), 361 B.R.

697, 719 (Bankr. S.D.N.Y. 2007) (citing Clark-Fitzpatrick, Inc.

v. Long Island R. Co., 70 N.Y.2d 382, 389 (1987)).  Here, the

tortious interference claim "adds nothing by way of legal

liability, and only seeks to explain the possible motives of

defendants" for their alleged breach of contract.  Miller v.

Vanderlip, 285 N.Y. 116, 125 (1941).  Appellants "may not split

[their] causes of action based upon a single grievance."  Id.

**Conclusion**

For the reasons set forth above, the Bankruptcy
Court's Order and Judgment is affirmed in its entirety, with
costs.

It is so ordered.

New York, N.Y.
May  $\mathcal{H}$  , 2008

ROBERT W. SWEET
U.S.D.J.

31